1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF WASHINGTON
2
   UNITED STATES OF AMERICA,      ) Case No. CR-11-6001-1
3                                 )              CR-11-6001-2
                     Plaintiff,   )              CR-11-6001-3
4                                 )              CR-11-6001-4
   vs.                            )              CR-11-6001-5
5                                 )              CR-11-6001-6
   LYNN J. OLSEN, II (1),         )              CR-11-6001-7
6  MARK G. PETERSON (2),          )              CR-11-6001-8
   BLAKE T. BENNETT (3),          )
7  JEFFREY J. GORDON (4),         ) May 16, 2013
   OLSEN AG, INC. (5),            ) Richland, Washington
8  POCO, LLC (6),                 )
   TRI-CITIES PRODUCE (7),        ) Jury Trial - Day 23
9  FRED F. ACKERMAN (8),          )
                                  )
10                   Defendants.  )
   _____
11           BEFORE THE HONORABLE EDWARD F. SHEA
           SENIOR UNITED STATES DISTRICT COURT JUDGE
12
   APPEARANCES:
13
   For the Plaintiff:          Mr. Tyler H. L. Tornabene
14                             U.S. Attorney's Office
                               920 West Riverside, Suite 340
15                             P.O. Box 1494
                               Spokane, Washington 99210
16
                               Mr. Shawn N. Anderson
17                             U.S. Attorney's Office
                               402 East Yakima Avenue
18                             Suite 210
                               Yakima, Washington 98901
19 For the Defendants:

20 Olsen and Olsen Ag:         Mr. Allen R. Bentley
                               Attorney at Law
21                             1111 Third Avenue
                               Suite 2200
22                             Seattle, Washington 98101

23 Peterson:                   Mr. Irwin H. Schwartz
                               Attorney at Law
24                             710 Cherry Street
                               Seattle, Washington 98104

25
```

```
 1  APPEARANCES (continued):

 2  Bennett and Tri-City           Mr. Mark E. Vovos
    Produce:                       Attorney at Law
 3                                 West 1309 Dean
                                   Suite 100
 4                                 Spokane, Washington 99201

 5  Gordon:                        Mr. Richard A. Smith
                                   Attorney at Law
 6                                 314 North Second Street
                                   Yakima, Washington 98901
 7
    Poco, LLC:                     Mr. R. Bruce Johnston
 8                                 Attorney at Law
                                   200 Winslow Way West
 9                                 Suite 300
                                   Bainbridge Island, WA 98110
10
    Ackerman:                      Mr. Nicholas W. Marchi
11                                 Attorney at Law
                                   7502 West Deschutes Place
12                                 Kennewick, Washington 99336

13

14

15

16

17

18

19

20  Official Court Reporter:       Ronelle F. Corbey, #2968
                                   United States District Courthouse
21                                 P.O. Box 700
                                   Spokane, Washington 99210
22                                 (509) 458-5283

23

24
    Proceedings reported by mechanical stenography; transcript
25  produced by computer-aided transcription.
```

JURY TRIAL - DAY 23 - MAY 16, 2013

1      (Court convened on May 16, 2013, at 8:36 a.m.)

2           THE COURTROOM DEPUTY:  All rise.

3      (Call to Order of the Court)

4           THE COURT:  Good morning.  Please, be seated.

5  Mr. Tornabene, what's on your mind?

6           MR. TORNABENE:  Your Honor, last night we received

7  from Mr. Bentley, as did the Court, I believe, the trial

8  memorandum regarding the anticipated testimony of Mr. Schultz.

9  And I've just conferred with Mr. Bentley regarding that.  And it

10 appears that Mr. Bentley has narrowed down the focus in terms of

11 which exhibits would be offered based -- from before.

12      That said, after conferring with Mr. Bentley, there are

13 still a few exhibits that he proposes to offer that we do have

14 objections to.  And I'll just go through those fairly quickly.

15 Proposed Exhibit 1045 --

16           THE COURT:  He hasn't -- okay.  1045?  It's in a

17 parenthetical?

18           MR. TORNABENE:  Yes, on Page 5, yes.

19           THE COURT:  Is that Harper?

20           MR. TORNABENE:  Correct.  This is, I believe, 113

21 pages of Harper analysis regarding onion prices and onion

22 valuations.  So we object in terms of, one, relevance here; but,

23 also, just in terms of getting into the settlement issues and

24 discussions that were going on.  I believe that contravenes this

25 Court's order.

JURY TRIAL - DAY 23 - MAY 16, 2013

1          THE COURT:  Well, let's share microphones so we can

2   make good use of our time.  Mr. Bentley, I invite you to the

3   podium and the use of the second microphone.  145 -- or 1045?

4          MR. BENTLEY:  I've tried to be judicious, your Honor.

5   There were four or five reports by Mr. Harper.  I've only

6   selected one of them.  And I believe that a similar report that

7   was 600 or so pages long was admitted on request of Poco, again,

8   involving Mr. Harper.  The point is to show how --

9          THE COURT:  Well, I haven't admitted any 600-page

10  exhibit that I can recall.  There were 600-page exhibits that

11  were marked and only 6 or 7 pages were actually used, as I

12  recall.  Ms. Brasel?

13          THE COURTROOM DEPUTY:  Yes, Judge.  The 600-page

14  document was 3070, I believe.

15          THE COURT:  All right.

16          MR. BENTLEY:  That would have been a Bennett document.

17          MR. VOVOS:  Yes.

18          THE COURT:  Right.

19          MR. BENTLEY:  I think there was testimony by

20  Mr. Masters about Harper -- a Harper report.  But, if the Court

21  feels that the issue is the length of this document, which is

22  not unmanageable but 140 some pages, I would be prepared to

23  limit it to the -- I think there's a cover letter that went with

24  it.

25          THE COURT:  Mr. Tornabene?

5

JURY TRIAL - DAY 23 - MAY 16, 2013

1          MR. TORNABENE:  The -- if -- I have on the screen what
2  I believe we're discussing from the JERS that Mr. Bentley
3  provided.  So, if I'm -- if I understand, his position --
4          THE COURT:  Let me say that I had thought that my
5  directions were clear; but I think it, on a case by -- or
6  exhibit-by-exhibit basis, I'm happy to take these up.  And I
7  think I understand your position on this matter.  And my -- and
8  my guidance on this is still the same.  You can get into the
9  facts, but you're not getting into all the details.  We're not
10 having a side -- to me, it's a 403 issue.  It's distracting and
11 gets us into a whole issue about what Mr. Harper said in every
12 respect and what was responded to and what the negotiations were
13 when, indeed, the relevant fact is that there was a serious
14 dispute between these parties.  And, to the extent that it
15 involves onions rather than potatoes and the refusal was on the
16 basis of certain crops rather than potatoes leading to certain
17 inferences that you think are helpful to you, I get it but not
18 113 pages.  So 1045 is out.  What's next?
19         MR. TORNABENE:  Your Honor, Proposed 1047 and 1111.
20 These are both appeals' determinations by various courts that
21 contain findings of fact and would request that those be
22 excluded based on your Honor's order.
23         THE COURT:  Mr. Bentley?
24         MR. BENTLEY:  Well, these are findings of fact that go
25 against my client.  So I don't understand the problem that the

JURY TRIAL - DAY 23 - MAY 16, 2013

1   Government has with them.  I'm -- I'm simply offering them to

2   create a full picture of what went on during the litigation over

3   the '01 and '02 claims.

4           THE COURT:  They're not admitted.  What else?

5           MR. TORNABENE:  Similarly, your Honor, Proposed 1310.

6   This is the order from Judge Van Sickle in the declaration

7   action, which also contains -- it's not like a one-page order.

8   It's several pages, contains background, et cetera.

9           THE COURT:  I don't know where we are.  I'm not

10  certain that I see that.

11          MR. BENTLEY:  It's on Page 6, your Honor.

12          THE COURT:  Page 6.  Okay.

13          MR. BENTLEY:  Bottom.

14          THE COURT:  Bottom.  Thank you.  There we are.

15  Thanks.  Here's how I read the case law.  And I've read it, I

16  think, several times because there have been several motions

17  occurring.  And my view has always been that it depends on what

18  was essentially at issue.  And, my recollection is, that the key

19  case, that an individual who was in -- allegedly engaging in

20  fraud filed a lawsuit to enforce his rights.  And, the Court,

21  essentially, in that case, made any number of findings that were

22  highly disfavorable to that claimant who was then involved --

23  later involved, I think, in a criminal matter.  And the question

24  became what use could be made of that?  And it depends on the

25  context in a criminal case, as I recall.

JURY TRIAL - DAY 23 - MAY 16, 2013

1    So that's my recollection.  And I can't think of the case's

2  name, but I think counsel probably recall it.  So that was

3  really the reason that I -- I decided to permit the kind of

4  factual recitation and the dynamic that was in play because it

5  seemed to me clear, unless the jury had a true sense of the

6  dynamic of the growers and the insurance companies, it couldn't

7  appreciate the true nature of their behavior.  Either it was

8  consistent with or inconsistent with an alleged fraud.  And, so,

9  to that extent, yes.

10    Now, the -- so that's the general principle that guides me

11  in these matters.  So, when it comes to a decision setting out

12  the rulings of another judge, you have to persuade me that

13  something consistent with that case, which I can't cite to you

14  off the top of my head, that makes that admissible.  It wasn't

15  really -- it was a very odd opinion because it was the context

16  in which it came up and whether it could be used for impeachment

17  and, if so, as I recall.

18    But, that said, my general rule is this is not coming in

19  unless you can persuade me that that case applies and that these

20  findings somehow have to come in.  So -- excuse me, the -- the

21  order from Judge Van Sickle.  The fact of it?  Yes.  The fact

22  that it was -- that it was -- that the issue of processor was

23  referred to an arbitrator or a mediator and what happened after

24  that, fine.  You can get that in, but you're not getting the

25  order in.

JURY TRIAL - DAY 23 - MAY 16, 2013

1      That takes care of 1031 (sic).  What's next?

2          MR. BENTLEY:  I believe that was 1310.

3          THE COURT:  I apologize.  1310.

4          MR. TORNABENE:  Your Honor, 1311 is a letter from

5  Mr. Schultz to Mr. Raekes involving settlement discussions.

6  There's a rhetorical question there as to whether or not

7  Mr. Raekes's clients had read the insurance policy.

8  Essentially, the settlement-discussion-type --

9          THE COURT:  I've read the letters.  This is typical

10  lawyer-to-lawyer negotiation stuff.  I mean, nothing unusual

11  about this sort of approach; but it simply gets us off onto

12  different subjects about the kind of behavior lawyers engage in.

13  And, then, we're going to have to talk about strategies and what

14  the point was because sometimes lawyers write letters that

15  they -- they actually don't mean.  And they say things that they

16  really don't think the other side is going to buy, but they have

17  to say them for the client.  There's any number of psychological

18  reasons why people write letters in negotiations.  So they're

19  not in.

20      The fact of them -- the fact of them, yes.  But they --

21  they disagreed, that they corresponded, that they eventually

22  reached a settlement, fine.  All of that gets in.

23          MR. TORNABENE:  And, your Honor, finally, as to

24  Mr. Bentley's proffer -- written proffer, 1314 is a mutual

25  release.  Again, we don't have any problem with the fact of

JURY TRIAL - DAY 23 - MAY 16, 2013

1  settlement, the fact of the amount.  But 1314 we would request

2  be excluded.

3          THE COURT:  Mr. Bentley?

4          MR. BENTLEY:  I believe it's -- it's relevant.  This

5  is -- this check is, if I'm not mistaken, an overt act in the

6  conspiracy.  And in the -- in its decision on the mail fraud

7  count, Count 11, the Court referred to the fact that that check,

8  which was a check to Poco, resulted from settlement negotiations

9  in which there was a release, I believe.  And there was

10 testimony about that.  I think this is the same general area

11 we're trying to prove the good faith of Mr. Olsen and the lack

12 of a conspiracy.

13         THE COURT:  I'll have to take a look at 1314.

14 Releases are filled with paragraphs.  And my guidance here is

15 always how much mischief can occur as a result of a -- of a two

16 or three or four or five-page document that sets out myriad

17 typical terms in a release and what will a jury make of those

18 and do I have somebody in the jury that will mismanage the jury

19 deliberations based on that person's prior undisclosed because

20 unasked experience with negotiations.  So I'm leery of putting

21 in those documents for that reason.  I think they have the

22 potential to do -- to have unintended consequences.

23     So the fact of it?  Yes.  I'll read it.  You can show it to

24 me, and I'll decide that later.  But let's get started.  Okay.

25 I hope that's enough.  Is that -- is there something more we

JURY TRIAL - DAY 23 - MAY 16, 2013

1    need to do before Mr. Schultz takes the stand?

2              MR. TORNABENE:  Well, your Honor, I guess the answer

3    is, it depends.  It depends on the order of presentation.  If

4    Mr. Bentley is going first, then that will probably take us

5    through to another break.

6         We were also provided a listing by Mr. Johnston regarding

7    the Poco aspect of Mr. Schultz's representation.  That includes

8    a number of objectionable --

9              THE COURT:  So, do you have a number of objections?

10   Well, you may need to call another witness.  You may simply have

11   to take somebody out of order because, when we -- when we met

12   last night, folks, nobody said we're going to need an hour or

13   45 minutes in the morning to take this up.  And I'm not going to

14   have the jury waiting.  I told you that before, and I'm sticking

15   to that.

16             MR. JOHNSTON:  And, your Honor, just -- I may have

17   missed an email; but I did not receive any objections to the

18   exhibits that we had offered.  And they were somewhat pared

19   down.  I will tell the Court that we had offered, as 2080, the

20   same January 20th letter; and we will abide by the Court's

21   letter on the duplicate.

22             THE COURT:  I have Mr. Bentley's, and I have the

23   United States'.  And my impression was -- let me just take a

24   quick look.  Let's see if I can -- I've read yours,

25   Mr. Johnston.  I may have missed something.  I have 1174, 75,

                JURY TRIAL - DAY 23 - MAY 16, 2013

1   and 76.  Those are the ECFs I picked up and read.

2              MR. JOHNSTON:  Your Honor, I was simply speaking to

3   our notification of the exhibits; and I've received no objection

4   to those.

5              THE COURTROOM DEPUTY:  Must have been an email that

6   wasn't filed.

7              THE COURT:  I'm sorry?

8              THE COURTROOM DEPUTY:  It must have been an email that

9   they received.  It wasn't a document filed.

10             THE COURT:  Okay.  So I haven't read them.  I don't

11  even know what you're talking about.

12             MR. TORNABENE:  Right --

13             THE COURT:  I haven't seen any documents from you

14  saying, "Here's my problems, and here they are."

15             MR. TORNABENE:  Per the procedure that was used in our

16  case in chief, the Defense provided us an email --

17             THE COURT:  Okay.

18             MR. TORNABENE:  -- albeit a little bit late but that's

19  fine, we're all busy -- from Mr. Johnston.  And a number of

20  those exhibits appear to -- for instance, there'd be a trial

21  brief by Mr. Schultz that's directly contravening this Court's

22  order.  So we're here to make those objections in the same

23  manner that they did in our case.

24             THE COURT:  Call another witness because the jury's

25  coming in fairly soon.  And, then, were going to have to spend --

JURY TRIAL - DAY 23 - MAY 16, 2013

1          MR. JOHNSTON:  You know what --

2          THE COURT:  -- and I'm going to send them out for two

3     hours at lunch, and we'll take it up that the time.

4          MR. JOHNSTON:  Your Honor, I think can clarify.  I

5     listed documents that I may use only to refresh the witness's

6     memory.  And I've offered and -- and I'm not going to offer or

7     present any documents inconsistent with the Court's order, is

8     our view and that we have not done so.  I've pared it down to

9     that.

10          THE COURT:  That sounds familiar with me.  Did you

11     copy us in on that?

12          MR. JOHNSTON:  I -- I did, your Honor.

13          THE COURT:  I think -- did you forward that to me?

14          LAW CLERK:  I did.

15          THE COURT:  Okay.  Well, then, I did see it because

16     Ms. Hartliep did forward it to me; and I did read it.  So I have

17     a sense of those exhibits.  And, if they're only used to

18     refresh, I don't know what your problem is.

19          MR. TORNABENE:  That -- that's correct, your Honor.

20     There are --

21          THE COURT:  What's your problem if they're only used

22     to refresh?

23          MR. TORNABENE:  I do not have a problem if there's not

24     testimony regarding the content of the arguments within.  That's

25     fine.  With -- there are other exhibits that have been provided

JURY TRIAL - DAY 23 - MAY 16, 2013

1   that we do have an objection to -- three, in particular, by

2   Mr. Johnston -- and those include 2136, the February '05 Poco

3   demand -- Poco amended demand, and the 2135, the Poco demand for

4   arbitration, as well as 2065, the November, 2005, settlement

5   agreement for crop year 2003, containing a mutual release.

6   Those are our three remaining --

7           THE COURT:  Yeah.  I don't see how we get to

8   Mr. Schultz this morning given the nature of your objections and

9   your determination to argue these points.  If you're determined

10  to argue these points and it requires the kind of time that

11  we've been giving all the way along, then I'm happy to give you

12  that time.  So you tell me what you want to do, but we're not

13  going to be holding the jury for another 45 minutes.  How do you

14  want to proceed?

15          MR. TORNABENE:  Your Honor, if I may suggest -- and

16  just briefly conferring with Mr. Bentley here -- it sounds like

17  Mr. Bentley may be the attorney who's starting with Mr. Schultz.

18  We've handled those issues with regards to that direct.  I think

19  that sounds like that would get us through to a break at which

20  point we really only have three exhibits to discuss before we

21  take up Mr. Johnston.

22          THE COURT:  That's acceptable.  Is that how you want

23  to proceed?

24          MR. BENTLEY:  Yes, your Honor.

25          THE COURT:  Okay.  That's fine.  Okay.  Bring in the

                 JURY TRIAL - DAY 23 - MAY 16, 2013

 1  jury, please.

 2       (Jury in at 8:52 a.m.)

 3           THE COURT:  Good morning to you all.  Please, be

 4  seated.  I understand -- let's see, Juror No. 9, you have a

 5  dental appointment tomorrow?

 6           JUROR NO. 9:  Yes, at 7:00 in the morning.

 7           THE COURT:  Okay.  I know you've been struggling a bit

 8  with that tooth so let us know.  We'll accommodate what you

 9  need.  And, if you're not here at 8:30, we'll just wait for you.

10           JUROR NO. 9:  Okay.  Thank you.

11           THE COURT:  All right, folks.  Let's get started.

12           MR. BENTLEY:  Defense calls John Schultz.

13           THE COURT:  Mr. Schultz, if you'll come up to your

14  right and to my left, Mr. Schultz, and put your back to the

15  door, we're going to take your photograph for use by the jury

16  during deliberations.  Thank you.

17       (Courtroom Deputy takes picture of the witness)

18           THE COURT:  Good morning.

19       (JOHN SCHULTZ, called by the Defendant, Lynn J. Olsen II,

20  was sworn)

21           THE COURT:  Good morning.  Please be seated.  And,

22  when you're comfortable, please tell us your first and last name

23  and spell them both for the jury.

24           THE WITNESS:  My first name is John, J O H N.  Last

25  name Schultz, S C H U L T Z.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1      THE COURT:  Good morning, Mr. Schultz.  Okay,

2  Mr. Bentley, you may proceed.

3

4                      DIRECT EXAMINATION

5  DIRECT BY MR. BENTLEY:

6  Q    Good morning, Mr. Schultz.

7  A    Good morning.

8  Q    How are you employed?

9  A    I'm in private practice of law.

10  Q    How long have you been in practice of law?

11  A    I passed the bar 50 years ago.  I spent one year as a

12  clerk, and I've been here for 49 years.

13  Q    And where is your practice located?

14  A    In -- it's been in Kennewick since 1994.  It was in Pasco

15  for 30 years before that.

16  Q    Do you practice as a solo or in a firm?

17  A    I'm in a firm.  Leavy, Schultz, Davis, and Fearing is the

18  name of the firm.

19  Q    Do you know my client, Lynn J. Olsen II?

20  A    I do.

21  Q    And how do you know Mr. Olsen?

22  A    He has been a client of mine.

23  Q    Do you recall when Mr. Olsen first became a client of

24  yours?

25  A    No.  Ten years ago.  Maybe more.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Q    Do you recall the nature of the legal matter that lead

2  Mr. Olsen to seek your services for the first time?

3  A    I believe the first time was this AGR claim; but, I think,

4  if I've done something else for him, I don't remember it.

5  Q    And, when you refer to the "AGR claim," can you tell us a

6  little more about the background of that matter?

7  A    Well, he had reached a dispute with American Growers over

8  payment of an insurance claim, or the AGR claim, and came to me.

9  At that time, these policies were brand new; and we hadn't

10 had -- nobody had had any experience with them.  But I've been

11 involved in the insurance business, defending and prosecuting

12 insurance claims, for my entire practice; and that's probably

13 what lead him to me, in addition to the fact I had considerable

14 agricultural background as a lawyer.

15 Q    When Mr. Olsen came to you, is it your recollection that

16 the Growers -- American Growers had rejected his claims?

17 A    That's my recollection.  They had rejected his claims, and

18 the next step was to demand arbitration under that policy.

19 Q    Did Mr. Olsen provide you with the written notification of

20 the rejection of his claims?

21 A    He did.

22 Q    I'd like to show you -- this is just -- not to the jury --

23 what has previously been marked as Exhibit 1033.

24 A    Are they in these books in front of me?

25 Q    They are.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1    MR. BENTLEY:  If I may, your Honor.

2    THE COURT:  Go ahead.

3    MR. BENTLEY:  I've left books.

4    THE COURT:  I saw that.

5    MR. BENTLEY:  I hope that's okay.

6    THE COURT:  It certainly is.  If you're not going to

7 use the ELMO, that's fine.

8    MR. BENTLEY:  Well, I will be using the ELMO.  So,

9 let's -- but there will be some documents that I want to show

10 him to refresh his recollection, and I thought we could do that

11 with the hard copies.

12    THE WITNESS:  Yes, that's the letter.  That is one of

13 the letters.

14    MR. BENTLEY:  All right.  I offer Exhibit 1033.

15    MR. TORNABENE:  No objection.

16    MR. BENTLEY:  Okay.  May it be published?

17    THE COURT:  1033 is admitted and may be published to

18 the jury.

19    (Exhibit No. 1033 admitted into evidence)

20 Q    (BY MR. BENTLEY)  And the date on this, Mr. Schultz?

21 A    December 19, 2003.

22 Q    And, so, it would be sometime after that when Mr. Olsen

23 approached you for representation.  Is that correct?

24 A    I assume so.  Yeah.

25 Q    And --

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1   A    I might have known him before that.

2   Q    Okay.

3   A    But --

4   Q    Does this letter explain why American Growers is rejecting

5   the '01 AGR claim of Mr. Olsen?

6   A    It does.

7   Q    Can you summarize for us the reasons?

8   A    I'm not so sure I could summarize very well on this policy;

9   but, basically, it went into crop history and claimed that the

10  crop history was not sufficient.  As I'm sure the jury's figured

11  out by now, adjusting these AGR claims is a very complicated

12  process.

13  Q    The insurance company has the authority to revise a crop

14  report submitted by a grower.  Correct?

15  A    Unlike almost any other insurance in the world, yeah.  They

16  go back -- once the claim is made, they go back to the very

17  beginning and start to see should they have accepted the risk.

18  Q    So, here they are --

19       (Interruption by the Court Reporter)

20       THE WITNESS:  Yeah and should the risk be paid or

21  should there be any payment.

22  Q    (BY MR. BENTLEY)  And, so, here they're revising under that

23  general authority that they have.  Correct?

24  A    Yes, which is -- these policies are reinsured by the U.S.

25  Government.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Q    And, in particular, looking at Page 2 of this letter, are

2  they revising his onion acres?

3  A    Yes.

4  Q    And they're reducing his expected value for his onion crop.

5  Is that correct?

6  A    Yes.

7  Q    And would you read, for the record, the highlighted

8  sentence at the bottom of Page 2 and at the top of Page 3?

9  A    "Based on the total" -- "Based on the revised total

10  commodity values, the coverage level and payment rate for which

11  you are eligible are limited to 65 percent coverage and

12  75 percent payment rate.  As a result of the revisions to your

13  approved AGR, coverage level and payment rate, your 2001 AGR

14  premium will be adjusted accordingly."

15          THE COURT:  Mr. Schultz, do me a favor and bring that

16  mic just a little bit closer to you so we can hear you in the

17  overhead speakers.

18          THE WITNESS:  Yeah.  I'll move just a little bit

19  closer to it.  Thank you.

20          THE COURT:  Thank you.  Mr. Bentley.

21  Q    (BY MR. BENTLEY)  And, finally, on Page 4, what is the

22  insurance company asking for here?

23  A    Net overpayment due to them --

24          THE COURT:  Is that microphone on, Mr. Schultz?

25          THE COURTROOM DEPUTY:  Green light should be on.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1    THE COURT:  The green light should be on.

2    THE WITNESS:  There you go.

3    THE COURT:  There we are.

4    THE WITNESS:  $479,713.

5  Q    (BY MR. BENTLEY)  So, they want Mr. Olsen to refund that

6  amount to them.  Correct?

7  A    Yes.

8  Q    And you mentioned arbitration.  Do you see a reference to

9  that toward the end of the letter?

10 A    Yes.  It says to review the AAA rules and file arbitration

11 with the American Arbitration Association.

12 Q    And do they also indicate that they've had assistance from

13 the RMA in their review?

14 A    That's the history of all of these policies.  The RMA

15 supervises them.

16 Q    And they also say, in that highlighted sentence, that they

17 did so "in light of the State of Rehabilitation of American

18 Growers."  What does that -- or what did that mean to you?

19 A    Well, apparently, American Growers insured a lot of these

20 risks without reinsuring them with the Government, which was a

21 bad decision; and they went broke.

22    MR. TORNABENE:  I'm going to object based on

23 foundation and --

24    THE COURT:  Sustained.

25    MR. TORNABENE:  -- would ask that be stricken, your

                    JURY TRIAL - DAY 23 - MAY 16, 2013
                         J. SCHULTZ/DI - BENTLEY

1  Honor.

2          THE COURT:  Stricken.

3  Q    (BY MR. BENTLEY)  Now, the letter that we just looked at,

4  Mr. Schultz, was concerned with the 2001 AGR underwriting and

5  claim review.  Correct?

6  A    Yes.

7  Q    And Mr. Olsen and the insurance company also had a dispute

8  about Mr. Olsen's '02 AGR claim.  Is that correct?

9  A    Yes.

10 Q    I'd like to show you --

11          MR. BENTLEY:  Not for the jury.

12 Q    (BY MR. BENTLEY)  -- what has previously been marked as

13 Exhibit 1102 and ask if you can identify that exhibit.

14 A    Yes.  That's another letter that was on the 2002 policy.

15          MR. BENTLEY:  I'm going to offer 1102.

16          MR. TORNABENE:  No objection.

17          THE COURT:  Admitted.

18     (Exhibit No. 1102 admitted into evidence)

19          MR. BENTLEY:  May this be published to the jury?

20          THE COURT:  It may.

21 Q    (BY MR. BENTLEY)  And the date on this letter, Mr. Olsen

22 (sic) -- or Mr. Schultz?

23 A    January 8, 2004.

24 Q    Who is that addressed to?

25 A    Debbie Moore.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Q    What is your understanding of her role at Olsen Ag,

2  Incorporated?

3  A    She was somewhat the office manager.  She -- she ran the

4  office, got all the records.  She was the go-to.  I'd known her

5  for a long time from one of her former employers.  At that

6  point, she worked with Olsen Ag.

7  Q    Now, they're indicating in this letter they have completed

8  the insurance company's review of the '02 claim.  Correct?

9  A    Yes.

10 Q    And they're pointing out certain obligations of the

11 insured, such as, reporting accurately all insurable commodities

12 expected to be produced and any planned operational changes.

13 Correct?

14 A    Yes.

15 Q    And they have been underwriting -- doing an underwriting

16 review, and what did they find?

17 A    They identified a difference in acreage between what was

18 reported under the AGR contract year and the 2002 Multi-Peril

19 Crop Insurance Acreage Report.

20 Q    Were those differences with regard to a particular

21 commodity?

22 A    Onions and potatoes.

23 Q    Two commodities.  Correct?

24 A    Yes.

25 Q    In going on to Page 2, would you read the first sentence of

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  the second paragraph on this -- that's on the screen.

2  A    "Based on this, we have no choice but to deny coverage on

3  your 2002 AGR policy and deny the claim for indemnity that was

4  filed."

5  Q    And, further down on the page, do we see language that's

6  similar to what was in the other letter concerning involvement

7  of RMA?

8  A    "RMA personnel ... are intimately familiar with the

9  workings of the AGR program performed this review in light of

10 the State of Rehabilitation of American Growers."

11 Q    And they are informing you of a procedural right that Olsen

12 Ag would have.  Correct?

13 A    Sure, to file arbitration with the American Arbitration

14 Association.

15 Q    Did you file for arbitration with the American Arbitration

16 Association?

17 A    I did after some discussion with the attorney for American

18 Growers.

19 Q    And, approximately, when did you file?

20 A    I don't remember.  I saw an exhibit that you have the exact

21 arbitration demand.

22 Q    1037, you have it, if that would refresh your recollection.

23 A    That would and appears to be dated June 25, 2004.

24 Q    Was that a demand with respect to both of the years in

25 question?

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  A    Yes, it was.

2  Q    And, in the ordinary course when the American Arbitration

3  Association receives a demand, what do they do?

4  A    Well, the first thing they do is appoint an arbitrator;

5  and, then, they begin a schedule not unlike what happens in a

6  regular court proceeding.  There'll be a schedule for the

7  hearing.  First, whatever discovery's going to be done.  What --

8  you know -- and, then, a time for --

9  Q    What are the advantages of arbitration over a court

10  hearing, then?

11  A    Well, there's considerable advantages because they are

12  usually done faster and the results are final.  There aren't

13  appeals.  There's no appeal from an arbitration award.  It's

14  binding between the parties.

15      The disadvantage is it's a little expensive.  The AAA is

16  expensive, but --

17  Q    When the arbitrator is appointed, does he or she set up a

18  schedule as you testified?

19  A    Yes.  Yes.

20  Q    And, at the end of a series of deadlines, they have a date

21  or dates for the actual arbitration.  Is that correct?

22  A    That's true.

23  Q    And when were the -- was the arbitration scheduled for, if

24  you recall?

25  A    I can't recall, but it would have been some months later.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1 And, in the meantime, the company filed bankruptcy, I believe.

2 Q    All right.  Well, let's take a look at Exhibit 1040 and see

3 if that refreshes your recollection with respect to the schedule

4 in this matter.

5 A    Well, this is a letter to the RMA.

6 Q    If you look at the second paragraph of the letter, I'd ask

7 if that would refresh your recollection.

8 A    Yes.  Arbitration was scheduled for between August 22 to

9 September 7, 2005.  And that was -- that was notifying the RMA

10 that they needed to become involved.

11 Q    Why was it necessary to notify the RMA of the arbitration?

12 A    I don't know that it was necessary, but I wanted them to be

13 notified anyway because they took over for American Growers and,

14 therefore, stood in American Growers' shoes.  At least that was

15 the position we took at that time.

16 Q    And did RMA respond to the invitation to participate in the

17 arbitration?

18 A    They said they did not have to participate.  They wanted us

19 to -- any dispute would have to go before a brother agency.  The

20 NAD, or National Appellate Division, of the USDA.

21 Q    After RMA declined to be involved in the arbitration, what

22 did you do?

23 A    Well, we had an argument with the arbitrators.  And there

24 were -- this is only one of the cases that I was handling at

25 that time, and we had arguments before two different

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  arbitrators.  And the USDA was involved.  The USDA claimed they

2  didn't have to participate.  And the arbitrators, in two

3  different situations, ruled that, yes, they did.  That was the

4  right that these insureds had under the policy, which was

5  reinsured by the FCIC.  And, therefore, under our policy, we had

6  a right to go to an independent tribunal, which was the AAA.

7  And that's what both arbitrators ruled.  I think correctly so

8  although later --

9            MR. TORNABENE:  Objection as to his opinion as to --

10           THE COURT:  Sustained.

11           MR. TORNABENE:  And would move to strike.

12           THE COURT:  Well, it's sustained.  The jury can sort

13  out what's opinion and what I've sustained and what wasn't.  Go

14  ahead.

15  Q    (BY MR. BENTLEY)  When RMA wrote you to decline the

16  invitation to participate in the arbitration, did they offer you

17  an alternative?

18  A    I'm not sure they did at the start, but they certainly did

19  through the appellate procedures of the National Appellate

20  Division of the United States Department of Agriculture.

21  Q    And the Appellate Division -- the appellate procedures came

22  after an administrative review by USDA?

23  A    I think it did.

24  Q    And was that a procedure that you followed for Olsen?

25  A    Yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Q    And, by the way, you mentioned some other arbitrations

2  involving other parties.  They didn't involve Olsen.  Correct?

3  A    No.

4  Q    This is only -- the only one that you were involved in for

5  Mr. Olsen.

6  A    Yes.

7  Q    Okay.

8  A    But Olsen wasn't the only farmer involved in the same

9  pickle when American Growers --

10         MR. TORNABENE:  Objection regarding testimony about

11 any other farmers not part of this case.

12         THE COURT:  Sustained.

13 Q    (BY MR. BENTLEY)  During the administrative review

14 conducted by the RMA of Mr. Olsen's and Olsen Ag's claims, did

15 you provide information in support of the information that

16 Mr. Olsen had provided in his Annual Farm Report or reports?

17 A    Yes.

18 Q    Tell us about that.

19 A    Well, I provided everything that we had provided to the

20 arbitrators and the arbitration decision, reports from experts,

21 and everything analyzing his loss under the policy.

22 Q    And what -- who was the principle expert that you relied

23 on?

24 A    Dan Harper.

25 Q    And what was the focus of his analysis?

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  A    Well, to go through the crop history and the Schedule F on

2  the -- on the tax returns, crop history to determine what

3  amounts are payable under the policy.  And that's what he did.

4  Q    And did he look at onion prices historically, as well?

5  A    Yes.

6  Q    And how many submissions did Mr. Harper make to the USDA,

7  if you recall?

8  A    I don't, but they were voluminous.  And he, I think -- I'm

9  not sure.  He may have had direct communication with them and

10 through me, also, attempting to comply with all the rules and

11 regulations of the -- the handbook, if you've seen the

12 settlement handbook for these claims.

13 Q    So, just so that we're clear on this, you're sort of moving

14 down two tracks at the same time.

15 A    Yes.

16 Q    Correct.

17 A    I was.

18 Q    You're getting ready for arbitration on this track, and

19 you're complying with what RMA says is the proper procedure with

20 the administrative review.  Correct?

21 A    I was, basically, afraid to put all my eggs in one basket

22 because --

23 Q    Yeah.  All right.  And, ultimately, RMA made a decision on

24 the administrative review they had been conducting.  Correct?

25 A    Yes, they did.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Q    Do you recall the date of that decision?

2  A    No, but I'm sure you have it.

3  Q    I'd like to show you two letters.

4         MR. BENTLEY:  Not for the jury.

5         THE WITNESS:  April 5, 2007.

6         MR. BENTLEY:  I'm showing the witness Exhibit 1046,

7  and I'm offering that exhibit at this time.

8         THE WITNESS:  This is the one from Cliff Parker.

9         MR. BENTLEY:  Correct.

10         THE WITNESS:  Okay.

11         MR. TORNABENE:  No objection.

12         THE COURT:  Admitted.

13      (Exhibit No. 1046 admitted into evidence)

14         MR. BENTLEY:  May it be published, please?

15         THE COURT:  It may be published.

16  Q    (BY MR. BENTLEY)  In the first paragraph, do they -- does

17  Mr. Parker, the author of this letter, summarize the conclusion

18  that the agency has reached based on its review of Mr. Olsen's

19  '01 claim?

20  A    Yes.  They claimed it did not trigger a loss under the 2001

21  Adjusted Gross Revenue Pilot Insurance Policy and that he was

22  overpaid.

23  Q    Now, American Growers wanted him to pay back, what, some --

24  A    400 and something.

25  Q    -- 480,000?

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1    A    Yes.

2    Q    So, he's sort of gone backwards.  Now they want him to pay

3    back the whole thing.  Correct?

4    A    And the arbitrators ruled otherwise.  But --

5    Q    And that arbitration decision was prior to this letter.

6    A    Yes, it was.

7    Q    But, as far as RMA was concerned and a judge later ruled,

8    it didn't matter because RMA couldn't be bound.  Correct?

9    A    I'm -- yeah.  The judge says I can't give you my opinions;

10   but, yes.

11   Q    And I say you can't give us your opinions, also.  Right?

12   A    Okay.  Okay.

13   Q    Now, on Page 2 -- withdrawn.

14        This -- this is a 21-page letter, single spaced, is it not?

15   A    If you say so.  What's the exhibit number, and I'll look at

16   the pages.

17   Q    It's Exhibit 1046.

18   A    Yes.  It's a 21-page letter.

19   Q    So, in this letter, Mr. Parker is providing an analysis of

20   why Mr. Olsen was not entitled to any indemnity in '01.  Is that

21   right?

22   A    Yes.

23   Q    And he goes through three different items in the original

24   Annual Farm Report.  Correct?

25   A    Yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1   Q    On the first one, they've agreed with Olsen that the

2   revised amount is -- is based on the written records.

3   Therefore, there's no dispute about the revised Annual Farm

4   Report.  Correct?

5   A    Yes.

6                THE COURT:  Where are you referring to?

7                THE WITNESS:  The letter on Page --

8                THE COURT:  No.  I meant, if you have a paragraph you

9   want him to look at, just point it out to him, would you?

10               MR. BENTLEY:  Yes.

11               THE COURT:  Thank you.  And you need to reask that

12  question.

13  Q    (BY MR. BENTLEY)  And they also found that they couldn't be

14  as comfortable with the average allowable expenses.  Correct?

15  A    Yes.

16  Q    On Page 40363, Bates -- the lowest Bates number, they

17  indicate they have no issue with regard to Olsen's expected

18  value of potatoes.

19  A    Yes.

20  Q    Their issue is with the expected value of onions.  Correct?

21  A    Yes.

22  Q    And they say that, at the bottom, $12 per hundred weight

23  expected value is completely unreasonable, not consistent with

24  the standard contained in the AGR handbook.

25  A    That was the claim.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1        THE COURT:  What do you mean "claim"?

2        THE WITNESS:  That's what they said in the letter.

3        THE COURT:  Okay.  Thank you.

4   Q    (BY MR. BENTLEY)  Moving right along, at Page 12 of the

5   letter, what did they decide with respect to Mr. Olsen's

6   coverage level?

7   A    Because Olsen only qualified with one commodity, the

8   coverage was reduced to the highest amount of coverage they were

9   eligible, which was 65 percent at a 75 percent payment rate.

10  Q    And, so, they used those numbers, did they not, to

11  calculate whether Mr. Olsen was entitled to an indemnity.

12  A    Yes.

13  Q    And this is shown on Page 20 --

14  A    Yes.

15  Q    -- on the screen now.

16  A    Yes.

17  Q    Zero indemnity.  Correct?

18  A    Yes.

19  Q    Now I'd like to direct your attention to Exhibit 1109.

20       MR. BENTLEY:  Not for the jury.

21  Q    (BY MR. BENTLEY)  Does this look familiar, Mr. Schultz?

22  A    Yes.

23  Q    And what is this?

24  A    The 2002 claim determination, same process, same drill.

25       MR. BENTLEY:  I offer Exhibit 1109 and ask that it be

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  published to the jury.

2        MR. TORNABENE:  No objection.

3        THE COURT:  Admitted and may be published.

4     (Exhibit No. 1109 admitted into evidence)

5  Q   (BY MR. BENTLEY)  And we see here, on the first page,

6  again, RMA -- RMA's decision that Olsen has not triggered a loss

7  under the AGR policy.  Correct?

8  A    Yes.

9  Q    That's because they recalculated his guarantee, and he did

10 not reach the trigger point in terms of the revenue shortfall.

11 Correct?

12 A    That was what they determined.

13 Q    This letter, like the one we just looked at, is also rather

14 long and complicated.  Correct?

15 A    Yes.

16 Q    But the bottom line is here on Page 23 --

17 A    Yes.

18 Q    -- where they show "Indemnity Amount 0."

19 A    Yes.

20 Q    Now, this one they found that he qualified for the

21 90 percent -- 70 percent -- 75 percent rates; but they reduced

22 his income so that he did not qualify for indemnity?

23 A    Yes.

24 Q    Okay.  Going back -- putting Exhibit 1109 back up on the

25 screen, did the letters from Mr. Parker, of which this is one,

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  inform Olsen of procedural rights that he had to challenge the

2  RMA's determination?

3  A    Yes.

4  Q    Is that what is shown here on Page 23 where they talk about

5  three options?

6  A    Yes.

7  Q    And those are?

8  A    Administrative review, mediation, appeal to the National

9  Appellate Division.

10  Q    And, continuing on, they're indicating that Mr. Olsen's

11  already used his administrative review rights.

12  A    Yes.

13  Q    What about mediation?  Did you mediate this thing?  Do you

14  remember?

15  A    I don't think so.

16  Q    Okay.  And what did you do with regard to the appeal to the

17  National --

18  A    We filed the appeal with the National Appeal Division,

19  which is not part of the policy.  It's a different process.

20  Q    Did that appeal lead to a hearing --

21  A    Yes.

22  Q    -- before a hearing officer?

23  A    Yes.

24  Q    Where was the hearing held?

25  A    Pasco.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Q    Who was present?

2  A    Well, I was the lawyer for the claimant; and the -- the RMA

3  didn't bring a lawyer.  They had Dave Paul, the -- they

4  didn't -- this hearing -- the National Appellate Division is

5  part of the USDA.  So --

6  Q    How did the -- how did the hearing turn out for Mr. Olsen?

7  A    Well, basically, the National Appellate Division rubber

8  stamped the findings of --

9         MR. TORNABENE:  Objection to the --

10        THE COURT:  Sustained.  Stricken.

11  Q    (BY MR. BENTLEY)  Did Mr. Olsen prevail in the hearing?

12  A    No.  They did just exactly what Dave Paul had done at the

13  beginning.

14  Q    And did you seek judicial review --

15  A    Yes.

16  Q    -- of that decision?

17  A    Yes.

18  Q    What did you do to seek that review?

19  A    Well, I tried to enforce the arbitration awards that we had

20  received pursuant to the policy and that -- assert that those --

21  that the decision of the National Appellate Division -- at that

22  point, if you appeal an administrative decision, the test is

23  whether it's arbitrary and capricious, which is a heavy burden.

24  Q    So, you had -- again, you're still moving down those two

25  tracks.  Correct?

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  A    I was.  One under the policy and one that was the

2  bureaucracy in the USDA.

3  Q    You felt that you had a valid award --

4  A    I did.

5  Q    -- under the arbitrator's decision?

6  A    I did.

7  Q    And you had lost in the NAD hearing.  You were trying to

8  get the Court to find that was arbitrary and capricious.

9  A    Right.  I was trying to get them to accept the insurance

10  policy.

11  Q    And you did not prevail on the lawsuit seeking to enforce

12  the arbitration award.  Correct?

13  A    No, I did not.

14  Q    Did you appeal from that decision?

15  A    At that point, we filed a Notice of Appeal; and, then, we

16  mediated a resolution.

17         THE COURT:  Now, why don't you clear up where the

18  appeal was filed because there's been --

19         THE WITNESS:  The appeal --

20         THE COURT:  Excuse me a second.  The appeal's been

21  tossed around a good deal, Mr. Bentley.  So, why don't you make

22  sure the jury gets that.

23  Q    (BY MR. BENTLEY)  Both of your lawsuits -- the one to

24  enforce the arbitration award and the one to reverse the NAD

25  hearing decision -- were filed with the United States District

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1   Court for the Eastern District of Washington.  Correct?

2   A    Yes.

3   Q    And, when you are seeking appellate review of a decision of

4   this Court, where do you go?

5   A    The United States Court of Appeals, Ninth Circuit.

6   Q    And, filing a Notice of Appeal, what does that involve as

7   the initial step?

8   A    Piece of paper filed and, then, they have a mediation

9   process, which we followed.

10  Q    Do you recall the name of the mediator?

11  A    No.

12  Q    What was the result of that mediation?

13        THE COURT:  Excuse me a second.  Would you clear up

14  who the parties to that particular appeal were so that, when you

15  get to mediation --

16        MR. BENTLEY:  Yes.

17        THE COURT:  -- it's set up?  Thanks.

18        MR. BENTLEY:  That's -- I -- yes.

19  Q    (BY MR. BENTLEY)  Who were the parties at that -- in that

20  appeal?

21  A    The RMA.

22  Q    On the one hand?

23  A    And us on the other hand or the farmer on the other hand.

24  Q    That did not involve American Growers because they were

25  kaput.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  A    They were already defunct.

2  Q    And please tell us what the result was as a result of the

3  mediation of the appeal.

4  A    Ultimately, Mr. Olsen agreed to a repayment provision to

5  repay what the RMA claimed that he shouldn't have received.

6  Q    Do you recall the amount?

7  A    No, I don't.  It was a lot of money though.

8  Q    Now, when was that settlement agreement reached?

9  A    Oh, several years ago now.  Three, four years ago.

10  Q    How many years, though, after the decisions -- the --

11  the -- the Notice of Appeal was filed in the case involving RMA?

12  A    It was not too long.  The U.S. Government or the -- the

13  Ninth Circuit Mediation Service got involved, and it wasn't --

14  it wasn't very long after that that business dictated that the

15  suit be stopped.

16  Q    Could you take a look at Exhibit 1051, please.

17         MR. BENTLEY:  This is not for the jury.

18         THE WITNESS:  Yes.

19  Q    (BY MR. BENTLEY)  Is that the written settlement agreement?

20  A    Yes, and it was -- I can give you the date of it.

21  Q    Yes, please.

22  A    Okay.  January of 2010.

23  Q    Does that refresh your recollection as to the amount of the

24  settlement?

25  A    Yes.  One million, two -- let's see.  There was --

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Q    Page 5.

2  A    Okay.  1,200,000.

3  Q    Now, you've taken us all the way to January, 2010.

4  Correct?

5  A    Yes.

6  Q    And, at that point on the civil side by this settlement

7  agreement, is it your view that all of the civil issues related

8  to the '01 and '02 AGR claims had been resolved?

9  A    Yeah.  It was a -- all claims were released.  It was over.

10 Q    Now, here we are in 2010.  I'd like to rewind the tape and

11 go back to 2005.

12 A    Okay.

13 Q    Do you recall another matter involving Mr. Olsen and an AGR

14 claim and a different insurance company coming to your

15 attention?

16 A    Yes.

17 Q    Tell us about that.

18 A    Well, we resolved that claim.

19 Q    Well, what -- who sued who in that case?

20 A    We sued them.

21 Q    Well --

22 A    Which -- which --

23      THE COURT:  Why don't you lay more of a foundation

24 here rather than have Mr. Schultz guess and test his memory.

25 I'm sure he has a good memory, but let's lay a foundation, shall

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  we?

2          MR. BENTLEY:  Yes.

3  Q    (BY MR. BENTLEY)  Did Mr. Olsen retain you to represent him

4  in connection with his AGR claim involving Farmers Crop

5  Insurance Alliance in the -- for the 2004 crop year?

6  A    I do have very little recollection of it because it was

7  resolved, and it was resolved in a rather a timely manner.  And

8  mutual releases were executed, and it was done.  And someplace

9  in here there's a copy of that release.

10  Q    All right.  Could you take a look at Exhibit 1310 and see

11  if that refreshes your recollection about the -- the genesis of

12  the involvement you had with Mr. Olsen's '04 AGR claim.

13  A    1310 is the issue concerning the Court Order.  It looks

14  like a Court Order to me.

15  Q    Well, looking at that, do you -- does that reflect a -- an

16  order filed in a lawsuit in this court?

17  A    Yes.

18  Q    Who was the plaintiff in that case?

19  A    Yeah, the insurance company.  That's correct.  The

20  insurance company had filed that declaratory judgment action to

21  interpret the policy.

22  Q    And did that have something to do with whether Tri-Cities

23  Produce was a processor or not?

24  A    Yeah, that was that -- that term isn't defined in any of

25  the AGR handbooks.  It was --

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Q     No, no.  My question is --

2  A     Yes.

3  Q     -- whether the lawsuit involved that issue.

4  A     Yes, yes.

5  Q     And did the judge make a ruling as to whether that issue

6  could be heard by the Court or by an arbitrator?

7  A     No.  He ruled that the arbitration provisions of the policy

8  controlled everything.  And, so, that policy -- or that had to

9  be arbitrated; and, then, we settled the case.

10 Q     And, in this case, we're dealing with Farmers Crop

11 Insurance Alliance, not with the RMA.  Correct?

12 A     Well --

13 Q     Or was RMA involved?

14 A     I think RMA is involved in every one of these --

15 Q     Okay.

16 A     -- and supervises all of the claims because, ultimately,

17 the FCIC pays the claim.

18 Q     Do you recall the name of the attorney who represented FCIA

19 in this declaratory judgment action?

20 A     It wasn't Rolf Tangvald?  I'm not sure I do.  Rolf Tangvald

21 and I --

22        THE COURT:  Well, excuse me just a second.  I think,

23 Mr. Schultz, it's a simple question.

24        THE WITNESS:  I don't remember.

25        MR. BENTLEY:  Okay.  Well, take a look at Exhibit

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  1311.

2          THE WITNESS:  Oh, John -- John Raekes represented the

3  insurance company.

4          THE COURT:  There you go.

5  Q    (BY MR. BENTLEY)  And did you and Mr. Raekes have some

6  repartee back and forth over a possible settlement of the case?

7  A    Yes.

8  Q    Did your discussions lead to a settlement?

9  A    Yes.

10 Q    And was a settlement agreement signed?

11 A    Yes.

12 Q    And did FCIA agree to make a payment to Mr. Olsen on his

13 '04 AGR claim?

14 A    Yes.

15 Q    Do you recall the amount of the payment?

16 A    No, but it was a lot of money.  A couple hundred -- a

17 couple million dollars, wasn't it?

18 Q    Take a look at 1314 and see if that refreshes your

19 recollection.

20 A    A million, five.

21 Q    And the date of that settlement and release was what?

22 That's Exhibit 1314.

23 A    January of '06.

24 Q    So, the -- and I'm not sure that I asked you this.  This --

25 this lawsuit was the insurance company suing Mr. Olsen.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/DI - BENTLEY

1  Correct?

2  A    Well, for a declare -- yeah.  Mr. Olsen had made a claim.

3  Q    Okay.

4  A    And, then, they brought a declaratory judgment action to

5  interpret the policy.

6  Q    Would you tell the jury what a declaratory judgment action

7  involves in 60 words or less?

8  A    Well, they brought an action asking the Court to interpret

9  the policy.  And the Court said, no, you follow the arbitration

10 provisions in the policy; and the arbitrator interprets the

11 policy.

12 Q    So, these things are going on simultaneously and not

13 necessarily being settled in sequence.  Would you agree?

14 A    Yes.

15 Q    And the '04 matter lead to a settlement that you have

16 described implemented in January of '06.

17 A    Yes.

18 Q    And the '01 and '02 claims were not resolved on the civil

19 side until four years later.  Correct?

20 A    Yes.

21 Q    Okay.

22 A    We were still trying to collect on that -- on those and,

23 then, the Government wanted it's money back so --

24       THE COURT:  Mr. Schultz -- Mr. Schultz, just that, you

25 know, if you restrict yourself to answering the question, this

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  will go more smoothly.  Go ahead.

2          MR. BENTLEY:  I'm done.  No further questions.

3          THE COURT:  All right.  Mr. Johnston, next.

4          MR. JOHNSTON:  Ms. Brasel, may we have the machine.

5

6                    CROSS EXAMINATION

7  CROSS BY MR. JOHNSTON:

8  Q    Good morning, Mr. Schultz.

9  A    Good morning.

10 Q    I'm Bruce Johnston, as you know, and represent Poco in

11 these matters.  When did you first become aware of Poco, LLC?

12 A    I'm not sure of that either.

13 Q    In relationship to time or an event, if you can --

14 A    2003, maybe.

15 Q    And was that in connection with an AGR claim?

16 A    Yes.

17 Q    And had you known Mr. Peterson before that time?

18 A    Many years.

19 Q    And, in regard to -- let me ask you the same question.

20         MR. JOHNSTON:  And if we can have previously admitted

21 Exhibit 2038?

22     (Discussion off the record)

23         MR. JOHNSTON:  Ms. Brasel, I don't think we have the --

24         THE COURTROOM DEPUTY:  Um-hum, it's over.

25 Q    (BY MR. JOHNSTON)  While we're waiting for that,

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1 Mr. Schultz, in regard to the early part of the first claim, who

2 was it at Poco that you primarily dealt with?

3 A    Well, I think Debbie Moore, probably, more than Mark.  She

4 was the one that would -- if I needed anything, she would get it

5 for me.  And, if I needed help gathering information, she would

6 be the gatherer.  I did talk to Mark, but it was -- primarily,

7 she was the executive officer of the company.

8          THE COURT:  Is Mark Peterson?

9          THE WITNESS:  Is Debbie Moore.

10          THE COURT:  Mark Peterson?

11          THE WITNESS:  Yes, Mark Peterson.  Yeah.

12 Q    (BY MR. JOHNSTON)  And, Mr. Schultz, is the document that's

13 there on the screen that's Exhibit 2038 -- is that the letter

14 that you understood was the denial of the Poco 2003 claim?

15 A    Go to the next page.  Is this the one that had the

16 71 acres?  Yes.

17 Q    Yes.  And, at that point, they were arguing that it wasn't

18 payable because 71 -- 2 -- 71.2 acres of corn in one of the

19 counties had not been insured under an MPCI policy --

20 A    I thought it was potatoes, but there was -- yeah, they

21 didn't have a multi-peril policy, which is required in order to

22 get an AGR policy.  But it was unrelated and it was in a

23 different county and there were no losses.

24 Q    Okay.  And did they also assert that there was an MPCI on a

25 corn policy?

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1   A    I can't recall the planting date.  I think there was a

2   planting date problem, or it wasn't available at the time and --

3   yes.

4   Q    And is that where the insurance is only available if the

5   corn is planted before --

6   A    Yes.

7   Q    -- a particular date?

8   A    They're date -- date sensitive.

9   Q    And, because it was a second crop, this was planted after

10  the date.  So, the MPCI policy wasn't available?

11  A    And, when it's not available, you get AGR coverage anyway.

12  Q    Okay.

13       MR. JOHNSTON:  And, then, for the Court, Counsel, and

14  the witness but not for the jury yet, can we see Exhibit 2132?

15  Q    (BY MR. JOHNSTON)  Well, while we've got 2131 up,

16  Mr. Schultz, was this an announcement that the insurance company

17  had changed from Farmers Crop Insurance Alliance to --

18  A    Yes.

19  Q    -- Northern -- North Central Crop Insurance?

20  A    Yeah.  Just change of name, but they were still --

21  Q    It -- it -- it was a merger so the new company took on all

22  the obligations of the prior company?

23  A    Right.

24  Q    Okay.

25       MR. JOHNSTON:  We would offer 2131, your Honor.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1     MR. TORNABENE:  No objection.

2     THE COURT:  Did you say 21 --

3     MR. JOHNSTON:  31.

4     THE COURT:  -- 31?  Okay.

5     MR. JOHNSTON:  Yes.

6     THE COURT:  2131 in.  Admitted.

7     MR. JOHNSTON:  And may we --

8     THE COURT:  It can be published.

9     (Exhibit No. 2131 admitted into evidence)

10    MR. JOHNSTON:  If we could publish that to the jury.

11    THE COURT:  Certainly.

12  Q    (BY MR. JOHNSTON)  And this was just, simply, an

13  announcement so that you knew who they were --

14  A    Yes.

15  Q    -- was responsible on the policy?

16  A    Yes.

17  Q    Okay.

18    MR. JOHNSTON:  Then, again, just for the Court,

19  Counsel, and the witness, may we see 2132?

20  Q    (BY MR. JOHNSTON)  Did Ms. Moore respond on the 71 acres

21  prior to your involvement or after your --

22  A    I believe she had before.

23  Q    Okay.  And you received a copy of her response before you

24  took action in regard --

25  A    Yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  Q    -- to the policy?

2  A    Yes.

3  Q    And is 2132 a document that was sent to Farmers Crop

4  Insurance Alliance by Ms. Moore and, then, subsequently, also

5  provided in further proceedings by yourself?

6  A    Yes.

7         MR. JOHNSTON:  We would offer 2132, your Honor.

8         MR. TORNABENE:  No objection.

9         THE COURT:  Admitted.

10        (Exhibit No. 2132 admitted into evidence)

11        MR. JOHNSTON:  May we display that to the jury --

12        THE COURT:  You may display.

13        MR. JOHNSTON:  -- and have the second paragraph blown

14  up.

15  Q    (BY MR. JOHNSTON)  And, Mr. Schultz, 2038 was dated June 1

16  of 2004.  And this letter was not dated but written shortly

17  after that time in response.  Correct?

18  A    Yes.

19  Q    Now, this is the explanation of Poco about the 71.2 acres.

20  Is that correct?

21  A    Yes.

22  Q    Now, Mr. Schultz, the 71.2 acres compared to the overall,

23  which was over 1,300 acres of potatoes alone and, then, other

24  acreage, was fairly insignificant in terms of just the

25  percentage acres.  Correct?

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  A    It was, and there were no losses here either.  So --

2  Q    And, then, so that the premium that wasn't paid would have

3  only been a few thousand dollars.  Correct?

4  A    At most.

5  Q    And the claim that you filed, initially, was over $800,000?

6  A    I recollect it was more than that, but --

7  Q    We'll get to that; but it was at least that amount, wasn't

8  it?

9  A    It was.

10 Q    And, so, the Government was saying, for not having paid a

11 2,000 or so dollar premium --

12        MR. TORNABENE:  Objection.  Objection.  The Government

13 wasn't --

14        THE COURT:  I can't hear you.

15        MR. TORNABENE:  The Government wasn't saying anything.

16        THE COURT:  The Government.  Correct.

17 Q    (BY MR. JOHNSTON)  The insurance company was telling you

18 that, for a few thousand dollars in premium and that

19 technicality, they were going to deny nearly a million-dollar

20 claim.

21 A    Yeah.  They were acting on behalf of the RMA.

22 Q    That was my next --

23 A    That's what they were saying, yes.

24        THE COURT:  Counsel --

25        MR. JOHNSTON:  You've anticipated my next question.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1        THE COURT:  -- excuse me.  Excuse me a second.

2        MR. JOHNSTON:  Yes, sir.

3        THE COURT:  He -- and, actually, not.  So, I'm going

4   to strike that answer because it's not responsive.

5        MR. JOHNSTON:  And I agree.

6   Q    (BY MR. JOHNSTON)  It was the insurance company that denied

7   the claim.  Correct?

8   A    Well, I think it was the RMA that denied the claim; and the

9   insurance company said it was denied, yes.

10  Q    And was that based on -- you mentioned a Mr. Paul.

11  A    Yes.

12  Q    Who is Mr. Paul?  Would you tell us about who he was?

13  A    Well, he is -- his background is he's a rodeo cowboy that's

14  -- but he's in charge of the RMA in Spokane.

15  Q    And had you had dealings with him before face to face?

16  A    Yes.

17  Q    On RM -- on AGR issues?

18  A    Many times.  I've had -- before this?  This was -- this was

19  in the beginnings of these claims.  I've had a number of

20  dealings with him.

21  Q    In the fullness of your dealings with Mr. Paul, was there

22  any question that he was the one in charge of claims decisions

23  at that level?

24  A    No.

25  Q    And was there any question in your mind, from the fullness

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1   of your dealings, that he was the one that had to approve any

2   denial or approval of a claim?

3   A    Yes.  And those things we just saw from Clifton Parker were

4   also through him.

5   Q    And did -- was there, actually, a review of the review that

6   went to Mr. Paul --

7   A    Yes.

8   Q    -- in the Olsen case?

9   A    I can't -- ask me that again.

10  Q    Well, you've got the Parker letter.  Was there, actually, a

11  review of that at some point in time that was indicated to you

12  as being by Mr. Paul?

13  A    Clifton Parkins (sic) -- Parker told me that he met with

14  Dave Paul.

15  Q    Okay.  Now, in terms of the -- let's see.  We've got 21.

16  Okay.  Let's move to -- now, did you next, then, attempt to work

17  out a resolution of the claim before filing an arbitration?

18  A    If I did, I don't remember it.  We filed arbitration so it

19  wasn't very successful.

20  Q    Okay.

21          MR. JOHNSTON:  And, for the -- for the Court, Counsel,

22  and the witness but not the jury, may we see 2135, which is a

23  one-page document.

24  Q    (BY MR. JOHNSTON)  Now, when you file an arbitration

25  demand, all you do is say, "We demand this amount of money based

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  on a particular crop year."  Correct?

2  A    Yeah.  There's a provision in the insurance policy as to

3  how to do it in this commercial demand.  These demands are,

4  then, filed in a -- on a form under the -- with the American

5  Arbitration Association.

6  Q    And there are no, you know, arguments or anything else in

7  these.  It's just a straightaway, four-line complaint.  Correct?

8  A    Well, it's just like filing a Complaint in a civil court.

9  You file it.  Nobody reviews it.

10  Q    And this, just for benchmark, we saw that the denial was on

11  June 1.  This document is -- was dated on August 30th of 2004.

12  Is that correct?

13  A    Yes.

14         MR. JOHNSTON:  Okay.  We would offer 2135, your Honor.

15         MR. TORNABENE:  Objection for the reasons previously

16  stated.  We have the date.  That's all we need.

17         THE COURT:  I'm going to permit this.  Go ahead.  It's

18  admitted.

19     (Exhibit No. 2135 admitted into evidence)

20         MR. JOHNSTON:  Thank you.

21  Q    (BY MR. JOHNSTON)  And, then, did you go through a similar

22  process that you described; that is, did you retain an

23  accountant to assist in assembling the correctness of the

24  numbers?

25  A    Yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  Q    And who was it that assisted you in regard to Poco's 2003

2  claim?

3  A    Dan Harper.

4  Q    And did Mr. Harper determine that there had been some

5  errors and so forth in the original reports?

6  A    He starts at square one and goes through the whole process,

7  yes.

8  Q    And, based on his reports, did you, then, file an amended

9  demand?

10 A    I -- there was more money involved than that -- the 800,000

11 just mentioned.  That's --

12 Q    Okay.

13         MR. JOHNSTON:  And may we, for the Court, Counsel, and

14 the witness but not the jury see 2136?

15         THE COURT:  Yes.

16 Q    (BY MR. JOHNSTON)  And this is a document over the Leavy,

17 Schultz, Davis, Fearing signature line, but it's by George

18 Fearing.  Would you tell us who George Fearing is.

19 A    He's one of my law partners.

20 Q    And did he work with you on this case?

21 A    This and others.

22 Q    And is the document -- amended claim -- is that simply a

23 statement of the amount that was changed because of Mr. Harper's

24 advice to you?

25 A    Yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1          MR. JOHNSTON:  We would offer 2136, your Honor.

2          MR. TORNABENE:  Object for the same reasons.

3          THE COURT:  Overruled.  Admitted.  What's occurred to

4    me is that it's clear that there's some foundation necessary to

5    show the position of the claimants here, and these documents do

6    that.  So, I'm going to permit these.

7          (Exhibit No. 2136 admitted into evidence)

8    Q    (BY MR. JOHNSTON)  Now --

9          (Discussion off the record)

10   Q    (BY MR. JOHNSTON)  Then, did this case actually get

11   arbitrated?

12   A    Yes.

13   Q    And do you recall where the arbitration was?

14   A    You know, I don't.  I'd say a local law office.  It was

15   either my office or John Raekes's office.  I can't remember.  We

16   do, probably, use them interchangeably.

17   Q    And your opponent -- faithful opponent was John Raekes --

18   A    Yes.

19   Q    -- in that case, as well?

20   A    Yes.

21   Q    And do you recall who the arbitrator was?

22   A    No.  It was an AAA arbitrator; and he signed the

23   arbitration award giving us, basically, what we asked for.

24   Q    And do you recall who was present at the arbitration?

25   A    Well, obviously, my clients were there and Mark Masters

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1    from the insurance company.  And I don't remember if Dave Paul

2    was there or not.  He might have been.  As I'm thinking, it was

3    -- the arbitration took place in Rettig-Osborne Building on

4    Clearwater.

5    Q    Was --

6    A    And -- and he heard the arbitration and, then, wrote an

7    opinion later.

8    Q    Okay.  Was there a Mr. Rippee as an adjuster who was also

9    present?

10   A    Yeah.  I think Dave Rippee and Mark Masters were.

11   Q    They were the insurance company --

12   A    Yes.

13   Q    -- guys?

14   A    Yes.  Yes.

15   Q    And was Mr. Harper also there?

16   A    Yes.

17   Q    And was Mr. Harper's report submitted to you -- or

18   submitted by you in Answers to Interrogatories before the

19   arbitration hearing?

20   A    Yeah.  There's full disclosure of everything.  Yes.

21   Everything had been -- and the argument was back to -- that

22   71.2 acres was the -- the focus of the defense was that because

23   there hadn't been that 70 --

24            MR. TORNABENE:  Object to the precise position of the

25   parties.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1          THE COURT:  I'm sorry?

2          MR. TORNABENE:  Objection to the precise position of

3   the parties.

4          MR. JOHNSTON:  I -- I don't think I'd asked.

5          THE COURT:  No.  It seems to me that the context, as

6   it's evolving, is that some of this is necessary.  So, go ahead.

7          MR. JOHNSTON:  Can we have 2084, please?  And this is

8   for the Court, Counsel, and the witness but not the jury at this

9   point.  Now, can we look at the second page?

10  Q    (BY MR. JOHNSTON)  This is Mr. Harper's report, is that

11  correct, addressed to George Fearing and dated January 1 (sic)

12  of 2005?

13  A    Yes.

14  Q    Or 31 of 2005?

15  A    Yes.

16  Q    And this is the precise report that was presented, both

17  before the arbitration and at the arbitration, as to the correct

18  numbers.  Correct?

19  A    Yes.

20          MR. JOHNSTON:  Your Honor, we would offer 2084.

21          THE COURT:  And what is 2084?  A one-page document?

22          MR. JOHNSTON:  No, it's -- your Honor, it's -- it's

23  a -- only Mr. Harper's report for the hearing.  It's --

24          THE COURT:  How many pages?

25          MR. JOHNSTON:  -- not a big report.  I think it's

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1   about -- it's -- it's 30 pages, your Honor.

2            THE COURT:  I'm going to permit some part of this.

3   Are you asking for the whole thing?  Is it really necessary for

4   it all to go in?

5            MR. JOHNSTON:  No, your Honor.  The -- the tax return,

6   the Schedule Fs and so forth at the back of it are -- are

7   backup.  The report itself really comes down to the first -- the

8   letter itself is probably sufficient together with the first

9   exhibit, which would be four --

10           THE COURT:  Are there Bates numbers on the exhibit?

11           MR. JOHNSTON:  First five pages.  Your Honor, the

12   Bates numbers begin at 751309, although it's blacked out on the

13   first page, through 751313.

14           THE COURT:  Mr. Tornabene, same objections?

15           MR. TORNABENE:  Your Honor, we would be -- I guess our

16   objection would be after page ending 324.  It gets into the

17   backup documentation that Mr. Johnston's talked about.  The tax

18   returns.

19           THE COURT:  I think he was only talking about 751309

20   through 751313, which is four pages.  Is that correct,

21   Mr. Johnston?

22           MR. JOHNSTON:  Yes, that's correct.  09 through 13.

23           MR. TORNABENE:  The backup documentation that extends

24   to 324?

25           THE COURT:  It's four pages.  Just 09 through 13.

1    MR. TORNABENE:  We understand.  But the backup

2 document -- some of that backup documentation -- we're going to

3 admit these -- these first pages, which seems appropriate.  But

4 some of that backup documentation should be included to

5 Page 324.  That doesn't include the tax return.

6    THE COURT:  Well, I'm not going to make you do this on

7 the fly.  I'm going to admit this part.  And, if you want to add

8 to it later, then you can do it in cross.

9    MR. TORNABENE:  Thank you, your Honor.

10    THE COURT:  That's just fine with me.

11    MR. JOHNSTON:  Your Honor, in looking at it, we have

12 no objection to the 324 being the beginning and end.

13    THE COURT:  The single page or from --

14    MR. JOHNSTON:  No.  From --

15    THE COURT:  -- 09 through 24?

16    MR. JOHNSTON:  -- 09 through 24.

17    THE COURT:  Is that what you're asking for?

18    MR. TORNABENE:  Yes.

19    THE COURT:  Admitted.

20    MR. JOHNSTON:  I think with counsel's request that's --

21    THE COURT:  09 through 24 on the Bates numbers.

22 751309 to 751324 admitted and may be published.

23    (Exhibit No. 2084 admitted into evidence)

24    MR. JOHNSTON:  Thank you.  And can we have the second

25 page, then, please?  Now, can we highlight the first paragraph

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  and the section just below it?

2  Q    (BY MR. JOHNSTON)   Now, this was a report that you had

3  requested from Mr. Harper.   Correct?

4  A    Yes.

5  Q    And Mr. Harper's an independent certified public

6  accountant.   Correct?

7  A    Yes.

8  Q    And he's governed by the rules and precepts and ethical

9  concepts of the AAICPA.   Correct?

10  A    Yes.

11  Q    And you requested him to act independently.   Is that

12  correct?

13  A    Yes.

14  Q    Then, here it says that there was a difference.   There's

15  the adjuster at 818,158, which was the amount of the claim as

16  you had initially filed it.   Correct?

17  A    Yes.

18  Q    And Mr. Harper had found a number of things, which are

19  explained in the letter, which lead him to a request of the

20  indemnity of 1,454,450.   Correct?

21  A    Yes.

22        MR. JOHNSTON:   And can we move forward to the fifth

23  page, please?   And can we highlight the columns?   Just the

24  center of the page to see it better.   No, the description, as

25  well.   Yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1    Q    (BY MR. JOHNSTON)  Now, this is -- these are the

2    fundamentals of an AGR claim.  Is that correct?

3    A    Yes.

4    Q    That is, you have the expenses, approved expenses.  And, in

5    the Government's column there, you see they have the expenses at

6    59.5 percent?

7    A    Yes.

8    Q    Now, if they're below 70 percent, that requires a reduction

9    of the approved AGR.  Correct?

10   A    Yes.

11   Q    And that's reflected as they believed the adjusted AGR

12   should be reduced by 418,849.  Correct?

13          MR. TORNABENE:  We would object and request

14   clarification for "they believe."  I believe we heard --

15          THE COURT:  Sustained.

16   Q    (BY MR. JOHNSTON)  Okay.  This was -- these were

17   Mr. Rippee's figures.  Is that correct?  Isn't that the dialogue

18   that was going on to try and find the numbers?

19   A    These were the insurance company's represent -- numbers

20   that had been reviewed and were presented to me.

21   Q    And wasn't --

22          THE COURT:  Counsel, I'm allowing you some

23   foundational leading questions; but --

24          MR. JOHNSTON:  Certainly.

25          THE COURT:  -- you need to be asking some direct

1  questions here.

2  Q    (BY MR. JOHNSTON)  Was it -- who was it that worked with

3  Mr. Harper to try and harmonize the numbers?

4  A    Well, our assignment to Mr. Harper was simply to review

5  these documents and determine whether or not there, number one,

6  was an AGR claim and, number two, what it was.  Then, after he

7  made that determination, where was the difference between his

8  determination and that that had been provided earlier.

9  Q    And both positions were, then, presented to the arbitrator.

10 Is that correct?

11 A    Yes.

12 Q    And the arbitrator awarded the precise number calculated by

13 Mr. Harper.  Isn't that correct?

14 A    He did.

15 Q    Okay.  And he -- and an award was issued in that amount?

16 A    Yes.

17 Q    And then what happened?  Did we have another --

18 A    Well, then, they -- then the direction was given to

19 Mr. Raekes to file an action in the United States District Court

20 claiming that the -- that the policy was void because of the

21 71.2 acres that was uninsured.

22 Q    I thought you said that arbitrations were final and that

23 there was no appeal.

24 A    Well, I don't know how much you want to go into what

25 happened; but --

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1      THE COURT:  Well, he only asked you that question.

2      THE WITNESS:  They are.

3      THE COURT:  Okay.  Now you can ask another one.

4      THE WITNESS:  And that was the ruling.

5  Q   (BY MR. JOHNSTON)  And, so, they, then, attempted to upset

6  the -- the --

7      THE COURT:  Counsel, you're leading the witness again.

8  Q   (BY MR. JOHNSTON)  Okay.  What did the Government, then, do

9  in their lawsuit?  What was their attempt?

10      MR. TORNABENE:  Objection, reference to the

11  Government's lawsuit.

12      THE COURT:  Sustained.

13  Q   (BY MR. JOHNSTON)  Excuse me, the insurance company.

14  A    The insurance company, acting on the direction of the RMA --

15      MR. TORNABENE:  Objection with regard to --

16      THE COURT:  Sustained.  Stricken.  Just answer the

17  question as asked.  Go ahead.

18  Q   (BY MR. JOHNSTON)  What was asserted by the plaintiff, the

19  insurance company, in the lawsuit?

20  A    That there should be no coverage.

21  Q    And the -- to make a long story short, did the -- was the

22  arbitration award upheld?

23  A    It was affirmed at the District Court level and then

24  they -- then an appeal was --

25  Q    You're anticipating my next question.  What did they do

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  after the arbitration award was affirmed?

2  A     They filed a Notice of Appeal to the United States

3  District -- or Court of Appeals.

4  Q     And that's in San Francisco?

5  A     The headquarters are in San Francisco.

6  Q     And did the mediation process of that court come into play

7  again?

8  A     No.  We didn't go to mediation.  I think a decision was

9  made, and I --

10          THE COURT:  Excuse me, Mr. Schultz.  Just -- I think

11  you answered the question.  A mediation didn't get invoked.  So,

12  what happened next?

13  Q     (BY MR. JOHNSTON)  Were there, then, settlement discussions

14  about how much should be paid and whether there should be

15  interest paid?

16  A     Yes.  There was an argument over the interest.

17  Q     And what was the consequence of that -- those series of

18  discussions with the insurance company?

19  A     Poco settled the claim.

20  Q     And they were paid, as we've seen, a check for 1.4 million

21  even?

22  A     The amount of the decision, I think, or pretty close.

23          THE COURT:  I'm sorry, Mr. -- just -- I didn't hear you.

24          THE WITNESS:  Yes, it was paid.

25  Q     (BY MR. JOHNSTON)  Okay.  And it was paid at slightly less

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  than the arbitration decision.  Correct?

2  A    Pennies, yeah.

3  Q    Now, were any of your attorney's fees paid in connection

4  with that resolution?

5  A    Well, my client paid me.

6  Q    I mean by the other side.

7  A    No.

8  Q    And that's because they're not recoverable in that kind of

9  an action.

10 A    That's right.

11 Q    And that was not an inexpensive endeavor.  Correct?

12 A    I -- I can't tell you.  I didn't -- I could find out, but I

13 don't know.  They probably remember.  I don't.

14 Q    Now, at the -- well, while the arbitration -- now, the

15 arbitration -- I think it will indicate if I may lead the

16 witness just a little -- was April 29th of 2005.  Is that

17 approximately right?

18 A    Okay.  Yeah.

19 Q    Now, was there an issue, then, that arose as to the 2004

20 claim at about that time?

21 A    I think there was.

22      MR. JOHNSTON:  And can we have Exhibit 2047, please,

23 just for the Court, Counsel, and the witness.

24 Q    (BY MR. JOHNSTON)  And, Mr. Schultz, is this the letter by

25 which Poco was advised that its 2004 claim was denied?

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  A    Yes.

2  Q    And, in regard to the 2004 claim, you've discussed a

3  declaratory judgment action with the Olsen claim.  Was a nearly

4  identical claim made against Poco by the insurance company in a

5  declaratory judgment action?

6  A    You know, I don't remember another -- there was only one

7  lawsuit.  I don't remember if there was.  A claim was probably

8  made, but --

9  Q    Isn't it the case, or was it the case, that both Olsen and

10 Peterson were sued -- or Poco, rather, were sued in the same

11 lawsuit?

12 A    I think they were, yeah.

13 Q    And, so, you've already described how the declaratory --

14 A    Yes.

15 Q    -- judgment action went.  So, we don't need to go through

16 that again?

17 A    Right.

18 Q    All right.  And that claim, then, at the point in time that

19 the declaratory judgment action sent it off to arbitration, Poco

20 changed lawyers at that point.  Is that correct?

21 A    Yes.

22 Q    And, so, you continued for Mr. Olsen.  And who was the

23 lawyer who took over for Poco at that point?

24 A    Brian Miller in Othello.

25 Q    And I take it you didn't have anything further to do with

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - JOHNSTON

1  that particular claim other than to, kind of, follow it?

2  A    Other than Brian and I've worked on I think -- he and I've

3  done a number of these claims.

4  Q    Okay.  And do you know what happened with that claim?

5  A    I think it was settled, but I --

6         THE COURT:  Excuse me, are you talking about the Poco

7  claim with Miller involved?

8         MR. JOHNSTON:  Yes.  I was just asking if he knew the

9  result.  But that was, literally, your Honor, my last question.

10        THE COURT:  Okay.  Did you want to ask the question?

11        MR. JOHNSTON:  Yes.

12        THE WITNESS:  I think it was settled, but I really

13 wasn't part of it at that point.

14 Q    (BY MR. JOHNSTON)  And you don't know the --

15 A    No.

16 Q    -- precise amount or do you?

17 A    No.

18        MR. JOHNSTON:  Okay.  Thank you very much, Mr. Schultz.

19        THE COURT:  For the record, 2047 was admitted May 1st.

20        MR. JOHNSTON:  It -- it was admitted.

21        THE COURT:  Previously admitted.

22        MR. JOHNSTON:  Yes.  May we display that just briefly

23 to the jury, your Honor, so they can see what we were talking

24 about?

25        THE COURT:  Certainly.  2047.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/COLLOQUY RE:   EXHIBITS

1      MR. JOHNSTON:  And can we go to the third page just

2  for a moment and look at the last paragraph?

3  Q    (BY MR. JOHNSTON)  And there the first sentence outlines

4  the issue on which it was declined; that is, in part, that --

5  that Tri-Cities was not a processor.  Is that correct?

6  A    That's the claim.  I --

7  Q    And -- and that was signed by Kevin Swanson.  You mentioned

8  Mr. Masters.  Do you know where Mr. Swanson stood in the

9  hierarchy?

10 A    No.  And they keep changing people in the insurance

11 companies, too.  So, I don't know.

12      MR. JOHNSTON:  Okay.  Thank you very much,

13 Mr. Schultz.  That's all I have.

14      THE COURT:  Okay.  Folks, let's take our morning

15 recess at this time.  Twenty minutes.  Thanks.

16      (Jury out)

17      (Court recessed at 10:06 a.m.)

18      (Court reconvened at 10:27 a.m.)

19      THE COURT:  Okay.  We have some exhibit issues.

20 Mr. Bentley, as I reflected on the position of the parties, I

21 wanted to make sure that I appreciated what the defense was

22 offering and for what.  On the one hand, I thought I understood

23 the defense case to be that the RMA and FCIA and all of the

24 other companies had full information all the way along.  And,

25 therefore, their position and what they said points out that,

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/COLLOQUY RE:  TAKING A WITNESS OUT OF ORDER

1  knowing what they knew they, nevertheless, took a position that

2  it was things completely unrelated to specific gravity and

3  bruise free, et cetera, that were -- that the basis for their

4  concerns, despite having all the information.

5      So, if you, like Mr. Johnston has with Mr. Harper's report,

6  want to put in pages from the Harper report, go right ahead.

7  That's up to you.  I just wanted to make sure you could think

8  that through so you could do that at some point while

9  Mr. Schultz is here.  Just think about it and let me know what

10  you think.

11      MR. BENTLEY:  Yes.  I noticed Mr. Johnston got in the

12  arbitration demand, and I -- I refrained from using that as an

13  exhibit.

14      THE COURT:  Well, I wanted to make sure that I was

15  treating both of you fairly.  And, as I looked at it, it seemed

16  clear to me those were all fundamental things that weren't a

17  story so much as they were just a fact.  This happened.  That

18  happened.  Here's the demand.  Here's the amounts in

19  controversy.  So, think it through.

20      MR. JOHNSTON:  Your Honor, may I address just one

21  question?  The Harper -- later Harper report will come in

22  through Judge Miller.  But Judge Miller is -- has a medical

23  issue and is only available at -- on Monday morning.  And I

24  wanted to ask the Court's indulgence, if it's necessary, to take

25  him out of order; that we could start with him on Monday morning

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/COLLOQUY RE:    EXHIBITS CONTINUED

1  given his schedule and his --

2        THE COURT:  Whatever the -- whatever.  I'm at the

3  parties' disposal.  Whatever's reasonable for you folks is fine.

4     So, are we ready to go?

5        MR. JOHNSTON:  Yes.

6        THE COURT:  Okay.  Let's proceed.

7     Oh and, in follow up, Mr. Bentley, Mr. Tornabene had an

8  objection as to some things; but you had a number of things

9  marked and some of which you didn't seek to admit through this

10 witness.  I just assume it was a trial judgment on your part.

11 So -- I mean, you went over a number of things that you were

12 using.  I didn't know if they were just to refresh or if you

13 were going to mark them and put them in.  So, it's up to you.

14       MR. BENTLEY:  Well, if the occasion should arise, I

15 will try to offer the arbitration demand that Olsen and Olsen Ag

16 made with regard to the '01 and '02 claims because it's really

17 the same as what Mr. Johnston was allowed to offer on his claim.

18       THE COURT:  I'm going to admit that.  If you want to

19 move it, tell me what the number is.

20    (Jury in)

21       THE COURT:  Please be seated.  Okay.  Let's resume.

22 And, Mr. Bentley, when you have that exhibit number, let me know

23 what it is.

24       MR. BENTLEY:  It's Exhibit 1037.

25       THE COURT:  1037 for -- Mr. Tornabene, same

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - TORNABENE

1  objections?

2          MR. TORNABENE:  Yes.

3          THE COURT:  1037's admitted.

4      (Exhibit No. 1037 admitted into evidence)

5          THE COURT:  And that is the --

6          MR. BENTLEY:  It's the Olsen arbitration demand with

7  respect to the '01 and '02 AGR claims.

8          THE COURT:  Okay.  If at some point you --

9          MR. BENTLEY:  Dated August 31, '04.

10          THE COURT:  If you want to put it on the screen with

11 this witness before he leaves, let me know.  Thanks.

12      Go ahead.  Who's up next?  I had Mr. Johnston.  Have you

13 concluded?

14          MR. JOHNSTON:  I am, your Honor.

15          THE COURT:  Is there anybody else on the defense team

16 for questioning?  If not, Mr. Tornabene, if you're going to take

17 this, then, I think, you're up.

18

19                      CROSS EXAMINATION

20 CROSS BY MR. TORNABENE:

21 Q    Good morning, Mr. Schultz.

22 A    Good morning.

23 Q    Mr. Schultz, you, of course, were retained by Mr. Olsen for

24 the Olsen '01 and -- and '02 claims we've been talking about?

25 A    Yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/CR - TORNABENE

1  Q    And you were later retained by Poco, through Mr. Peterson,

2  for those related claims?

3  A    Yes.

4  Q    And, obviously, in those capacities, you were advocating

5  for your clients.  Correct?

6  A    Yes.

7  Q    And I think, as you put it, there was a lot of money on the

8  line?

9  A    Yes.

10  Q    Now, you mentioned a Mr. Dan Harper, the accountant?

11  A    Yes.

12  Q    And, at some point, he was retained, I think you said, to

13  provide independent judgment?

14  A    Yes, by me to evaluate the claim and as a potential

15  witness.  And he did testify.

16  Q    And, now, how much was he paid?

17  A    Gee, I don't remember but at an hourly rate.  I could

18  guess, but I don't know for sure.

19  Q    The -- do you have occasion in -- in your practice to

20  retain CPAs for various legal issues?

21  A    Yes.

22  Q    And what would be the typical rate that was being charged

23  in the time period?

24  A    Probably a couple hundred dollars an hour.  My guess is his

25  fees would -- in this case, would have been $15,000 maybe.

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/REDI - BENTLEY

1        MR. TORNABENE:  All right.  Thank you.  Nothing

2   further.

3        THE COURT:  Okay.  Then it would seem, Mr. Bentley,

4   you can reopen to do that if you'd like.

5

6                    REDIRECT EXAMINATION

7   REDIRECT BY MR. BENTLEY:

8   Q   Mr. Schultz, in my examination, you mentioned the demand

9   for arbitration on the '01 and '02 claims.

10       MR. BENTLEY:  And if we could have the ELMO, please.

11  Q   (BY MR. BENTLEY)  Is that the first page of the demand for

12  arbitration?

13  A   Yes.

14       MR. BENTLEY:  And this is in evidence.  It should be

15  published to the jury.

16       THE COURT:  What is the exhibit number?

17       MR. BENTLEY:  1037.

18       THE COURT:  37?  Admitted and may be published.

19       (Exhibit No. 1037 admitted into evidence)

20  Q   (BY MR. BENTLEY)  And, in this demand, what was your client

21  seeking in terms of money on the '01 year claim?

22  A   588,000.

23  Q   And what were they seeking on the '02 claim?

24  A   $2,407,508.

25  Q   And did they also seek some action regarding American

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/REDI - BENTLEY

1 Growers reimbursement claim?

2 A     Yes --

3 Q     What --

4 A     -- to deny the claim.

5 Q     Okay.  Looking at the second page, is that a demand for

6 arbitration that spells out what was sought?

7 A     Yes.  It was probably attached to the prior page.

8 Q     And does it bear your signature?

9 A     Yes.

10          MR. BENTLEY:  No further questions.

11          THE COURT:  Anyone else on this?  Mr. Tornabene, any

12 questions on this?

13          MR. TORNABENE:  No, your Honor.

14          THE COURT:  Okay.  Mr. Schultz, thank you for being

15 here.  You're excused and you may step down.  Do you have any

16 exhibits there, Mr. Schultz?

17          THE WITNESS:  I do not.  I had the books.  I gave them

18 back.

19          THE COURT:  Thank you.  Okay.  Next witness.

20          MR. BENTLEY:  Steve Sackmann.

21          MR. TORNABENE:  Your Honor, this is not a person that

22 we've been advised of for today.

23          THE COURT:  If he's not advised as of today, you can't

24 call him.

25          MR. BENTLEY:  I have no documents with this person,

JURY TRIAL - DAY 23 - MAY 16, 2013
J. SCHULTZ/REDI - BENTLEY

1   your Honor.

2          THE COURT:  I don't know that that's the point.  Do

3   you -- why don't you two talk about this.

4       (Discussion off the record)

5          THE COURT:  How do you want to proceed?

6          MR. BENTLEY:  Mr. Vovos has some witnesses, your

7   Honor.

8          THE COURT:  Okay.  Thank you.  Mr. Vovos?

9          MR. VOVOS:  Yes.  May I go to the --

10         THE COURT:  If you wish.

11         MR. VOVOS:  I have to get him, Judge.  Thank you.

12         THE COURT:  Okay.

13         MR. VOVOS:  Tom Heath.

14         THE COURT:  I'm making the assumption that

15  Mr. Sackmann was not an emergency issue of some sort that had to

16  be accommodated.  But that's between you and counsel.  But

17  that's the assumption I'm making.  But you two work it out.

18  And, if you can't, then, the rule applies.

19      (Witness enters courtroom)

20         THE COURT:  Good morning.  If you'd just place your

21  back to the door so we can take your photograph for use by the

22  jury during deliberations.  Thank you.

23      (Courtroom Deputy takes picture of the witness)

24         THE COURT:  Please, raise your right hand.

25      (TOM HEATH, called by the Defendant, was sworn)

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/DI - VOVOS

1          THE COURT:  Please just be seated.  Tell us your first

2  and last name and, then, spell them both for the record.

3          THE WITNESS:  Tom Heath.  T O M.  H E A T H.

4          THE COURT:  Good morning.  You may proceed.

5          MR. VOVOS:  Please the Court, ladies and gentlemen of

6  the jury.

7

8                   DIRECT EXAMINATION

9  DIRECT BY MR. VOVOS:

10 Q    Mr. Heath, where do you live?

11 A    Moses Lake.

12 Q    Okay.  And would you tell the jury what your profession or

13 occupation is, please?

14 A    Yes.  I'm a vice president with Washington Trust Bank, in

15 Moses Lake.

16 Q    And, as the Vice President of Washington Trust Bank in

17 Moses Lake, can you explain to the jury what you do, just

18 generally?

19 A    Yes.  My primary function is as a commercial and

20 agricultural loan officer dealing with businesses throughout

21 Eastern Washington.

22 Q    When you say, "a commercial," can you state whether or not

23 you deal with agribusiness or farm loans?

24 A    Yes, I do.  I deal with both business and agriculture.  I'm

25 sorry if I didn't state that.

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/DI - VOVOS

1  Q    That's okay.  That's okay.  Can you tell the jury what your

2  background in banking is, in a general sense, prior to your

3  current position at Washington Trust Bank?

4  A    Yes.  I graduated from Washington State University in 1982

5  with a degree in agricultural economics.  I was -- worked for

6  the Farm Credit System for a few years in the Willamette Valley

7  of Oregon.  After that, I worked at a bank in Omak for four

8  years.  Again, at that time, doing similar to what I do now,

9  working with both business and agricultural business owners.

10 Worked in Helena, Montana, for three years, again, doing the

11 same thing.  And, since 1991, I've been in -- with Washington

12 Trust Bank in my current role both in Moses Lake and in

13 Wenatchee.

14 Q    Is the Washington Trust Bank a federally insured bank in

15 the United States?

16 A    Yes, we are.

17 Q    Okay.  And could you explain, in a general sense, in

18 dealing with people in agri-business or farmers as far as loans

19 or financing, what type of documentation or information do you

20 obtain from a customer if somebody wants to borrow money, for

21 example?

22 A    Well, the circumstances vary based on the type of loan, the

23 amount of loan.  But we are asking for financial statements on

24 the individuals, the owners of the business.  We're asking for

25 financial statements on the business, itself.  We ask for tax

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/DI - VOVOS

1  returns.  Depending on the type of operation, we may ask for

2  budgets.  We ask for different corporate documents.  We may ask

3  for accounts receivable and accounts payable listings.  It just

4  depends on the type of financing that we're providing to that

5  individual business and its owners.

6  Q    Okay.  Can you state whether or not, in your banking

7  experience, you have dealt or come to know Blake Bennett, Mark

8  Krcma, or Steve Cox at Tri-Cities Produce?

9  A    Yes, I have.

10  Q    And can you tell the jury, just generally, what year are --

11  are we talking about?  Would be the early 2000 or so.

12  A    If memory serves me, we began our banking relationship with

13  those gentlemen and their businesses in 2002.

14  Q    Can you state whether or not you -- your bank, Washington

15  Trust Bank, has provided financing for Tri-Cities Produce over

16  the years and -- and related companies?  I believe there are

17  other companies --

18  A    Yes.

19  Q    -- that are related with it.

20  A    Yes.  We have -- we have provided financing to Tri-Cities

21  and others.

22  Q    And does that include equipment financing?

23  A    Yes.

24  Q    And does it also include loans for the purpose --

25  purchase -- for the expansion of -- of Tri-Cities Produce or

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/DI - VOVOS

1  improvements of -- of that business, if you know?

2  A    Yes, it included that.

3  Q    And are the loans -- you say, fairly substantial.  Can you

4  give us an idea of the operating -- the operating lines of

5  credit for Tri-Cities and its related business, just in a --

6  just in a general sense?

7  A    It varies from year-to-year.  But our financing would

8  probably run in the -- from the 7 to $10 million range for debts

9  outstanding with the companies.

10 Q    When we talk about this, so the jury will know, is the bank

11 in a secured position?  That is, do they have security and --

12 A    Yes, we do.

13 Q    Okay.  And are all the companies cross collateralized with

14 Washington Trust Bank?  The companies that are involved with

15 Tri-Cities Produce and farms.

16 A    Yes, sir, they are.

17 Q    Okay.  Do you know who an Alan Schlimmer is?

18 A    Yes.

19 Q    And who is he?

20 A    He is an accountant and I believe a partner in an

21 accounting firm by the name of J.R. Newhouse & Company in Moses

22 Lake.

23 Q    Okay.  Can you tell the jury how -- how -- how you happened

24 to become acquainted with Mr. Bennett or his partners or

25 Tri-Cities Produce, in a general sense?

                    JURY TRIAL - DAY 23 - MAY 16, 2013
                         T. HEATH/DI - VOVOS

1  A    Yes.  Mr. Schlimmer, the certified public accountant,

2  introduced me to Mr. Bennett and introduced him to the bank, I

3  should say, in 2002.  I was acquainted with Mr. Schlimmer prior

4  to that time.

5  Q    Does Tri-Cities Produce or its companies provide financial

6  statements and income tax returns to the bank for review?

7  A    Yes.

8  Q    And can you state whether or not, in the ordinary course of

9  business, that lines of credit or financing are reviewed on an

10 annual basis or a semiannual basis?

11 A    Yes.  They are reviewed on a -- typically, an annual basis.

12 Q    Okay.  Can you state whether or not you were aware that

13 Tri-Cities Produce has loaned money to Lynn Olsen?

14 A    I'm sorry.  Say the question again.

15 Q    Were you aware that Tri-Cities Produce had loaned money to

16 Lynn Olsen in about 2002?

17 A    Yes.

18 Q    And was this something, if you can state whether or not in

19 a general sense, that your bank knew about?

20 A    Yes.  We were aware of it.

21 Q    Was it discussed with the principals of Tri-Cities Produce?

22 A    Yes.

23 Q    Can you state whether or not, on the financial statements

24 or documents that Tri-Cities Produce provided, whether or not

25 the loan to Lynn Olsen was reflected?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/DI - VOVOS

1  A    Yes, it was reflected.

2  Q    Do you have information, if -- if -- if you can recite it

3  generally, how that loan to Lynn Olsen came about?

4         MR. ANDERSON:  Objection, your Honor.  It would have

5  to be hearsay.

6         THE COURT:  Sustained.  Unless you lay a foundation,

7  Counsel, that he was involved in the -- in the negotiations in

8  some fashion or other, there's no foundation for that -- his

9  knowledge.

10  Q    (BY MR. VOVOS)  Okay.  Can you state whether or not that

11  loan continued from 2002 up to and including the present time?

12  A    I don't recall when the loan was originated between

13  Mr. Olsen and Tri-Cities Produce; but, yes, it's been reflected

14  up to present date on their financial information.

15  Q    All right.

16         THE COURT:  On whose?

17         THE WITNESS:  Tri-Cities Produce, your Honor.

18         THE COURT:  Thank you.

19  Q    (BY MR. VOVOS)  In the financing of -- well, just talk

20  about -- what is 3P Farms?  Is that -- is that a farming

21  operation that is owned in part by Mr. Bennett and other

22  individuals?

23  A    Yes, that's correct.

24  Q    Do you provide -- does Washington Trust Bank provide

25  financing to them?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/DI - VOVOS

1  A    Yes, we do.

2  Q    Can you state whether or not the insurance on crops or any

3  financing is part of any security that the -- that the bank has

4  or insists on?  And "insurance" meaning is -- is insurance a

5  requirement for obtaining financing for crops in the farm

6  operation?

7  A    I'm sorry.  Are you -- I just want to clarify.  Are you

8  referring to crop insurance?

9  Q    Yes.  I'm talking about crop insurance.

10 A    We don't require it on 3P Farms at this time.  But, in

11 years past, yes, we did require it as a condition of financing.

12 Q    Okay.  Can you state whether or not if Washington Trust

13 Bank has liens or obligations?  Are insurance checks ever made

14 payable to the bank and to the principal company, for example?

15 A    They have been, yes.  In the past, when we had a -- when we

16 required it as a condition, we would take an assignment of the

17 insurance policy.  And, if there were -- I don't recall if there

18 were crop insurance checks paid during those years.  But, if

19 they would, they would have been -- we would have required the

20 checks be made jointly payable to both the bank and the

21 borrowing entity.

22 Q    Has Washington Trust Bank continued up to the present date

23 to lend money to Tri-Cities Produce, Mr. Bennett, and his

24 partners, even after the charges had been leveled in this case?

25 A    Yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - BENTLEY

1    MR. VOVOS:  You can cross-examine.

2    THE COURT:  I gather that means you've concluded,

3 then.  Mr. Bentley, do you have some questions?

4    MR. BENTLEY:  Yes.

5    THE COURT:  Okay.

6    MR. BENTLEY:  Could we get up Exhibit 142, please.

7

8                      CROSS EXAMINATION

9 CROSS BY MR. BENTLEY:

10 Q    Hi, Mr. Heath.  My name is Allen Bentley, and I represent

11 Lynn Olsen.

12 A    Good morning.

13 Q    Morning.  Mr. Heath, you probably have not seen this

14 document before; but it is in evidence.  Can you tell us from

15 the heading of the document what it appears to be?

16 A    It simply states "J.R. Simplot Company, Open Purchase

17 Potato Contract."

18 Q    Okay.

19 A    Between J.R. Simplot Company and Tri-Cities Produce.

20 Q    And did Washington Trust Bank have a lien on potatoes that

21 are owned by Tri-Cities Produce, if you know, back in the year

22 of this contract, March of '04?

23 A    We were providing financing at the time.  I -- I don't know

24 if we had a lien on the potatoes of Tri-Cities Produce,

25 specifically.

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - BENTLEY

1          MR. BENTLEY:  Could we -- could we go to page -- the

2   final page of this document.  And go up a little bit, please.

3   Thank you.

4   Q    (BY MR. BENTLEY)  Looking at the final page where the

5   signatures are, do you see under Paragraph XII, "Grower will be

6   financing/has financed the potato crop through Washington Trust

7   [Bank], Kennewick."  Do you see that?

8   A    Yes.

9   Q    Does that suggest to you that Tri-Cities Produce recognized

10  some type of collateral obligation or security interest that

11  your bank would have in these potatoes?

12  A    Yes.

13  Q    And, based on your familiarity with financial matters

14  relating to agribusiness, is it uncommon, excuse me, to -- to

15  see a two-party check being issued by a company like J.R.

16  Simplot when it purchases potatoes?

17  A    It's common to see a two-party check.

18  Q    And, if J.R. Simplot were to make payment on this contract

19  to Washington -- to -- to Tri-Cities Produce and Washington

20  Trust in the ordinary course of business, would you expect that

21  to be a two-party check with both Tri-Cities Produce and your

22  bank as payees?

23  A    Yes, I would expect it.

24  Q    And that's -- and that's the reason for this paragraph, is

25  it not?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - BENTLEY

1  A    That's correct.

2  Q    Okay.

3          MR. BENTLEY:  Could we go to 143.

4          THE COURT:  Previously admitted?

5          MR. BENTLEY:  Previously admitted.  And the final

6  page.

7  Q    (BY MR. BENTLEY)  And do we see here the -- the very same

8  words written in hand -- handwriting that grower has either

9  financed or is financing the crop through Washington Trust in

10 Kennewick?  Do you see this?

11 A    Yes, I do see that.

12 Q    Very similar --

13 A    Yes.

14 Q    -- to the last one.  Now, you have no personal knowledge of

15 whether J.R. Simplot issued a check to Tri-Cities Produce alone

16 or to Tri-Cities Produce and Washington Trust Bank at this time,

17 do you?

18 A    No, I do not.

19 Q    But, in the normal course, you would expect that there

20 would have been a two-party check issued in order to protect the

21 collateral interest or the security interest of your bank.

22 Correct?

23 A    Yes.

24 Q    And, if that -- and, if there were a two-party check of

25 that kind, it would be -- that would be the way to assure that

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  the bank received the payment and, if applicable or if

2  appropriate, it was used to reduce the balance outstanding on

3  the line of credit of Tri-Cities Produce.

4  A    Correct.

5        MR. BENTLEY:  Thank you.

6        THE COURT:  Anyone else for examination of this

7  witness?  All right.  And, then, for the Government?

8  Mr. Anderson, good morning.  You may proceed.

9

10                    CROSS EXAMINATION

11 CROSS BY MR. ANDERSON:

12 Q    Good morning, Mr. Heath.

13 A    Good morning.

14 Q    The documents that you were just shown, they indicate some

15 sort of a security interest for your bank.  Can you tell who

16 that's in favor of?  Whether it's Mr. Olsen or Tri-Cities

17 Produce?

18 A    I believe it said the grower.  I'd have to look at the

19 document again, but I believe the grower was Tri-Cities Produce.

20 I -- I'd have to look at the document again.

21 Q    I'll bring that back up.  It would be Government's 143.

22 Does this look like that document?

23 A    Yes.

24 Q    And I can go down to the last page.  Who does the grower

25 appear to be?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  A    Lynn Olsen.

2  Q    Okay.  And do you know how he's related business wise with

3  Tri-Cities Produce?

4  A    Can you clarify that, please?  I'm not sure.

5  Q    Do you know how he's related to the business of Tri-Cities

6  Produce?

7  A    Are you referring to ownership?  I'm not sure what you're

8  referring to, sir.

9  Q    Ownership.  Let's start off with ownership.  Are you aware

10  of him being related ownership wise to Tri-Cities Produce?

11  A    No.

12  Q    Okay.  What is your understanding of any relationship Lynn

13  Olsen would have with Tri-Cities Produce?

14  A    Mr. Olsen delivered potatoes to -- as a grower to

15  Tri-Cities Produce for a number of years.  I -- that's, I

16  believe, the extent of their relationship.  He now does custom

17  farming for the related entity 3P Farms.  I understand Mr. Olsen

18  was a farmer and has equipment; and he does the majority of the

19  farming practices for 3P Farms, the related entity, even today.

20  Q    You mentioned that your bank has extended credit to

21  Tri-Cities Produce?

22  A    Yes.

23  Q    Could you tell us what type of credit that is?

24  A    With Tri-Cities Produce, our loans are for the facility in

25  Pasco and equipment.

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  Q    So it's the property?

2  A    Let me clarify that.  The facility is actually owned by

3  another related entity called M & B Properties.  We have

4  provided financing for the improvements that have been made to

5  that facility.  We have provided financing over the course of

6  time for equipment that, I believe, was owned by Tri-Cities

7  Produce.

8  Q    Any other type of financing?

9  A    We provide operating financing to the farming entity, which

10  is 3P Farms.

11  Q    Are there separate agreements for that type of financing?

12  Or is that all under one -- one, sort of, umbrella agreement to

13  provide financing to Tri-Cities Produce?

14  A    No.  Each loan is documented separately to the borrowing

15  entity.  And, then, we have -- the other entities guarantee the

16  debt, and the individuals guarantee the debt, as well.

17  Q    And when were loans first extended to Tri-Cities Produce?

18  A    If memory serves me, it was 2002.

19  Q    And that would have not been the beginning of the company.

20  It started in 2000, early 2001.  Is that right?

21  A    I believe that's correct, sir.

22  Q    Your bank, then, was not involved in providing financing

23  for the acquisition of that business by Mr. Bennett?

24  A    Correct.  We were not involved.

25  Q    Okay.  And the total amount of credit initially extended to

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  Tri-Cities Produce.  What was that?

2  A    I don't recall.

3  Q    Can you give us an idea?  Was it over a hundred thousand?

4  Over a million?

5  A    May I ask for a clarification?  Are you referring to,

6  again, Tri-Cities Produce or are you referring to all -- all

7  three related entities or --

8  Q    Just -- just Tri-Cities Produce for the purpose of our --

9  of your testimony this morning.

10  A    I don't recall the amount back in 2002.  I'm sorry.

11  Q    You did mention a total amount, though, I think, over the

12  years of 7 to -- 7 to 10 million?  Line -- is that a line of

13  credit you referenced?

14  A    That would be the sum of all the loans that we have

15  outstanding with the company from time to time during the year

16  to all of the -- all of the related entities.

17  Q    Okay.  What about just to Tri-Cities Produce?

18  A    I don't believe we have any loans out to Tri-Cities Produce

19  at the moment.  We have to the other entities, though.

20  Q    Okay.  Do you recall when the last time you would have had

21  a loan extended to Tri-Cities Produce?

22  A    Approximately, five years ago.

23  Q    And what do you look at as far as factors when someone

24  applies, like Tri-Cities Produce did, for financing at your

25  bank?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1   A    As I mentioned a few minutes ago, we look at any number of

2   factors.  We look at the financial statements of the company to

3   assess the overall strength of the borrowing entity.  And I'm

4   just going to use that in the plural because we look at all

5   three entities together.  We look at past history, the

6   profitability.  We look at the -- we balance, or also include

7   when we look at profitability, the other loan payments that they

8   have to make for machinery, equipment, real estate to make sure

9   that, if they are borrowing more dollars, that, at least,

10  historically, they have adequate funds, you know, on a

11  historical basis to make that new loan payment.

12      We also can look at times at the -- if they are planning to

13  make changes or do things in the future.  If they are, for

14  instance, doing an expansion to the building that will generate

15  more revenue or reduce expenses, we would factor those -- those

16  issues into -- into our analysis, as well.

17  Q    And you and your bank have experience in extending this

18  kind of credit to this part of the agricultural industry?

19  A    Yes, sir.

20  Q    How do you -- how do you verify that information?

21  A    The financial information's typically from tax returns that

22  are prepared by, in this case, the certified public accountant.

23  We ask for internal reports.  We will sometimes ask for the -- a

24  business to also provide a CPA-prepared independent financial

25  statement.  More than just the tax returns but, actually, a

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  full -- full set of financial statements and financial records

2  for us.

3  Q    And do you know where that type of information came during

4  this application process for Tri-Cities Produce?  Who provided

5  that?

6  A    J.R. Newhouse & Company was the CPA firm that was providing

7  the tax returns.  The internal financial reporting would have

8  come from the Tri-Cities Produce and the related entities.

9  Q    Do you recall what was done to verify the information that

10 was received from Tri-Cities Produce?

11 A    What information are you referring to, sir?

12 Q    Any type of financial information that Tri-Cities Produce,

13 itself, would have provided to your bank.

14 A    Are we referring back to 2002?

15 Q    2002.  Correct.  The initial --

16 A    I'm sorry.  I don't recall what verification we would have

17 done back then.  We -- I do recall we made onsite visits to the

18 properties that they owned.

19 Q    But it would be important to show all sources of potential

20 income in applying for credit with your bank?  Is that correct?

21 A    Yes.

22 Q    And all expenses, as well?

23 A    Yes.

24 Q    Okay.  And what's your understanding of what Tri-Cities

25 Produce does?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  A    Tri-Cities Produce is a potato processing facility.  They

2  bring in raw potatoes.  Fresh potatoes, I should say.  And they

3  run them through their facility.  They clean them.  They wash

4  them.  They grade them.  They, then, sell them to -- into the --

5  the various markets that they have that they -- that they sell

6  into.

7  Q    As part of this application for financing -- by "this," I

8  mean any of the applications that they've made to your bank --

9  have they ever provided any sort of a business plan?

10 A    Not that I recall.

11 Q    Okay.  Do you know what a business plan is?

12 A    Yes, sir.

13 Q    Can you describe what that is for us?

14 A    Well, a business plan can take any number of -- it can look

15 any number of different ways.  But it -- in general, a business

16 plan is provided by the -- the business owner; and it talks

17 about the various factors that are important to the success of

18 their business.  It may talk about financing.  It may talk about

19 marketing.  It may talk about employees.  It may -- it -- a

20 business plan would vary greatly depending on the type of

21 business that the person is operating or is considering

22 operating.

23 Q    And when -- in 2002 forward to -- through, let's say, 2004,

24 2005, what was your understanding of what would be done with

25 these funds that were extended as credit to Tri-Cities Produce?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1   What was that money for?

2   A     Well, again, we had -- we have different types of loans

3   that were made to Tri-Cities Produce and the related entities.

4   Are you -- are you speaking specifically about Tri-Cities

5   Produce, or are you talking about the related entities, sir?

6   Q     Yeah.  I'm just talking about Tri-Cities Produce.

7   A     My recollection is that, again, Tri-Cities -- the funds

8   that were extended to Tri-Cities Produce were for improvements

9   to the facility in Pasco.

10  Q     And what type of oversight did you have as to what was done

11  with those actual funds?

12  A     I don't -- I don't recall my steps from ten years ago.  I

13  mean, I can tell you in general what we would do.

14  Q     What's your bank practice for oversight of funds that are

15  extended as credit to a customer, such as, Tri-Cities Produce?

16  A     Well, for -- are we referring to those -- that specific

17  type of transaction where they were making improvements to the

18  facility, sir?

19  Q     Let's take that one first.

20  A     We would typically -- if there is work being done to the

21  facility, we would inspect it to make sure that the work that is

22  being billed, say, by a contractor or an equipment dealer that

23  is bringing equipment into the facility, we would do an onsite

24  inspection to make sure that the work was actually done.  The

25  equipment that was being financed or installed was, in fact,

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  installed and working properly.  We would want to see a bill of

2  sale or an invoice or some documentation from the -- the -- the

3  contractor or the equipment dealer or the seller to verify make,

4  model, serial number, those sorts of things.  And, then, after

5  that, we would disburse the funds.

6  Q    And that was -- this is with regard to the equipment.  Now,

7  as I also understand it, there was a line of credit, as well --

8  A    Correct.

9  Q    -- that was extended?

10 A    To 3P Farms, sir.

11 Q    Okay.  That did not involve -- okay.  So that did not

12 involve Tri-Cities Produce.

13 A    That's correct.

14 Q    It's just that loan for equipment.

15 A    To the best of my recollection, that's all we've provided

16 to Tri-Cities Produce.

17 Q    You -- you mentioned to counsel that you understood or you

18 had knowledge that Tri-Cities Produce did loan money to Lynn

19 Olsen.  Is that right?

20 A    Yes, sir.

21 Q    Why would your bank need to know that?

22 A    We require full disclosure of all assets and liabilities

23 from our clients.

24 Q    It's important for the security of that loan?  Would that

25 be accurate?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  A    No.  I -- I don't think that's accurate.  Not for the

2  security of the loan.

3  Q    Okay.  Was this a secured loan?

4  A    Yes.

5  Q    What was it secured by?  The equipment itself?

6  A    To the best of my recollection, yes.

7  Q    Okay.

8  A    It was just equipment.

9  Q    And there were some sort of terms where Tri-Cities Produce

10  would have to pay back this loan.  Is that correct?

11  A    Yes.

12  Q    And there may be certain things going on in the business of

13  Tri-Cities Produce that would affect its ability to pay back

14  this loan.  Isn't that correct?

15  A    Yes.

16  Q    And that could include Tri-Cities Produce, in turn,

17  extending credit out to one -- to one of the growers that it

18  contracted with.  Is that correct?

19  A    Yes.

20  Q    Are you aware of the amounts that Tri-Cities Produce loaned

21  to Mr. Olsen?

22  A    Yes.

23  Q    Can you tell us what those amounts are?

24  A    I -- I don't know the exact amount.  Are you referring to

25  today or --

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  Q    Do you know what the total was, say, in 2004?

2  A    No.  I don't recall the amount in 2004, sir.

3  Q    What's your understanding of what the total is today?

4  A    Approximately, 4.5 million.

5  Q    Okay.  Are you aware of any documentation to support those

6  loans, such as loan agreements?

7  A    No.

8  Q    Okay.  Are you aware of any repayment terms?

9  A    No.

10 Q    Are you aware of any interest that Tri-Cities Produce would

11 require on that -- on those loans?

12 A    No.

13 Q    Are you aware of Mr. Olsen having any sort of signing

14 authority for Tri-Cities Produce?

15 A    Not to my knowledge.  May I ask for clarification?  I'm

16 sorry, your Honor.

17 Q    Are you aware --

18 A    Signing authority for what, sir?  There's --

19 Q    Place a signature on a document that might bind Tri-Cities

20 Produce in any manner.

21        THE COURT:  You mean today?

22 Q    (BY MR. ANDERSON)  During -- during the time you've had

23 these loans through Tri-Cities Produce that you would have been

24 aware of.

25 A    As it relates to any of the bank documents, no.  He had no

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1   signing authority.

2   Q    And is it your understanding that Mr. Olsen has paid off

3   all these loans?  Or you said he didn't.  There was an

4   outstanding amount.  Is that right?

5   A    There's an outstanding amount, sir.

6   Q    Okay.  And what's your understanding of how much he has

7   paid off on those loans?

8   A    On a net basis, there are -- there's money being advanced

9   and there are payments back on the loan during the course of the

10  year.

11  Q    Okay.  And you don't recall when those payments were made?

12  A    No.

13       MR. ANDERSON:  I have no other questions, your Honor.

14  One second.

15     (Discussion off the record)

16  Q    (BY MR. ANDERSON)  When -- well, you mentioned that you're

17  familiar with Tri-Cities Produce making these loans to

18  Mr. Olsen.  How were they categorized when they were disclosed

19  to you?  As an asset?  As a liability?

20  A    I -- I'm not an accountant.  But, I believe, according to

21  accepted accounting principles, it would be a loan receivable;

22  would show as an asset on a -- on any financial statement.

23  Q    Loan receivable?

24  A    That's correct.

25  Q    It wasn't shown as any sort of account receivable or -- is

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/CR - ANDERSON

1  that considered a long-term type of loan?

2  A    It was listed as the -- as a loan receivable on the

3  company's financial statement.

4  Q    Okay.  But, in terms of -- of the length of that loan, do

5  you have any understanding of the length of that loan?

6  A    I'm not sure I understand.

7  Q    You had no understanding of the terms of the loan to begin

8  with, as I believe you testified before.

9  A    No.  That was -- we were aware that it was not going to be

10  paid off in the course of a single year.

11  Q    And how were you aware of that?

12  A    Mr. Olsen wasn't -- according to Mr. Bennett and the others

13  in the company, Mr. Olsen wasn't in a position to pay the loan

14  off.

15  Q    Okay.  And -- and this loan that we're talking about, it

16  was just for that property -- or just for that equipment at

17  Tri-Cities Produce.

18        MR. BENTLEY:  Objection to the form.  I'm not sure

19  what loan we're talking about right now.

20        THE COURT:  Sustained.

21  Q    (BY MR. ANDERSON)  I think we -- were we just talking about

22  one loan that was extend to Tri-Cities Produce for equipment?

23  A    Yes.

24  Q    Okay.

25        (Discussion off the record)

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/REDI - VOVOS

1          MR. ANDERSON:  I have no other questions.

2          THE COURT:  Thank you.  Redirect, Mr. Vovos.  Do you

3     have some redirect?

4          MR. VOVOS:  Yes.

5          THE COURT:  Okay.

6

7                      REDIRECT EXAMINATION

8     REDIRECT BY MR. VOVOS:

9     Q    Hi, again, Mr. Heath.  Keeping with the last question,

10    counsel asked you about the -- your knowledge of -- of this loan

11    to Mr. Olsen.  Can you state whether or not this was a -- was a

12    loan for farming -- for farming purposes?

13    A    Yes.  It was -- we understood that the loan was for farming

14    purposes for Mr. Olsen's farm operation.

15    Q    And do you understand if there was any information from

16    Mr. Olsen's bank as to, potentially, what may be used to pay

17    back that loan if it was not to be paid within a year?

18    A    We never had -- I never had discussions with Mr. Olsen or

19    his bank.  But it was our understanding that there were,

20    obviously, crop insurance claims that had been filed.

21    Mr. Bennett had been in touch on a -- had been in touch with a

22    gentleman from -- I believe it was U.S. Bank that -- where

23    Mr. Olsen was receiving his financing.  And there had been

24    discussion about refinancing or other methods by which the loan

25    could be repaid.

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/REDI - VOVOS

1  Q    Okay.  And you mentioned to the jury that, from a banking

2  point of view, this was something that was carried on the books

3  of Tri-Cities Produce.  It was something that was fully

4  disclosed and you were aware of --

5  A    Yes, it was.

6  Q    -- and the bank was aware of --

7  A    Yes, we were.

8  Q    -- at all times.

9  A    Yes.

10  Q    I want to ask you this, Mr. Heath:  Can -- why, if you

11  know, did Mr. Olsen's loans come to your attention?  And, I

12  guess, has -- is that related to any credit extended to

13  Tri-Cities Produce?  And maybe that's two questions.  I'll just

14  ask you the first one.  Do you know why it came to your

15  attention?

16  A    I don't recall when the loan between Mr. Olsen and

17  Tri-Cities Produce started, but it was always reflected on the

18  balance sheet; and the owners of Tri-Cities Produce and the

19  related entities always brought it up.  You know, they --

20  they -- they fully disclosed --

21          MR. ANDERSON:  I'm going to object.  Object as to

22  hearsay, your Honor.

23          MR. VOVOS:  It just goes to --

24          THE COURT:  It's simply asked to understand what this

25  person does.  It's not offered for the truth.  Go ahead.

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/REDI - VOVOS

1    MR. VOVOS:  Yes.  It's not offered for the truth.

2   Q   (BY MR. VOVOS)  You were going to say it was never -- I

3   believe you were interrupted before you gave your answer.

4   A   I was just saying that we were made aware of it.  It was

5   always disclosed on the financial -- the loan to Mr. Olsen was

6   always disclosed on the company's financial statements, and we

7   discussed it.  The owners -- I -- excuse me.  The bank always

8   discussed it or discussed it often with the owners, and we

9   discussed often how that loan might be repaid.

10  Q   Okay.  And, were you aware, were there any efforts to try

11  to get it repaid, just in a general sense?

12  A   Yes, there were.

13  Q   Okay.  My -- the second part of the question I asked you,

14  with the fact of that -- of that loan to Mr. Olsen, was it

15  related, if can you tell the ladies and gentlemen of the jury,

16  to any credit extended to TCP or to the related companies?

17  A    No.  The -- the loan to Mr. Olsen -- well, maybe I need you

18  to clarify that.  May I ask, are you asking if the loan was --

19  if the loans we made to the company were, then, lent to

20  Mr. Olsen?  Is that what you're asking?  I'm sorry.  I don't

21  understand the question.  Perhaps, I don't --

22  Q   Would you assume, if -- if there was money that was lent to

23  Tri-Cities Produce or relate --

24      (Interruption by the reporter)

25  Q    (BY MR. VOVOS)  If there was money lent to Tri-Cities

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/REDI - VOVOS

1  Produce and there was, essentially, credit being extended from

2  Tri-Cities to Mr. Olsen, could some of that money from

3  Washington Trust Bank have been used to do that?

4  A    No.

5  Q    All right.  Did it affect or did it relate to the -- I

6  guess, to the credit to Tri-Cities Produce or to the extended

7  companies, though?  I'm talking about the loan.

8  A    Certainly, the bank looked at that loan receivable when we

9  were analyzing the overall financial health of the companies,

10 yes.

11 Q    Okay.  Counsel asked you about the factors and factors that

12 you look at.  Do you look at business history in a -- in a

13 person that's borrowing money, business acumen, how they perform

14 in business, business practices, and -- and the person

15 themselves?

16 A    Yes, absolutely.

17 Q    And has that been something that you have done over the

18 years, your bank has done over the years with Mr. Bennett and

19 his partners, Mr. Krcma and Mr. Cox?

20 A    Yes.

21 Q    Counsel asked you about a business plan.  Can you tell me,

22 is there any requirement that any business plan be in writing or

23 in a certain form or in a document that is written out?

24 A    No.  We have no formal policy for requiring a business

25 plan.

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/REDI - VOVOS

1  Q    Okay.  Counsel asked you about the acquisition of TCP.

2  Were -- and I'll just ask you.  Were you aware that what is now

3  Tri-Cities Produce was an acquisition through the Small Business

4  Administration, an SBA loan?

5  A    Yes.

6  Q    Okay.  Counsel asked you, as far as Mr. Olsen and any

7  involvement aside from this loan with Tri-Cities Produce, in the

8  10, 12 years that this has been involved, do you have any

9  information, knowledge of any ownership whatsoever on the part

10 of Mr. Olsen in Tri-Cities Produce, directly or indirectly?

11 A    No, sir.

12 Q    You were asked about expansion.  And I'll -- I'll just ask

13 if -- if you know this from your personal experiences as -- as

14 the banker.  During 2002 or 2005, there were funds that were

15 apparently used for expansion and improvement of Tri-Cities

16 Produce.

17 A    Yes.

18 Q    Can you tell the jury if, in your consideration of loans to

19 Tri-Cities Produce, you were aware of any payments or

20 distributions to the partners of Tri-Cities Produce that would

21 deplete that company in any way?

22 A    All right.  Can you clarify that, please?

23 Q    Yeah.  That's probably not a very good question.  Were you

24 aware of any payments to the partners as opposed to reinvestment

25 in the company?

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/RECR - BENTLEY

1  A    I don't recall.  They took -- they all took salaries out of

2  either that company or the related entities.  But --

3  Q    Nothing --

4  A    Whether there were distributions in those years or not, I

5  don't recall any.

6  Q    All right.  That's -- that's fine.

7         MR. VOVOS:  I think that's all the questions I have.

8  Thank you, Mr. Heath.

9         THE COURT:  Mr. Bentley?

10

11                    RECROSS EXAMINATION

12  RECROSS BY MR. BENTLEY:

13  Q    One more set of questions, Mr. Heath.  Is it your

14  understanding that Mr. Olsen, over the years, has been a major

15  source of potatoes for Tri-Cities Produces' operations?

16  A    Yes.  I'm aware that he was a main source of potatoes.

17  Q    And, from your understanding of the business model of

18  Tri-Cities Produce, would you agree with me that, if they do not

19  have a reliable source of potatoes, they cannot make money and

20  your -- your loans to them, if you have any, are in jeopardy?

21         MR. ANDERSON:  Objection.  Leading.

22         THE COURT:  Overruled.

23         THE WITNESS:  Please restate the question.  I got a

24  little confused there.

25  Q    (BY MR. BENTLEY) Would you agree with me that Tri-Cities

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/RECR - BENTLEY

1 Produce needs potatoes in order to make money?

2 A     Yes.  I would agree with you.

3 Q     And, if they don't have potatoes, they're going to lose

4 money --

5 A     Yes, more than likely.

6 Q     -- because of their fixed costs.  Correct?

7 A     More than likely.

8 Q     And if they're losing money --

9     (Interruption by the reporter)

10 Q     (BY MR. BENTLEY)  Because of their fixed cost, if they do

11 not have potatoes to move through their -- their system, they're

12 going to be losing money.  Correct?

13 A     Yes.

14 Q     And if Olsen -- and -- withdrawn.

15     Growing potatoes is a very expensive area of agriculture.

16 Is that correct?

17 A     Yes, it is.

18 Q     And, if Mr. Olsen failed and were no longer growing

19 potatoes, wouldn't that negatively impact Tri-Cities Produce?

20 A     Yes, because he supplied a lot of potatoes.

21 Q     And would you agree that the loans to Mr. Olsen are,

22 therefore, understandable in light of the business needs of

23 Tri-Cities Produce?

24 A     Yes.

25             MR. BENTLEY:  Thank you.

JURY TRIAL - DAY 23 - MAY 16, 2013
T. HEATH/RECR - BENTLEY

1         THE COURT:  Is there recross examination?

2         MR. ANDERSON:  No, your Honor.

3         THE COURT:  Okay.  Thank you for being here.  You're

4    excused.  You may step down.  Mr. Vovos?

5         MR. VOVOS:  Yes, Judge.

6         THE COURT:  Your next witness is?

7         MR. VOVOS:  Alan Schlimmer.

8         THE COURT:  Okay.  Mr. Schlimmer.  You're welcome to

9    take a stretch if you need one.

10        (Witness enters courtroom)

11        THE COURT:  Mr. Schlimmer, if you'll come here,

12   please, to your right and to my left.  Please, place your back

13   to the door for the photograph for use by the jury during

14   deliberations.

15        (Courtroom Deputy takes picture of the witness)

16        THE COURT:  Please, raise your right hand.

17        (ALAN SCHLIMMER, called by the Defendant, was sworn)

18        THE COURT:  Please, be seated.  Tell us your first and

19   your last name and, then, spell them both for the record.  Thank

20   you.

21        THE WITNESS:  My first name is Alan.  Last name,

22   Schlimmer.  A L A N.  S C H L I M M E R.

23        THE COURT:  Okay.  S C H L I M M E R.

24        THE WITNESS:  Correct.

25        THE COURT:  Thank you.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1                    DIRECT EXAMINATION

2    DIRECT BY MR. VOVOS:

3    Q    I think it's important, Mr. Schlimmer, that you move a

4    little closer to that microphone and make sure you speak so his

5    Honor, Judge Shea, and all the members of the jury can hear you.

6    A    Okay.

7    Q    Okay?  And counsel.  Where do you live?

8    A    I live in Warden, Washington.

9    Q    Try to talk to the jury.  Okay?  And why don't you tell us

10   about yourself.  How long have you lived in our area?

11   A    I've lived in Eastern Washington my entire life.  I grew up

12   in Odessa, small town about an hour-and-a-half north of here.

13   And I farmed for a lot of years; and I'm a CPA, as well.  And,

14   as my CPA practice got busier and I had kids, I kind of phased

15   out of the farming and let my brother handle that and

16   concentrate on my accounting practice.

17   Q    Okay.  We're going to slow down.  You've got a lot of

18   answers to questions I -- I wanted to ask you a little bit.  You

19   do have farming experience --

20   A    Yes.

21   Q    -- then, I take it?

22   A    Yes.

23   Q    Let's start out -- where'd you go to high school?

24   A    Odessa.

25   Q    What -- what is your educational background, Mr. Schlimmer?

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  A    I went to high school in Odessa.  I went to community

2  college in Moses Lake for my first years of college education,

3  and, then, I went to --

4         THE COURT:  You need to just answer a little more

5  slowly.

6         THE WITNESS:  Slow.  Sorry.

7         MR. VOVOS:  That's okay.

8         THE COURT:  We're trying to write down everything you

9  say.

10        THE WITNESS:  Oh, okay.

11        THE COURT:  Thank you.

12        THE WITNESS:  Sorry.  And, then, I went to Eastern in

13 Cheney to get my four-year degree.

14 Q    (BY MR. VOVOS)  Okay.  And you have a four-year degree --

15 A    Yes.

16 Q    -- from Eastern Washington State University?

17 A    Eastern Washington University, yes.

18 Q    And tell the jury what the degree is in, please.

19 A    It's in business administration accounting.

20 Q    Okay.  And, after you had that degree, did you get some

21 additional education; or did you go to school to become an

22 accountant?

23 A    That's when I became an accountant.  After I finished my

24 four-year degree there, then that's when I took the exam and

25 became a CPA.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  Q    Okay.  And will you tell the jury, when did you become a

2  CPA?

3  A    Back in 1991.

4  Q    So that makes us -- here today you've been a CPA in the

5  State of Washington for how long?

6  A    Approximately 22 years.

7  Q    Okay.  Once you became a CPA, can you tell the jury, just

8  generally with your experience and your background, what have

9  you done as a CPA as it pertains to, let's say, businesses or

10 individuals in your practice?

11 A    My practice primarily is with small businesses, farmers,

12 you know, local owners, things along that line.  I primarily do

13 tax -- tax return, tax planning, that type of stuff.  Various

14 entity planning.  Things along that line for more small

15 businesses than -- than large businesses.  I don't do auditing.

16 Things along that line.

17      (Interruption by the reporter)

18          THE WITNESS:  I don't do auditing.  I'm sorry.

19 Q    (BY MR. VOVOS)  Your voice sort of tails off there, and I

20 know -- I know that --

21 A    I'm just getting over a chest cold.  Sorry.

22 Q    I got it.  I got it.  What does your family consist of,

23 Mr. Schlimmer?

24 A    At this time, I have, let's see, three teenagers; and I

25 have a baby girl who's going to be seven months here in a couple

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  days.  So --

2  Q    Seven months.  Congratulations.

3  A    Thanks.

4  Q    Okay.  Okay.  Your experience.  Who did you go to work for

5  when you first became a CPA?  I'd like to just go through your

6  experience in that regard.

7  A    Okay.  When I first graduated from college, I was living in

8  Odessa, still farming; and I went to work for a local firm there

9  for about a year.  And, then, I -- when I kind of phased out of

10 farming, I moved to a different firm down in Moses Lake; and

11 that's where I've been since that point in time.

12 Q    Okay.  What is the company that you -- that you work for at

13 the present time?

14 A    The name is J.R. Newhouse & Company.

15 Q    And are -- are they certain types of accountants or what do

16 they do or do they specialize in anything?

17 A    We're a general certified public accounting firm.  Like I

18 said, we primarily deal with small businesses, family owned

19 businesses.

20 Q    Do you know the owners of Tri-Cities Produce?

21 A    Yes, I do.

22 Q    And how -- how long have you been acquainted with them?

23 A    I've known them for at least, probably, 20 years.

24 Q    And that includes Mr. Bennett and his wife, Janet?

25 A    Correct.  Yes.  I've known his wife, actually, since --

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1   since high school.  She grew up in a town about 30 miles south

2   of Odessa.  So I've known her and her family since I was in high

3   school.

4   Q    Okay.  And can you tell the jury what position or what work

5   you have done for Tri-Cities Produce?

6   A    Basically, I'm their CPA.  I prepare year-end adjusting

7   entries to help them get their books all adjusted at year end;

8   and, then, I prepare tax return --

9          THE COURT:  No, I think you need to just -- you need

10  breakup your questions so that he can answer in a short way

11  because he speaks pretty quickly.

12  Q    (BY MR. VOVOS)  That's okay.  It's pretty hard on the

13  stand.  Take a breath and, then, I'll -- it's probably my fault.

14  I'm -- I'm gonna try to ask slow questions.  Okay?

15  A    Okay.

16  Q    Okay.

17         THE COURT:  Start again.

18         MR. VOVOS:  I'm going to.  I'm just trying to remember

19  where I was, Judge.

20         THE COURT:  Okay.  You asked him --

21         MR. VOVOS:  I know --

22         THE COURT:  -- what work he did for Tri-Cities

23  Produce.

24         MR. VOVOS:  Yeah.

25         THE COURT:  And he's going to tell us now, in speaking

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1   slowly, what work he did for Tri-Cities Produce.

2          THE WITNESS:  Sorry, about that.  Basically, what I do

3   at year end, after they've got their books pretty well put

4   together to where they feel they're as done as they can get them

5   done for bookkeeping goes, then they contact me.  I come down.

6   We help them get the final year end, anything they have

7   questions on.  We prepare a depreciation schedule based on

8   assets that they bought, assets they may have sold, prepare that

9   for them, help them make those adjusting journal entries.  And,

10  then, after that's all done, we, basically, prepare the tax

11  return for the businesses.

12  Q    (BY MR. VOVOS)  Do you review the books of Tri-Cities

13  Produce?

14  A    I look at accounts that -- that are brought up either

15  between Mr. Bennett and myself; or if there's accounts that have

16  had big changes or if something jumps out at me, then I ask

17  further questions.  But, as far as, you know, like I said

18  before, I don't audit.  So, no, I'm not digging deep into

19  anything; but just the general year end -- year-end adjustments.

20  Q    Okay.  Can you tell the jury, do you meet with the other

21  partners annually concerning the financial status of the

22  business?

23  A    As a general rule, yes, we do; and that's been that way

24  from day one.  Blake's always encouraged that:  To have me,

25  actually, after we're done with the year end, to meet with his

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  other partners; explain any questions they have; explain how the

2  company did for the year; how it affects their tax returns; all

3  those kind of issues; and, any questions they have.  We meet on

4  a separate basis from Blake in case they have any questions they

5  want to go over.

6  Q    I want to ask you about Marta Sowers.  Can you tell the

7  jury, do you know her?

8  A    Yes, I do.

9  Q    And can you just briefly explain your actions or

10 interactions with her at Tri-Cities Produce?

11 A    Marta is, basically, the in-house bookkeeper, comptroller.

12 She -- like I said, she's usually the one that contacts me and

13 says, "I've got things as well as I can get them done for year

14 end."  She reconciles most of the accounts on the balance sheet

15 and ties them to an outside source.  And, when she's gotten as

16 far as she can with the books, that's when she calls me; and I

17 come in and help her deal with the last final adjustments that

18 need to be done for year end.

19 Q    Okay.  And can you tell the jury, did you know a Hildred

20 Nielsen, a person who was there at the same time Marta was?

21 A    I knew her.  I dealt with her for maybe a year, maybe two

22 years before Marta took over as full time.

23 Q    Okay.  I believe her name has changed now, but you knew her

24 as Hildred Nielsen?

25 A    That -- I believe so.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  Q     All right.  In -- in your capacity as the CPA, can you

2  state whether or not Tri-Cities Produce has ever audited by the

3  State or if there's been any audits that -- that have been done

4  in -- in the company?

5  A     Yes.  I believe --

6          MR. ANDERSON:  Objection as to relevance.

7          MR. VOVOS:  It states what -- it just has to do with

8  his experience as far as the books and the financial

9  transactions that he deals --

10         THE COURT:  Just a simple context for background.

11 I'll permit that.

12 Q     (BY MR. VOVOS) Yes.  Just a simple contract -- context is

13 what I'm saying.  Have you participated in financial audits by

14 the State in a general sense?

15 A     Correct.  The Department of Revenue, I believe, has audited

16 them a couple of times since I've been doing their work.

17 Q     Okay.  And can you state the results of those audits?

18 Everything was --

19 A     One, I believe, was what we call --

20        (Interruption by the reporter)

21 Q     (BY MR. VOVOS)  Yes.  Any results of the audits?

22        MR. ANDERSON:  Your Honor, I'm going to object, again,

23 as to relevance.

24        THE COURT:  Overruled.

25 Q     (BY MR. VOVOS) You can state what the results are.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  A    I believe, one, they got a small refund because they were

2  paying, what we call, business and occupation tax.  It's a tax

3  to the State.  They were overpaying on that, and they got a

4  refund.

5       And, then, I believe the second one was, what we call, a no

6  change.  It means the auditor found no adjustments that needed

7  to be made to -- to their books and records.

8            THE COURT:  Mr. Schlimmer, I think you're doing better

9  with your answers.  I think you're keeping in mind that the

10  court reporter is writing down everything you say.

11           THE WITNESS:  Okay.

12           THE COURT:  And I want to congratulate you on the

13  progress you're making.  So --

14           THE WITNESS:  Thank you.  Slow me down if you need to.

15  I'm sorry.

16      (Interruption by the reporter)

17           THE WITNESS:  Okay.  Perfect.

18           MR. VOVOS:  She will.

19  Q    (BY MR. VOVOS)  So I want to ask you -- try to get a tempo

20  here -- about, in your actions with Tri-Cities Produce, are you

21  aware of what Famous is as it pertains to the books and the

22  accounts at Tri-Cities Produce?

23  A    Yes, I am.  Famous is the --

24  Q    Okay.  I was going to ask another -- I was gonna break it

25  down.  And can you just basically explain Famous and your

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  workings with Famous, please.

2  A    Famous is, basically, the software program that the company

3  uses to account for its books and records.  It's a pretty

4  intense program because it does all the -- the detailed general

5  ledgers, the trial balances, balance sheets, profit and losses,

6  all the reports that I use to prepare the tax returns.

7       And I believe it also --

8            THE COURT:  That's enough of an answer.  Ask another

9  question.

10           MR. VOVOS:  Okay.

11 Q    (BY MR. VOVOS)  Okay.  Are you familiar enough with Famous

12 to know if -- if the system has ever been changed or has there

13 ever been an update from one version of Famous to another

14 version of the Famous?

15 A    Yes, I believe so.  It's like any software.  It's updated,

16 improved, additional features are added.

17 Q    And, if you know, as -- as a CPA and the accountant, is

18 Famous able to be deleted or erased or is everything maintained

19 on that system?

20 A    As far as the program itself?

21 Q    Yeah, as far as the program, as far as what's entered.

22 A    Well, Famous is --

23           THE COURT:  Excuse me, Counsel.  Are you asking him --

24 I don't think you're asking him a programming-level question.

25 You're asking him about the accounting software, itself.  Is

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  that right?

2         MR. VOVOS:  The accounting software.

3         THE WITNESS:  You're asking about transactions inside

4  the software?

5         THE COURT:  Yes.

6  Q    (BY MR. VOVOS)  Yes, I am.  Yes.

7  A    Famous is -- like I said before, it's a very high-level

8  software.  It's not like your simple QuickBooks or Quicken

9  programs where you can enter a transaction.  If you find out

10 later something needs to be change, you can go back in and

11 change it to -- to where it should be.

12     This is something that, once you've entered a transaction,

13 to move it from one account to a different account, you actually

14 have to do a second transaction and post it so it is moved to

15 the correct account.

16 Q    Okay.  In -- in that regard, we've heard the term in this

17 courtroom called "double entry" procedures.  Do you -- can you

18 explain that?

19 A    That's an accounting -- accounting term, basically.  And,

20 as far as explaining goes, are you talking about accounting as a

21 double entry or double entry into accounts in the system?

22 Q    Yeah, just into accounts in the system.  I mean, is that

23 something that Tri-Cities Produce has as far as entering in,

24 say, a temporary account and, then, moving it somewhere else?

25 A    Yes.  And that's what I was explaining earlier is, if you

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  enter a transaction into -- let's say you want to post a check

2  and you want to post it to repairs, you would make that.  That's

3  your first entry.  You find out later it needs to go into

4  supplies, for instance, you couldn't just move that entry from

5  repairs into supplies.  You'd actually have to do a second entry

6  which would take it out of repairs and, then, post it over into

7  the supplies.

8  Q    All right.  Do you know, Mr. Schlimmer, in the general

9  ledger of Tri-Cities Produce, how big is that document, just in

10 a general sense for the jury?  The -- the whole general ledger.

11 A    The general ledger?  Are we talking about detailed general

12 ledger or a summary general ledger because there's a difference?

13 Q    Okay.  How about detailed summary?

14 A    Oh, I'm -- detailed, probably, I'm assuming, would be

15 thousands of pages.

16 Q    How about the other part of it?

17 A    A summary, which is basically what I refer to there is the

18 accounts with just the year-end total balances for the year

19 without the detail, is five, six pages.

20 Q    Okay.  Can you state how many different accounts there are,

21 if you know, in the general ledger of Tri-Cities Produce?

22 A    I believe, the last time I talked to Marta, there's 115,

23 120 different accounts in that system.

24 Q    Are you aware of any loans to Lynn Olsen or to Olsen

25 Agriprises as far as Tri-Cities Produce is concerned?

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  A     Yes.

2  Q     And can you tell the jury how -- how you became aware of

3  them?

4  A     I became aware of them when Mr. Bennett told me about them,

5  and they're also a separate line item on this general ledger

6  that we're talking about.

7  Q     When you say, "a separate line item," can you explain what

8  that means?

9  A     Okay.  The report that that shows up on is what's called a

10 "balance sheet."  It starts out with your cash and checking,

11 those type of accounts, your receivables, your inventory, and,

12 then, we go to what we call "other assets," which would be, for

13 instance, this loan to Lynn Olsen.

14     (Interruption by the reporter)

15         THE WITNESS:  Lynn Olsen.  Okay.

16 Q     (BY MR. VOVOS)  Can you state -- can you tell the jury how

17 long this loan account for Lynn Olsen has been in existence to

18 the best of your knowledge?

19 A     On the books and records of the company?

20 Q     Yes.  I'm talking about Tri-Cities Produce.

21 A     From the very beginning from when they first started

22 loaning him funds.

23 Q     And is it -- can you tell the jury is it an item that is

24 reflected in the financial statements of Tri-Cities Produce?

25 A     Yes.  Like I said, it's a separate line item on the -- on

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  the balance sheet of the company.

2  Q    And is it something that's reflected in the documents that

3  a bank would look at?

4  A    Absolutely.

5  Q    And is it reflected, in a general sense, on the federal

6  income tax returns that are filed?

7  A    I believe so, yes.

8  Q    Are you able to look at the books and determine money or

9  gross revenues that are made by Tri-Cities Produce as far as

10  contracts or items from what is contained on Famous?  Or I'm

11  just going to refer to what the books are.

12  A    Yes.  On -- on -- now we're to a different report, which is

13  called a "profit and loss," which shows your income and your

14  expense items.  There are also separate line items on there for

15  contract income and contract expenses or the costs of goods sold

16  related to that income.  Those are both separate line items on

17  that report.

18  Q    In this case, the case that we're in court about, we're

19  talking about contracts from the year 2001 through the year

20  2004, 5.  Are you -- are you familiar with that in a general

21  sense?

22  A    Yes.

23  Q    From the books at Tri-Cities Produce, can you tell this

24  jury whether or not Tri-Cities Produce made any money on those

25  contracts?

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/DI - VOVOS

1  A    In summary or --

2  Q    Just -- just in summary.

3  A    In summary, no.  Over the four-year period we're looking at

4  here, they broke even at best and -- and looks like they lost a

5  small amount over the four-year period.

6          MR. SCHWARTZ:  I'm sorry, your Honor.  I couldn't hear

7  the last part of the answer.  Could I get that again?

8          THE COURT:  He said that it looks like they lost a

9  small amount over the four-year period, broke even at best.

10          MR. SCHWARTZ:  Thank you.

11  Q    (BY MR. VOVOS)  Can you state whether or not, if -- if you

12  know, whether or not there are any storage costs in relation to

13  those contracts that are reflected that are -- are -- are paid

14  by Tri-Cities Produce?

15  A    Yes, there are.  Tri-Cities Produce pays for the storage

16  associated with the potatoes they have under contract.

17          MR. VOVOS:  All right.  I think that's all the

18  questions I have at this time, Mr. Schlimmer.  There will be

19  other questions.

20          THE WITNESS:  Thank you.

21          THE COURT:  Thank you.  Are there other questions from

22  anyone?  Mr. Johnston?  Okay.

23

24  /  /  /  /  /

25  /  /  /  /  /

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - JOHNSTON

1                         CROSS EXAMINATION

2  CROSS BY MR. JOHNSTON:

3  Q    Morning, Mr. Schlimmer.  I'll ask you some brief but slow

4  questions.

5  A    Okay.

6  Q    As a certified public accountant, in addition to taking the

7  test, did you have to also have some experience requirements

8  before getting licensed?

9  A    Yes.  There is a year experience requirement before you

10 actually become a formal CPA and have your actual license.

11 Q    And, even though you don't do audits, the test covers, in

12 detail, auditing.  Correct?

13 A    I don't know if I would use the word "in detail," but there

14 are auditing questions, auditing topics on the test, yes.

15 Q    Now, when you -- did you also prepare financial statements,

16 that is, of balance sheet and income statement that bore the

17 representation of your company for Tri-Cities Produce?

18 A    For which years are we talking?

19 Q    Let's -- in the 2001-2004 time frame.

20 A    I don't believe so, but I don't recall.  I don't have files

21 back that far.  As a general rule, no, we don't.

22 Q    All right.  And -- and are there several types of financial

23 statements?  There's a compilation.  Is that right?

24 A    Correct.

25 Q    Did you ever do a compilation for Tri-Cities Produce?

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - JOHNSTON

1  A    Not to my recollection, no.

2  Q    In performing your duties, though, as an accountant, you're

3  governed, generally, by the precepts of the AICPA?

4  A    Correct.

5  Q    And, in regard to that, did you advise the company

6  regarding the adequacy, for example, of its controls?

7  A    No.  I was never asked to perform those duties.

8  Q    In regard to the Famous system, isn't that a system

9  designed to have controls sufficient for -- to support either

10 review or compilation statements?

11 A    That would be part of it.  Like I explained earlier,

12 that -- the fact that you can't go in and change entries is one

13 of the control features that is built into that program.

14 Q    And is the availability and use of that system one of the

15 reasons it was unnecessary to have you do a second review or

16 compilation?

17 A    That's correct.

18 Q    And did you understand, when you prepared your financial

19 statements for TCP, that they would, in fact, be given to

20 financial institutions to rely upon?

21 A    Prepared financial statements or tax returns?

22 Q    Well, tax returns.

23 A    Tax returns, yes.  I knew they were going to be going to

24 the bank, yes.

25 Q    And the tax return does include a balance sheet, as I

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - JOHNSTON

1  recall?

2  A    Correct.

3  Q    I can't remember which schedule, but --

4  A    Correct.

5  Q    And the loans to Olsen were reflected separately thereon.

6  A    I believe so, yes.

7  Q    Now, you indicated that you did a year-end review to do

8  year-end journal entries.  Did I understand that correctly?

9  A    Correct.

10  Q    And is that the process where you review the accounts to

11  make sure they're in the right categories for tax and other

12  reporting purposes?

13  A    That's part of it.  It's more looking at the documents that

14  Marta would put together.  And, you know, she would obviously

15  reconcile the bank.  And, so, I would check the bank balance on

16  their books with her reconciliation report and things along that

17  to make sure that nothing jumped out at me that was off.  But,

18  as far as the word "review," going in and looking at a lot of

19  detail, no.

20  Q    In terms of the bank accounts, the reconciliation means

21  that every payment of money into the company's bank accounts and

22  out of the company's bank accounts is reflected.  And you can

23  tell me whether it's not in the Famous system.  Is that right?

24  A    Well, no.  The bank reconciliation I'm talking about is she

25  would take a copy -- make me a copy of the December bank

1 statement and, then, do a reconciliation showing any outstanding
2 items that hadn't cleared yet on the bank statement.
3 Q    Did you also reconcile it one way or the other with the
4 Famous system balances?
5 A    That was already done by Marta, yes.  And I just verified
6 the balances with her work papers to show that they were the
7 same.
8         MR. JOHNSTON:  Thank you very much, Mr. Schlimmer.
9 That's all I have.
10        THE WITNESS:  Thank you.
11        THE COURT:  Anyone else on the defense?  No?  Cross
12 examination, Mr. Anderson?
13
14                    CROSS EXAMINATION
15 CROSS BY MR. ANDERSON:
16 Q    Good morning, Mr. Schlimmer.
17 A    Good morning.
18 Q    The Famous system.  That's relied on quite a bit by
19 Tri-Cities Produce?
20 A    Yes.
21 Q    I heard you say it pretty much runs the business?
22 A    No, it doesn't run the business.  I said it's a pretty
23 intense program that has a lot of safeguards built into the
24 system.
25 Q    But, yet, the integrity of that system, as far as

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - ANDERSON

1   recordkeeping system, does it rely on the accuracy of the

2   information that goes into it?

3   A    Any -- any accounting system does, yes.

4   Q    And you mention that it does categorize certain loans that

5   were made to Mr. Olsen.  It does contain evidence of loans made

6   to Olsen?

7   A    Yes, it does.

8   Q    Okay.  And how are those placed into the Famous system?

9   A    Those -- they set up that account when they originally

10  started loaning him funds.  And, then, those funds -- any loans

11  were applied and taken in and out of that loan account that was

12  a separate line item on the balance sheet.

13  Q    How would you describe that account, itself, on a balance

14  sheet?

15  A    As far as what type of account it is or --

16  Q    Type of account.

17  A    We would call it an "other asset."

18  Q    Okay.  How would that be entered differently -- so it was

19  entered as a loan.  How would it be different from, say, a

20  payment directly to a grower, like, Mr. Olsen?  How would that

21  be accounted for?

22  A    A -- a payment to a grower would be in the cost of goods

23  sold or the contract expense that there was a separate line

24  item, and that's on a different report called the "profit and

25  loss" because that's an expense account.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - ANDERSON

1  Q    Okay.  The loan, itself, would be a note receivable?  Is

2  that right?

3  A    Correct.

4  Q    Well, what's the difference between that and, say, an

5  account receivable?

6  A    Account receivable is something that, if you're doing

7  transactions with your ordinary customers and they charge

8  something, that's something that they owe you for.  The services

9  or the product that you sold them, and they just haven't paid

10 you yet.  Versus this.  This is an actual lending transaction.

11 We're actually loaning them funds versus selling them a -- a

12 product or a service.

13 Q    Are both of those considered assets of the business?

14 A    Yes.

15 Q    And they both show up in the balance sheet?

16 A    Correct.

17 Q    Would you say one's a longer term or shorter term than the

18 other?

19 A    Yes.

20 Q    And can you describe what you mean by that?

21 A    That's why I said it's an "other asset."  Generally in

22 accounts receivable is what we call a "current asset," which,

23 basically, in simple terms, means you expect to receive that

24 money that a customer owes you in the near future.  An "other

25 asset" is something that could be more of a long-term

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - ANDERSON

1  transaction versus just a 30-day or 60-day transaction.

2  Q    In both of those types of methods of accounting, you

3  anticipate some sort of a collection on those accounts?

4  A    Yes.

5  Q    What happens if you have a note receivable and it's not

6  collected?  How does that change that entry or the

7  categorization?

8  A    Once it's determined it may or may not be collectible, then

9  you have to look at writing it off as what we call "bad debt."

10 Q    And how do you do that?

11 A    That's determined by management on whether they think they

12 can collect it or not.

13 Q    And, with regards to an account receivable, what happens

14 when that becomes uncollectible?

15 A    An accounts receivable?  It depends on the company's

16 policy.  Sometimes they're turned over to collection.  I mean,

17 there's lots of options.  Sometimes they're written off, as

18 well.

19 Q    Okay.  And you said you're familiar with the contracts that

20 are at issue in this case?  The contracts between the growers

21 and Tri-Cities Produce?

22 A    I knew there were contracts.  As far as contract law, no,

23 I'm not an attorney.

24 Q    No.  I'm not going to ask you that.

25 A    Okay.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - ANDERSON

1  Q    But, as far as the financial side, I believe you testified

2  that Tri-Cities Produce broke even at best.

3  A    Um-hum.

4  Q    Were you aware of Mr. Bennett being asked if he made any

5  money on these contracts?  And, in fact, he said -- or confirmed

6  that he made a pile of money on them.  Are you aware of that?

7        MR. VOVOS:  Judge, I object.  It's a confusing

8  question.  What -- what year?  I think Counsel should --

9        THE COURT:  It depends on the year.

10        MR. VOVOS:  -- what year.

11        THE COURT:  And you're using plural.  And I think we

12  need to make sure that we establish here with this witness, when

13  he's asked about 2001 and 2004, whether we're talking about the

14  overall operation of TCP during those years or these contracts,

15  if they're broken out.  And I'm uncertain that that was clear.

16  Q    (BY MR. ANDERSON)  If I could ask more specifically as it

17  relates to these contracts for 2001 and 2002, are you aware of

18  Tri-Cities Produce making money on these contracts?

19  A    Yes.  I believe they made money in 2001 and a little bit of

20  money in 2002.

21  Q    All right.  You also mention that you review the books of

22  Tri-Cities Produce annually?

23  A    Yes.  That's part of that year-end process where I meet

24  with Marta and go through and -- and do our year-end

25  adjustments, yes.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - ANDERSON

1  Q    Describe exactly what you do during that process.

2  A    Basically, like I said earlier, she usually has the general

3  ledger tied down as best she can to -- and reconciled at year

4  end.  She has a printout for me --

5        (Interruption by the reporter)

6        THE WITNESS:  Okay.  Sorry.  She has the general

7  ledger printed out for me.  The balances on those accounts that

8  she can reconcile, there again, with an outside source, i.e.,

9  the bank reconciliation.  She'll have all those ready for me.  I

10 go down through the accounts with her and help her adjust any

11 accounts that she may not know how to adjust.  Or, like I said,

12 and the biggest -- most amount of time is spent on depreciation

13 schedules.  The new equipment that they buy.  She doesn't know

14 how to calculate how much depreciation you take, things along

15 that line.  So I help her with those adjusting entries.

16 Q    (BY MR. ANDERSON)  And you're not going back and adjusting

17 entries on the Famous system, itself?

18 A    No.  I -- to my knowledge, I have never ever made an entry

19 in their actual system.  That's something Marta does.

20 Q    And you don't modify that at all at the end of the year

21 during your review at all?

22 A    Modify what?

23 Q    Modify.  You don't change the entries at all?

24 A    You can't change the entries in the system.

25 Q    You can't change them.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/CR - ANDERSON

1  A    Right.

2  Q    You'd have to do another entry, in effect, to cancel that

3  out?

4  A    Correct.  Correct.

5  Q    But you rely on the entries that are preexisting in doing

6  your review.  Is that correct?

7  A    Exactly.

8  Q    Would you ever have occasion to verify the amounts

9  Mr. Olsen owed to Tri-Cities Produce?

10 A    As far as -- verify as in confirm the numbers or confirm

11 with --

12 Q    Confirm the basis --

13 A    -- with Lynn or --

14 Q    Confirm the basis for the loans.  Is that something that

15 you would do?

16 A    No.

17 Q    Okay.  Would you confirm the amounts that were owed to

18 Tri-Cities Produce from Mr. Olsen?

19 A    No.

20 Q    Okay.  And, if you didn't do that, who else would?

21 A    That would be basically Marta and Blake.  They would have a

22 detailed transaction report of what transactions went in and out

23 of that account during the year.

24         MR. ANDERSON:  I have no other questions.

25         THE COURT:  Do you have any for recross?

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/REDI - VOVOS

1    MR. VOVOS:  Yes I do, Judge.

2    THE COURT:  Okay.

3

4                    REDIRECT EXAMINATION

5    REDIRECT BY MR. VOVOS:

6    Q    Counsel asked you about writing off a bad debt.  I want to

7    ask you:  In your capacity as the accountant for Tri-Cities

8    Produce, is there any plan or any knowledge or ever been any

9    discussion about writing Lynn Olsen's debt off as a bad debt?

10   A    There's been discussion.  Obviously, as the outside

11   accountant, I talk and discuss this matter with Blake every

12   year.  But, no, that has not -- no write off to my knowledge and

13   no plans for any write offs to my knowledge.

14   Q    All right.  Counsel asked you in relation to Tri-Cities

15   Produce and making money on these contracts of 2000 through

16   2004.  I think he went through 2001 and 2002.  And you said they

17   made money in 2001 and 2002.  Tell the jury what happened in

18   2003 and 2004.

19   A    In 2003, basically, they had a small loss on those

20   contracts.  In 2004, they basically got hampered hard and had a

21   huge loss on those contracts.

22   Q    All right.  And is that the reason for your statement that

23   they broke even or less than broke even?

24   A    Correct.  So, when you add up those four years, there's two

25   years of positive, two years of negative.  It comes out to a

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/REDI - VOVOS

1  small negative figure.

2  Q    All right.  Were you aware, in your position as a certified

3  public accountant, of any efforts on the part of Tri-Cities

4  Produce and its partners or management to collect this money

5  from Mr. Olsen?

6  A    I believe there were some --

7  Q    You just need to answer --

8  A    Yes.

9  Q    -- if there were.  All right.  Just overall, Mr. Schlimmer,

10  can you tell the jury, the books at Tri-Cities Produce, based on

11  your experience and your background during the time that you've

12  been there, are they kept reasonably in accordance with

13  generally accepted accounting procedures?

14  A    Yes, absolutely.  For a company of this size with this many

15  transactions, it's probably one of my clients that have the

16  fewest numbers of adjusting entries that I have to make at year

17  end.  So they do a very good job of tracking their -- their

18  transactions.

19          MR. VOVOS:  That's -- that's all.  Thank you very

20  much.

21          THE WITNESS:  Thank you.

22          MR. SCHWARTZ:  Your Honor, could I have just a second

23  with Mr. Vovos?

24          THE COURT:  Sure.

25      (Discussion off the record)

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/RECR - ANDERSON

1          MR. SCHWARTZ:  Thank you, your Honor.

2          THE COURT:  Okay.  On that point, do you have some

3    other questions?

4          MR. ANDERSON:  I just have a few, your Honor.

5

6                          RECROSS EXAMINATION

7    RECROSS BY MR. ANDERSON:

8    Q    When you talk about writing off a bad debt, what do you

9    mean by that, the concept of "writing off"?

10   A    When you have a receivable, whether it be a loan or

11   accounts receivable, it's something you have on your books that

12   people owe you that money.  To get it off your books, you move

13   it you out of that account into what we call "bad debt expense."

14   And, then, you would deduct it if you determine that it's not a

15   collectible account.

16   Q    And, going through that, when you deduct it, what happens

17   then?  What's -- what's the effect of that --

18        (Interruption by the reporter)

19   Q    (BY MR. ANDERSON)  When you would, then, deduct -- when

20   would you deduct it, what would be the effect of that?

21   A    The effect of that is you would have a deduction on your

22   tax return, which would bring down your income.

23   Q    Okay.  Which would, in turn, bring down your taxes, as

24   well?  Or could?

25   A    Correct.

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/RECR - ANDERSON

1  Q    And, with regard to writing off a bad debt, what would you

2  expect to be written off sooner, a note receivable or an

3  accounts receivable?

4  A    There's no way to determine that.  You'd have to look at

5  each of those accounts on a separate basis to determine that.

6  Q    Well, one is longer term and one is shorter term.  Does

7  that --

8  A    That really doesn't have anything to with whether it's

9  collectible or not --

10  Q    Okay.

11  A    -- or whether the management decides they need to write it

12  off.

13  Q    Would one be more likely to be written off sooner?

14  A    Not necessarily, no.

15  Q    And why is that --

16      (Interruption by the reporter)

17  Q    (BY MR. ANDERSON)  Would one be more likely to be written

18  off sooner versus later?

19  A    No.  And -- and, therefore, the same reason.  You don't

20  know.  Somebody could come and charge something in your store,

21  for instance, and leave town.  How are you going to collect

22  that?  It may only be two days old and be a bad debt.  I mean,

23  there's no way of determining that.

24  Q    What would that be?  Would that be an accounts receivable?

25  A    That would generally be an accounts receivable if they came

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/RECR - ANDERSON

1  in your store and bought -- bought a product or something from

2  you, yes.

3  Q    And, then, what would be a notes receivable?

4  A    Notes receivable would be something where you would loan

5  somebody some money.

6  Q    Perhaps on a more longer-term basis?

7  A    Correct.

8  Q    Okay.  You said 2004, in particular, Tri-Cities Produce

9  took a huge loss in the contracts?

10  A    Correct.

11  Q    Is that right?  Have you had occasion to review the packout

12  sheets from those years?

13  A    I believe so, yes.  I looked at lots of packout sheets.

14  Q    Do you recall when you did that?

15  A    Oh, that's been pushing two years ago now.

16  Q    Okay.

17          MR. ANDERSON:  I have no other questions.

18          MR. VOVOS:  Within the scope, Judge, if I could?

19          THE COURT:  Sure.  You've got four minutes before noon

20  time.

21          MR. VOVOS:  Get it done the best I can.

22

23                    FURTHER REDIRECT EXAMINATION

24  FURTHER REDIRECT BY MR. VOVOS:

25  Q    Counsel's talking about the amount.  I want you to keep in

JURY TRIAL - DAY 23 - MAY 16, 2013
A. SCHLIMMER/RECR - ANDERSON

1  mind the amount of indebtedness that's owed to Tri-Cities

2  Produce.

3  A    Correct.

4  Q    Tell the jury what accounting basis or tax basis they have.

5  Is it cash or accrual?

6  A    Accrual.

7  Q    If Tri-Cities Produce, considering the amount of that loan

8  that the bank knew about, you knew about, everybody knew about

9  -- if they charged interest on that note -- are you with me?

10 A    Um-hum.

11 Q    What would happen to their tax obligation?

12 A    If they accrued interest on it?

13 Q    Yes.

14 A    Or charged interest?

15 Q    If they -- if they charged interest on that amount of

16 money, what would happen to Tri-Cities' tax obligation?

17 A    It would increase because you would have some interest

18 income on your books.

19         MR. VOVOS:  Thank you.

20         THE WITNESS:  Um-hum.

21         THE COURT:  Mr. Anderson?

22         MR. ANDERSON:  I have nothing further, your Honor.

23         THE COURT:  Okay.  Thank you.  Mr. Schlimmer, thanks

24 for being here.  You're excused.  You may step down.

25         THE WITNESS:  Thank you.

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1      THE COURT:  And I appreciate your slowing down.

2      THE WITNESS:  Thank you.

3      THE COURT:  Okay.  Ladies and gentlemen, I need a

4  minute or two with the lawyers.  So I'm going to give you lunch

5  and see you back here at 1:30.  Thanks.

6      (Jury out at 11:59 a.m.)

7      THE COURT:  Please, be seated.  Okay.  Folks, bring me

8  up to date on what the afternoon looks like.

9      MR. BENTLEY:  Well, your Honor, I would like to

10 entreat Mr. Tornabene on that one witness.  But, passing that,

11 we would intend to call Stewart Turner, an expert.

12     THE COURT:  All right.  Well, then, that will take up

13 our afternoon.  I'll let you folks work out the Sackmann issue.

14 And what is Mr. Sackmann going to testify to?  He's an attorney

15 up in --

16     MR. BENTLEY:  He's in Othello.  He's down here from

17 Othello.  He represented Mr. Olsen in a Chapter 11 bankruptcy

18 filed in '99, and he'll talk about Mr. Olsen's financial straits

19 in -- in the late '90s to provide a basis for Mr. Olsen's

20 willingness to enter into these contracts.

21     THE COURT:  Okay.  That said, I'll let you folks work

22 that out.  Do we have document issues on Sackmann if he's --

23     MR. BENTLEY:  And I apologize to everyone.  I really

24 take it seriously.  I don't want to put Mr. Tornabene in a bad

25 place, but I have no documents with Mr. Sackmann; and I think

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1    his testimony will be quite brief.

2            MR. TORNABENE:  I'll confer with counsel.

3            THE COURT:  Good.  Thanks, folks.  See you at 1:20ish

4    to make sure we don't have issues.

5        (Court recessed at 12:01 p.m.)

6        (Court reconvened at 1:28 p.m.)

7            THE COURT:  Please, be seated.  Five minutes without

8    jury.  What do we have?  Somebody needed some without-jury time?

9    Mr. Anderson, I thought I was just talking to myself here for a

10   few minutes; but at least I had that message.  So tell me what

11   we have.

12           MR. ANDERSON:  Well, just some upcoming exhibits to be

13   offered through defense witnesses.  One, in particular, through

14   a Mr. Jeff Smith.  It's an Exhibit 3109 entitled Washington

15   State Fruit and Vegetable Inspection Program and a multipage

16   document.  I haven't finished printing it off.  How many pages?

17   118 pages and I just don't see that it has any relevance in this

18   case.

19           THE COURT:  And who marked -- is it Exhibit 310 --

20           MR. ANDERSON:  3109, your Honor.

21           THE COURT:  Jeff Smith?

22           MR. ANDERSON:  Right.  That's what --

23           THE COURT:  I don't think anybody on the defense

24   intends to use it because nobody's responding.  So I'm

25   assuming --

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1          MR. VOVOS:  Oh, I'm the one that marked it.

2          THE COURT:  Do you want to explain why we're having

3     this exhibit?

4          MR. VOVOS:  Judge, it's an exhibit from the Washington

5     State Department of Agriculture, which is the handbook for

6     safety and inspection of potatoes that's used by Tri-Cities

7     Produce after the potatoes are run through the processing at

8     Tri-Cities Produce after they've been inspected by the United

9     States Department of Agriculture.  And it's all the standards

10    that Washington State imposes on Tri-Cities Produce.  And, in

11    fact, we have a witness who's just going to identify it.

12    Whether it comes in substantively, it's just a -- it's a book

13    and a manual of all of the safety standards, inspections, and

14    the requirements of the State.

15         THE COURT:  So you're calling a witness to simply say

16    that's -- that's the book of the State of Washington?

17         MR. VOVOS:  It's the book of the State of Washington

18    that pertains to safety, specifications, standards of -- of

19    potatoes.  The grading of potatoes.  1's -- 1's and 2's and how

20    they're packed and all of the rules and regulations pertaining

21    to potatoes.

22         THE COURT:  And how do they -- how do those things

23    relate to this case?

24         MR. VOVOS:  Well, it has to do how the potatoes are --

25    in the overall scheme of things, how they're packed, how they're

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1   processed, how they're run, how they're boxed.  And it just

2   shows a -- an example of all of the requirements of the State

3   for the inspection of potatoes.  It's not just something that

4   anybody can do.  Licensed by the State, and it's an illustrative

5   exhibit.  And I marked it in an abundance of caution with the

6   Court saying that --

7        MR. ANDERSON:  The inspection of potatoes under State

8   program was not part of the Government's case.  All the evidence

9   that came in had to do with Ag World inspection.  That was a

10  private entity.  So we just don't see that -- how this could

11  possibly have any relevance, especially, you know, that large of

12  a document.

13       THE COURT:  Well, it's immaterial to me the length.  I

14  mean, sometimes I get concerned that documents are identified

15  for one discrete purpose.  And, in an abundance of diligence,

16  counsel identify the entire document only to plant something in

17  there that catches some juror's mind that's completely

18  unintended; and now we have a major problem on our hands.  And,

19  so, I'm always concerned about the -- about lengthy documents.

20       In this case, I just don't see the relevance at all to this

21  document, Counsel.

22       MR. VOVOS:  Judge, it's very relevant because it has

23  to do with the quality and the potatoes that go through the

24  shed and --

25       THE COURT:  But nobody's arguing about the quality.

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1    MR. VOVOS:  Well, I think that they are indirectly.

2  They're saying that this isn't this what they consider to be

3  something; and we want to show that there are standards and

4  requirements, not only by the Federal Government, by the State

5  Government --

6    THE COURT:  How is that relevant to -- to what point?

7  I'm missing the point.  Please help me.

8    MR. VOVOS:  The point is is what is called a processor

9  or a packer shed; that there are rules and regulations

10  pertaining to potatoes; and it doesn't specify what you have to

11  be.  It's -- it's an issue.  It's part of our defense.

12    THE COURT:  No.  This is very indirect.  It's very

13  indirect for me, Mr. Vovos.  Very indirect.  You're telling me

14  that this goes to the question of what a processor is?

15    MR. VOVOS:  I think it goes to that issue indirectly.

16  I think --

17    THE COURT:  Well, if this person's going to testify

18  substantively as to what a processor is --

19    MR. VOVOS:  No, he's not.

20    THE COURT:  -- well, then, it doesn't go to processor.

21    MR. VOVOS:  He's not going to testify substantively.

22    THE COURT:  Okay.

23    MR. VOVOS:  He's the safety person, and it's just --

24    THE COURT:  All right.

25    MR. VOVOS:  -- what we have to do; and it's manuals

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1    that govern the operation of the plant.  That's all.

2            THE COURT:  I'm going to sustain the objection.  I

3    don't see it relevant at all.  So what's next?

4            MR. TORNABENE:  Your Honor, I did confer with

5    Mr. Bentley; and we have agreed for going forward with

6    Mr. Sackmann starting up.

7            THE COURT:  Okay.

8            MR. TORNABENE:  And my understanding from the defense

9    is that, after that, we may get to Mr. Smith who we've also

10   agreed, based on the brevity of the testimony, to go forward

11   with today, and, then, Mr. Turner.  And I've been provided over

12   lunch with some exhibits that the defense intends to, I believe,

13   introduce through him.  These are publications; some of which

14   have been admitted, some we've seen before.  However, there are

15   two, three -- there are four which I don't believe were in any

16   Rule 16 disclosure of Mr. Turner.  I conferred with Mr. Bentley

17   on that point, and he was not able to point me to that at that

18   time.

19           THE COURT:  Okay.  Mr. Bentley, are you calling

20   Turner?

21           MR. BENTLEY:  Yes, your Honor.

22           THE COURT:  All right.  I have eight exhibits.

23           MR. BENTLEY:  Yes, your Honor.  These are all part of

24   the professional literature on which Mr. Turner bases his

25   opinion in part.  These are documents that, as best I can

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1  recall, Mr. Turner provided to me after the Daubert hearing.  I

2  looked at my exhibit list.  I see that, on February 22nd, I

3  filed a second amended exhibit list.  I'm sorry I don't have the

4  ECF number.  And these documents were not included on that list.

5      On March 29th, I filed my third amended exhibit list, ECF

6  1012, and that list does include these documents.  I would agree

7  that I did not cull out these particular documents to

8  Mr. Tornabene as part of a Rule 16 disclosure; but I don't think

9  that the Rule 16 disclosure, under the Federal Rules of Criminal

10 Procedure, imposes as extensive an obligation as it might in a

11 civil case.  And I don't think that there should be a problem

12 with having Mr. Turner identify these publications.

13      THE COURT:  Okay.  Well, my concern is a

14 straightforward one.  The disadvantage of not having these

15 titles in order to read them, show them to your experts, get

16 some feedback on what the appropriate questions are, the same

17 sort of prep that every litigator engages in.  So --

18      MR. BENTLEY:  If I may, your Honor, just to make

19 clear, these were -- these were provided to the Government as

20 part of our JERS exhibits; and they were listed on ECF 1012.

21 And, in fact, on Page 31 of ECF 1012 filed on March 29th,

22 there's a section heading.  It says, "Documents Relating to

23 Agricultural Experts."  And, with the exception of Exhibit 1545,

24 which was offered and intro -- accepted through Dr. Stark, all

25 of these other documents were listed; and they were disclosed

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1  along with our JERS exhibits.

2          THE COURT:  Okay.  Anything else, Mr. Tornabene?

3          MR. TORNABENE:  No, your Honor.

4          THE COURT:  Okay.  The objections are overruled on

5  that basis.  And, if there's something more that comes -- to

6  which the Government objects later and, by all means, bring it

7  to my attention.  So you may use those in connection with your

8  witness.

9          MR. BENTLEY:  Thank you, your Honor.

10          THE COURT:  I'm satisfied that Rule 16 is substantially

11  complied with.

12      What else do we have before the jury comes in?  Just a

13  thought, folks.  Please think about this.  A week from Friday is

14  Memorial Day weekend.  Juror No. 11's son is getting married the

15  next day at her home.  We need to think about whether we're

16  going to give her just the afternoon or whether we're going to

17  give her the whole day.  Start thinking about that.

18      Okay.  What else?

19          MR. VOVOS:  I'll just mention something, if I could,

20  if it please the Court, for a second.  In an effort to economize

21  and make use of the Court's time and that of counsel, we're

22  proceeding with the defense by calling witnesses as a group to

23  make sure that we can get them here in court and have them ready

24  to testify.  And I know.  The -- the length of time on cross

25  examination can affect things.  And just by way of an

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1  explanation, we had three witnesses yesterday; and we only have

2  two back today.  Those are always problems that come up.

3      But what I'm seeing, your Honor, in the -- in the whole

4  picture of the defense is that we may, depending on what happens

5  with the cross today, run out of witnesses this afternoon.  I --

6  you know, I -- I -- I can't say.  And, perhaps, tomorrow, even

7  if there's four or five -- I'm talking from getting them from

8  all of the defendants; but it's working together and trying to

9  do everything together to get witnesses to come together.  The

10 witness list has been cut short.  I guess what I'm saying, it

11 looks like we're going to be finishing our case next week.

12 Maybe, Tuesday.  Maybe earlier than that with where we're at.

13 But that's what I'm saying --

14         THE COURT:  Okay.

15         MR. VOVOS:  -- to the Court.  And I --

16         THE COURT:  I'm open minded on this issue, Counsel.

17 So just tell me.

18         MR. VOVOS:  I -- I --

19         THE COURT:  Okay.  Let's just get to it and see where

20 the day takes us and we'll go from there.  Thanks.

21         MR. VOVOS:  That -- that's fine.  Thanks, Judge.

22         THE COURT:  Okay.  Let's get the jury in.

23     (Jury in)

24         THE COURT:  Okay.  Folks, welcome back.  Please be

25 seated.  Do we have another witness?

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1          MR. BENTLEY:  Yes.  The Defense calls Steve Sackmann.

2          THE COURT:  Mr. Sackmann.

3      (Witness enters courtroom)

4      Mr. Sackmann, if you'll place your back to the door so we

5  can take your photograph for use by the jury during

6  deliberations.  No, I'm sorry.  Over here.  Back to the door.

7          THE WITNESS:  Oh, back to the door.

8          THE COURT:  Back to the door.  Sorry.  That direction.

9      (Courtroom Deputy takes picture of the witness)

10         THE COURT:  I apologize.  I should have been better at

11  that.

12         THE WITNESS:  I don't take instruction well.

13         THE COURT:  Well, please take this one well.

14     (STEVE SACKMANN, called by the Defendant, was sworn)

15         THE COURT:  Good afternoon.  Please be seated.

16         THE WITNESS:  Good afternoon.

17         THE COURT:  Please tell us your name and spell both

18  for the jury.

19         THE WITNESS:  Steven H. Sackmann, S T E V E N.

20  Sackmann, S A C K M A N N.

21         THE COURT:  So, it's Sackmann.

22         THE WITNESS:  Right.

23         THE COURT:  Thank you, Mr. Sackmann.

24  /   /   /   /   /

25  /   /   /   /   /

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1                          DIRECT EXAMINATION

2    DIRECT BY MR. BENTLEY:

3    Q    Good afternoon, Mr. Sackmann.

4    A    Good afternoon.

5    Q    You and I met for the first time last Friday afternoon.

6    Correct?

7    A    Yes.

8    Q    You'd been down here for the seminar that gave us all a

9    little break in these proceedings?

10   A    Yes.

11   Q    And how are you employed?

12   A    I'm an attorney.

13   Q    Where is your practice located?

14   A    Othello.

15   Q    And do you have a particular specialty or emphasis?

16   A    Yeah.  It's pretty general.  Farm practice, agri based.  I

17   represent farmers, packers, processors, everything to do with

18   agriculture, typically.

19   Q    Do you know my client, Lynn Olsen?

20   A    I do.

21   Q    Do you see him here in court today?

22   A    Yes.

23   Q    Is he the gentleman in the blue shirt?

24   A    Yes.

25            MR. BENTLEY:  Okay.  May the record reflect the

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1  identification of Mr. Olsen?

2          THE COURT:  It's the light blue shirt.  Right?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  Thank you.  Go ahead.

5  Q    (BY MR. BENTLEY)  Can you tell us the first contacts you

6  had with Mr. Olsen?

7  A    Yes.  I think it was in 1999.  His father asked me to help

8  Lynn with financial difficulties that he was having.

9  Q    And what is his father's name?

10 A    Lynn, Senior.

11 Q    Have you represented Lynn Olsen, Sr., in the past or do

12 you --

13 A    I have for many years and still do.

14 Q    And is he a farmer?

15 A    He is.

16 Q    What does -- does he have a principal crop that he grows?

17 A    Potatoes.

18 Q    Okay.  And when -- after -- withdrawn.

19      After Lynn Olsen, Sr., asked you to assist his son, what

20 did you do?

21 A    I advised him to commence a Chapter 11 reorganization.

22 Q    Now, Chapter 11.  Is that part of the Bankruptcy Code?

23 A    It is.

24 Q    Can you give us a brief explanation of what Chapter 11 is?

25 A    Chapter 11 is the bankruptcy proceeding for large

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1   corporations or can be used for individuals.  Anybody can use

2   it.  But normally it's -- it's the proceeding that General

3   Motors or railroads or anybody would be in.

4        Chapter 12 is a farmer program that came in in the mid

5   '80s.  But the debt that Mr. Olsen had at the time in 1999

6   exceeded the jurisdictional limits for a 12.  So, his options

7   were 11 as opposed -- a 7 is a liquidation; 11 you reorganize

8   the business.

9   Q    So, if I had a neighbor who had extensive medical bills and

10  they were out of work and they found it necessary to seek a

11  bankruptcy solution for their problems, under what chapter would

12  that be pursued?

13  A    That could be -- if it's an individual, it could be a -- if

14  it's hopeless, you know, it might be a 7 or it might be a

15  Chapter 13, which is a wage earner plan.  Similar to Chapter 12

16  for a farmer.  And, in some cases, if -- if it was big enough,

17  an 11 would be appropriate.

18  Q    Have you heard the term "reorganization" used in the

19  context of the bankruptcy laws?

20  A    Yes.

21  Q    How does that relate to Chapter 11?

22  A    That is the reorganization.  If -- 13, 12, and 11 are the

23  three sections of the Bankruptcy Act that -- that people can

24  restructure their business.

25  Q    In the course of your work for Lynn Olsen, Jr., in the

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1  bankruptcy area, did you become familiar with the financial

2  problems that he was encountering?

3  A    I did.

4  Q    And did you acquire knowledge of where those problems

5  began?

6  A    I did.

7  Q    Can you tell us about that?

8  A    Yes.  Lynn was a potato farmer like his father but in

9  separate farming operations.  He had farmed since the early '80s

10  as a young man, first with his dad and then on his own.  He has

11  another brother that farms with his father.

12      Lynn was a big potato grower in '95, '96, '97, '98, those

13  years.  By "big," I mean he was farming 4,000 acres of potatoes.

14  Part of them were open.  Part of them were contracted.  And, in

15  1996, when we talk about potatoes, that's referred to as

16  probably the worst potato year or one of the worst that we've

17  ever seen in the Columbia Basin.  And he was in that.  '97

18  wasn't a good year for him.  And, then, in '98 he had hail

19  damage.

20      He farmed both potatoes on contract with processors and

21  open potatoes where he was marketing them through fresh heads.

22  But he -- he developed a whole bunch of debt, and he was being

23  financed by KeyBank and some of our local fertilizer companies.

24  And there was litigation between KeyBank and the fertilizer

25  companies.  And, basically, KeyBank, in the spring of '99,

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1  pulled the plug and he said "We're not financing him anymore."

2      And there was some litigation, I think.  I can't remember

3  what it was, but it precipitated us.  By the time Lynn got to

4  me -- I wasn't involved in the earlier litigation -- we didn't

5  have any opportunity to avoid a bankruptcy.  We had to stop

6  entry of a Judgment.  So, we filed a petition and started the

7  Chapter 11 proceeding.

8  Q    Now, you refer to growing potatoes open versus growing

9  under contract.  Could you explain those terms to the jury?

10 A    Yeah.  Open means you are taking the market risk.

11 Typically, the processor, McCain or -- or Simplot will give you

12 a contract to raise potatoes for them with a price, a quality

13 standard that you have to meet.  That's a contract.  Or a fresh

14 head can give you a contract and with a floor price or some kind

15 of a guarantee of what you're going to get.

16     When I talk about open potatoes, that means there is no

17 guarantee; that nobody has told you what those potatoes will

18 bring in the market.  A good potato grower, like Lynn, can

19 usually raise the crop.  A lot of the risk in potato growing is

20 in what price you're going get for -- after you raise it.

21 Q    And you mentioned the '96 year.  Would it be fair to say

22 that Lynn experienced significant losses on his open potatoes in

23 that year?

24 A    Yes.  I think everybody did on open potatoes.  Anybody that

25 had them had the loss.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1   Q    And was he able to dig to get out of that hole in the next

2   two or three years?

3   A    During -- he's kind of unique because he was -- well, not

4   unique, I guess; but he farmed in the Chapter 11 proceeding for

5   two years and was profitable both years.

6   Q    Well, let's go back to '97, '98, '99, and 2000.  Did Lynn

7   have a contract at that time?

8   A    He had some contracts.  He had contracts with Simplot and

9   Nestles''', I think; but he also raised open potatoes.  And the

10  combined effect, in two of those years, he had tax losses.  In

11  '98, had he -- or '97 he had a tax loss of over a million

12  dollars.  One of those other years -- and I can't remember

13  which -- it was about a half million.  And, then, he had one of

14  those years he made a couple of hundred thousand to the good.

15  That's -- they're on tax -- on cash basis.  So, they're a year

16  behind with a lot of that.  But --

17  Q    And was he incorporated at that time?

18  A    He had a corporation, and he -- and, also, an individual.

19  Yeah.

20  Q    Are you familiar with Olsen Agriprises?

21  A    Yes.

22  Q    And was that a DBA?  A "doing business as"?

23  A    I can't remember whether it was a DBA or whether that was

24  the corporation.  I'm not positive.

25  Q    Do you remember if the bankruptcy was filed in the name of

1  Lynn and Julie Olsen?

2  A     It was.

3  Q     Would that suggest to you that he was --

4  A     A DBA.

5  Q     Okay.  So, after you file seeking the Court's protection,

6  tell us what happens next.

7  A     Usually, the first problem that the farmer has that comes

8  to me in the spring with that kind of a problem is they need --

9  you know, they want to farm in 1999.  And they have -- hopefully

10 they have receivables from '98 or even earlier that have not yet

11 been paid.  Because one thing you can't do in a reorganization

12 is you cannot force the bank or anybody to finance you.  So,

13 you -- the critical thing is figuring out how you are going to

14 farmer in the current year, in this case 1999, when you don't

15 have any financing.  No bank is going to touch you.

16       Lynn had carryover crops from '98.  Substantial.  He owed

17 KeyBank around six million, and he had carryover crops of four

18 or five million.  And what we did in the bankruptcy, initially,

19 in the month of April, was make a motion to use the prior year's

20 receivables to farm with in '99, which is typical what we do

21 with farmers.  They -- we have to get a Court Order.  We have to

22 convince the Judge that there's no risk of losing that cash

23 collateral.  And, then, if we are successful in that, he let's

24 the farmer use last year's money to farm in '99.

25 Q     And, when you say, "carryover crops," are you referring to

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1  potatoes that were harvested in, say, '98 but still unsold?

2  A    Yes.

3  Q    That -- so what -- what you might call in a -- in a retail

4  setting "inventory."

5  A    That's right.

6  Q    Correct?

7  A    Either the actual crop or, perhaps, the receivable that

8  somebody owed him for that '98 crop.  I think he also did some

9  onions in '98.  So, it could have been onions and potatoes.

10 Q    Did he continue farming, then, throughout the pendency of

11 the Chapter 11 proceedings?

12 A    Yes.

13 Q    How did he do that aside from the carryover funding you

14 that described?

15 A    Well, we, initially, tried to use those funds.  KeyBank

16 objected.  And, eventually, he negotiated with third parties;

17 and he farmed, in 1999, in five separate joint ventures with

18 farmers and other business people.  And we gave KeyBank the cash

19 receivables that they had.  By the end of the bankruptcy, out of

20 that six million that came, he paid the bank with the cash

21 about -- he only owed them about 60,000.  But they claimed

22 another half-a-million dollars of interest, attorney fees,

23 costs, that type of thing.

24 Q    Could you describe for the jury how one of those joint

25 venture operations worked?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1  A    They were all pretty similar.  And what Lynn had to do --

2  the -- he had a couple things going for him.  One, he was a very

3  good potato farmer.  He knew how to raise those crops.  And,

4  two, he had negotiated with Simplot and Nestles'' in prior

5  years.  I think they were five-year contracts to raise potatoes

6  for them.  I think they were each about 2,000 acres apiece.  And

7  he had negotiated in that contract in -- I'm not sure when those

8  contracts started.  Maybe '96, '97, maybe '98.

9      But they were for -- they were on escalators.  So, his --

10 what they paid him increased every year.  Whereas, with most

11 other growers, I -- I'm not aware of anybody else that had a

12 long-term contract with Simplot or Nestles'' and, certainly,

13 none that had the escalating price.

14     So, in the bad potato years, his contract allowed him to

15 get paid more than the typical grower.  And -- and that's what

16 was valuable to his business partners.

17     And the joint ventures, essentially, were these other

18 people put up the money to raise the crop that he had no way of

19 coming up with through commercial sources.  They took -- they

20 did it at two percent over what they could borrow at the bank

21 because these people did have the ability to borrow.  So, they

22 got interest on their investment.  And they got a six percent

23 management fee.  And, then, they split the profits above that

24 with Lynn.

25 Q    Are you familiar with the concept of a plan as that term is

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1  used in the context of a Chapter 11 proceeding?

2  A    I am.

3  Q    Is it fair to say that the formulation of a plan is the

4  goal that you, as an attorney, work toward during a Chapter 11?

5  A    Yes.

6  Q    And did you work toward that goal in the bankruptcy for

7  Lynn and Julie Olsen?

8  A    We did.

9  Q    Did you achieve that goal?

10 A    We did.

11 Q    And a plan has to be approved by somebody.  Correct?

12 A    Yes.

13 Q    And who is that somebody?

14 A    In the case of 11, the plan gets voted on by the creditors.

15 You treat secured creditors individually in your plan.  So,

16 every one of his -- that's John Deere, that's KeyBank, all those

17 people -- they get -- you spell out in the plan how you're going

18 to pay them.  And those payments might run out 10, 15, 20 years

19 sometimes.

20      Unsecured creditors are typically treated in one class; but

21 all of the creditors, after you put out your plan, they get the

22 opportunity to vote.  In some cases, if they -- if you can't get

23 them to agree to vote for your plan, you can confirm a plan,

24 sometimes, over their objections by meeting certain statutory

25 requirements that the Judge views as being fair and equitable.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1  Q    Was the plan in Lynn's case approved by vote of the

2  creditors --

3  A    Yes.

4  Q    -- or was it -- or did it have to go to the Court over

5  someone's objection, if you recall?

6  A    No, we didn't.  We -- it was a very litigious Chapter 11,

7  primarily, because of KeyBank.  They -- even though they almost

8  got paid out with the cash receivables, they bled the thing.

9  They were over secured.  They had the assets, you know.  And, in

10 my view, the attorney just bled it.  He did a lot of unnecessary

11 things that were very expensive.

12      But, ultimately -- and we had hired an attorney who

13 specializes in -- in suits against banks to investigate.  But,

14 ultimately, we dropped our claim against the bank.  We settled

15 with the bank.  They reduced the attorney fees they were

16 claiming and the interest and a bunch of other things.  We

17 settled with them and with every other creditor.  And -- and

18 unsecured creditors voted for the plan.  And, so, we confirmed

19 without litigation.

20 Q    Do you recall, approximately, when the plan was confirmed?

21 A    January 16th of 2001.

22 Q    And did the plan provide a road map for Lynn's farming

23 operation over a period of years after that?

24 A    Yes.

25 Q    And there were certain requirements he was subject to as

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/DI - BENTLEY

1  far as making payments to creditors and whatnot?

2  A    Yes.  The terms for each secured creditor are spelled out,

3  and they substitute for any prior agreement.  So, each creditor

4  and Lynn knew exactly what he had to pay in monthly or annual

5  payments, the interest rate's set, and the term is set.

6  Q    So, over the course of time, whatever period it was that

7  the plan envisioned, Lynn kept up his commitments and did what

8  he was required to do?

9  A    Yes.

10 Q    And that, ultimately, lead to his being completed with the

11 plan.  Correct?

12 A    Yeah.  They're actually -- he actually -- you get out from

13 under bankruptcy supervision after you confirm a plan, and it

14 might take a couple of months to close that bankruptcy.  Then,

15 your -- your rights and responsibilities are all spelled out in

16 the Chapter 11 plan.  And, if -- if the debtor or somebody in

17 Lynn's position, say he defaulted on a provision, what the

18 creditor does -- he does not go back into bankruptcy court.  He

19 goes into state court and says, "Here's the plan provision, and

20 this fellow didn't comply."

21 Q    And that never happened with Lynn, did it?

22 A    No, it did not.

23       MR. BENTLEY:  Okay.  No further questions.

24       THE COURT:  Cross?  Mr. Anderson, good afternoon.  You

25 may proceed.

1    MR. ANDERSON:  Thank you, your Honor.

2

3                    CROSS EXAMINATION

4  CROSS BY MR. ANDERSON:

5  Q    Good afternoon, Mr. Sackmann.

6  A    Good afternoon.

7  Q    I just have a few questions.  I think you briefly mentioned

8  Mr. Olsen's farm income or losses in the few years leading up to

9  the Chapter 11 filing?

10 A    Yes.

11 Q    Do you recall those exact numbers?

12 A    No.  They were nominal.

13 Q    What if I said, 1996, he had a loss of just over $505,000?

14 Would that be about right?

15 A    Yes, I think that's right.

16 Q    And, then, in 1997, a total income of 100 -- $168,000?

17 A    That's a possibility.  I recall it was, like, 200,000.

18 But --

19 Q    And, then, 1998, about 1.2 million loss.

20 A    Yes.

21 Q    Does that seem about right?  And, as far as secured

22 creditors, do you know the total amount owed to them at the time

23 of filing?

24 A    No, I don't.

25 Q    Would a figure of around six million sound about right?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/CR - ANDERSON

1   A    I'd say that's too low.

2   Q    It was higher than that?  It was higher?

3   A    Yes.

4   Q    Okay.  And what was the return, as part of this plan, cents

5   on the dollar?  How much did they get back?

6   A    Secured?

7   Q    The unsecured.

8   A    The unsecured?  14 percent.

9   Q    They got 14 percent back?

10  A    Yeah.  Were you asking me of unsecured debt or secured

11  debt?

12  Q    I was asking you about unsecured debt.

13  A    Oh, okay.  And what number did you ask me?

14  Q    About six million dollars.  Does that sound --

15  A    That's right.  I --

16  Q    Okay.

17  A    Yes.

18  Q    And they got 14 percent of that back?

19  A    That's correct.

20  Q    And when was the plan complete?

21  A    January 16th of 2000 --

22  Q    Okay.

23  A    -- and 1.  2001.

24  Q    And it was your understanding that his business was getting

25  better at that point?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. SACKMANN/CR - ANDERSON

1  A    Well, he was profitable both years.  It's -- the potato

2  business is all about risk.  It's up and down, you know, from

3  one year to the next.

4  Q    So, he was profitable, then, after the plan had ended?

5  A    I don't know after the plan.  He was profitable in 1999,

6  and he was profitable in 2000.

7  Q    Okay.

8          MR. ANDERSON:  I have no other questions, your Honor.

9          MR. BENTLEY:  No redirect.

10         THE COURT:  You may step down, Mr. Sackmann.  Good to

11 see you.  Thank you for being here.

12         THE WITNESS:  Thank you.

13         THE COURT:  Next witness.

14         MR. BENTLEY:  We call Stuart Turner.

15         THE COURT:  Stuart Turner.  Mr. Turner, if you'll come

16 up to your right and to my left.  And, then, you've been in

17 court so you know the procedure.  Right?

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Thank you.

20    (Courtroom Deputy takes picture of the witness)

21         THE COURT:  Please, raise your right hand.

22    (STUART TURNER, called by the Defendant, was sworn)

23         THE COURT:  Okay.  Please be seated.  When you're

24 comfortable, tell us your first and last name speaking directly

25 into the microphone.  Thank you.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1    THE WITNESS:  Stuart Turner.  S T U A R T.  T U R N E R.

2    THE COURT:  Okay.  You have may proceed.

3

4                        DIRECT EXAMINATION

5    DIRECT BY MR. BENTLEY:

6    Q    By whom are you employed, Mr. Turner?

7    A    My wife and I have a small consulting business, Turner &

8    Company, Inc.

9    Q    And where is your business located?

10   A    It's in West Richland.

11   Q    What is the nature of your consulting business?

12   A    It's diverse.  I'm an independent.  About 50 percent of my

13   work is forensic examination of crop loss.  About 25 percent of

14   it is research, often contract research, for NRCS-USCPA, similar

15   organizations.  And the remainder of the work I do is farm

16   management work.

17   Q    Do you have any family background in agronomy?

18   A    I do.

19   Q    Could you tell us about that?

20   A    Well, I'm one of two witnesses in this case that's sort of

21   second generation.  My father came to this country in 1950 and

22   formed a consulting group, initially based in Seattle,

23   eventually expanded nationwide with -- with five offices.  Did,

24   really, very much the same work that I'm doing.  I think he's

25   credited by many people as really being the inventor of forensic

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1   agronomy.  So, starting from the time that I could walk, I was

2   in citrus groves and potato fields and cotton fields and wheat

3   fields.  So I just grew up with the business.

4   Q    All over the country?

5   A    All over the country.

6   Q    Please, describe your education for the jury.

7   A    I graduated high school, 1974, Mercer Island, and went to

8   Washington State University; got a BA in American history; got a

9   degree, a second degree, a Bachelor of Science in agronomy,

10  specializing in plant protection chemistry.

11  Q    So you have two bachelors degrees?

12  A    I do.

13  Q    And they're both from WSU?

14  A    They are.

15  Q    Can you tell us how you transition from history to plant

16  science or agronomy?

17  A    Well, as I mentioned, I spent a lot of time with my father;

18  and he did a lot of work like this.  And, of course, the first

19  30 years of his life there -- there was no real alternative

20  dispute resolution.  So everything went to trial.  And I got to

21  attend a few trials, was sort of interested in the idea of

22  becoming an attorney.  And, then, I sort of spent more time with

23  attorneys and realized that I just really wasn't cut from that

24  cloth and that I needed to come home at the end of the night

25  with, you know, stains on my knees and dirt under my nails.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  Q    Do you hold any professional certifications?

2  A    I do.

3  Q    Can you tell us what they are?

4  A    I'm board certified by the American Society of Agronomy,

5  the Crop Science Society of America, and the Soil Science

6  Society of America --

7       (Interruption by the reporter)

8           THE WITNESS:  The Crop Science Society of America and

9  the Soil Science Society of America.  The three professional

10 societies formed a joint certification board.  My particular

11 certification is Certified Professional Agronomist.  I've been

12 so certified for most of my career.  There's fewer than 600 of

13 us in the world.  There's currently 17 of us in this state.

14 Q    (BY MR. BENTLEY)  So your certification was issued to you

15 by a joint committee of the American Society of Agronomy, the

16 American Society of Soil Science, and the American Society of

17 Crop Science?  Is that --

18 A    Close.

19 Q    -- a fair summary?  I missed some of those names, but --

20 A    Yeah, the three.  We call them the "tri-societies."

21 Q    Okay.  What does one need to do in order to obtain this

22 certification?

23 A    Well, it's a combination of things.  I -- the first five

24 years in the certification program I was certified at the -- the

25 lower level as the Associate Professional Agronomist, and that's

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  a requirement unless you have a -- a Ph.D.  You have to --

2  every -- in a 24-month cycle, you have to submit a minimum

3  number of continuing education requirements of a certain

4  category.  There are five different categories.  You have to

5  take a board exam, you have to provide professional references,

6  and you have to be able to establish that you've worked

7  professionally for the minimum length of time and, then, you're

8  allowed to take the full certification, which I did in, I think,

9  1990.

10 Q    Are you also a certified crop advisor or is that part of

11 the same certification as an agronomist?

12 A    Yeah, that's a separate program.  That's a little bit of a

13 different program.  It's called the CCA certification.  And CCAs

14 are the people who you see very frequently in the field.

15 They're the ones that are usually pulling the samples, checking

16 for bugs and disease.  And it's a lower level of certification,

17 but it's a -- it's a production-oriented certification.  There's

18 quite a few CCAs.  There's about 30,000 of them.

19 Q    As a certified agronomist, have you received any special

20 recognition from the U.S. Government?

21 A    Yes, I have.

22 Q    Would you tell us about that?

23 A    Well, I -- Governor Gregoire and the acting, at the time,

24 Director of the Department of Ecology appointed me several years

25 ago to the board of the GWMA, which stands for the Groundwater

1  Management Area.  And we have a problem here, both in the

2  Columbia Basin where there's been a GWMA for about 15, 20 years

3  and in the Yakima Valley, with nitrates, principally, from

4  agricultural sources -- and nitrates are just a form of

5  nitrogen, one of the major plant nutrients -- being over applied

6  and, in combination with over irrigation, contaminating

7  groundwater.  So I'm on what's called the GWAC, which is the

8  Governing Committee of 22; and I'm acting as a technical

9  advisor.

10      I've also been appointed by the NRCS, which is a division

11  of USDA.  The National Resource Conversations Service is

12  responsible for writing certain technical standards.  One of the

13  standards is called the "590," and it's the nutrient standard.

14  And it's directly linked to appropriate practices for the

15  application and management of nutrients on crops.  We've been

16  rewriting the 590 for about a 12-month period.  We meet usually

17  monthly.  We'll complete that task in June.  And that will,

18  then, stand for five years before it's again revised.

19  Q    Have you -- withdrawn.

20      When did you start working in the area of the potato

21  industry in the State of Washington?

22  A    Well, ignoring what I did following and helping my dad,

23  1977.

24  Q    Have you performed various jobs associated with potato

25  production?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  A    I've had the most bottom rung job of cleaning out the

2  potato storages and shoveling out rotting potatoes, sand

3  blasting tanks, delivering fertilizer.  And I started at the

4  bottom and worked my way up.

5  Q    Have you worked in the seed potato business?

6  A    Yes.  I have a number of seed potato producers that I am a

7  technical advisor for.

8  Q    Are you a member of any professional societies --

9  A    A number.

10 Q    -- relating to agriculture?

11 A    Yes.

12 Q    Tell us what --

13 A    My -- my parent society is the American Society of

14 Agronomy.  But I'm also a member of the Western Society of Wheat

15 Science; the Wheat Science Society of America; the Washington

16 State Horticultural Association; International Society of

17 Arboriculture, which is a fancy word for trees; and I -- I

18 attend other professional organizations on an occasional basis,

19 part of what I have to do for my continuing education

20 requirements.

21 Q    Have you had a professional relationship with some of the

22 defendants in this case?

23 A    Over the last 25 years, I have.

24 Q    Well, let's go through the -- the defendants individually;

25 and why don't you tell us about work that you have done with

1  Mr. Olsen, first of all.

2  A    Well, I've known of Mr. Olsen for probably 20 years.  I've

3  actually worked for him off and on for the past 12 years.  I've

4  worked closely with him since 2006.  Since he's been renting

5  ground from one of the farms that I manage, I tend to see him on

6  a very regular basis.

7  Q    And Mark Peterson?

8  A    Mr. Peterson I know just sort of incidentally.  He's a

9  manager of Carr Farms.  When Jr.'s father, Jack, was alive, I

10 worked for him; but I otherwise haven't had a lot of contact

11 with him.

12 Q    What about Jeff Gordon?

13 A    I know Jeff sort of as one of the Gordon brothers.  I've

14 worked with them.  I know at least twice I've been called out

15 when they had a major problem in their potato fields.

16 Q    I didn't catch -- a problem with what?

17 A    Their potato fields going back to the late '80s.

18 Q    And do you know Fred Ackerman?

19 A    I do know Mr. Ackerman.

20 Q    Have you ever had any professional connection with

21 Mr. Ackerman?

22 A    I've been in his office before, usually on crop insurance

23 claim related information.

24 Q    Have you provided or do you provide expert consulting

25 services for other Washington potato growers besides --

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1    A    I do.

2    Q    -- Mr. Olsen and --

3    A    Yes.  I have one large grower that provides about

4    29 percent of Lamb Weston's raw products.  That's AgriNorthwest.

5    I have a number of other smaller growers that I consult with, as

6    well.

7    Q    Have you prepared a PowerPoint presentation for the jury to

8    explain the basic potato production cycle?

9    A    I have.  It's a very, very basic -- within the limits of

10   the time constraints here, yes.

11           MR. BENTLEY:  All right.  Could we show the first

12   slide of this presentation, Exhibit 1507, without showing to the

13   jury so that Mr. Turner can identify it?

14           THE COURT:  Do you have a copy of this, Mr. Tornabene?

15           MR. TORNABENE:  Yes.

16           THE COURT:  And this is for illustrative purposes

17   only?

18           MR. BENTLEY:  Yes.

19           THE COURT:  Okay.  Thank you.  Any issues before we

20   begin this presentation, Mr. Tornabene?

21           MR. TORNABENE:  No, your Honor.

22           THE COURT:  Okay.  You may proceed.

23           MR. BENTLEY:  I offer 1507.  I ask permission to

24   publish to the jury.

25           THE COURT:  You may publish for illustrative purposes.

1    MR. BENTLEY:  Thank you.

2    (Exhibit No. 1507 admitted into evidence)

3 Q   (BY MR. BENTLEY)  Let's go to the first slide.

4    MR. BENTLEY:  And, if I may, your Honor, I'd like to

5 let Mr. Turner describe and narrate the 14 slides that are here.

6    THE COURT:  You may proceed.

7    THE WITNESS:  Okay.  The first slide is just simply a

8 title.

9    Can we blow this up a little?  Could we get to full screen

10 because this is small.  Now it's really small.  You're going to

11 force me into my glasses.

12    (Discussion off the record)

13    THE WITNESS:  I think we can move on.  I can --

14    MR. BENTLEY:  Okay.  We have it?  We have it.  If we

15 may go to the ELMO, I think that might work.

16    THE WITNESS:  Certainly.

17    MR. BENTLEY:  I think we can blow it up a little more.

18 Q   (BY MR. BENTLEY)  Just so we're all on the same page, is

19 this the first slide?

20 A   It is.  Now we've lost our color.

21 Q   We lost our color.

22 A   Yeah.  Thank you.  At the very top, you can see a series of

23 little -- we call them micro-plants.  The very beginning of

24 potato culture is actually tissue culture where we go to a

25 single cell or a group of small cells; and we grow those on a --

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  basically, a petri dish.  It's, like, an auger growth medium.

2       When we get the little plant that's developing several sets

3  of leaves, we carefully transplant them.  So you can see sort of

4  in the center picture there's a series of small little plantlets

5  there.  And, at the -- at the bottom, we -- we finally get to

6  the harvest.  We have something that we can actually transplant

7  and grow.

8       The reason that we do this is that the potato is one of the

9  very few crops that's vegetatively reproduced.  In other words,

10 it's a chunk of the tuber that we actually plant in the field.

11 And that encompasses a whole host of problems and risks because,

12 when you have all that tissue compared to a discrete, usually,

13 very dry seed -- seeds are typically less than 25 percent

14 moisture, often down in the ten percent range -- disease doesn't

15 survive well on or in seeds.  But it thrives well in a juicy

16 little piece of tuber.

17      Ah, color.  Perfect.  What an improvement.  So we start

18 with the microtuber of something that we know is ultra clean.

19 It's been virus tested.  It's called an indexing process.  We

20 you use amino assays and other sort of neat little tests to make

21 certain it doesn't have disease.  And this is the very beginning

22 of the process.  You can see that this can occur year-round.  In

23 fact, we do -- a lot of potato research, to my wife's delight,

24 occurs on the islands of Hawaii since we can grow three crops in

25 a year.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1    Once we get to the -- let's go to the next slide.  Once we

2  get to the little mini-plant, then we -- we grow it out.  First,

3  it's in a smaller field than you see in this -- this photo I

4  have here.  But, typically, it will be in a -- in a one to

5  15-acre field plot.  That grows for one season, then that is

6  increased out from generation one to generation two.  And, so,

7  this is a full circle.  Just, typically, 100 to 125-acre circle.

8  Even though you see green in the very bottom of the screen,

9  that's not another potato plant.  We grow potatoes in a very

10  isolated area so that we don't have the insects, the vector

11  diseases, and we don't have soils that may be infested with

12  common potato pathogens.

13    So this is the field, then, at the end of this production

14  season.  This field, when the vines die down, we actually

15  desiccate them with a chemical.  We spray a chemical on them

16  that completely dries them down because that reduces disease

17  transmission.  It also helps to set the skins so that the

18  Russet-type skin is more abrasion resistant when you're

19  harvesting.  And this field would, then, be harvested; and it

20  will go into a storage.

21    Let's have the next slide.  You can see the grower walking

22  through the field.  This is something -- the seed fields get a

23  lot of walking.  And, if you compare this to one of our fields

24  here, this is almost end of the season.  This is a -- a mid to

25  late August photograph.  You can see that it's quite easy to

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1   walk down the rows.  There's still some bare soil there because

2   seed's often grown in a high altitude area where the growing

3   season is very short.  And we don't want to produce a lot of

4   potatoes because everything that's oversize has to go for use

5   that we get a lot less money.  It frequently will go for process

6   use.  So you want small seed, and so you have a very short

7   growing season.  So you don't close the rows completely.  So the

8   vines are often only two feet long.  Our potato vines here, when

9   they're fully developed, are four to five feet long.

10          Next slide.  Okay.  This is an aerial shot of -- of the

11  actual harvest process.  This is very typical.  We see a tractor

12  pulling the digger.  The digger has a great big shoe on the

13  front that goes down underneath the potatoes.  It lifts the

14  potatoes and the soil together.  And there's a -- there's a

15  series of rotating chains that have long bars that are just a

16  certain distance apart.  And the bars are coated with rubber

17  because this begins the process of handling the tuber where

18  bruise because something that we're really focused on.

19          So they're elevated.  They're cleaned.  The vines and other

20  material gets blown out the back.  There are big fans on the

21  machine there.  You can see there are two individuals.

22  Depending on the field, they're either picking out anything

23  that -- that looks really off type or they're more commonly

24  pulling whatever remnants of vines are coming up the chain or

25  they're pulling a rock out.  If you're in a field that has rock,

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  the digger can't distinguish between a nice smooth rock and a

2  tuber.  They look kind of the same to the digger.

3      So it, then -- the boom goes over to the truck.  And you

4  can see that there's a very small drop.  That's a flexible boom

5  that can move up and down.  And you'll see that the near side of

6  the truck has a partition that has been dropped down.  That's

7  hydraulically controlled by the -- by the driver.  So the boom

8  can be lowered further because every time you drop a potato,

9  you're going to damage it.

10      Next slide.

11 Q    Before we leave that, could we go back to that slide?  At

12 the -- the title of this is "Generation II/III Seed Harvested."

13 A    Right.

14 Q    Is generation -- is either of those generations suitable as

15 a seed potato for a commercial potato grower?

16 A    Yes.  We rarely buy Generation II seed.  It's more expense,

17 and there's less of it.  We typically buy G-III.  There's --

18 sometimes the market permits us to buy G-II.

19 Q    And, when say, "Generation II" or "Generation III," are we

20 not referring to years of development from that little bitty

21 piece --

22 A    Right.

23 Q    -- into the first generation, then, that expands the second

24 year and the third year and so on?

25 A    That is correct.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  Q    Let's go to the next slide.

2  A    Okay.  Here -- here's where they're going into storage.

3  And storages have really changed from -- over the years.

4  Initially, they were bulldozed into the ground because we didn't

5  have effective heating and ventilation.  And we just used the

6  natural cooling of the earth.

7      Now we have these wonderful steel structures.  You can see

8  the polyurethane foam insulation is sprayed on them, and they

9  have lighting down the center.  You can see these corrugated

10  tubes with little holes in them on the floor.  Those are very

11  important.  That's how we move air and, in some cases, moisture

12  and, in some cases, chemicals -- sprout control chemicals, not

13  for seed but for commercial purposes.

14      And you can see that the very far left edge is the truck,

15  which is backed in; and it's unloading on -- that machine has a

16  conveyer belt there.  It's called the piler.  And, so, they're

17  gently piling those to a certain depth, and they work back and

18  forth across the face of that with each truckload laying

19  additional ventilation as needed until they have this storage

20  full.  Once it's full, they close the doors; and they pull the

21  temperatures down.

22      Now, for seed, we want to make sure that it's -- really

23  goes dormant; and we're not going to treat it with sprout

24  inhibitors because, eventually, next spring we need it to

25  sprout.  So we'll pull it down to a temperature a little bit

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1   lower than we typically would for production potatoes.  And, if

2   we -- if we did that with production potatoes, it would cause

3   the sugar sort of problem.

4       So it's put to see sleep with temperature.  We control

5   moisture.  We watch the pile.  We use a little handheld device.

6   It's an infrared gun, and it detects hot spots.  And what we're

7   looking for is biological activity.  Any biological activity

8   gives off heat.  So, if we see a little hot spot as we're

9   scanning in the pile, we got to be like a little gopher.  We'll

10  need to dig down to it and look and see what our problem is

11  there.  Often you can just get a couple of three or four or

12  five-gallon buckets, remove sort of the start of the infection,

13  and force a lot more air through and -- and kind of settle them

14  back down and put them back to sleep.

15  Q   Now, what we're looking at in this slide are seed potatoes.

16  Correct?

17  A   Yes.

18  Q   But, if I wanted to pull out one of those and take it home

19  and boil it and eat it for dinner, I could.  Right?

20  A   Yes.

21  Q   Let's go to the next slide.

22  A   Okay.  This is a slide I took out on one of the farms that

23  I manage, and this Mr. Olsen's equipment.  You can see there's a

24  tractor.  It has a very particular split-wheel arrangement that

25  has to do with the spacing of the rows for the -- for the row

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  width, and it's pulling a -- a four-row potato planter.

2  Q    This would be over on the left side --

3  A    Behind the tractor --

4  Q    -- yellow -- yellow --

5       (Interruption by the reporter)

6          THE WITNESS:  I'm sorry.

7  Q    (BY MR. BENTLEY)  You're referring over to the left side of

8  the slide?

9  A    Well, the -- the farthest side is the tractor.

10 Q    Correct.

11 A    The center is the planter that's attached to the tractor.

12 And, of course, it has all kinds of electrical and hydraulic

13 controls to lift it up, to put it back down, to adjust the

14 depth.  And the planter, actually, is doing a lot of things.

15 We're applying fertilizer in a banded treatment.  This is one of

16 the things we do to reduce the amount of fertilizer that we use.

17 We apply it just below and to the side of the seed so that the

18 young plant doesn't have to go far for it, and it's not diluted

19 in the mass of soil.  So it's there to start the plant.  It's

20 called the starter or a pop-up-type fertilizer.

21      We also have a product -- several different products we can

22 use, Phymed (phonetic) and Mocap are a couple of common trade

23 names.  And they're insecticides or nematicides.  And they're

24 designed to protect against pests.  Nematodes are very small,

25 unsegmented worms that can attack the potato; and they can

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1   really cause an awful lot of damage economically.  They can come

2   in early season.  So this is a treatment that protects against

3   wireworms and other soil pests.

4   Q    So this -- this slide is showing that -- someone planting

5   the seed potatoes.  Is that correct?

6   A    That is correct.  This is a commercial field.  The

7   equipment you see that's yellow that's on the right-hand side

8   has a very particular attachment.  That's a specialty built

9   attachment, and that's loaded from a truck of seed pieces.  So,

10  from the storage that we saw in the -- in the prior slide, those

11  whole potatoes are pulled out.  They're run across sizers and

12  cutters, and they're cut into approximately two-ounce pieces.

13  You'd have at least one eye because, if you don't have an eye,

14  you have what's called a "blind seed piece."  It will just rot.

15  It won't sprout.  It doesn't have a means to generate and -- and

16  to come.

17      And we, then, treat that seed with a fir bark dust and

18  often a fungicide so that we don't have Erwinia or related soft

19  rot because we plant potatoes early in the year.  They're,

20  basically, a cool-season crop.  Typical year, the very earliest

21  of the earlies go in on Washington's birthday.  The main part of

22  the crop goes in, probably, from the last week of March through

23  about the 20th of -- of April.

24      So that basket that the yellow machine has was all full of

25  seed.  And, if you look closely, you can actually see some seed

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  trickling out and going down into the top of the seeder.  So

2  this is just the loading of the seeder prior to the commencement

3  of the -- the planting process, which also applies fertilizer,

4  also applies, you know, the insecticide, nematicide.

5  Q    Next slide?

6  A    Now, here, this is just a shot of the planter actually

7  operating.  If you look at the far right, you can see there's a

8  -- kind of a light yellow tank.  There's a dark green liquid in

9  it.  That's ammonium polyphosphate.  It's a fertilize I used to

10  manufacture when I was in that business.  It -- it contains some

11  nitrogen and some phosphorus.  That's our starter of material.

12      And the -- the planter has two great big sets of disk

13  openers that actually create a furrow.  They move the soil

14  aside.  Then there's a series of cups that are on a rotating

15  wheel that is on a certain spacing based on the speed of the

16  planter that grabs ahold of each of these seed pieces that's

17  trickling down from the main compartment above.  And, as the

18  wheel turns, it places the seed.  And, then, coming in behind

19  that, there are two very large disk that are called "closers."

20  And they pull that soil back up and over so that they actually

21  create, you know, a protective soil cap so that early season we

22  don't get freeze damage to the potatoes.  So it's -- it's

23  actually planted when we still have freezing temperatures,

24  typically.

25      And, then, in a later process, two to three weeks later, we

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  have what's called "drag off" where we pull a machine and we

2  knock the tops of those hills off and reform those furrows.

3  Q    Are we at the end of the slide show?

4  A    Yes, we are.

5  Q    Okay.

6  A    Okay.  Now we've got the crop up.  My most advanced

7  potatoes are just a little smaller than this particular slide

8  right now.  This is a cultivation procedure where we're usually

9  doing two things at once.  In this particular field, they're

10 only doing one thing.  They're just cultivating.  So they reform

11 the rows, and they're destroying any weeds that have come.

12     We often, in this country because we have such high

13 temperatures in the summer, we make very heavy applications of

14 water.  We use an additional piece of machinery called the

15 "Dammer Diker."  And it looks sort of like a little ferris wheel

16 in the back except it doesn't have the -- the rim.  It's a

17 series of spokes that have shovels on them.  And, as they turn,

18 they come and they dig a pit about the size that you could put a

19 brick in as it goes down the row and, then, that creates a

20 little tiny reservoir.  So, when the circle comes around and we

21 put on 7/10 or 9/10 of an inch water in a relatively short

22 period of time, it doesn't runoff.  It will stay in that little

23 reservoir; and, then, over the next hour or two, it will soak in

24 and provide moisture for the crop.

25     Next.  This is sort of a -- just a schematic drawing out of

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1   one of my textbooks that shows the potato plant and its major

2   parts.  And you'll see at the very top it identifies a flower.

3   My sister did her Ph.D. at Cornell on one of -- one part of it

4   was on trying to make true seed for potato.  It didn't work.  So

5   she ended up restarting and doing it on sweet peppers.

6        We don't use that, but that's a function of the plant.  And

7   its an indicator to field people.  By variety, each variety has

8   a different sort of flowering pattern.  And a lot of times, if I

9   drive past a field and I see a beautiful set of flowers on it, I

10  immediately stop because flowering, in a lot of varieties, is an

11  indicator of stress.  One of the genetic things about plants is

12  that they are programmed to survive.  The plant knows two ways

13  to survive.  It makes tubers.  It makes flowers.  Okay.  Even

14  though the seed doesn't come true, which is why we don't use it,

15  it makes flowers.

16       Then you have the leaflets that come down, and you can look

17  at the larger leaflets in the bottom; and you can see they have

18  an arrangement where they're a little like your hand.  There's

19  kind of a -- a central leaf that points straight out; and, then,

20  there are several side leaves to each side of that.  And -- and

21  potatoes are typically what we call "alternately leafed" so they

22  have a series sort of like you're climbing up a tree.  They have

23  alternately spaced leaflets.

24       About the fourth one down is the one that's really the

25  first mature leaflet.  That's the part of the plant that we

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  sample when we're looking to monitor the -- the nutrient status

2  of the plant, and it's call a petiole.  It's just a fancy word

3  for the stem that supports the leaflets.

4       As you get to the soil line, you can see we have the root

5  structure.  We have the tubers.  These are obviously modified

6  underground stems.  There are several sets of tubers.  You can

7  see here (indicating) in different stages the old seed pieces

8  shown.  In some instances, even at harvest, I'll get small,

9  intact parts of seed pieces that will make it up the chain.

10 It's rare, but it -- it happens.

11      And the different stages of the tuber is very interesting

12 because it represents critical growth stages for the potato

13 plant.  The initial tuberization here typically takes place in

14 the early crop in late May.  In the late crop, it's in early

15 June to mid June.  And anything environmental that happens to

16 the plant during that tuberization process can cause either good

17 things to happen or bad things to happen.  If the plant gets

18 under a lot of stress, it will actually reabsorb and abort a

19 tuber.  Sometimes, if the tuber's already formed, it will cause

20 the tuber to be malformed.  It will have a really funny shape to

21 it.

22      So you can see, also, the plant has a root system.  It's a

23 very modest root system.  The -- the potato plant feeds

24 substantially off that mother seed piece for really the first

25 month.  And, then, the soil temperatures come up and the plant

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  begins to develop and grow.  We're really looking to monitor the

2  moisture in just the top two feet of the -- of the soil for

3  potatoes.  They're not a deep-rooted plant.

4          THE COURT:  Counsel, we need to move this along.

5          MR. BENTLEY:  Yes, your Honor.

6          THE WITNESS:  Next.

7  Q    (BY MR. BENTLEY)  Another slide?  All right.

8  A    You can see here from the title this just shows that we

9  have two ways to control insects.  One is we let mother nature

10 do its good thing.  We do work closely with what's called

11 "integrated pest management," and part of that is trying not to

12 use very toxic insecticides to control pests.  This is, on the

13 left side, the victim here is a -- probably a second instar of

14 the Colorado potato beetle, which is the most common of -- of

15 potato pests.

16      If they get away from us -- let's go to the next slide --

17 sometimes we come in and we spray, and this particular job is

18 being done by ground rig.  We rarely use ground rigs here

19 because our plant protection chemistry from planting will often

20 carry us until we have complete row closure, and we don't want

21 to drive over those vines.

22 Q    Let's go to the next slide, yeah.

23 A    Yeah.  So this is the gentleman we usually call.  This is

24 an Air Tractor 801.  Several of the local applicators use this

25 exact machine.  And, as you can see, that's a very fast way.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1    He's doing about 130 miles an hour right there.

2         Finally, we get, you know, to the harvest phase, hopefully

3    soon to pay day.  This is just a different view of a -- of a

4    harvester.  Same things we talked about earlier.  You can see

5    the spread wheel sort of on the -- the tractor in order not to

6    run over and damage the potatoes.  And, then, the digger's

7    picking them up.  And, then, they're very carefully being piled

8    with a minimum drop onto the ten-wheeler that's shown there.

9    Q    All right.  Is that the end of your slide for --

10   A    That is.

11   Q    -- your PowerPoint?

12   A    That's Potatoes 101.

13        MR. BENTLEY:  Would this be a good time for a break?

14        THE COURT:  It is.  Let's take our break at this time.

15   (Jury out at 2:42 p.m.)

16   (Jury in at 3:02 p.m.)

17        THE COURT:  Please, be seated.  Let's resume.  Okay.

18   Q    (BY MR. BENTLEY)  Mr. Turner, I'd like you to describe the

19   influence of the market on potato production in Washington.

20        THE COURT:  In general?

21        MR. BENTLEY:  As to the processor, french fry

22   processor, and the french -- fresh market.

23        THE COURT:  Thank you.

24        THE WITNESS:  Well, there are two separate markets;

25   and, in addition to the french fries, we have a lot of other

1  process potatoes.  The fresh market is really the source of wild

2  gyrations.  And, at times, some of that excess can be picked up

3  and utilized on the process side and sometimes it cannot.  When

4  there's a shortage, there's a shortage on both ends.  The price

5  will go wild on the fresh side; and, if the french fry guys are

6  short, they'll pay exorbitant, you know, prices for any

7  available open uncontracted potatoes.

8  Q    (BY MR. BENTLEY)  Have there been some particularly bad

9  market years over the last 15 years or so or 20?

10 A    Yeah.  I -- you know, other testimony has brought out 1996

11 and 2000 are probably the outstanding bad years, although, 2012

12 wasn't much of a picnic either.

13 Q    Are you familiar with the concept of dual-purpose potatoes?

14 A    I am.

15 Q    Can you tell us what that entails?

16 A    Well, really, since I can remember, there's always really

17 just been, you know, three kinds of potatoes:  Specialty

18 potatoes, which would be, like, the little reds, white-skinned

19 potatoes, the Yukon Golds, the yellow potatoes, and, even in

20 recent years, purple and blue potatoes.  Specialty.  That's a

21 very, very limited market.  Then there's the general fresh

22 market, which is a Russet-type spud.

23     And, when I first started, it was a variety called Norgold,

24 which was a North Dakota release.  1987, a new variety came out.

25 It was significantly improved, Norkotahs.  In other states, they

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  don't grow a lot of these varieties.  But here that's been sort

2  of the -- the mainstay in recent, excuse me, years on the fresh

3  market side.

4      On the process side, really, you go back and look at the

5  seed sales.  And they tell you that the Russet Burbank was king,

6  really, for a long time until 12, 15 years ago, when the

7  Tri-State Variety Development Programs and other programs

8  started to bring in replacement varieties.  Because, although

9  the Russet Burbank was a fairly high yielder, it was very

10 disease susceptible to certain problems.  And, occasionally, it

11 was a -- process usage was low.  You'd get a low percent of U.S.

12 No. 1s and 2s.  It's the original dual-purpose potato.  In

13 Idaho, most of the potatoes packed are Russet Burbanks whereas,

14 in Washington, they're mostly the Norkotahs or the newer

15 varieties that were developed specifically for this dual

16 purpose.

17     And the idea of dual-purpose is to give the grower an

18 option so that, in this changing market, which shifts sometimes

19 day-to-day between hot, medium and cool, if you have the ability

20 to capitalize on a -- on a really hot market, we can see returns

21 that are really high.  You know, I know that other witnesses

22 have testified about prices in the 100, $120-ton range.  I've

23 seen it spike up to $300.  The ability to capitalize and -- and

24 hit that fresh market, if you have a shed that you can sell to

25 and if the market's that high, it is very important because, in

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  many years, you don't make money on the fresh side.  Your

2  safety, your insurance program, is the ability to sell them to

3  process usage, whether it's french fry, other frozen, dehy chip,

4  some other use.

5       And having a dual-purpose potato is obviously a concept

6  that's relatively recent, but it's become the focus of attention

7  through the breeding program, for the development program.

8  We've gone from, in 20 years, essentially, having very little

9  interest or understanding of that market to now a significant

10 portion of the market is -- is gravitating that direction.

11 Q    Are you familiar with the quality standards that were

12 contained in the contracts between Tri-Cities Produce and Lynn

13 Olsen or Olsen Ag?

14 A    I am.

15 Q    And, in particular, are you familiar with the specific

16 gravity and bruise-free standards?

17 A    Yes.

18 Q    Can you -- excuse me.  Can you explain how those factors

19 would relate to the dual -- dual-purpose potato that you've just

20 described?

21 A    Bruise is an important factor for any sale because you're

22 going to get graded, either by the USDA standard or the WSDA

23 standard in the fresh shed or, you know, the USDA standard

24 process grade if you go to the process side.  So bruise is

25 important always.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1        Specific gravity is more important as it relates

2   specifically to certain of the process uses.  In particular, the

3   frozen process usage.  So putting those elements in the contract

4   is an affirmative step and it's also a declaration saying, "I

5   want to preserve my option if it's a red hot market and I can

6   hit it, but I'd like to have very high standards" because most

7   of the process usage is preseason contracted.  They're very

8   careful to not expose themselves to risk.

9        The big three companies, they're run by professional.  They

10  know exactly how much product they're going to need.  What they

11  can't forecast is exactly how much is going to be produced.  So

12  there's always a little bit of open that they have to pick up in

13  most years, and you're hoping to hit that market when there's a

14  shortage.  If you have high specific gravity, you have a low

15  bruise, you have a premium product that's very enticing to a

16  processor.

17  Q    In your opinion, were the specific gravity requirements in

18  the contracts appropriate for the purpose of producing a

19  dual-purpose potato?

20  A    I think they were designed, really, expressly for that

21  purpose.

22  Q    And what about bruise?  The 90 -- 90 or 80 percent bruise

23  free?

24  A    Yes.  Again, the higher quality the potato, the more people

25  will compete for it, the higher price will be paid for it.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  Q    There's been evidence that Mr. Olsen was growing Norkotahs

2  in '01 and grew Norkotahs again in '02.  I'd like to ask you

3  about that.  How easy is it for a grower to change varieties on

4  a relatively short notice?

5  A    Well, it's sort of like doing 30 knots in a 900-foot long

6  aircraft carrier and stopping on a dime and turning it around.

7  The process of seed production that I discussed a little bit

8  earlier and a lot of the other witnesses have touched on is, you

9  know, a three- to four-year process.  So the seed that we

10  planted a month or so ago was stuff that was developed

11  initially.  Somebody initially made a decision, starting with

12  the plantlet's, three or four years ago.  So you can't just say,

13  "Oh, I'm going to change colors and go to this other color."

14      The seed producers try and anticipate, to some extent, the

15  market.  But right in 2000, 2001, 2002, that's the beginning of

16  sort of an industry recognition of the need for the dual-purpose

17  potato.  So availability was extremely limited or nonexistent, I

18  would say, in 2001, starting to become available in '02, more

19  widely available in '03 and '04.

20  Q    So, if, hypothetically, Mr. Olsen's harvesting his '01 crop

21  in September of '01 and sees test results showing that his crop

22  is not making the quality standards, would it have been possible

23  or feasible for him to call up his seed grower and ask them to

24  produce a different variety for him in '02?

25  A    No.  At the same time that he's harvesting his 2001 crop, 4

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1   or 500 miles away the seed grower is harvesting the crop that

2   will be the seed for the 2002 crop.

3   Q    Are you familiar with the term "processor" and its role in

4   this case?

5   A    Yes.

6   Q    Can you tell us what that term means based on your

7   familiarity with the potato industry?

8   A    Well, it's a term I use.  And I use it to describe what

9   happens, the disposition of the harvested tuber.  For example,

10  Tri-Cities Produce is primarily a process fresh packer; but they

11  have substantial bulk sales of process, potatoes that go off to

12  a different processor.  You have process frozen french fry.  You

13  have process frozen other:  Tater Tots, wedges.  You have

14  process cooked fresh.  Like, there's a Reser's plant in Pasco.

15  It makes potato salad.  So there's -- any time that you

16  materially change something, it's a process.

17      In the fresh side, you take a product that's not salable as

18  it comes off the truck.  As it comes off the truck, it's dirty.

19  There's little pieces of vine.  Occasionally, there's rocks.

20  There may be cut and -- and rotted potatoes mixed in.  You have

21  to go through a process of cleaning, sorting by grade, sorting

22  by size, and packaging and shipping.  And that's a -- that's a

23  material process.  So we call it a "process fresh pack."

24  Q    Are you familiar with the specific gravity requirements in

25  the contracts that were at issue in this case?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  A    Yes.

2  Q    And they were 1.079 the first year and, then, 1.078 in the

3  ensuing years.  Is that correct?

4  A    Yes, that's correct.

5  Q    Do you have a professional opinion as to whether those

6  specific gravity levels were reasonably achievable for the

7  grower?

8  A    Well, I -- I think it depends on the grower.  And it

9  depends to a certain extent on the season and a certain extent

10 on the location and a lot on the particular culture.

11 Q    When you say the "culture," you mean the techniques of the

12 grower?

13 A    Yes.

14 Q    Tell us more about that, if you would.

15 A    Well, it's not for amateurs.  I mean, there's nothing about

16 potato growing that's really for amateurs.  It's a very

17 intensive crop.  It's one of the highest risk crops that we

18 grow.  Everything in the world likes to eat a potato.  And we

19 have the seed issue.  It's, basically, a cool season crop that

20 we've adapted to a seasonally very hot climate.  And the -- only

21 the upper tier growers, really the top half, I think are capable

22 of achieving gravities like this.  And, even then, they're going

23 to have to have a little assistance from mother nature.

24 Q    You've been present during the testimony in the trial.

25 Correct?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  A    I have.  I've been sitting in the back there taking notes.

2  Q    And did you -- do you remember hearing the testimony about

3  the results from the Western Potato Trials or the Tri-State

4  Trials?

5  A    Well, both.

6  Q    Yes.  And do you have an opinion as to the significance of

7  those test results for one of the top tier potato growers like

8  Mr. Olsen?

9  A    Well, you have to understand the purpose of the trials and

10 how the trials are actually constructed.  The typical trial --

11 and I go -- we have a Potato Field Day at the Othello Research

12 Station the third week of June every year.  And they plant three

13 rows of each variety.  Norkotahs were planted as one of the

14 three standard varieties against numbered compounds -- numbered

15 -- numbered lines that were being developed so we can evaluate

16 against some kind of a standard.  And they're fairly small

17 plots.  They plant one plant of blue potatoes at the beginning

18 of each row.  They plant, then, 20 feet of three rows and, then,

19 plant another set of blue plants to separate so that, when

20 they're harvesting and they hit the blue potatoes, they know

21 they're at the end of the plot.

22     So, of the three rows, they then have, usually, three or

23 four replicates that are randomized.  They just take and roll

24 the dice.  They have a plot plan where they have -- the

25 different plots are numbered.  And they just roll the dice and

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  start assigning them randomly to try to get the variables out.

2      Then, out of the three rows in each plot, they only harvest

3  the center row.  So the total data set from these trials would

4  be about two-thirds the side of the jury box.  It's fairly

5  small.  I'm conducting herbicide residue studies this year with

6  potatoes.  My plots are four rows wide and they're 300 feet

7  long.  They're 15 times larger.

8  Q    And the purpose of the -- are we talking the Western Trials

9  or the Tri-State?  Both?

10 A    Well, they're -- they're both -- they're both quite

11 similar, and they have somewhat similar objectives.

12 Q    Their purpose is to test the overall characteristics of --

13 of the test potatoes.  Is that correct?

14 A    Yes.  And some years they've actually done the trials in

15 commercial fields.  They'll just not plant a little section.

16 And, then, they'll bring their little research planter over; and

17 they'll plant that little section.  And they use sort of common

18 commercial practices to try and mimic the results the average

19 grower would get.  They have no particular focus on any specific

20 parameter.  So the fertilizer, irrigation, the timing of the

21 planting, the timing of the harvest, none of that is -- is

22 designed or focused culturally on a specific issue.

23      Instead, they're just saying, "Oh, we're going to try to

24 mimic Joe Potato Grower.  And there's many different practices

25 so we're just going to shoot for an average."

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1 Q    They're not focused on that specific gravity characteristic

2 of their test potatoes.

3 A    They are not.

4 Q    Do you have an opinion with respect to the bruise-free

5 levels contained in the contracts?

6 A    Yeah.  The bruise-free levels in the contract, typically

7 the initial year, are high.  I think they're achievable, and I

8 speak from direct experience because I do a lot of forensic work

9 where something bad has happened to a potato field.  One of the

10 things that I have to do is, at harvest, evaluate -- let's say

11 the west half of the field was damaged but the east half is

12 undamaged.  We need to make a comparison.  So, you know, on a

13 comparison basis, you know, you're -- you're trying to evaluate

14 one piece of data against another.

15 Q    You've heard the testimony of Dr. Stark and others

16 concerning the potential negative impacts of heat on a tuber.

17 Correct?

18 A    Yes.

19 Q    We also heard the testimony of Dr. Daly with regard to the

20 average maximum monthly temperatures.  Correct?

21 A    Yes, I did.

22 Q    What is your opinion with respect to the relationship

23 between high heat and specific gravity in a potato?

24 A    Well, it's one of about a dozen parameters that is a

25 significant influence.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  Q    Can you give us more detail about how a potato -- say, when

2  the tubers are about to be set, how a potato responds to high

3  heat?

4  A    Well, it depends.  It depends on the conditions preceding

5  the heat event, whether it's been cloudy and cool.  The plant

6  has a daily cycle, a diurnal cycle, a day/night cycle.  And the

7  plant, in its simplest term, is a water pump in the same way

8  that an internal combustion engine is an air pump.  Everything

9  physiologically is driven by the availability of water.  So the

10  plant has to osmotically regulate itself or it will wilt and be

11  injured or die.

12      And one of the ways that the plant does that is it's

13  genetically coded to sort of monitor "What's the weather like."

14  If it's cloudy and it's cool out, the plant makes very little

15  epicuticular deposition of wax.  You've seen a newly washed car

16  where the -- the water beads up because it's nicely waxed or

17  it's a new car.  And, you know, plants are the same way.  They

18  use this cycle of sort of, "Okay.  It's 70 degrees out.  It's

19  cloudy.  There's not a lot of wind.  I can afford to lose a lot

20  of water."  So it doesn't deposit a lot of wax.

21      And you can see this same effect for herbicides.  One of

22  the herbicides that we use has a label that says don't put this

23  on unless you have three sunny days before the application

24  because those sunny days will trigger the plant to produce that

25  wax and it will mean less of the chemical will go into the

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  potato.  So the potato plant will be able to metabolize sort of

2  what's going on and not get a toxic load.

3      So the amount of solar radiation; whether there's wind; the

4  speed of the wind; the duration of the wind, which we measure as

5  what's called "total wind run" on the WSU Ag Weather Net System;

6  relative humidity.  If it's low humidity, there's a greater draw

7  to pull moisture out of the plant.  And, yeah, you have heat

8  transfer that's -- that's occurring and that direct solar

9  radiation is actually physically heating the plant.

10      Now, a certain amount of heating is good.  The basic

11  biological law of Q10 is that, for every 10 degree rise in

12  centigrade you get, the rate of biological reactions doubles.

13  The problem is -- is that potatoes are a cool season plant; and

14  their limit is -- you know, for really efficient operations, is

15  up to about 90 degrees.  Once you get above 90 Farenheit, the

16  potential for heat injury is there.

17      One of the biggest factors of heat injury is:  What's the

18  recovery cycle?  Because we're always thinking about the daytime

19  because we go home and we go to bed and it's dark out.  The

20  plant respires or catches up and does all its other

21  physiological functions at night.  If the nighttime temperatures

22  drop down into the -- into the high 40s, even if you've had a

23  100-degree day, the plant has a substantial ability to recover.

24  It can rehydrate itself, and the amount of stress is limited.

25  It can, then, face another hot day.  But, if you get the evening

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  temperatures, night temperatures, stay in the mid to upper 50s

2  or even in the 60s or 70s, it has less ability to recover.  So

3  that's a very significant factor.

4      Another factor is, early in the season, the soil.  The

5  plants are designed to intercept as much light as possible.

6  It's the photosynthesis that produces the sugars and the

7  carbohydrates.  But, early in the season, we haven't closed the

8  rows yet.  You have the sun directly hitting the soil.  And, in

9  some instances, you'll actually get physical burning of the stem

10 right where it meets the soil because the soil gets 120, 130

11 degrees Farenheit.  It will burn the plant.  And there's also

12 some light-colored soils that are just like a reflector.

13 They're -- they're like tinfoil.  And they'll shine the light up

14 underneath the plant and the plant will get sometimes necrosis.

15 You get some burning on the leaves.

16          THE COURT:  You need to ask some other questions.

17          MR. BENTLEY:  Yes, your Honor.

18 Q    (BY MR. BENTLEY)  So, with reference to a specific gravity,

19 are there cultural practices that a grower can use to enhance or

20 improve the gravity of his crop?

21 A    Yes.  And it's a host of things that you do together.

22 There's no single factor that stands out alone.  But, you know,

23 the beginning of it all is irrigation management.  If you have a

24 modern, efficient, effective irrigation system and you have

25 ready access at all times to moisture, you do not allow the

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1   soils to be depleted so that the plant enters a cycle of stress

2   before the next irrigation comes around.

3        If you manage your fertility.  Fertilizers are double-edged

4   swords.  If you put on high rates of fertilizers in addition to,

5   maybe, some environmental issues you don't want, you have high

6   expenses; but it stimulates the vegetative part of the plant.

7   The plant wants to produce vine.  We don't harvest vine.  We

8   harvest tubers.  You have to have this balance in your fertility

9   program that, earlier in the season than later, you need to

10  start dialing back, particularly, on nitrogen, which is the

11  major plant growth nutrient.  And, if you do this, you still

12  have an effective canopy for photosynthesis; but you're not

13  promoting vegetative growth.  You're, instead, physiologically

14  directing the plant to push more of those solids down into the

15  tuber and that has a positive effect on specific gravity.

16  Q    And it's your opinion that the standards in the contract as

17  to specific gravity were achievable?

18  A    You know, in the -- in the first year at 1079 (sic), that's

19  a fairly high bar.  The next year's, when it drops to 1078 (sic),

20  particularly with the introduction of the new dual-purpose

21  varieties, those are generally achievable.

22  Q    And those varieties are Gems and -- what are they?

23  A    Well, at that time, Gems and Westerns.

24  Q    Okay.

25  A    Both are a Russet-type potato.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1 Q    And it's your opinion that, as you've said, heat can impact

2 the specific gravity in a tuber?

3 A    Absolutely.  There's research that's been conducted,

4 specifically here in the Columbia Basin, by Washington State

5 over many years that establishes that.

6 Q    Is your opinion on that issue form -- influenced by

7 publications in professional journals?

8 A    Yes.

9 Q    I'd like to show you Exhibit 1521, in evidence, on the

10 ELMO.

11     (Pause in the proceedings)

12 Q    (BY MR. BENTLEY)  Is this one of the articles that has

13 influenced your opinion?

14 A    Yes.

15 Q    And who's this by?

16 A    Dr. Davenport of WSU.

17 Q    Are you familiar with her as an expert?

18 A    Yes.  I've been to many Potato Field Days and heard her

19 speak.

20 Q    And, for the record, would you read the highlighted

21 material on this page?

22         MR. BENTLEY:  This is in evidence.

23         THE COURT:  Yep.

24         THE WITNESS:  "Climatic conditions will determine if a

25 growing region has a 'good' or 'bad' year for gravity."  "During

                    JURY TRIAL - DAY 23 - MAY 16, 2013
                          S. TURNER/DI - BENTLEY

1   the three years of this study, the 1998 growing season was

2   extremely hot (Figure 1), and tuber specific gravity was low

3   throughout the growing region."

4   Q    (BY MR. BENTLEY)  Now, I'm showing you -- this should not

5   be for the jury -- what has been marked as Exhibit 1515.  Do you

6   recognize that?

7   A    Yes, that's a chapter out of Dr. Stark's book.

8   Q    Oh, okay.  I'll withdraw that.  Let's go to -- well, yeah.

9   Let's go to 1545.  No.  Let's stay with 1515.  It's the same.

10          MR. BENTLEY:  I offer this into evidence.

11          MR. TORNABENE:  No objection.

12          THE COURT:  Admitted.

13       (Exhibit No. 1515 admitted into evidence)

14  Q    (BY MR. BENTLEY)  And what does Dr. Stark tell us in the

15  highlighted material at the bottom?

16  A    The subheading is "Environmental Factors That Influence

17  Specific Gravity."  "Air and soil temperatures are the primary

18  environmental factors affecting specific gravity of irrigated

19  potatoes.  Warm days (80° to 90° F) and cool nights (50° to

20  60° F) provide optimal conditions for producing high specific

21  gravity tubers.  High soil temperatures have a direct effect on

22  tuber physiology and inhibit starch deposition.  Other weather

23  conditions can also affect tuber specific gravity.  High

24  evaporative demand caused by low relative humidity, high solar

25  radiation, and/or high wind speed can also reduce

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  photosynthesis."

2  Q    Are you familiar with a publication known as the Valley

3  Potato Grower?

4  A    Yes.

5  Q    Is that the official publication of the Northern Plains

6  Potato Grower Association?

7  A    Believe it is.

8  Q    Okay.  I'd like to show you, not for the jury,

9  Exhibit 1508.  Does that appear to be the cover of the Valley

10  Potato Grower, September/October, 2012, issue?

11  A    Yes.

12        MR. BENTLEY:  I offer Exhibit 1508.

13        MR. TORNABENE:  Voir dire on this briefly?

14        THE COURT:  Yes, you may.

15        MR. TORNABENE:  Mr. Turner, the Valley Potato Grower.

16  How -- how is that publication generally utilized in the

17  industry?

18        THE WITNESS:  It's a trade publication.

19        MR. TORNABENE:  And, if you could, please, explain

20  what you mean by a "trade publication" in this context.

21        THE WITNESS:  Its target is potato researchers, potato

22  growers, extension personnel, processors, you know, fresh

23  process.  Anybody who's affiliated with the -- the business;

24  But, in particular, it's focused on the grower.

25        MR. TORNABENE:  Okay.  And who or what entity puts

                    JURY TRIAL - DAY 23 - MAY 16, 2013
                        S. TURNER/DI - BENTLEY

 1  this together?

 2              THE WITNESS:  I'm sorry.  I don't understand.

 3              MR. TORNABENE:  What group puts this together?  I

 4  mean, what -- what entity?

 5              THE WITNESS:  Well, "Official Publication of the

 6  Northern Plains Potato Growers Association."

 7              MR. TORNABENE:  Okay.  And what is that?

 8              THE WITNESS:  Well, it's a grower organization.

 9              MR. TORNABENE:  All right.  And where are they

10  located?  Is it here in the Columbia Basin or --

11              THE WITNESS:  No, no, no.  No.  This is North Central.

12              MR. TORNABENE:  Okay.  And are you aware of how this

13  is relied upon by agronomists?

14              THE WITNESS:  Well, most agronomists that are potato

15  growers will read a lot of these.  Some of them come in

16  electronic format.  Some are in print.

17              MR. TORNABENE:  Okay.  So they read them, but how do

18  they rely on them?

19              THE WITNESS:  Well, you're looking to see what's

20  happening with the crop.  We're all interested to see how other

21  regions, in particular, are doing since their impact on the

22  market is going to raise or lower our prices.

23              MR. TORNABENE:  I see.  Thank you.  No objection.

24              THE COURT:  Admitted.

25          (Exhibit No. 1508 admitted into evidence)

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1    MR. BENTLEY:  May it be published to the jury?

2    THE COURT:  It may be.

3  Q    (BY MR. BENTLEY)  And I'll show you the article:  Article

4  by Andy Robinson, Extension Potato Agronomist, North Dakota

5  State University.  Why don't you read for us the first sentence

6  of the paragraph that I'm pointing to.

7  A    "Optimum potato growth is considered to be 74°F during the

8  daytime and 54°F at night."

9  Q    Why don't you continue with the remainder of that block of

10 highlighted material.

11 A    "Higher temperatures cause photosynthesis to decline and

12 maintenance respiration to increase.  Photosynthesis is

13 responsible for over 90% of the dry weight.  Photosynthesis uses

14 sunlight, carbon dioxide, and water to produce starch in tubers.

15 Maintenance respiration is when the plant expends energy to

16 repair and maintain itself.  As a result, high temperature and

17 water stress over a ... period of time -- over a prolonged

18 period of time ..."  Should I finish the sentence there?

19 Q    Finish with the highlighted material at the top of the next

20 column.

21 A    Okay.  Let me start that sentence over.  "As a result, high

22 temperature[s] and water stress[es] over a prolonged period of

23 time can increase misshapen potatoes, encourage second growth,

24 and can reduce yield and quality."

25 Q    And, then, the highlighted material in the third column to

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1   the right.

2   A    "Additionally specific gravity can be reduced because the

3   amount of starch available for transport from the leaves to the

4   tubers is reduced."

5   Q    Finally, I'd like to show you Exhibit 1535.  Can you

6   identify that?

7          MR. BENTLEY:  This is not for the jury, at this point.

8          THE WITNESS:  Yes, I can.

9   Q    (BY MR. BENTLEY)  What is that?

10  A    This is a written version of a paper I heard Mike Thornton

11  give at the Washington Potato Conference.

12  Q    And who -- is Mike Thornton related to another expert who

13  has not yet testified in this case?

14  A    Big brother, Rob Thornton; and they're both sons of the

15  elder Rob Thornton who was, for 30 years, Mr. Potato at WSU.

16  Q    And where was this presentation by Mike Thornton, that is,

17  Exhibit 1535, presented?

18  A    For many years, the potato conference was at the Big Bend

19  Community College Facility in Moses Lake.

20  Q    And when was this presented, based on the material at the

21  bottom of the page?

22  A    Oh, 1991.  This is going back a ways, yeah.

23          MR. BENTLEY:  I offer Exhibit 1535.

24          MR. TORNABENE:  No objection.

25          THE COURT:  Admitted.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1    (Exhibit No. 1535 admitted into evidence)

2    Q    (BY MR. BENTLEY)   Does this paper, in the highlighted

3    material, essentially, repeat the materials that we've already

4    gone over as to the impact of heat on specific gravity?

5    A    It does.

6    Q    And why don't you read us just the first sentence at the

7    top.

8    A    "Temperature is one of the most important factors

9    influencing potato plant growth, tuber yield and quality."

10   Q    And the last sentence of that same paragraph.

11   A    "Low specific gravity is one of the main problems that was

12   experienced by the Northwest potato industry during 1990."

13   Q    Thank you.   You were present when Dr. Daly testified about

14   the average maximum monthly temperature in the basin during '01,

15   '02, '03, and '04?

16   A    Yes.

17   Q    Is there anything about that testimony that causes you to

18   change your opinion about the relationship between heat and

19   specific gravity?

20   A    No.

21   Q    Do you feel that that information is at all relevant to --

22       MR. TORNABENE:   Objection, your Honor.   Relevancy is

23   for the jury to determine.

24       THE COURT:   I agree in that sense.   Different --

25   perhaps same issue but a different approach.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1    MR. BENTLEY:  All right.

2 Q    (BY MR. BENTLEY)  In your work as an agronomist, if you

3 were attempting to consider whether a crop had been affected by

4 high -- a potato crop had been affected by high heat, would you

5 rely on average monthly temperatures for the month in which the

6 damage was said to have occurred?

7 A    No, I wouldn't even look at it.

8 Q    Please tell us why.

9 A    Anyway, all we can understand that, if the temperature

10 range in a month was 0 degrees and 120 degrees, the average

11 temperature wouldn't tell us whether the potato plant would

12 thrive.  When you pool that large amount of data together, you

13 wipe out the ability to discern patterns or specific events.  I

14 spoke earlier of the importance not just of the daytime high

15 temperature on an individual day but, within that 24-hour

16 diurnal cycle, what was the nighttime temperature?

17    And, in my experience, two- or three-day events,

18 particularly if you add wind to the equation, particularly if

19 you're on very coarse, sandy ground that doesn't hold a lot of

20 water, even if you've got your circle running as fast as you

21 can, if it's 100 degrees and it's blowing 20 or 30 miles an

22 hour, you cannot keep up.  You will have damage.  So, looking at

23 a blended number, it's just the wrong data set.  It doesn't tell

24 you anything.

25 Q    What about Dr. Jeffrey Stark's testimony concerning the

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/DI - BENTLEY

1  Tri-State Trials or the Western Regional trials?

2  A    I was puzzled when I first saw that.  Dr. Stark is a very

3  experienced, talented researcher.  And, again, the data set that

4  he chose, particularly in those R-squared diagrams, was puzzling

5  to me.  And I studied them for a while and listened to his

6  testimony and thought about it.  Two things occurred to me.

7     The first is that mathematically there isn't much of a

8  change.  If you take the average mean monthly high temperature

9  in Honolulu and insert it into that equation, you're going to

10 get a very similar R squared.  And you kind of know you're going

11 to get that because of that extreme scattering of the data

12 points.  And, assuming that there was some effort made to try

13 and uniform the plots -- and Dr. Folwell talked about this at

14 length yesterday -- which is virtually impossible when you have

15 them in many different geographic areas, different planting

16 dates, different culture, different fields, different

17 researchers, you get a variation just from that.

18     But the year-to-year variation is -- when I look at it, to

19 me it explains the very close relationship between weather and

20 variation of specific gravity because, if the University system

21 is making a good-faith effort to try and do the plots with some

22 uniformity from year-to-year in terms of their practices and

23 planting dates and everything else, what else explains the

24 scatter in the diagram?  Why is it way up here (indicating) one

25 year and way down here (indicating) the very next year?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - SMITH

1   Something has to explain that.  And it's not 31 days of data

2   pooled.

3           MR. BENTLEY:  No further questions.

4           THE COURT:  Anyone else for this witness on the

5   defense?  Okay.  Cross examination.

6           MR. SMITH:  I have a few questions, your Honor.

7           THE COURT:  I'm sorry, Mr. Smith.  Go right ahead.

8   You may proceed.

9           MR. SMITH:  Thank you, your Honor.

10

11                  CROSS EXAMINATION

12  CROSS BY MR. SMITH:

13  Q    Mr. Turner, I just have a -- a few questions for you.  As

14  you know, I represent Jeffrey Gordon.  And I wanted to touch on

15  the -- the last part of your testimony first regarding this heat

16  issue.  Let me try to be a little bit specific.  Do you -- are

17  you aware of the area outside of Pasco in the Dogwood and Cherry

18  areas that's been described to me?

19  A    Very familiar, yes.

20  Q    All right.  And -- and, even more specifically, are you --

21  do you know whether or not, in 2003, Jeff Gordon had fields in

22  that area?

23  A    He did.

24  Q    All right.  And are you -- are you aware that the

25  Hanford -- or what the Hanford Meteorology Station is?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - SMITH

1  A    Yeah.  I believe that's the one that Battelle runs.

2  Q    All right.  And that's just across the river from that

3  Dogwood -- Dogwood area.  Is that what it's called?

4  A    Yeah.  It's just to the west.

5  Q    All right.  I'm -- I want to show you what's been marked as

6  Defendant's Exhibit 4139.

7        MR. SMITH:  Just for the witness at this point, your

8  Honor.

9  Q    (BY MR. SMITH)  And let me ask you, sir, if -- if you've

10 had a chance to -- to go over this particular exhibit at my

11 request.

12 A    Yes, I've seen this.

13       THE COURT:  Use the microphone.

14 Q    (BY MR. SMITH)  All right.  And the -- this is data that is

15 produced by the Battelle, Hanford Meteorological Station.

16 Correct?

17 A    Yes.

18 Q    And it is one -- I think you -- you mentioned a couple

19 services.  Was one, like, Agri-Med (sic)?  Is that a --

20 A    Ag Weather Net.  It's Washington State University's

21 agricultural meteorological service.  And they've got, I think,

22 over a hundred reporting stations take data every 15 minutes.

23 Q    The -- and -- and are you -- are you aware that this -- the

24 -- the information from the Hanford station -- it's -- it's

25 publicly available information?  Is that correct?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - SMITH

1  A    Yes, I've accessed it.

2         MR. SMITH:  I move for the admission of 4139.

3         MR. TORNABENE:  No objection.

4         THE COURT:  Admitted.

5    (Exhibit No. 4139 admitted into evidence)

6  Q    (BY MR. SMITH)  Sir --

7         MR. SMITH:  Can we show this to the jury?

8         THE COURT:  You may publish as you wish.

9  Q    (BY MR. SMITH)  Now, this particular exhibit is with regard

10  to the -- the year 2003.  Do you agree with that?

11  A    Yes.

12  Q    And I'm -- I'm showing you here (indicating) on the left

13  side -- it kind of runs through the -- is that the days of the

14  month?

15  A    Yes.

16  Q    Okay.  And then --

17         THE COURT:  Before you start making some other

18  adjustments, why don't you adjust that microphone.  Bend it to

19  your right.  And, then, when you're over the ELMO, you'll be

20  able to utilize it.  Thanks very much.  That's good.

21         MR. SMITH:  I always appreciate your assistance, your

22  Honor.

23         THE COURT:  Just trying to help you, Mr. Smith.  Go

24  right ahead.

25  Q    (BY MR. SMITH)  Sir, when you were talking about the -- the

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - SMITH

1  affect of -- of temperature and how -- just simply an average

2  with regard to temperature, I mean, is -- is -- this is my word

3  not yours, I think -- but is, essentially, meaningless in making

4  these determinations.  When we look at the temperature data

5  here, can you -- can you give us an example or show the jury an

6  example of where there's high temperature yet it has -- the

7  nighttime temperature has not dropped too low or very low.

8  A    Well, beginning on the upper-left portion, you've got the

9  -- the 10th and the 11th of that month at a high temperature of

10 100 on the 10th, 105 on the 11th.

11       And, then, the other important thing to look over to the

12 right, there's just a little dab of yellow there showing the

13 peak gust and average wind speeds.  And you can see that, you

14 know, at 7.8, 7.2, with peak gusts at 22 and 30, it was a breezy

15 day.  And, so, that's going to really drive the stress factor

16 for the plant.

17 Q    What about -- as I show you here, on the 23rd and the 24th

18 day, what can we gather from this information as we run it

19 across?

20 A    Well, those are the dog days of summer.  The 23rd's 108,

21 the 24th's 99 for a high.  Your -- your low is -- is 70 degrees

22 and 71.  So you're -- you're quite a ways above, sort of, your

23 desired mid 50s to lower 50s recovery temperature.

24       And, if you look at the wind speed, you have relatively

25 high average winds -- 11.3, 10.8 -- and gusts at 36 and 37.  At

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  this stage of crop development, that's really damaging.

2  Q    And the -- we heard information or testimony -- I guess,

3  there's just -- I have just one more.  At the -- at the end of

4  the month, July 30th and 31st, these figures here (indicating),

5  is that, I mean, the same kind of conditions that -- that cause

6  stress to the potato plant?

7  A    Yes.

8  Q    And, then, apparently, that continues into August?

9  A    Yes.  I can't see August.  It's --

10 Q    Oh, I'm sorry.  Let me see if I can get that to you.

11 A    Yes.  That's August, 2003.  Correct.

12 Q    And the -- here, again, we're showing temperatures of 104

13 with nighttime temperatures of 67 and, then, 38 mile-an-hour

14 wind gusts?

15 A    Yeah, plus the average wind speed is, you know, at 9.5.

16 That's -- for a 24-hour cycle, that's a lot of air movement.

17         MR. SMITH:  Thank you, sir.  I have no other

18 questions.

19         THE COURT:  Mr. Tornabene?

20         MR. TORNABENE:  Your Honor.

21         THE COURT:  You may proceed.

22

23                      CROSS EXAMINATION

24 CROSS BY MR. TORNABENE:

25 Q    Good afternoon, Mr. Turner.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  A    Good afternoon, sir.

2  Q    Mr. Turner, Mr. Bentley had asked you a little bit about

3  your relationship to each of the defendants or most of the

4  defendants.  Just wanted to verify a little bit of that with

5  you.  You reference that you'd done some work over the years for

6  Mr. Olsen and his various companies.  Is that correct?

7  A    Yes.

8  Q    And when did you first start doing that?

9  A    I believe it was 2001.

10 Q    And this was in your capacity as a consulting agronomist?

11 A    Yes.

12 Q    And, in 2001, could you describe for us what -- what

13 specific consulting were you doing for Mr. Olsen?

14 A    He had a problem in one field.

15 Q    What was that?

16 A    It was a water-related problem.

17 Q    Can you elaborate?

18 A    Yeah.  He was renting ground far north, actually, almost

19 within sight of the town of Wilbur.  It's really at the very

20 northern edge of our potato production area.  Those are deep

21 well Odessa subaquifer irrigated areas.  They're not in the

22 Columbia Basin project.  Water is a little scarce.  And potatoes

23 are a very water-intensive crop and require water on demand --

24      (Interruption by the reporter)

25          THE WITNESS:  Water-intensive crop.  And they -- when

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  they need water, they got to have it.

2      And, apparently, what was going on is the landowner had

3  rented the one circle to Mr. Olsen for potatoes but had crops on

4  several other circles.  And, when the sun went down and most of

5  the Olsen employees left town to go down to Moses or Pasco, the

6  water would get turned off the potatoes and would go on to the

7  other crops.  And, then, just before it would get light, the

8  water would go back on the potatoes.  And, so, the fieldmen

9  would arrive and, well, the field's being irrigated but it's

10  dry.  What's wrong?  So, with a little bit of work, we sort of

11  sorted it out with the landowner and got an understanding that

12  the water needs to be on.  And, when the water needs to be on,

13  that's what we pay for in the rent.

14  Q    And, so, your role in that was in terms of -- as an

15  agronomist was determining that there was an irrigation problem

16  despite the fact that the observation was that, when people were

17  there, the water was on.

18  A    Yes.  And I -- I followed up during harvest and monitored

19  the -- the actual harvest, rode the digger, looked at the

20  transloader to just -- you never know how much damage is done

21  until the crop comes out of the ground.  So there was never a

22  claim presented.  It just sort of satisfied myself that,

23  although it was touch and go for a bit, pulled it back together

24  at the end.

25  Q    And, with regards to that consulting assistance that you

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  did for Mr. Olsen in 2001, how much of your business was that in

2  2001 would you estimate?

3  A    Speaking about my forensic-type work?

4  Q    Yes.

5  A    2001 it was probably 60, 70 percent.

6  Q    Okay.  And let's move forward then.  Well, is that -- is

7  that all the work that you did for Mr. Olsen in 2001?

8  A    I believe so.

9  Q    How about in 2002?  Did you do any work for him?

10 A    Yeah.  It was -- he called me about something, and I went

11 and looked at several of his fields.  I think it was a disease

12 issue, blight.  Just sort of got busy with the applicator, got

13 caught up, provided crop protectant materials, and the crop got

14 straightened back up.

15 Q    And how long did it take you to sort that 2002 issue out

16 for Mr. Olsen?

17 A    Very short time.  Basically, one day in the field

18 examining, talking on the phone, making a decision about the

19 mixture of products to apply, and -- and, then, speaking to his

20 field staff.

21 Q    Any other consulting work for Mr. Olsen that year in 2002?

22 A    No.

23 Q    How about in 2003?  Any work for Mr. Olsen then?

24 A    I had a little problem in '03.

25 Q    Okay.  I'm sorry.  Did -- who had a little problem?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1    A    Mr. Olsen did.

2    Q    Okay.  So -- and what -- what was the nature of your

3    consulting arrangement with Mr. Olsen in 2003?

4    A    Well, he called me out when the potato plants started to

5    look funny.

6    Q    Okay.  And let's try it this way:  In 2003, how much of

7    your consulting business was devoted to work for Mr. Olsen?

8    A    Probably one percent.

9    Q    Okay.  So this is another smaller job?

10   A    Yes.

11   Q    Okay.  And of the same variety that you described in 2002?

12   A    No.

13   Q    Okay.  Well, did it get sorted out?

14   A    Well, I gave him the answer; but it wasn't the answer he

15   wanted.

16   Q    Okay.  Did you still get paid?

17   A    Yes.

18   Q    How about in 2004?  Any consulting work for Mr. Olsen then?

19   A    I don't recall anything in '04.

20   Q    Okay.  And, moving forward, I know in 2006 it sounds like

21   there's been more work since then for Mr. Olsen.  How about 2005

22   though?

23   A    I don't think so in '05.

24   Q    Okay.  And you described a little bit that -- about 2006

25   forward, I believe, is -- am I remembering that right?  Is that

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1   work that you've been doing fairly consistent -- consistently

2   for Mr. Olsen since 2006?

3   A    Yeah, he leased four circles from one of my clients in

4   2006.

5   Q    And, so, the nature of the consulting work you've been

6   doing in 2006 with Mr. Olsen has been what?

7   A    Well, it's different because I'm not paid by Mr. Olsen.

8   I'm paid by the landowner.

9   Q    Okay.

10  A    It's a package deal.  You get me with the farm.

11  Q    Okay.  And, so, Mr. Olsen is the beneficiary of that.

12  A    Yes.

13  Q    And how much of your consulting business from 2006 forward

14  has been devoted to that arrangement?

15  A    Well, he didn't rent from us again until, I think, 2009.

16  He's been on for four years since.  He's currently there.

17  Q    So, in 2006, how much of your consulting business,

18  approximately, was devoted to the arrangement that you've

19  described?

20  A    What year?

21  Q    2006.

22  A    In 2006, he just had those four circles.  There's 31

23  circles on that particular farm.  So very small.  Probably a

24  percent, maybe less.

25  Q    And how about your opportunities of your consulting

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  business, though, for all of those landowners fields?  How --

2  what was the percentage there in terms of your consulting --

3  A    Well, that's significant.  That's probably 15 percent.

4  Q    Okay.

5  A    The grower has 22,000 acres.

6  Q    Now, with regards to Mr. Olsen and Olsen -- and I'm sorry.

7  I just to want clarify.  Any other consulting for Olsen Ag,

8  Inc., that we haven't covered?

9  A    Excluding this matter, none.

10 Q    And you mentioned Mr. Peterson; that you'd done some

11 consulting work for him, I believe.  Is that correct?

12 A    I had a case he was involved in; but I can't remember his

13 particular role, whether he was a grower or a landowner.  It was

14 a fumigation issue on potatoes.

15 Q    And how about -- just for thoroughness, how about Poco,

16 LLC?  Any additional consulting work for them outside of this

17 litigation?

18 A    Some of the stuff I looked at in '03 was Poco.

19 Q    Okay.  That -- that you described earlier as part of your

20 consulting for Mr. Olsen in '03?

21 A    Yes.

22 Q    Okay.  And how about Mr. Gordon?  What consulting have you

23 done for him or one of his companies as an agronomist outside of

24 this litigation?

25 A    I had two prior potato cases.  A seed issue in the late

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  '80s.  And, in the early '90s, a fertilizer company put on way

2  too much of one particular fertilizer and burned a field up.

3  Q    And you helped Mr. Gordon with that?

4  A    I did.

5  Q    And -- but this was back in the late '80s you mentioned.

6  Is that --

7  A    Late '80s and, then, I think, '91 or '92 on the fertilizer

8  issue.

9  Q    Any other consulting work for Mr. Gordon or any of his

10 companies outside of this litigation since then?

11 A    None that I can recall.

12 Q    And you were asked about Mr. Ackerman outside of, again,

13 this litigation.  Could you, please, describe the nature of your

14 work with Mr. Ackerman.

15 A    The agency that he worked for is a major writer locally or

16 sales outlet for crop insurance.  So, whenever I had a field

17 that was damaged, if there was crop insurance on, we either had

18 contact with Mr. Ackerman or some of his staff.  One of the

19 things that they do is they accumulate all of the information

20 for the crop insurance.  And it simplifies my life as a forensic

21 guy to go in and just get a copy of their file because then I

22 have the certified acres in the field, the planting dates, the

23 variety.  Everything's there for me and it's all in a -- in a --

24 you know, nicely formatted.

25 Q    Between 2001 and 2004, can you give us a general estimate

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  of how many times you worked with Mr. Ackerman in that capacity

2  that you've described?

3  A    You know, I don't think I remember a specific time during

4  '01 through '04 that I was in there; but I probably was.  I'm

5  not even sure I saw Mr. Ackerman.  It might have just been

6  staff.

7  Q    I see.  Okay.  And how about Mr. Bennett?  Have you ever

8  done any consulting work for him?

9  A    When he was employed by T16 in either the late '80s or

10  early '90s, I did quite a bit of work for T16.  It was a large

11  irrigated circle farm near Lind.

12  Q    Any other consulting work that brought you in contact with

13  Mr. Bennett outside of this litigation?

14  A    He's a partner in 3P Farming; and I do regularly work for

15  one of the other partners, not for Mr. Bennett.

16  Q    And is that work that you -- that consulting work, is that

17  for 3P Farms?

18  A    Yes.

19  Q    And that regular consulting work -- let's just start with

20  the period of 2001 to 2004.  How much of your consulting

21  business was that regular consulting work?

22  A    I think I was out two of those years.  Both of them were

23  herbicide issues, damage to potatoes.

24  Q    And were these smaller consulting issues of the kind you've

25  described?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  A    Yes.  Typically, one, two-day job.

2  Q    And, then, any consulting for Tri-Cities Produce?

3  A    None.

4  Q    Now, you were asked about a -- your professional

5  relationship with the defendants.  Do you know any of them

6  personally outside of your professional interactions?

7  A    None of the defendants are friends of mine.  They're

8  professional people that I deal with.  They're pleasant, but

9  they -- I don't -- you know, they don't -- we don't socialize.

10 Q    Okay.  And what -- what are your fees, typically, for being

11 an agronomist consultant outside of litigation?

12 A    Well, there's no distinction.  My fees are the same.

13 Q    Okay.  And what are they?

14 A    My standard fee schedule is $130 an hour.  I typically

15 offer frequent flier discount.  If you are a repeat grower, a

16 repeat client, I'll discount it 10, 20, or $30 an hour.

17       On the larger research projects that I've undertaken,

18 particularly, the USCPA work, I'll often take a steeper discount

19 than that because I'm going to get a huge block of hours.

20 Q    And, so, does your fee -- in terms this litigation, does it

21 include time on the stand as well as time in the courtroom

22 observing testimony?

23 A    It's door-to-door.  When I leave my office to come here to

24 when I get home, the clock's running.  If I'm at -- in the

25 office, I work out of my home.  If I'm working on matters

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  associated with this case, they're billed by the clock.

2  Q    Now, you've testified here today that, at least as to

3  Mr. Olsen, you believe he's, I believe the phrase was, a "top

4  tier grower."  Do you recall that?

5  A    Yes.

6  Q    And, by that, you mean that he's very good at potato

7  farming.  Is that correct?

8  A    He is.

9  Q    With regards to Mr. Peterson, would you also consider him a

10 top tier grower?

11 A    I spent less time in his fields, but I've seen the outcome.

12 I've seen a lot of the packout sheets and the pay outs.  And I

13 would consider him also a top tier grower.

14 Q    And just so I can be clear because we've heard testimony

15 that Mr. Peterson grows onions.  I'm speaking specifically with

16 regards to potatoes for Mr. Peterson.  Is -- is that what you

17 understand?

18 A    Yes.

19 Q    Same answer?

20 A    Yes.

21 Q    And how about Mr. Gordon with regards to potatoes?  Would

22 you consider him a top tier grower?

23 A    He was a very good grower.  But, since my last contact with

24 him was 20 years ago, I'd have a harder time answering that

25 today.  Twenty years ago he was definitely top tier.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  Q    Okay.  Any reason to believe that that's changed?

2  A    No.

3  Q    Now, you testified that, with regards to the achievability

4  of the specific gravity, that you believe that is achievable.  I

5  believe it's with significant effort.  Is that fair?

6  A    You have to have, sort of, several elements.  Significant

7  effort.  I believe I mentioned you have to have the cooperation

8  of mother nature.  You can't do this every year.  But, if you

9  have cooperative weather, good management, good site, I think

10 it's an achievable goal.

11 Q    So, even if you're a top tier grower with the specific

12 gravity standards of these contracts, you're not going to

13 achieve them every year.  Is that correct?

14 A    Not every field.  Not every year.

15 Q    And, if I understand your critique of the Western Regional

16 Trial data in use in this litigation, it's that those fields are

17 not -- by design, they're not specifically trying to achieve, in

18 this instance, specific gravity considerably higher than the

19 average potato grower.  Is that a fair assessment?

20 A    That -- that -- that's a fair assessment, yes.

21 Q    Now, here in this case, you're aware, of course, that the

22 significant effort that you're testifying to by these growers,

23 top tier growers, resulted in rejection all four years of

24 potatoes.  Correct?

25         MR. SMITH:  Objection, your Honor.  Objection, your

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  Honor.  It's too general.  Form of the question.  Different --

2  different growers in different years.

3          THE COURT:  Yeah.  Thank you.  Sustained.

4  Q    (BY MR. TORNABENE)  Mr. Turner, with regards to Mr. Olsen,

5  all the years that he entered into the contract acting as a top

6  tier grower, nonetheless, he was not able to meet those

7  standards, was he?

8  A    Not in these years.

9  Q    And, with regards to Mr. Peterson, top tier grower, the

10 years that he entered into the contract, '03 and '04 through

11 Poco, not able to meet these standards.  Correct?

12 A    I'd really like to refresh my memory.  Do you have a

13 summary of the grade sheets?  The Ag World support sheets.  I

14 haven't looked at that data recently.  I'm just hesitant to --

15 to confirm you.

16 Q    That's fair.  Did you review the contracts at issue in this

17 case?  Correct?

18 A    I did, yes.

19 Q    And you reviewed the rejection letters.  Correct?

20 A    Yes.

21 Q    And -- but yet, as you sit here right now, you're not sure

22 whether or not the Poco fields did not pass the grade in those

23 years?

24 A    Well, the rejection letter could be either for grade or for

25 bruise.  My hesitation is I think there were instances where

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  they made specific gravity but didn't make bruise or vice versa.

2  Q    I see.  I see.

3  A    That's my hesitation.

4  Q    I see.  And, so, let me be clear.  The contract doesn't

5  really matter if you meet one grade and not the other.  Correct?

6  A    The way the contract's written, yes.

7  Q    Same result either way.

8  A    Yes.

9  Q    So, with that in mind with regards to these contracts, top

10 tier growers, speaking regarding Mr. Peterson in 2003, that was

11 rejected, wasn't it?

12 A    I believe so.  But, again, the documents are in evidence.

13 It's whatever they say.

14 Q    Certainly.  And, with regards to 2004, Mr. Peterson, acting

15 as a top tier grower, we can assume with significant effort,

16 also a rejection under the contract yet again.  Correct?

17 A    Yes.

18 Q    And Mr. Gordon, presumably still a top tier grower, also

19 under these contracts in 2003, rejected.  Correct?

20 A    Yes.

21 Q    And, in 2004, still a top tier grower presumably, still

22 with significant effort, rejected under the contract again.

23 Correct?

24 A    Yes.

25 Q    When you --

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1    THE COURT:  How are we doing on time for everybody?

2  It's ten after 4:00.  We've been at this an hour and ten

3  minutes.  I didn't know if -- we'll take a short break or not?

4    MR. TORNABENE:  A short break would be fine, your

5  Honor.

6    THE COURT:  All right.  Why don't we take a short

7  break, get everybody up and moving so we can finish the day.

8  Thank you.

9    (Jury out at 4:11 p.m.)

10    (Court recessed at 4:11 p.m.)

11    (Court reconvened at 4:22 p.m.)

12    THE COURT:  Please, be seated.  Okay.  Are we ready to

13  talk to me about tomorrow?  What's going to happen tomorrow?

14  Well, I'm told that you don't have enough witnesses to bring the

15  jury in for tomorrow and you want to start Monday.  Now, is

16  somebody going to confirm that rumor --

17    MR. BENTLEY:  That is --

18    THE COURT:  -- or are you all being very circumspect

19  about this?

20    MR. BENTLEY:  We were all afraid --

21    THE COURT:  Nobody wants to take the blame?

22    MR. BENTLEY:  We were afraid we might not be able to

23  persuade the Court to do that, but we would be very happy to do

24  that.  And we feel that the juror who's having a wedding would

25  be very happy, too.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1          THE COURT:  Well, that all depends on what next week

2    looks like.  So tell me what you want to do.  Who's in charge

3    from the defense side for tomorrow?  Okay.  Mr. Marchi, do you

4    have any witnesses tomorrow?

5          MR. MARCHI:  No, your Honor, I don't.

6          THE COURT:  Okay.

7          MR. MARCHI:  And any witnesses that I'll have will be

8    next week, if I have any.

9          THE COURT:  Mr. Smith?

10         MR. SMITH:  I -- I don't have any witnesses for

11   tomorrow, your Honor.

12         THE COURT:  Mr. Schwartz?

13         MR. SCHWARTZ:  I have none, your Honor.

14         THE COURT:  Okay.  Mr. Johnston?

15         MR. JOHNSTON:  No, your Honor.

16         THE COURT:  Mr. Bentley?

17         MR. BENTLEY:  No, your Honor.

18         THE COURT:  Mr. Vovos?

19         MR. VOVOS:  I can have one witness here, but I can

20   bring him Monday just as easy.  And I hate to convene the Court

21   for one -- one witness that would be very short.

22         THE COURT:  Well, here's my problem.  There's the end

23   portion of this case when we're going to spend a couple of hours

24   talking about jury instructions.  And I -- we can also

25   anticipate there'll be more Rule 29 motions.  So, that said,

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  tell me what your week looks like and what you want to do

2  because there'll be a day when I don't bring the jury back until

3  1:00 for evidence next week because I want to make sure that, in

4  advance of the end of your case, I have a complete set of jury

5  instructions and a verdict form that I'm probably going to give

6  at that point.  So what day do you want to plan that meeting

7  for?

8          MR. BENTLEY:  Your Honor, Mr. Johnston reminds me that

9  this one witness, who could be brought in tomorrow, Mr. Hirano,

10  has a number of areas in his testimony and would not necessarily

11  be as brief as most of the other witnesses that we might call.

12          MR. JOHNSTON:  If Mr. Vovos has one witness --

13          THE COURT:  Look, I've got a jury standing outside the

14  door.  What do you want to do?

15          MR. VOVOS:  Mr. Hirano is the one witness that I have

16  tomorrow -- that -- that you have.  It would be your witness.

17          THE COURT:  Is he going to take three hours, four

18  hours?

19          MR. JOHNSTON:  I don't think he'll take three or four

20  hours, your Honor; but it'd probably be an hour and 45 minutes.

21          THE COURT:  Well, how's your schedule for next week?

22          MR. JOHNSTON:  Well, your Honor, we had planned to

23  start on Monday.  So we can try and find an additional witness

24  for tomorrow.  I'm not sure that we can do that, but I --

25  Mr. Hirano, I think, can take up --

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1        THE COURT:  Do we have objections to his exhibits or

2  something of that nature?

3        MR. TORNABENE:  We haven't seen them.  I -- I know

4  generally who he is.  I don't think there'd be much issue to

5  take up.

6        MR. JOHNSTON:  I don't anticipate difficulty with

7  witnesses (sic) with Mr. Hirano.

8        THE COURT:  Okay.  Well, let's just bring him because

9  I don't see how this witness is going to be finished by tonight

10  by 5:00.

11        MR. JOHNSTON:  Okay.

12        THE COURT:  Let's just bring the jury in; and, then,

13  we'll see where we are at the end of the day.  Okay.

14     (Jury in at 4:25 p.m.)

15        THE COURT:  Please be seated.  Thank you for your

16  patience.  Sorry we roused you unnecessarily.  Let's resume and

17  see where we go.

18        MR. TORNABENE:  Thank you, your Honor.

19  Q    (BY MR. TORNABENE)  Mr. Turner, you testified on direct, I

20  believe, with Mr. Bentley that in -- I believe, it was in 2002

21  Mr. Olsen would have had difficulty changing the variety of

22  potato.  Do you recall that?

23  A    Yes.

24  Q    And -- and that was based on the -- the seed issues that

25  you'd walked us through.  Correct?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  A    Correct.

2  Q    Now, Mr. Olsen, January 1st, 2002 -- he, of course, did not

3  have to enter into the same contract again, did he?

4  A    No.

5  Q    But he did.

6  A    Yes.

7  Q    Now, with regards to your testimony --

8         MR. BENTLEY:  I'm going to object to that question and

9  move to strike because Mr. Olsen's contract in '02 was not the

10 same as the contract in '01.

11        THE COURT:  I'll sustain that, and you can reask the

12 question.

13 Q    (BY MR. TORNABENE)   In 2002, did he enter into a contract

14 that was the same in all respects with the exception of, I

15 believe, the specific gravity was 1.078?

16 A    I believe that was the change that year.

17 Q    And he entered into that contract again with Tri-Cities

18 Produce.  Correct?

19 A    Yes.

20 Q    And he entered into it again with the company that he had a

21 one-third ownership in, Agri-Pack.  Correct?

22 A    Yes.

23 Q    But, again, you're not saying that he was forced from prior

24 commitments to enter into those contracts again, are you?

25        MR. BENTLEY:  Objection.  Foundation.

1    THE COURT:  Sustained.

2  Q    (BY MR. TORNABENE)  So, Mr. Turner, you testified on direct

3  regarding your opinion of the term "process" in the potato

4  industry.  Do you recall that?

5  A    I do.

6  Q    Aren't you just putting the word "process" before

7  everything that happens to a potato after it's taken out of the

8  ground?

9    MR. SCHWARTZ:  Objection to the form of the question

10  as argumentative, your Honor.

11    THE COURT:  Sustained.

12  Q    (BY MR. TORNABENE)  Is there -- based on your definition,

13  is there a way to do anything with a potato other than leave it

14  in the ground and not call it a process?

15  A    Yes.

16  Q    I -- let me ask you this:  Your testimony was that the

17  process of taking the tuber out of the ground and separating it

18  from dirt and rock is a process in terms of how that is

19  understood in the potato industry.  Is that correct?

20  A    That's the harvest process, yes.

21  Q    So how is it that you could do anything with a potato other

22  than leaving it in the ground and not call it a process under

23  your definition?

24  A    Well, there are two common uses where you don't do anything

25  to the potato.  The first is seed.  They don't wash it, grade

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1    it, sort it.  It's loaded bulk, handled right as it came out of

2    the field into the seller, back into the truck, and to the

3    seed-cutting shed.

4         The other use is feed.  We direct feed these to dairy and

5    beef cows, particularly, when prices are really low like they

6    have been this last year.  There's no processors.  There's no

7    change.  It just comes direct from the field or direct down to

8    the seller without any process at all.

9    Q    So, with seed potatoes, they don't separate it from rock

10   and dirt?

11   A    No.  They're just as they -- I mean, there's some

12   separation with rock and dirt during the -- the harvest process.

13   Q    Okay.

14   A    But they're not otherwise handled.  They're simply placed

15   into storage; and, then, they're removed from storage, shipped

16   in bulk, unchanged.  They go to a seed house.  There's changes

17   that occur there.

18   Q    Okay.  And, so, separating rock -- rock and dirt -- under

19   the definition that you're providing an opinion on, separating

20   rock and dirt when it's fresh pack, that's a process.  But any

21   separation of rock and dirt for use for seeds, that's not a

22   process.

23   A    Every time you touch a potato you have the opportunity to

24   separate rock and dirt.  The photo I showed, for example, the

25   harvest showed a ten-wheeler.  Often, if we have fields that are

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  a long distance from the delivery point, we, then, go to a

2  corner of the field with that ten-wheeler.  We transload with a

3  piler into a semi.  So there's an opportunity and there's

4  usually two or three people picking out rocks and -- and dirt

5  there.  When they unload into the seller for storage, there's

6  usually somebody doing that same thing there; but that's not a

7  substantial multistep process.  It's just taking advantage of an

8  opportunity.

9  Q    So, then, to summarize, in your opinion, everything other

10 than seed potatoes and cattle feed is processing.

11 A    Yes, in some form.

12 Q    So, when somebody says, "Well, this is the processing

13 market," that, for you, has no meaning other than it's not seed

14 and it's not cattle feed.  Correct?

15 A    Well, again, on average, if we have a hundred trucks

16 delivering to Tri-Cities Produce, which is principally a fresh

17 process pack facility, depending on the quality of the lot, 15

18 to 40 truckloads of that original hundred are going to come out

19 of that shed.  They're going to go to some other process for

20 additional processing.  So a delivery to a fresh process packer

21 in all instances, every single shed I've ever been in, some of

22 those go to process.  Further process.  Whether it's frozen,

23 dehy, or other, they go to other process.

24 Q    Mr. Turner, my question was:  For you, using your

25 definition, if somebody says, "the processing market," for you,

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1   that simply means, well, it's any market for a potato that isn't

2   cattle feed or seed.  Isn't that correct?

3   A    Yeah.  My -- my question is which process?

4   Q    I believe we have the same question, Mr. Turner.  My

5   question is, under your opinion and your definition that you've

6   testified to, isn't it true that, if somebody says to you

7   "processing market," all that means is not seed potatoes, not

8   cattle feed.

9   A    Yes.

10  Q    And you feel that's standard in the industry?

11  A    That's the common usage of the people I deal with.

12  Q    Mr. Turner, you testified that these contracts of the

13  defendants, in your opinion, were designed to create a premium

14  potato.  Do you recall that?

15  A    No.  The contracts don't create anything except

16  opportunity.

17  Q    Okay.  I'll rephrase.  The contracts entered into by the

18  defendants and the quality factors listed therein were designed

19  to get a premium potato if it met the grades.

20  A    They were setting requirements for premium potatoes under

21  the contract terms.

22  Q    So, under the contract terms, if they were met, then, in

23  your opinion, you would have a premium potato.  Is that correct?

24  A    Well, those are only two of a number of important quality

25  factors; but they're two of the important ones.

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/CR - TORNABENE

1  Q    So, under those contracts, then, you -- even if the grade

2  was met, you wouldn't necessarily have a premium potato.

3  Correct?

4  A    That is correct.  You can have very what we call "rough

5  potatoes" that have second growth, knobs, misshapen, under size,

6  you know, internal defect, external defect, rot.  But, if you

7  have high specific gravity and low bruise, they would meet those

8  two parameters.  But I don't think anybody would reasonably call

9  them high quality potatoes.

10 Q    And is that because, in that contract, you don't have, for

11 instance, USDA Grade No. 1 or No. 2?  We're talking size issues.

12 A    Right.

13 Q    Is that fair?

14 A    That's fair.

15 Q    And, in the contract, we don't have fry color.  Correct?

16 A    That's correct.

17 Q    And we don't have anything about sugars.  Correct?

18 A    Correct.

19         MR. TORNABENE:  Nothing further.  Thank you.

20         THE COURT:  Okay.  Is there any recross or redirect

21 for this witness?

22         MR. BENTLEY:  Yes, your Honor.

23         THE COURT:  I do hope we can finish this witness by

24 5:00.

25 /  /  /  /  /

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/REDI - BENTLEY

1                              REDIRECT EXAMINATION

2    REDIRECT BY MR. BENTLEY:

3    Q     Mr. Turner, you were asked about an issue in 2003 with --

4    where you consulted with Mr. Olsen.  Do you -- on cross

5    examination.  Do you remember that?

6    A     Yes.

7    Q     And you testified that you made a recommendation, and

8    Mr. Olsen did not accept that recommendation?

9    A     That is correct.

10   Q     Can you give us more of the details on that, please?

11   A     Mr. Olsen was farming a number of units up in the bullocks

12   sort of west of Basin City, would be the best sort of direction,

13   that were contaminated with a very potent picolinic acid, a

14   pyridine compound, sold under the trade name of Tordon.  It's an

15   oxonic growth regulating herbicide that's used to control really

16   noxious weeds like Canada Thistle; and it's very effective also

17   on things like Russian Olive, which are very hard to kill.

18   Because it's a broadleaf specific material and the potato is

19   highly sensitive to it to the fraction of a part per billion,

20   it's a chemical that has to be used very carefully.

21        Two different federal agencies were spraying in the

22   immediate proximity of an irrigation supply ditch we call an

23   "intermediate."  In other words, it's not the largest of the

24   canals, but it's the next size down.  And their spray

25   inadvertently got into the irrigation water, which didn't cause

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/REDI - BENTLEY

1  any damage to a lot of the crops.  They're just not sensitive to

2  that herbicide.  But it caused damage and significant symptoms

3  to these potatoes.  And the recommendation I made was that he

4  retain an attorney and -- and attempt to recover his damages.

5  And he elected not to.

6  Q    Now, you were asked on cross examination questions

7  suggesting that the growers had done the same thing every year

8  after year.  Do you remember that?

9  A    Yes.

10 Q    Is it your understanding that these growers, Mr. Olsen,

11 Peterson, and -- and Gordon -- first of all, with Mr. Olsen, you

12 understand that he was farming potatoes four years in a row

13 under this -- under a contract with Tri-Cities Produce.

14 Correct?

15 A    Yes.

16 Q    And the first two years with another company, Agri-Pack.

17 Correct?

18 A    Yes.

19 Q    Mr. Peterson and Mr. Gordon were farming only '03 and '04,

20 pursuant to contracts with Tri-Cities Produce.  Is that correct?

21 A    Yes, that's correct.

22 Q    And do you understand that Mr. Peterson, that is, Poco,

23 farmed exactly the same varieties in '04 as it had in '03?

24 A    I'd have to refer to the records to be certain.

25 Q    Okay.  I'm going to show you --

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/REDI - BENTLEY

1           MR. BENTLEY:  This is for -- not for the jury.

2    Q    (BY MR. BENTLEY)  -- two documents.  Exhibits 2011 and

3    2012.  Can you see those documents, Mr. Turner?

4    A    Yes.

5    Q    Do they show that Mr. -- that Poco was farming different

6    varieties in '04 than it had farmed in '03 in many respects?

7    A    Yes.  There's a market shift.

8    Q    And it's a shift to -- to fewer acres of Norkotah and

9    more -- more acres of Westerns?

10   A    Yes.

11   Q    Okay.  And I'm showing you Exhibit 1707.  Does this appear

12   to be a four-year analysis of Mr. Olsen's crops, variety by

13   variety, in terms of number of acres in each variety?

14   A    Yes.

15   Q    And does it appear that the -- he principally farmed

16   Norkotahs in '01 and '02 and, then, stopped entirely in '03?

17   A    That's correct.

18   Q    And, then, he went --

19           MR. TORNABENE:  I object, your Honor.  It misstates

20   the exhibit, which I don't even believe is in evidence.

21           THE COURT:  Say that again, please.

22           MR. TORNABENE:  It misstates the exhibit, and I'm not

23   clear as to whether or not this is in evidence yet we're having

24   the witness read off of it.

25           THE COURT:  Yeah.  I don't know how you're going to

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/REDI - BENTLEY

1  get this in through this witness because he doesn't know

2  anything about it.

3        MR. BENTLEY:  Subject to connection; but I'll move on,

4  your Honor.

5  Q    (BY MR. BENTLEY)  Now, you testified with respect to the

6  differences between the '01 and '02 contract that Olsen, as an

7  individual, had with Tri-Cities Produce in '01 and the contract

8  that Olsen Ag, Inc., had in '02.  Do you remember that?

9  A    Yes.

10 Q    And you testified that the specific gravity requirement had

11 been reduced from 1.079 to 1.078.

12 A    Yes.

13 Q    Correct?  Now, I'd like to show you a page from Exhibit 90,

14 which is the '02 contract --

15        THE COURT:  Previously --

16 Q    (BY MR. BENTLEY)  -- referring to --

17        MR. BENTLEY:  In evidence.  Previously admitted into

18 evidence and this may be displayed to the jury with the Bates

19 No. 80202.

20 Q    (BY MR. BENTLEY)  And, referring you to Paragraph 12 toward

21 the bottom of the page, the "Refusal Clause," Subsection c. of

22 12, what does that indicate the bruise free requirement was?

23 A    85 percent.

24 Q    And how did that compare with the bruise free requirement

25 in the '01 contract, if you recall?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/REDI - BENTLEY

1  A    It's five percent lower, I believe.

2  Q    Okay.  So both the specific gravity and the bruise free

3  were reduced by comparison of the '02 contract to the -- the

4  standards in the '01 contract were reduced -- both of those

5  standards were reduced in the '02 contract.

6  A    Yes.

7  Q    You understand that potatoes are a rotational crop.

8  Correct?

9  A    Normally, yes.

10 Q    And, with these particular growers, they rotated and rented

11 land in different fields for each year.  Correct?

12 A    That's the common practice, yes.

13 Q    And isn't the result that you can expect somewhat dependent

14 upon the location that you're farming?

15 A    Depends on the location, the conditions of the location,

16 and what the prior management and prior cropping history has

17 been.

18 Q    Finally, Mr. Turner, were there advantages to these

19 contracts that would induce a grower to sign them?  Despite the

20 quality standards?

21 A    I think my answer is -- is situational and specific.  Given

22 the financial, sort of, stress created by the disaster in 2000,

23 the necessity to have a safety net -- because one more is going

24 to take you right off the board.  You're going to be out of the

25 business.  I would be highly motivated to really give close

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - SMITH

1  consideration to these contracts.  I think the greatest

2  reservations I have with them really aren't on the grower side.

3  It's actually over on the processor side.

4          MR. BENTLEY:  Thank you.

5          THE COURT:  Any other defense?  Mr. Smith?

6

7                    RECROSS EXAMINATION

8  RECROSS BY MR. SMITH:

9  Q    Mr. Turner, let me ask you some questions somewhat specific

10 to Mr. Gordon.  The -- do you know what variety of potato

11 Mr. Gordon grew or what varieties Mr. Gordon grew in 2003?

12 A    No, not without referring to the records.

13 Q    Do you know if he changed varieties in 2004?

14 A    I can't recall without specifically refreshing my memory

15 with records.

16 Q    The evidence that we've heard is that he -- or that's

17 introduced here is that, in 2003, he grew Norkotahs; and he grew

18 Reds and Yukons.  And you spoke about Reds and Yukons a little

19 bit?

20 A    Yes.  I recall that now, yes.

21 Q    Do we -- or can you -- do you characterize, in your

22 business, Reds and Yukons as a -- is it fair to say they're,

23 like, a specialty potato?

24 A    They are.

25 Q    And, in -- in that regard, I think you talked about it a

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - SMITH

1   little bit.  Can a grower expect to -- in general, to obtain a

2   higher value for those potatoes?

3   A    You have to because the yield numbers are usually much

4   lower.

5   Q    All right.  The -- with regard to achieving certain

6   standards, I'm showing you what's been admitted in evidence as

7   4194B.

8            MR. SMITH:  And this can be shown to the jury.  Will

9   you check on me, Ms. Brasel, so I don't -- thank you.

10           THE COURTROOM DEPUTY:  It is.

11  Q    (BY MR. SMITH)  Do you recognize this type of a document?

12  A    Yeah.  This is a Simplot Contract Inspection Grade Sheet.

13  Q    And, in -- in this particular grade sheet, I want to direct

14  your attention to this (indicating).  It's a field number.  Is

15  that correct?

16  A    Yes.

17  Q    And, then, when -- when -- on these, when they talk about

18  "Delivered Weight," is that the weight of the sample?

19  A    Yes.  The processors have forklifts and bins.  So normal

20  sampling is in 50-pound sacks, but they take larger samples

21  because they have forklifts and bins.

22  Q    So that -- that sample would be 500 pounds?

23  A    Yes.

24  Q    All right.  And, then, I know this is old and it's hard to

25  read; but can you tell me what the specific gravities that were

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - SMITH

1   measured on that field are according to this report?

2   A    Well, you can see it's broken out by size range; but the

3   average is 1.080.

4   Q    And, then, I want to show you what's been identified and

5   previously admitted as 4194A.  And, again -- oh, excuse me.  Let

6   me go back for just a second.  Does it -- does it indicate a

7   inspection date and time on this report?

8   A    Yes.

9   Q    And I know we can all read it, but that's September 23rd of

10  2004?

11  A    Yes.

12  Q    All right.  And, then, let me show you here Defendant's

13  Exhibit 4194A.  And, also, if I just run through the report with

14  you, it shows, again, an inspection date of September 23rd?

15  A    Yes.

16  Q    The field number is different.  It's 8404?

17  A    Correct.

18  Q    And the delivered weight is 500 pounds?

19  A    Right.

20  Q    All right.  And, then, in this particular sample, the

21  specific gravities were identified as what, please?

22  A    1.081.

23  Q    What -- what is this when they run -- when the report runs

24  this down -- because it starts out it says, "Average 1.082."  Is

25  that identified as to size?  Or how -- why does it go 1.82 (sic)

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - SMITH

1  and, then, have the final figure of 1.081?

2  A    Typically, if you go to the left side of the column, the

3  header is "Size" and, then, it goes "4 OZ," "6 OZ," "10 OZ,"

4  et cetera; and you just follow the data over to the right.  The

5  raw data's there for weight in air, weight in water, difference,

6  and, then, the calculated specific gravity.

7  Q    So are we saying that there was -- that there was -- you

8  know, they -- they tested specific gravity for different sizes

9  of the potato?  Is that what you're saying?

10 A    That is correct.

11 Q    All right.  And -- and, with regard to that, the -- the

12 specific gravities were even higher for certain sizes.

13 A    That's typical.

14 Q    All right.  You -- are you aware of whether or not

15 Mr. Gordon's field location changed from crop year 2003 to 2004?

16 A    I don't know the specifics, but I would expect because of

17 rotational issues it would.

18 Q    Okay.  Regardless of other issues --

19 A    Right.

20 Q    -- you have to rotate.  All right.

21        MR. SMITH:  Okay.  Very good, sir.  I have no other

22 questions.

23        THE COURT:  Mr. Vovos?

24 /  /  /  /  /

25 /  /  /  /  /

1                        RECROSS EXAMINATION

2    RECROSS BY MR. VOVOS:

3    Q    Good afternoon, sir.

4    A    Good afternoon.

5    Q    I have a couple questions.  I was listening when

6    Mr. Bentley was talking to you.  And you said you had

7    reservations as far as these contracts and after the year 2000

8    and the catastrophe that happened in 2001, but your reservations

9    were more from the processor side.  And I wanted to know -- I

10   guess I'd just ask you.  What did you mean by that?  Was there a

11   concern about the processors entering into these contracts?

12   About the purchase or about the purchaser?

13   A    Let me break that answer out sort of by year.  A disaster

14   situation where the U.S. Government actually stepped in and

15   tried to help the market at the end in 2000.  That's what's on

16   your mind when you're thinking about forming this 2001 contract?

17   Q    Yes.

18   A    You got that guaranteed minimum price in there.  You're

19   basically taking possession of the -- title to them under the

20   contract on delivery whether it goes to storage or -- you know.

21   And, after harvest, whether or not they are accepted and meet

22   all the specifications or the rejected and the contract minimum

23   is paid, either way you're going to be on the hook for the

24   storage.

25   Q    Are you talking about the purchaser?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - VOVOS

1  A    I'm talking about, in this case, the contractor, Tri-Cities

2  Produce.

3  Q    Yes.

4  A    So, coming out of the gates with this fresh searing memory

5  of 2000, you need to swallow hard to kind of lay that out that

6  you're going to assume all of that on the front end.

7  Q    All right.

8  A    Then you get into 2001 and it kind of reverses.  The market

9  goes up and you start thinking rosy thoughts, but you sign a

10  similar contract with some changed terms.  In 2003 and '4, the

11  market slides and goes back down again.  So the risk factor --

12  and I think the testimony earlier was that they actually lost

13  money --

14  Q    Yeah.

15  A    -- over the long run.  So, I guess my feeling about risk is

16  borne out by the history of the finances.

17  Q    You were present when Mr. Carr testified or were you?  It

18  was an owner of Agri-Pack.

19  A    I was.

20  Q    He expressed the same concern about signing a contract.

21  A    Yeah.  That's why he didn't go that direction after his

22  first couple of years.

23  Q    I want to change subjects, and I want to talk to you about

24  this definition of processing.  What are processed grade

25  potatoes in the industry, in the standard, when you talk about

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - TORNABENE

1  "processing grade"?  Is there a certain type of potato, when you

2  talk about 1's and 2's and, then, processing grades that go to

3  dehy makers that -- that is a term that's used for describing

4  potatoes?

5  A    It is a particular term.  It describes a particular type of

6  potato.

7  Q    Explain that to the jury.  What is processing grade

8  potatoes?

9  A    It's a really nice way to say that, on average, these are

10 potatoes that went through a process fresh pack facility and

11 were knocked out somewhere in the process.  They were graded out

12 for defects, size, whether it was internal/external rot,

13 excessive dirt.  Whatever it was, they got knocked out of U.S.

14 No. 1 or U.S. No. 2.  So now we call them "process grade," and

15 they go to a different processor.

16 Q    Okay.  Is that a term that's used in the industry?

17 A    Yes.

18           MR. VOVOS:  Thank you, Mr. Turner.

19           THE COURT:  Anyone else on the defense side?  Okay.

20 Recross.

21

22                    RECROSS EXAMINATION

23 RECROSS BY MR. TORNABENE:

24 Q    Mr. Bentley asked you about some documents that he put

25 before you.  Do you recall that?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - TORNABENE

1  A    Yes.

2  Q    And, without getting further into those, I guess my

3  question is, with regards to -- what was -- take a step back.

4  Strike that.

5      If you have records of the different seeds that are

6  purchased by a grower, all the different kinds of seeds, you

7  would know what seeds they purchased.  Correct?

8  A    Assuming you have a complete set of records, yes.

9  Q    You're not going to know from that accounting what they

10  grew, necessarily, are you?

11  A    I don't know anybody that's bought seed potatoes at a very

12  high price and dumped them unless there was a defect with them.

13  Q    You're not going to know from just the seed records what

14  they grew.  Isn't that accurate?

15  A    Well, you can't grow potatoes without seed.

16  Q    I understand that.  From the seed records -- so, you're

17  saying, from the seed records alone, you know what the grower's

18  going to grow.

19  A    It's a highly reliable indicator, yeah.

20  Q    All right.  Do you also know what contract, what is

21  ultimately grown, will be transferred or will be utilized for

22  transferring those potatoes?

23  A    It depends on whether all of your potatoes are contracted.

24  Q    So, if -- the contracts we're dealing with here, they don't

25  specify a variety.  Correct?

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - TORNABENE

1  A    No.

2  Q    So, looking at the contract for, say, Poco, 2003, and their

3  seed records for 2003, you would need more information to know

4  what was ultimately transferred under that contract, wouldn't

5  you?

6  A    You'd need more information, yes.

7  Q    And would that information include the packout sheets that

8  are associated with the fresh packer to that contract?

9  A    It depends.

10  Q    That -- that wouldn't be good information?

11  A    Well, it's not that it's bad information it just might be

12  misleading.  In a situation like Tri-Cities Produce with their

13  Famous system and the DOS version the first few years and the

14  default coding everything to Norkotah, you could be mislead if

15  you didn't get all of the information.

16  Q    If -- if that information wasn't provided to you, you could

17  be mislead.

18  A    Well -- or if you didn't seek it out.  Either way, yes.

19  Q    So, if that's what was provided to, say, an insurance

20  company, they might be mislead.

21  A    Depends on whether they asked for it.

22       MR. BENTLEY:  I'm going to object to that.  It assumes

23  a fact not in evidence.

24       THE COURT:  Overruled.

25  Q    (BY MR. TORNABENE)  Mr. Turner, you would agree that

JURY TRIAL - DAY 23 - MAY 16, 2013
S. TURNER/RECR - TORNABENE

1 Colorado 3s are a -- I believe, it's a strain of Norkotahs.  Is

2 that correct?

3 A    They are.

4 Q    So, if records indicated that a grower stopped growing

5 Norkotahs, standard Norkotahs, and, instead, grew Colorado 3s,

6 they would still be growing a strain of Norkotahs.  Correct?

7          MR. SCHWARTZ:  I object, your Honor.  This is beyond

8 the scope.

9          THE COURT:  I'm going to permit some latitude here.

10 The nature and extent of the redirect was significant.  So I'm

11 going to permit this.  Go ahead.

12          THE WITNESS:  Could I have the question again, please?

13 Q    (BY MR. TORNABENE)   If a grower stopped growing standard

14 Norkotahs one year and, instead, grew Colorado 3s, they would

15 still, nonetheless, be growing a strain of Norkotahs.  Correct?

16 A    Yes.

17          MR. TORNABENE:  Nothing further.  Thank you.

18          THE COURT:  Have we finished with this witness?

19          MR. VOVOS:  We have nothing I don't think, Judge.

20          MR. JOHNSTON:  No questions, your Honor.

21          MR. BENTLEY:  No questions.

22          THE COURT:  Well, Mr. Turner, you may step down.

23 Thank you.

24          THE WITNESS:  Thank you.

25          THE COURT:  Ladies and gentlemen, I'm going to ask you

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1  to step out and just stay for a few minutes.  We're going to try

2  to sort out tomorrow and see where we are and, then, Monday.  So

3  give us a few minutes so we can tell you what your report time

4  is at some point.  Thank you.

5           (Jury out at 4:58 p.m.)

6           THE COURT:  Please be seated.  By my calculations,

7  if -- if, for some reason, we should end up at the end of

8  evidence sometime next week, my estimate is that it's unlikely

9  that we could actually complete closings in less than two full

10 days.  I don't see how that's possible.  So that -- that tells

11 you what your week looks like next week.  If you think you're

12 getting to get jury next week, then, I assume you've got

13 virtually nothing to put on for next week.  If you have evidence

14 for Monday -- if you have a single day of evidence, it's

15 certainly doable.  But, if you have more than a single day of

16 evidence, then you're right at the edge of spilling into the

17 week after.  So I think you need to be realistic about the --

18 the extent of the testimony you expect so that I can tell the

19 jury right now "Don't come in tomorrow" or "Come in tomorrow."

20 So tell me what you want to do.

21          MR. JOHNSTON:  Your Honor, I think that we had planned

22 our witnesses on Monday and Tuesday for what would take about

23 two days.  And --

24          THE COURT:  Who's "we"?

25          MR. JOHNSTON:  That's Poco, your Honor.  And we are --

1  have contacted two witnesses, that were scheduled, to try and

2  move them up to tomorrow.  I think we -- we can get one

3  additional to Mr. Hirano, and we'll try and fill the day.  But I

4  -- I don't want to get -- I mean, I think next week is pretty

5  full and will take us to Thursday at some time.

6             THE COURT:  For evidence.

7             MR. JOHNSTON:  For evidence.  That would be --

8             THE COURT:  Yeah.  See, we're going into the week

9  after without any question.

10            MR. JOHNSTON:  I think that's accurate, your Honor.

11            THE COURT:  Well, then, let's work tomorrow.  I'm

12  going to be here all afternoon with a whole docket and other

13  things.  So it's not -- and no -- and none of you are going to

14  be taking a day off either as I well know.  So that said --

15            MR. JOHNSTON:  And, your Honor, we will have

16  Mr. Hirano.  We believe that we may have Mr. Dave Long.

17            THE COURT:  Okay.

18            MR. JOHNSTON:  If I can have, maybe, an extra hour or

19  so to identify our witnesses to, recognizing the issue, to you.

20  We'll do it as quickly --

21            THE COURT:  Sure.  Ms. Brasel, tell the jury they can

22  go home.

23            THE COURTROOM DEPUTY:  Okay.  And what time do you

24  think?

25            THE COURT:  8:30.

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1    MR. BENTLEY:  And, your Honor, is that juror with the

2    dental appointment having that tomorrow?  Does that affect our

3    court time?

4    THE COURT:  Yes.  7:00 tomorrow.  That's his

5    appointment.  So we'll await his arrival.  Well, why don't you

6    tell them 9:00.  Why don't we just come in at 9:00 and give them

7    a little break.  Okay.  9:00.  Thanks.

8    All right.  Folks, we know what our witnesses are for

9    tomorrow.  Excuse me, Mr. Peterson, have a seat.  What -- what

10   are we going do tomorrow, then?

11   MR. JOHNSTON:  Your Honor, Mr. Peterson was just

12   trying to advise us that there may be an available third

13   witness; and we'll know that in about ten minutes.  But I think

14   we can fill the day tomorrow.

15   THE COURT:  9:00 to noon.  That's what we're doing

16   because I have a full afternoon and my staff needs lunch.  So

17   we'll be concluding at noontime.

18   Anything else we need to take up?  Issues that need to be

19   researching?  Other issues?  Okay.

20   What I'll try to do is to get a set of jury instructions to

21   you sometime Monday, maybe Tuesday.  But, since we're not doing

22   it until the next week, I don't feel significant pleasure.  But

23   I will build in some time next week, depending upon that, at

24   least a couple of hours on jury instructions some morning.  So

25   it may be that that will all have to happen Friday morning

JURY TRIAL - DAY 23 - MAY 16, 2013
COLLOQUY

1   without the jury, and they'll get a four-day weekend.  So you

2   might want to think tentatively about being together Friday

3   morning to do jury instructions based on the working set that

4   I'm giving you so that you'll have something to take home over

5   the weekend, you can take a look at, and including your

6   arguments.  At least, that's the tentative plan subject to some

7   adjustment.

8        Anything else before we conclude?  Okay, folks, see you at

9   9:00 tomorrow.  Thanks.

10        (Court recessed at 5:03 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **GENERAL INDEX**

2                                                              **PAGE**

3    Colloquy Re:  Exhibits during John Schultz's
     testimony........................................... 67
4
     Colloquy Re:  Taking a Witness Out of Order.......... 68
5
     Colloquy Re:  Exhibits Continued during John
6    Schultz's testimony................................. 69

7    Reporter's Certificate.............................. 258

8

9                          **WITNESS INDEX**

10   **DEFENDANT WITNESSES**                                    **PAGE**

11   JOHN SCHULTZ            DIRECT BY MR. BENTLEY        15
                            CROSS BY MR. JOHNSTON        44
12                          CROSS BY MR. TORNABENE       70
                            REDIRECT BY MR. BENTLEY      72
13
     TOM HEATH              DIRECT BY MR. VOVOS          75
14                          CROSS BY MR. BENTLEY         82
                            CROSS BY MR. ANDERSON        85
15                          REDIRECT BY MR. VOVOS        98
                            RECROSS BY MR. BENTLEY       103
16
     ALAN SCHLIMMER         DIRECT BY MR. VOVOS          106
17                          CROSS BY MR. JOHNSTON        121
                            CROSS BY MR. ANDERSON        124
18                          REDIRECT BY MR. VOVOS        131
                            RECROSS BY MR. ANDERSON      133
19                          FURTHER REDIRECT BY MR. VOVOS 135

20   STEVE SACKMANN         DIRECT BY MR. BENTLEY        147
                            CROSS BY MR. ANDERSON        159
21
     STUART TURNER          DIRECT BY MR. BENTLEY        162
22                          CROSS BY MR. SMITH           208
                            CROSS BY MR. TORNABENE       212
23                          REDIRECT BY MR. BENTLEY      236
                            RECROSS BY MR. SMITH         241
24                          RECROSS BY MR. VOVOS         245
                            RECROSS BY MR. TORNABENE     247
25

**EXHIBIT INDEX**

| NO. | DESCRIPTION | ADMITTED |
|---|---|---|
| 1033 | Letter from John Sheeley of American Growers Insurance Company (In Rehabilitation) to Lynn Olsen dated December 19, 2003, informing Olsen that AGIC has reviewed his AGR claim and has concluded that his approved revenue should be reduced because he overvalued his onion crop and therefore he does not have a claim [Court Bates 6731-34] | 17 |
| 1037 | "American Arbitration Association, Commercial Arbitration Rules, Demand for Arbitration" filed on behalf of Olsen d/b/a Olsen Agriprises, dated August 30, 2004, versus American Growers Insurance Co., seeking arbitration pursuant to the AGR policy with respect to both 2001 and 2002 issues [Court Bates 6711-12] | 70 & 72 |
| 1046 | Letter from Clifton parker to John Schultz dated April 5, 2007, explaining that after a re-evaluation of its earlier position, RMA has still concluded that Olsen did not have an AGR claim for the 2001 crop year [Court Bates 268-88] | 29 |
| 1102 | Letter from John Sheeley of American Growers Insurance Company (In Rehabilitation) to Debbie Moore of Olsen Ag, Inc., dated January 8, 2004, informing Moore that AGIC has determined that Olsen Ag, Inc., does not have a claim under its AGR policy for the 2002 year because its expected income from potatoes has been determined to be more than 83.35% of the total expected allowable income [Court Bates 6744-45] | 21 |
| 1109 | Letter from Clifton Parker, RMA's Assistant Deputy Administrator for Insurance Services, to John Schultz, attorney for Olsen, dated April 5, 2007, stating that, after a review of the file, revenue-to-count exceeded the guaranteed revenue and thus no indemnity is due [Six-digit Bates 000004-28; Exhibit 5 to the original expert report of Stu Turner] | 33 |

1       __EXHIBIT INDEX (continued)__

2 __NO.__  __DESCRIPTION__          __ADMITTED__

| NO. | DESCRIPTION | ADMITTED |
|-----|-------------|----------|
| 1507 | PowerPoint presentation to be narrated by Stuart Turner - For Illustrative Purposes Only | 170 |
| 1508 | "The Effects of Heat and Water Stress on Potatoes," article by Andy Robinson, Extension Potato Agronomist, NDSU/UMN, that appeared in Valley Potato Grower, September/October 2012 issue | 202 |
| 1515 | Article on Tuber Quality by Stark, Olsen, Kleinkopf, and Love (3pages) | 200 |
| 1535 | Michael K. Thornton, "High Temperature - How It Influences Potato Yield and Quality," presented at the 1991 Washington Potato Conference and Trade Fair (4 pages) | 205 |
| 2084 | Bates Nos. 00751309 through 00751324 only of January, 2005, Harper Reporter 2003 AGR Claim | 58 |
| 2131 | December 2003 Notice of Merger into Farmers | 47 |
| 2132 | Poco Response to Cancel of AGR | 48 |
| 2135 | August 30, 2004, Poco Demand for Arbitration | 52 |
| 2136 | February 1, 2005, Poco Amended Demand | 54 |
| 4139 | Climatological Data from Hanford Meteorology Station | 210 |

C E R T I F I C A T E

I, RONELLE F. CORBEY, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and at the time and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings.

DATED this 9th day of March, 2015.


                              */s/ Ronelle F. Corbey*

                              RONELLE F. CORBEY, RPR, CSR, CRR
                              Official Court Reporter for the
                              U.S. District Court in
                              Spokane County, Washington