```
 1                   UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF WASHINGTON
 2
   UNITED STATES OF AMERICA,        ) Case No. CR-11-6001-1
 3                                   )            CR-11-6001-2
                      Plaintiff,     )            CR-11-6001-3
 4                                   )            CR-11-6001-4
   vs.                               )            CR-11-6001-5
 5                                   )            CR-11-6001-6
   LYNN J. OLSEN, II (1),            )            CR-11-6001-7
 6 MARK G. PETERSON (2),             )            CR-11-6001-8
   BLAKE T. BENNETT (3),             )
 7 JEFFREY J. GORDON (4),            ) May 21, 2013
   OLSEN AG, INC. (5),               ) Richland, Washington
 8 Poco, LLC (6),                    )
   TRI-CITIES PRODUCE (7),           ) Jury Trial - Day 26
 9 FRED F. ACKERMAN (8),             )
                                     )
10                   Defendants.     )
   _____ )
11             BEFORE THE HONORABLE EDWARD F. SHEA
            SENIOR UNITED STATES DISTRICT COURT JUDGE
12
   APPEARANCES:
13
   For the Plaintiff:          Mr. Tyler H. L. Tornabene
14                             U.S. Attorney's Office
                               920 West Riverside, Suite 340
15                             P.O. Box 1494
                               Spokane, Washington 99210
16
                               Mr. Shawn N. Anderson
17                             U.S. Attorney's Office
                               402 East Yakima Avenue
18                             Suite 210
                               Yakima, Washington 98901
19 For the Defendants:

20 Olsen and Olsen Ag:         Mr. Allen R. Bentley
                               Attorney at Law
21                             1111 Third Avenue
                               Suite 2200
22                             Seattle, Washington 98101

23 Peterson:                   Mr. Irwin H. Schwartz
                               Attorney at Law
24                             710 Cherry Street
                               Seattle, Washington 98104

25
```

```
1    APPEARANCES (continued):

2    Bennett and Tri-City          Mr. Mark E. Vovos
     Produce:                      Attorney at Law
3                                  West 1309 Dean
                                   Suite 100
4                                  Spokane, Washington 99201

5    Gordon:                       Mr. Richard A. Smith
                                   Attorney at Law
6                                  314 North Second Street
                                   Yakima, Washington 98901
7
     Poco, LLC:                    Mr. R. Bruce Johnston
8                                  Attorney at Law
                                   200 Winslow Way West
9                                  Suite 300
                                   Bainbridge Island, WA 98110
10
     Ackerman:                     Mr. Nicholas W. Marchi
11                                 Attorney at Law
                                   7502 West Deschutes Place
12                                 Kennewick, Washington 99336

13

14

15

16

17

18

19

20   Official Court Reporter:      Ronelle F. Corbey, #2968
                                   United States District Courthouse
21                                 P.O. Box 700
                                   Spokane, Washington 99210
22                                 (509) 458-5283

23

24
     Proceedings reported by mechanical stenography; transcript
25   produced by computer-aided transcription.
```

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1    (Court convened on May 21, 2013, at 8:41 a.m.)

2        THE COURTROOM DEPUTY:  All rise.

3    (Call to Order of the Court)

4        THE COURT:  Good morning.  Please be seated.  Okay.

5    I've read the materials that have been filed.  What's first?

6        MR. ANDERSON:  The Government has some objections to

7    proposed exhibits that we believe will be offered today.  The

8    first would be, apparently, offered through Marta Sowers.  It's

9    Defense Exhibit 3141, letter from Mr. Bennett to former AUSA

10    Shogren.  We object to the admission of that based on hearsay.

11    We don't believe a foundation can be laid for it as a business

12    record.

13        THE COURT:  Who's up on that one?

14        MR. VOVOS:  I am, Judge.

15        THE COURT:  Okay.

16        MR. VOVOS:  Is the ELMO working?

17        THE COURTROOM DEPUTY:  Yes.

18        MR. VOVOS:  This is the exhibit, Judge.  The first

19    Grand Jury was in 2006.  Documents were produced by Tri-Cities

20    Produce at the Grand Jury.  This document was in discovery.  It

21    bears the 80001 Bates stamp, which indicates it was received in

22    the Grand Jury, and has the receipt of the United States

23    Attorney on August 6th, the day after the letter was written.

24    It is a part of the business record that's kept at -- by

25    Tri-Cities Produce.  Marta Sowers is the custodian.  It was at

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1   the time that the matters were produced to the Grand Jury, and

2   we want to call her to have her identify the letter.  And that's

3   our purpose.

4           THE COURT:  That's your -- and that's your evidentiary

5   foundation?

6           MR. VOVOS:  That's the evidentiary foundation under

7   803(6), yes.

8           THE COURT:  Mr. Anderson.

9           MR. ANDERSON:  Well, just reading from the face of the

10  document, it's clearly not a business record of Tri-Cities

11  Produce.  It's a letter written directly by Mr. Bennett to a

12  government agency for a very select purpose not really having to

13  do with the business of Tri-Cities Produce.  So I don't believe

14  it falls within that exception.

15          MR. VOVOS:  I would only -- that -- that is not the

16  case, Judge.  This was kept with the records that were submitted

17  to the Grand Jury.  It -- it was kept at the time.  She is the

18  custodian.  And, even in this case, Judge, this Court has

19  admitted, in 2011, the Poco letter that was after documents were

20  submitted by Poco to the Grand Jury.  This is merely a follow

21  up, and I think it's to some --

22          THE COURT:  I don't know how that relates to this.

23          MR. VOVOS:  No, it's -- it's --

24          THE COURT:  If you want to point to that document,

25  then do so; and I'll look at the Poco document.  If you have it,

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1   I'll look at it.  Tell me what it is, and I'll look at it.

2            MR. VOVOS:  All right, Judge.

3            THE COURT:  But a reference to a I "admitted a

4   document" numbers into the hundreds.

5            MR. VOVOS:  I understand.

6            THE COURT:  So, if your memory's better than mine,

7   just give me the ECF.  I'll give you the doc -- the exhibit

8   number.  Do you have it?

9            MR. VOVOS:  I -- I don't have it.

10           THE COURT:  I don't have it either.  So, until you

11  cite it and I can make reference to it, it's not a learned

12  authority, so to speak.  So --

13           MR. VOVOS:  I understand, Judge.

14           THE COURT:  You go take a look.  And, when you get it,

15  you let me know; and I'll go over it with you.

16           MR. VOVOS:  All right.

17           THE COURT:  Right now it's out.  So you can persuade

18  me that it's back in somehow.

19      What's next?

20           MR. ANDERSON:  Also, a number of exhibits,

21  photographs, to be offered through Mr. Jeff Smith.  They're

22  generally identified as Exhibit 3072 with a number of subparts.

23           THE COURT:  I've read that.  What's the basis for

24  this?

25           MR. VOVOS:  Judge, these are photographs of Tri-Cities

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  Produce, a business, one of the defendants in this case, that

2  generally show their business.  There is no evidence that has

3  been admitted in this court as an exhibit.  There were documents

4  that were shown and pictures in opening statement but nothing

5  has been admitted.  This is not cumulative at all, and it

6  generally goes through and shows and depicts for the jury

7  what one of the --

8          THE COURT:  My recollection is there have been two

9  videos shown --

10         MR. VOVOS:  No, no, Judge.

11         THE COURT:  -- about potato processing.

12         MR. VOVOS:  Well, there's been two videos shown; but

13 only one pertains to Tri-Cities Produce.  And that was in the

14 opening statement of Tri-Cities Produce here last week.

15         THE COURT:  Did you not show two videos?

16         MR. VOVOS:  I did, Judge.  I showed --

17         THE COURT:  You showed one during opening statement,

18 which was 15 minutes long?

19         MR. VOVOS:  Yes.

20         THE COURT:  Okay.  And, then, you showed a second that

21 was 3 to 5 minutes long?

22         MR. VOVOS:  I think it was an example of two things,

23 Judge.  They were for witnesses during cross examination, but

24 they showed storage and potatoes going into storage.  But, in

25 the opening statement that -- when this trial was first started,

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1  I -- I had pictures that I showed the jury that were used in --

2  in our PowerPoint presentation of Tri-Cities Produce.  And this

3  witness will be short and will just testify that, as an employee

4  of Tri-Cities Produce, that he is aware the pictures are

5  accurate, they depict what they show, and he can identify them

6  under Evidence Rule 901.

7            THE COURT:  Mr. Anderson.

8            MR. ANDERSON:  There's some 15, 20 of these

9  photographs, your Honor.  I don't see that they're relevant, and

10 they certainly are cumulative.  I -- I don't know if the video's

11 coming in at a later time, as well.

12           MR. VOVOS:  I haven't asked for the video, Judge.

13           THE COURT:  Well, not yet.

14           MR. VOVOS:  I haven't.  Right.  This only has to do

15 with these photos.  Yes.

16           MR. ANDERSON:  I have nothing further on that.

17           THE COURT:  Thank you.  Okay.  The answer is that --

18 and you might want to make a note.  So 3072, 6, 14, 15, 17, 18,

19 21, 22, 27, 28, 32, and 41 are okay.  The others are out.

20           MR. VOVOS:  And, Judge, may I take the time?  The Poco

21 letter to the Grand Jury is Exhibit 2336A.

22           THE COURT:  And who wrote it?

23           MR. VOVOS:  It was written -- Poco letter was written

24 by Bruce Johnston, the attorney for Poco.

25           THE COURT:  Okay.

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1      MR. VOVOS:  And the Gordon -- Jeff Gordon letter is

2  2 -- 4503 and 4504.

3      THE COURT:  And who wrote those?

4      MR. VOVOS:  I'll ask -- Mr. Smith, I think, wrote

5  those.

6      THE COURT:  Okay.  And who was your proposed exhibit

7  written by?

8      MR. VOVOS:  It was written by Blake Bennett from

9  Tri-Cities Produce.

10      THE COURT:  And you're introducing it for what reason?

11      MR. VOVOS:  To rebut the -- to rebut the evidence that

12  not everything was produced to the Grand Jury in 2006; to show

13  that there were two Grand Juries, one in 2006 and one in 2011;

14  and that Mr. Bennett provided everything that he thought that

15  needed to be provided and said, if he didn't provide it, just

16  let him know and him and his attorney, Mr. Rettig, would --

17  would provide information.  And there wasn't any response.

18      THE COURT:  I'll think about it, Counsel.  But the

19  other two were written by attorneys.  This was written by him.

20  You're asking the jury to believe it.  It's a statement by a

21  defendant introduced by you, not by the Government; and you're

22  asking the jury to believe it.  And I believe that that's

23  prohibited.  So I'll think about it, but the answer is "no"

24  right now.

25      MR. VOVOS:  There's a -- there's a suggestion that

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1    everything wasn't provided, and this is just a response

2    saying --

3             THE COURT:  I'm sure that you can elicit that through

4    one or more of your witnesses.

5             MR. VOVOS:  Thank you, Judge.

6             THE COURT:  Thank you.

7             MR. ANDERSON:  Final objections are to a series of

8    exhibits to be offered through Ms. Tiffany Couch.  Those are

9    identified in my briefing.  There were a number of other

10   exhibits that have been disclosed, as well; went through those;

11   identified those that had our Bates numbers that we stipulated

12   to previously or otherwise agreed to.  These were not among

13   those.  And, given that Ms. Couch is a forensic -- forensic

14   examiner and not a records custodian of Gordon Brothers or

15   Kamiak Vineyards, I believe there's no foundation to offer these

16   into evidence.

17            THE COURT:  Why is Kamiak Vineyards in this case?

18            MR. SMITH:  Your Honor, they're -- frankly, they're

19   not.

20            THE COURT:  Then why do we have a 4046, which is an

21   IRS form 1120 and attachments for Kamiak Vineyards?

22            MR. SMITH:  Oh, it would -- that -- that document,

23   your Honor, was relied upon by Ms. Couch in making her

24   determination that the -- any loans were fully accounted for.

25   And there was a -- there was a -- there was a write-off that was

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1  subsequently accounted for in its 2007 tax return as income to

2  what became Kamiak.  Gordon Brothers became Kamiak, as we know

3  from the -- the deposition that was entered.  But would -- does

4  that answer the Court's question?

5       THE COURT:  It answers it, but I still don't

6  understand its relevance.

7       MR. SMITH:  The -- the -- part of the payment of

8  expenses and loan -- loans, as between Gordon Brothers and Poco

9  and Olsen Ag, there was a portion of one loan that was -- there

10 was a negotiated settlement and it was written off.  It's

11 reflected in the 2007 tax returns of Kamiak Vineyards.

12      THE COURT:  Okay.  Now, there's -- 4026 is -- simply

13 says, "Checks and transaction records" on ECF 1187, which is

14 Mr. Anderson's objections.  And it appears to me that there are

15 multiple pages of documents, and I'm simply not in a position to

16 rule on those at the present time.  So tell me what your

17 intention is, just generally, about the admission of these long

18 list of documents numbering, probably, close to a hundred pages.

19      MR. SMITH:  In several different exhibits, your Honor.

20 Those -- those -- all those documents were provided as

21 reciprocal discovery to the Government, and they were documents

22 which we indicated that would be relied upon by Ms. Couch in

23 order to give her opinion as to the -- the practices of -- the

24 accounting practices and expense payment and loan payment of

25 Gordon Brothers.

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1      The -- we'd refer the Court and counsel to -- to Rule 703,

2  where -- what we're saying is, the information that she relied

3  upon has been provided to the Government; and it is -- I don't

4  believe that it either has to be admitted or admissible for her

5  to rely upon it as a basis for her opinion.  And, then, she

6  would be subject to cross examination.  I think all those

7  documents fall within that -- that ambit.  The only ones that

8  don't are the ones that are actual bank records that have been

9  stipulated to by the Government.

10      THE COURT:  You're certainly right that the expert may

11  rely on those documents.  That doesn't mean that they get into

12  evidence.

13      MR. SMITH:  No, that's -- that's true.  We agree.  And

14  what I indicated to Mr. -- to -- to -- to Mr. Anderson was that

15  we would either refer to or -- refer to or introduce.  And --

16  and we gave him some long list.  The ones that we intend to

17  introduce are really the documents, number one, that have

18  already been introduced in -- in evidence.  And, then, those

19  that are listed as the 4141 through 4151 series, which are

20  charts and graphs that, again, have been previously provided

21  along with --

22      THE COURT:  Okay.  Well, let's see where it takes us

23  when we're there.

24      MR. SMITH:  Thank you, your Honor.

25      THE COURT:  Thank you.  What else?

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1          MR. VOVOS:  May I just have another minute?

2          THE COURT:  Sure.

3          MR. VOVOS:  Pertaining to the pictures -- and -- and I

4   understand.  I just wanted to put some context as to the

5   relevance of the pictures as far as Mr. Smith is concerned.

6          THE COURT:  I thought I already ruled on that.

7          MR. VOVOS:  You did, and I'm asking that the Court

8   reconsider the picture 60 because, without any context to 60, it

9   can appear it's just another scene at Tri-Cities Produce or

10  something that shows somebody in a boxing area.  That is the

11  picture, 60, of the United States Department of Agriculture

12  Inspector that is in that business.  And I think that's relevant

13  and important to this case to show that the United States

14  Department of Agriculture is present at Tri-Cities Produce doing

15  inspections.  And that's -- that's what Exhibit 60 is.  It's

16  just a photograph.

17         MR. ANDERSON:  There's been no evidence as to how that

18  might be relevant or what kind of inspection's been going on

19  inside of there.  There's -- there's nothing like that at all.

20         THE COURT:  Who's Mr. Smith?

21         MR. VOVOS:  Mr. Smith is an employee.  He is the

22  safety manager at -- at Tri-Cities Produce.  He is aware of the

23  requirements, and one of the requirements for Tri-Cities Produce

24  in their business is that the United States Department of

25  Agriculture inspects potatoes as they leave the facility.  And

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1   the United States Department of Agriculture is present.  I think

2   it pertains to a matter that's in issue in this case, Judge.

3            THE COURT:  Well, what is that issue?

4            MR. VOVOS:  Well, the issue is the United States

5   Department of Agriculture is involved in these statements.  If

6   they wanted information, all they'd have to do is go ask their

7   own employee.  It's -- it's a -- it's a fact in the case.

8            THE COURT:  What's Mr. Smith going to say?

9            MR. VOVOS:  What is Mr. Smith going to say?  That the

10  Department of Agriculture has a presence there, and this is a

11  picture of the station where the potatoes are inspected by the

12  United States Department of Agriculture.

13           THE COURT:  For what purpose?

14           MR. VOVOS:  As they leave the --

15           THE COURT:  For what purpose?

16           MR. VOVOS:  To show that the potatoes are inspected by

17  the United States Department of Agriculture.

18           THE COURT:  For what purpose?

19           MR. VOVOS:  As part of the business, as part of the

20  structure --

21           THE COURT:  What's the purpose of the inspection by

22  the United States Department of Agriculture person who is on

23  site?

24           MR. VOVOS:  I understand, Judge.  It has to do with

25  the quality of the potatoes, whether there's any disease,

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  whether there's any bruising, any condition that would make the

2  potatoes not wholesome, unfit to ship.

3              THE COURT:  Is that relevant here?

4              MR. VOVOS:  Safety.  I -- I believe it is, Judge.

5              THE COURT:  Well, tell me what it is.

6              MR. VOVOS:  Well, it has to do with the quality of the

7  potatoes.  It has --

8              THE COURT:  Quality of potatoes is not at issue here,

9  is it?

10             MR. VOVOS:  Well, I think the quality of potatoes

11 indirectly pertains to bruise free, the percent of bruise free.

12             THE COURT:  But he's not examining that for bruise

13 free.

14             MR. VOVOS:  Yes, I'm -- I'm afraid that they are,

15 Judge.  That's one of the things --

16             THE COURT:  That's what he does?  That's what the

17 Department -- the inspector does?

18             MR. VOVOS:  They can.  They can peel off the -- that's

19 one of the things I think you've heard from --

20             THE COURT:  Well, you lay a foundation through

21 Mr. Smith outside the presence of the jury for that; and I might

22 permit that if I hear the right -- if the answer's correct and

23 tells me that that's why he's there, to examine for bruise free.

24             MR. VOVOS:  And -- and -- and other conditions.

25             THE COURT:  And specific gravity, as well?

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1          MR. VOVOS:  I don't think specific gravity, Judge; but

2    for --

3          THE COURT:  Well, is it for specific gravity?

4          MR. VOVOS:  I'm sorry, your Honor.

5          THE COURT:  Is it for specific gravity?  The

6    inspection.

7          MR. VOVOS:  I don't think there are any tests that are

8    done there for specific gravity.

9          THE COURT:  Okay.  And, until you establish there are

10   tests for bruise free, the answer is "No."  But, if you can

11   establish that there was something about bruise free, then

12   that's a different story.

13         MR. VOVOS:  I understand, Judge.

14         THE COURT:  Thank you.

15         MR. VOVOS:  Thank you.

16         THE COURT:  What else?

17         MR. TORNABENE:  Your Honor, I'm mindful of the time

18   and the jury.  I just want to put on the record with regards to

19   Mr. Moore.  My understanding is that he would take the stand

20   after Mr. Miller, probably, mid morning.  I'm conferring with

21   Mr. Bentley on the -- the few issues that we have and believe

22   that we could take those up, hopefully, during our morning break.

23         THE COURT:  Good.  Let's get started.

24      (Jury in at 8:59 a.m.)

25         THE COURT:  Please, be seated.  Good morning.  Call

1  your next witness.

2          MR. JOHNSTON:  Poco would call Frank Miller.

3          THE COURT:  Mr. Miller, would you come forward,

4  please.  When you reach the door, put your back to the door.

5  We'll take your photograph for use by the jury during

6  deliberations.  Thank you.

7      (Courtroom Deputy takes picture of the witness)

8          THE COURT:  Please, raise your right hand.

9      (FRANK MILLER, called by the Defendant, was sworn)

10         THE COURT:  Good morning.  Please be seated.  When

11 you're comfortable, please tell us your first and last name and

12 spell them both for the jury.  Thank you.

13         THE WITNESS:  My name's Frank Miller.  F R A N K.

14 M I L L E R.

15

16                    DIRECT EXAMINATION

17 DIRECT BY MR. JOHNSTON:

18 Q    Good morning, Mr. Miller.

19 A    Good morning.

20 Q    Would you tell us what your current business is?

21 A    I'm employed as a forensic accountant investigator with the

22 firm of Draughon and Draughon, Ltd.

23 Q    And would you tell us, after high school, what your

24 education -- formal education was.

25 A    After a couple years in the Navy and a couple years at

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  Boeing, I went back to school at the University of Washington.

2  I graduated in 1973 with a degree in business administration

3  with an emphasis in accounting.

4  Q    And what, after you graduated, was your first employment?

5  A    Shortly after graduation, I went to work for the Internal

6  Revenue Service as a Special Agent with the Criminal

7  Investigation Division.

8  Q    And for how long were you with that division?

9  A    Twenty-five years.

10  Q    At some point in time, did you move from being an agent to

11  anything else?

12  A    Yes.  For ten of those years, I was a Supervisory Special

13  Agent, which managed 10 to 12 other Special Agents.

14  Q    And in -- in what year did you leave the service of the

15  Internal Revenue Service?

16  A    At the end of 1997.

17  Q    And have you been in your current employment since then or

18  was there something in between?

19  A    No, current employment since then.

20  Q    Okay.  What -- what is a -- well, strike that.

21       Did you become a certified public accountant at any point?

22  A    Yes, I did.  I took the test as a -- for a CPA in 1981 and

23  passed the test.

24  Q    And your work with the Internal Revenue Service met the

25  practice requirements?

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  A    Yeah, my experience requirement.  I completed that the

2  next -- the follow year and got my license, I believe, in 1982.

3  Q    And are you currently a CPA?

4  A    Yes, I am.

5  Q    And that requires continuing education and all kinds of

6  updates and so forth?

7  A    Yes, it does.

8  Q    Okay.  Now, what is a forensic accountant as opposed to

9  somebody who does our taxes or maybe our financial statements?

10 A    Well, forensic accountant is sort of also known as an

11 investigative accountant.  And, generally, what they do is

12 detailed analysis of accounting, other financial and business

13 records that document and determine the purpose, nature, and

14 source and disposition of funds and other related matters.

15 Q    Now, in the accounting provision, when a -- a letter of

16 engagement or an undertaking is made, is it common or uncommon

17 to essentially do some kind of plan for what it is you're going

18 to do?

19 A    You generally develop a work plan, investigative plan.

20 Q    And was that also the case while you were with the Internal

21 Revenue Service?

22 A    Yeah.

23 Q    When you had an assignment, you would put a plan together?

24 A    More so with -- yeah, with the IRS.

25 Q    And what was the purpose of that kind of plan?

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  A    Well, so the -- a couple of purposes.  But one is so that

2  you have an idea of what you're trying to accomplish.  And,

3  secondly, from a manager's standpoint, you want to know that

4  your agents are going in the right direction.  And you can

5  typically follow up with them on a -- I did on a quarterly basis

6  to check have they been accomplishing the plan, revising it as

7  appropriate, and what's the future plan every quarter.

8  Q    Is it important or unimportant in investigating financial

9  matters to have a plan that is designed to lead to a meaningful

10 result?

11 A    Certainly.

12 Q    Now, in -- with regard to this particular matter, what was

13 your undertaking in regard to this case?

14 A    I was retained to evaluate the -- the Government's

15 schedules and information as it related to Poco.

16 Q    And that was the extent of your focus; that is, simply to

17 evaluate what the Government presented.

18 A    Yes, that's correct.

19 Q    You weren't doing an audit or anything like that.

20 A    No, I was not.

21 Q    And you didn't prepare financial statements or anything

22 like that for people.

23 A    No.

24 Q    Now, did -- was that -- well, what -- what kind of

25 information from the Government did you evaluate?

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/DI - JOHNSTON

1  A    I was provided the -- the 80,000 pages or so of discovery

2  information that the Government provided.

3  Q    And did you focus on any particular areas that -- that they

4  produced in summaries?

5  A    Primarily, the -- the schedules that the Government

6  prepared related to the funds received and expenses and payments

7  to Poco on specific fields.

8  Q    And did you also look at the list of checks that were

9  indicated as, quote, "unidentified"?

10 A    Yes, I did.

11 Q    And were you here in the courtroom when Mr. Bearden

12 testified?

13 A    Yes.

14 Q    And were you here when Mr. Burcham testified?

15 A    Yes.

16 Q    And were you here when Ms. Keys testified?

17 A    Yes.

18 Q    And were you here when Ms. Sowers testified in the

19 Government's case?

20 A    Yes, I was.

21 Q    Now, in regard to the issue of what was paid TCP and -- and

22 Poco, did you prepare a schedule for each year, 2003 and 2004?

23 A    Would you --

24 Q    A spreadsheet of -- of the data.

25 A    Yes.

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1 Q    And --

2          MR. JOHNSTON:  May I approach, your Honor?

3          THE COURT:  You may.

4 Q    (BY MR. JOHNSTON)  Now, you were also in the courtroom when

5 Ms. Moore testified yesterday?

6 A    Yes.

7 Q    I've handed you what were admitted as Exhibits 2343 and

8 2344.  Is that a set of foundational data that you used in

9 preparation for -- of your summary?

10 A    Yes.  These are the Grower Status Detail sheets from

11 Tri-Cities.

12 Q    And, within the 80,000 pages, were there additional sets of

13 copies produced by other companies other than the 81,000 series

14 that you have there?

15 A    Of this same document?

16 Q    Of the same type of documents as --

17 A    Yes.

18 Q    And you reviewed those at least to make sure they were

19 similar.  Is that correct?

20 A    Yes.

21          MR. JOHNSTON:  Okay.  May we have Exhibit 2009,

22 please.  Ms. Brasel, we need to --

23          THE COURTROOM DEPUTY:  Oh, I thought you had them on

24 ELMO.

25          MR. JOHNSTON:  And this is for the Court, counsel, and

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  jury -- or the Court, counsel, and witness only at this point.

2  Q    (BY MR. JOHNSTON)  Mr. Miller, is this the spreadsheet that

3  you prepared field by field in -- for the crop year 2003?

4  A    Yes, it is.

5         MR. JOHNSTON:  Can we highlight the left-hand column,

6  please?

7  Q    (BY MR. JOHNSTON)  Were these the field-by-field

8  designations that you went through?

9  A    Yes.

10  Q    And did you check those with the various documents in 2343?

11  A    Yes, I did.

12  Q    And did you also confirm, for example, with Ms. Moore that

13  they were accurate and complete?

14  A    Yes.

15         MR. JOHNSTON:  Can we knock that one down?  And can we

16  have the heading lines, please.

17  Q    (BY MR. JOHNSTON)  And in this you put a "Document

18  Reference Number" column.  Is that correct?

19  A    That's correct.

20  Q    And Exhibit 2343 is each and every document that you've

21  referred to in that line.  Is that correct?

22  A    Yes.  Yes.

23  Q    And, then, you have two columns.  One says, "Net to Poco"

24  then underlined "*If* No Contract" and the one next to it

25  "Payments to Poco Under [the] Contractor or as Agreed."  Do you

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  see that?

2  A    Yes.

3  Q    Now, how were you able to get -- or calculate the net to

4  Poco if there was no contract?

5  A    You just looked on the Grower Status sheets, and it showed

6  an amount paid under -- there was a contract adjustment amount

7  and a packing fee amount that we used to calculate that.

8  Q    And did you understand, after your investigation, that

9  the -- the packout sheets were prepared on a commission-merchant

10 type basis, but the payment was on a different basis?

11 A    That's correct.

12 Q    And you compared the two based on the information in the

13 sheets.

14 A    Yes.

15        MR. JOHNSTON:  We would offer 2009, your Honor.

16        MR. ANDERSON:  No objection, your Honor.

17        THE COURT:  Admitted.

18     (Exhibit No. 2009 admitted into evidence)

19        MR. JOHNSTON:  And may we have Exhibit 200 -- may we

20 display this to the jury?

21        THE COURT:  Counsel, remind me.  2343 is already

22 admitted?

23        MR. JOHNSTON:  Yes, it is, your Honor.  It was

24 admitted through Ms. Moore yesterday.

25        THE COURT:  Okay.  And what is that again, please?

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1        MR. JOHNSTON:  That's the pile -- that's quite a thick

2   document, your Honor.  It is the actual packout sheets, which

3   are referenced in and tied to this particular --

4        THE COURT:  Thank you.  That's what my notes showed,

5   but I wanted to make sure I was correct.  Thank you.

6        MR. JOHNSTON:  Okay.  And may we --

7        THE COURT:  You've asked for an exhibit, and I

8   interrupted you.  What were you asking for?

9        MR. JOHNSTON:  No.  I was simply asking to display the

10  Exhibit --

11       THE COURT:  Certainly.

12       MR. JOHNSTON:  -- 2009 to the jury.

13       THE COURT:  Go ahead.

14       MR. JOHNSTON:  And may we go to the "Totals" line and,

15  perhaps, set over that the headings.

16  Q    (BY MR. JOHNSTON)  Did you determine for the year 2003 that

17  Poco's actual receipts --

18       MR. JOHNSTON:  Just up a little bit.

19  Q    (BY MR. JOHNSTON)  -- were $653,901.37?

20  A    That's correct.

21  Q    And, if there had been no contract in 2003, they would have

22  received more.  Is that correct?

23  A    That's correct.

24  Q    And that would have been $880,897.47?

25  A    Yes.

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  Q    So the existence of the contract in 2003, just in terms of

2  comparing the dollars, not looking at storage or other issues,

3  actually set Poco back $226,996.10.  Is that correct?

4  A    That's correct.

5          MR. JOHNSTON:  Okay.  May we have next Exhibit 2010.

6          THE COURT:  For whom?

7          MR. JOHNSTON:  Pardon Me?  Oh, not for the jury.  This

8  has not been offered.

9          THE COURT:  For identification.

10          MR. JOHNSTON:  For identification.  Thank you, your

11  Honor.

12  Q    (BY MR. JOHNSTON)  Now, is 2010 the same headings and

13  format but for the year 2004?

14  A    That's correct.  Same schedule but just the second year.

15  Q    And back up.  Bates numbers listed for 2004 in your second

16  column are the -- the foundation is Exhibit 2344.  Is that

17  correct?

18  A    That's correct.

19  Q    And you were here when Ms. Moore testified about that.

20  A    Yes.

21  Q    And had you been provided with a copy of those documents

22  before?

23  A    Yes.

24  Q    And had you compared them also to documents in the 80,000

25  produced in other places?

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  A    Yes.

2  Q    Now --

3         MR. JOHNSTON:  We would offer 2010, your Honor.

4         MR. ANDERSON:  No objection, your Honor.

5         THE COURT:  Admitted.

6      (Exhibit No. 2010 admitted into evidence)

7         MR. JOHNSTON:  Now, let's display just the "Field"

8  column for a moment.

9  Q    (BY MR. JOHNSTON)  Now, these were the fields of Poco that

10 you determined were grown in 2004.  Is that correct?

11 A    That's correct.

12 Q    Let's go to --

13        MR. JOHNSTON:  If we can just highlight the three

14 columns "Net to Grower if" -- or "Net to Poco *IF* No Contract"

15 and the payment and the difference.

16 Q    (BY MR. JOHNSTON)  Now, the -- you determined, I take it,

17 that the actual payments to Poco were a number we've heard a

18 number of times $1,008,929.87.  Correct?

19 A    That's correct.

20 Q    And were you here when Mr. Harper's report from many years

21 before indicated that it was 1,008,929.97?

22 A    Yes, I was.

23 Q    So, looking at these matters many years apart, you and

24 Mr. Harper disagreed by ten cents.  Is that correct?

25 A    Correct.

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  Q    And, in regard to this, if there had been no contract in

2  2004, Poco would have received $792,160.59.  Is that correct?

3  A    That's correct.

4  Q    And, so, the contract benefited Poco, just on the dollar

5  for dollar, not counting storage or those thing, $216,769.28.

6  Is that correct?

7  A    That's correct.

8  Q    So the net effect over those two years, again, on a

9  dollar-for-dollar basis, without consideration of storage, was

10  approximately $10,000.  Is that right?

11  A    Yes.

12  Q    And that's less than one half of one percent of the total

13  funds received by Poco.  Is that right?

14  A    I haven't calculated that, but that sounds about right.

15  Q    Now, in the course of this matter, were you provided by --

16  with various spreadsheets and input by the Government?

17  A    Spreadsheets the Government prepared?

18  Q    Yes.

19  A    Yes, I was.

20  Q    And did they purport, in essence, to say, essentially -- or

21  to analyze the same data that you were analyzing?

22  A    Yes.

23  Q    For example, did you receive one set in July of 2012?

24  A    Yeah.  Yeah.  Around that time.  I'm not sure of the exact

25  date.

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  Q    And did you receive another set as recently as a few months

2  ago?

3  A    I believe, in March of this year, the third set or fourth

4  set.

5  Q    Now, were their various sheets the same each time or were

6  they different?

7  A    Well, they were revised each time.

8  Q    So, I take it that, if they were all different, at least

9  some of them were incorrect.  Is that right?

10 A    There were -- each of the sheets -- some of the numbers

11 were the same and some had been changed based on corrections

12 that had been made.

13 Q    And you were here when Mr. Bearden testified that the most

14 recent ones weren't being offered because they were incorrect.

15 Is that right?

16 A    That's correct.

17         MR. TORNABENE:  Objection.  That completely misstates

18 what was testified to.

19         MR. JOHNSTON:  I don't --

20         THE COURT:  I didn't hear you.

21         MR. TORNABENE:  Objection.  That completely misstates

22 what was testified to.

23         THE COURT:  Well, it's for the jury to determine what

24 was testified to.  Go ahead.

25 Q    (BY MR. JOHNSTON)  And do you agree, in looking at the most

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  recent spreadsheets provide by Mr. Bearden, that they were

2  incorrect?

3  A    As it relates to the schedules for Poco, yes, they were.

4  Q    And, in regard to, for example, your Schedule II 009, what

5  were the differences -- some of the difference -- just an

6  example or two, between the ones that the Government prepared

7  and the one you prepared?

8  A    The initial one in July of 2012 I believe the Government

9  double counted the tons on -- or some -- some of the tons on --

10  on the number of fields.  I believe 8 in 2003 and 10 in 2004 --

11  or 2004, around that number.  And the double counting was in the

12  range of 7,000 tons.  So they over counted by that much.

13  Q    Were there any fields that were incorrect according to your

14  review?

15  A    Yes.  There were two fields listed on the Poco schedule

16  that were farmed by Mr. Gordon, not by Mr. Poco -- or not by

17  Poco.

18  Q    And were there packout sheets indicating large amounts of

19  money that were simply omitted from the Government's analysis in

20  each of the sheets that they prepared?

21          MR. ANDERSON:  Your Honor, I'm going to object.  I

22  don't believe these reports are even in evidence.

23          THE COURT:  Excuse me.  I think there's a -- you need

24  to coordinate with each other because one of you can make

25  objections but not both of you.  So --

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/DI - JOHNSTON

1        MR. TORNABENE:  Sorry, your Honor.  I'll yield to

2   Mr. Anderson.

3        THE COURT:  Thank you, Mr. Tornabene.  Go ahead,

4   Mr. Johnston.

5        MR. JOHNSTON:  Thank you, your Honor.

6        THE COURT:  Overruled.

7        MR. JOHNSTON:  And may we, for identification only,

8   show just the witness, Court, and counsel what was marked but

9   not offered by the Government as Exhibit 219?

10       THE COURT:  219 for identification or for --

11       MR. JOHNSON:  Just for identification, your Honor.  I

12  don't intend to offer it, but I want to show it to the witness

13  as an example of the documents he's just been testifying to.

14       THE COURT:  The documents that he just testified

15  about?

16       MR. JOHNSTON:  Well, the -- a document which was

17  provided to him by the -- by us from the Government.

18       THE COURT:  Okay.

19  Q    (BY MR. JOHNSTON)  Do you have 219 there in front of you,

20  Mr. Miller?

21  A    I do.

22  Q    And do you see in the second and third lines they have a

23  Field "259/223 blend" and a "CL 223/259 blend"?

24  A    Yes.

25  Q    And were those fields Mr. Gordon's fields?

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1          MR. SMITH:  Objection, your Honor.  Lack of

2    foundation.

3          THE COURT:  Sustained.

4    Q    (BY MR. JOHNSTON)  Were those fields -- did they appear in

5    other spreadsheets and were duplicated in the Government's

6    analysis?

7    A    I believe they were removed after this version.

8    Q    Well, this is the last version.

9    A    Oh, okay.

10   Q    Okay.

11   A    Then they were in other versions then.

12   Q    Okay.

13          MR. JOHNSTON:  Now, may we have next Exhibit 2005 for

14   the Court, witness, and counsel only.

15   Q    (BY MR. JOHNSTON)  Is this a document, which -- which you

16   prepared, which summarizes just the revenue to Poco if a

17   contract, no contract, and difference?

18   A    Yes.

19   Q    And the foundation is your spreadsheet, Exhibit 2009.  Is

20   that right?

21   A    That's correct.

22          MR. JOHNSTON:  We would offer 2005, your Honor.

23          MR. ANDERSON:  Can I voir dire?

24          THE COURT:  You may.

25          MR. ANDERSON:  Mr. Miller, how is this exhibit any

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  different than previous exhibits today?  Specifically, I

2  believe, it would be 2009.  How is this different?

3          THE WITNESS:  It's limited to fewer columns, more

4  specific information about the contract versus noncontract.

5          MR. ANDERSON:  Is this information contained within

6  2009?

7          THE WITNESS:  Yes, it is.

8          MR. ANDERSON:  Then I'd object based on being

9  cumulative, your Honor.

10          MR. JOHNSTON:  Your Honor, we would point out that, in

11  the spreadsheets provided by the Government, they also provided

12  very similar summaries.

13          THE COURT:  Overruled.  You may proceed.

14          MR. JOHNSON:  Thank you, your Honor.  And did the

15  Court rule on the admission?

16          THE COURT:  Exhibit 2005 and you moved its admission.

17          MR. JOHNSTON:  Yes.

18          THE COURT:  He objected, and I overruled.  So it's

19  admitted.

20      (Exhibit No. 2005 admitted into evidence)

21          MR. JOHNSTON:  Thank you, your Honor.  And may we next

22  -- and can we display that to the jury?

23          THE COURT:  Certainly.

24  Q   (BY MR. JOHNSTON)  And this is the sheet that indicates the

25  comparison of contract versus no contract for 2005 (sic).  Is

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/DI - JOHNSTON

1  that correct?  Of 2003?

2  A    Yes, for 2003.

3          MR. JOHNSTON:  May we next have Exhibit 2007.

4          THE COURT:  Well, let's go back to -- let's go back to

5  2005.  2005 is a -- for the crop year 2000 --

6          MR. JOHNSTON:  3.

7          THE COURT:  3.  Okay.  Thank you.

8          MR. JOHNSTON:  And, now, to 2007 for the Court,

9  counsel, and witness only.

10  Q    (BY MR. JOHNSTON)  Is this, for the year 2004, the same

11  analysis as 2005?

12  A    Yes, that's correct.

13          MR. JOHNSTON:  We would offer 2007, your Honor.

14          MR. ANDERSON:  No objection, your Honor.

15          THE COURT:  Admitted.

16      (Exhibit No. 2007 admitted into evidence)

17  Q    (BY MR. JOHNSTON)  Now, Mr. Miller, did you also, after it

18  was provided, look at the Government's Exhibit 125, a listing of

19  checks by Ms. Keys?

20  A    Yes, I did.

21  Q    And did you -- were you supplied with copies of the backup

22  that was Exhibit 3151-A through 3151-N and 3152(1) through (44)?

23  The -- the backup for Ms. --

24  A    I have the backup.  I'm not sure about the designation --

25  exhibit number designation.

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/DI - JOHNSTON

1  Q    Okay.  And did you review on the Government's Exhibit 125

2  and also the colored copy, which was Exhibit 3151, I believe,

3  the transactions relating to Poco?

4  A    Yes, I did.

5  Q    Did you find that any of them were unidentified or

6  unidentifiable?

7  A    No.

8  Q    And did each one have a reasonable business explanation or

9  not?

10 A    Yes, they did.

11 Q    And --

12        THE COURT:  Each one of what?

13        MR. JOHNSTON:  Each entry that related to Poco on the

14 Government's Exhibit 125.

15        THE COURT:  All right.

16 Q    (BY MR. JOHNSTON)  Is that how you understood the question,

17 sir?

18 A    Yes.

19 Q    And, in -- did you also review the -- the Olsen loan

20 ledger, which was Exhibit 126?

21 A    Yes, I did.

22        MR. JOHNSTON:  May we have 126?  If we can look at the

23 second page.  This is an admitted exhibit, so it -- yeah.

24 Q    (BY MR. JOHNSTON)  And, in regard to this exhibit, did you

25 find any transaction that related to Poco that wasn't an

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/DI - JOHNSTON

1 ordinary business transaction fully explained by the documents?

2 A    No, I did not.

3 Q    Now, did you find -- in reviewing the contentions regarding

4 these checks in 125, 126, and in the prior versions that you

5 looked at over the many months, did you find any transaction

6 identified by the Government that indicated in the slightest

7 way, one way or the other, whether there was a kickback, an

8 under-the-table payment, or anything like that?

9 A    There was no indication in any of the evidence that I saw

10 that indicated any of those things.

11 Q    And, in fact, did you look, at least briefly, at the loans

12 between Gordon and Poco?

13 A    Yes, I did.

14 Q    And did you find that they were made and fully paid?

15 A    There were loan payments and loan repayments.  I don't

16 recall whether they ultimately were fully paid or when; but I

17 remember seeing payments -- loans and repayments back.

18 Q    Now, in looking at the -- the many documents that were

19 provided, were there records in the Grand Jury returns -- as

20 they've called them, the documents that were there -- that

21 identified, for example, payments listed on the Government's

22 Exhibit 125?

23 A    I'm not sure I understand your question.

24 Q    Well, did you find, for example, in what is now marked as

25 Exhibit 2037, documents -- the checks that were 40,000, 70,000,

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  and so forth that were actually listed on the Government's

2  exhibit as unidentified?

3  A    Yes, I did.

4  Q    And the documents which explained those as 2002 crop

5  payments were actually in the original 80,000 documents.

6  Correct?

7  A    That's correct.

8  Q    And an examination of those records would have indicated

9  long ago that there were no -- that those checks were not

10 unidentified or suspicious in any way.  Is that correct?

11 A    That's correct.

12          MR. JOHNSTON:  Thank you, Mr. Miller.  That's all the

13 questions I have.

14          THE COURT:  Anyone else on the defense side?  Okay.

15 Mr. Anderson.  You may proceed when you're ready.

16          MR. ANDERSON:  Thank you, your Honor.

17

18                     CROSS EXAMINATION

19 CROSS BY MR. ANDERSON:

20 Q    Mr. Miller, so you're currently employed as a forensic

21 fraud examiner?

22 A    I'm a CPA specializing in forensic accounting.

23 Q    Okay.  Is that sort of a specialty for the business you

24 work for?

25 A    Yes, it is.

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  Q    Okay.  And you were retained by the defense in this case?

2  A    That's correct.

3  Q    What -- what's your fee for doing your work in this case?

4  A    My rate in this case is $160 an hour.

5         THE COURT:  Pull that microphone a little closer so

6  you can hear yourself in the overhead speakers.  There you go.

7  Q    (BY MR. ANDERSON)  Does that change at all if you're

8  testifying or is it a flat rate?

9  A    No, it's the same rate.

10 Q    And you've testified before in court as part of your

11 business, haven't you?

12 A    Yes, I have.

13 Q    And, for this case, tell us what sort of records you

14 reviewed.

15 A    I've reviewed the records, the 80,000 plus pages, that were

16 provided by the Government in discovery and some other business

17 records that were provided that were not a part of the discovery

18 information.

19 Q    Can you describe what those records are?

20 A    There were some records from Poco related to a few of the

21 field that had not -- either they hadn't been provided or I

22 hadn't found them in the 80,000 pages of documents.  So I

23 went -- I went the easiest way to find them, which was to Poco.

24 Q    Did those include any sort of financial records, as well?

25 A    There were records related, I believe, to the loans between

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  Poco, Mr. Gordon, and Mr. Olsen --

2  Q    Okay.

3  A    -- or their entities.

4  Q    And we'll get to those.  Did you use any sort of bank

5  records to reconcile the work that you did in this case?

6  A    No, I did not reconcile.

7  Q    And, as far as the Government's exhibits that you looked

8  at, what were those?  As far as the Government's spreadsheets?

9  A    I'm -- I looked at the ones that were provided.  I'm not

10 sure what you mean by that.

11 Q    Well, you mentioned one -- I think it was Exhibit No. 125.

12 Was that a spreadsheet of some checks that didn't appear in the

13 ledger?

14 A    I'm not familiar with the actual exhibit number put on the

15 schedules.  They weren't numbered when I received them.

16 Q    Can you tell us the types of spreadsheets, the types of

17 summaries that you reviewed?

18 A    Yeah.  It was -- there was a spreadsheet for Poco for each

19 year, 2003, 2004, that detailed or listed fields, listed the

20 reference numbers for those fields as to the documents that we

21 used to prepare the schedule.  It listed the tons per field, the

22 sales price, the supposed alleged sales price, expenses, net.

23 There were a number of columns on the schedule.

24 Q    Well, is that, essentially, Exhibit 209, the first exhibit

25 that you -- you testified to?  Your summary of -- your summary

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1   from 2003?

2   A    No.  I believe 2009 is the summary we prepared.  It's not --

3   Q    Okay.

4   A    It's not what the Government provided.

5   Q    Okay.  Let's go on to that one then.  I'll get it up here.

6   Do you recognize this document?

7   A    Yes, I do.

8   Q    Okay.  On this lower portion here (indicating) --

9   A    Yes.

10  Q    -- it mentions a "Miller Report."  What is that?

11  A    Those are fields that the Government failed to include in

12  the schedule that they -- that was submitted, and we added them

13  in because they were fields that belonged to Poco.

14  Q    What's a "Miller Report"?

15  A    That's a report that I prepared based on my review of the

16  documents and the Government's schedule -- the first version of

17  the Government's schedule for this year for Poco.

18  Q    Okay.  And, then, we have -- is this a similar exhibit but

19  for 2010?  Is that correct?

20  A    No.  It's for 2004, but it is a similar --

21  Q    2004, rather.  It's Exhibit 2010 for 2004.

22  A    Yes.

23  Q    Now, on the bottom here -- let's see if I can blow this up

24  a bit.  There's a line for "Dumped fields."  What is that?

25  A    That's a field designation that was on the Grower Status

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  Report that's designated "Dump Field."

2  Q     Why would you include that in?

3  A     Because it was one of the transactions between Poco and

4  Tri-Cities.

5  Q     How did you determine that that was a transaction to

6  include?

7  A     I had the Grower Status Detail sheet.

8  Q     Okay.  Would you agree that that item alone accounts for

9  quite a bit of the -- the variation here in the final figures?

10 A     Yes, it does.

11 Q     You also looked at what -- what you said were loans among

12 defendants in this case.  Describe the loans that you identify

13 between certain parties.

14 A     I -- I just reviewed a schedule of loans and matched up

15 bank records to -- you know, to confirm that the payments or

16 those loan proceeds went from one party to the other and the

17 repayments went back to confirm the amounts and the fact that

18 they were loans versus some other explanation of what the funds

19 were for.

20 Q     Well, how were you able to determine whether they were

21 loans?

22 A     Because they were on a loan schedule that had been prepared

23 at the time of the transactions is my understanding.

24 Q     Did you see any loan agreements associated with those

25 transactions?

1  A     No, I did not.

2  Q     Did you see any evidence of collateral in these 80,000

3  documents that you reviewed?

4  A     No, I did not.

5  Q     Did you see any evidence of payment -- or of interest,

6  rather, to be made?

7  A     I think there were some occasions when there was interest

8  paid.

9  Q     Did you see any schedules setting out payments for

10 interest?

11 A     No, I did not.

12 Q     You had occasion to review Poco's general ledger for an

13 account receivable from Olsen Ag for April 2002 through

14 December 2002.  Is that right?

15 A     Would you say that again?

16 Q     You reviewed Poco's general ledger for an account

17 receivable from Olsen Ag for April 2002 through December 2002.

18 Is that right?

19 A     I may have.  I don't recall that specifically.

20 Q     Okay.  Do you recall occasions when Poco appeared to be

21 acting as if they were providing a line of credit to Olsen Ag?

22 A     Yeah, and there were funds that could have been termed

23 "line of credit."  I'm not -- you know, that's a technical term.

24 I'm not sure if it's exactly appropriate; but, yeah, there were

25 funds that appeared to be provided by Poco to Olsen for -- for

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  farming purposes, I believe.

2  Q    How do you know that's what they were for?

3  A    I don't know for sure.  I just assumed based on their

4  business relationship.

5  Q    From that alone, you assume that that's what they were for?

6  A    I may have been -- I may have discussed that with them.  I

7  don't recall at the present time.

8  Q    But, again, you saw no sort of a loan agreement that would

9  memorialize --

10  A    No.

11  Q    -- some sort of a contract?

12  A    No.

13  Q    No evidence, again, of collateral or any sort of a payment

14  schedule you made?

15  A    No.

16  Q    Okay.  In these flows of funds between these defendants,

17  they amounted to millions of --

18         MR. SMITH:  Objection, your Honor.

19         MR. ANDERSON:  Well, did --

20         THE COURT:  Sustained.

21  Q    (BY MR. ANDERSON)  With regard to those two defendants in

22  this case, Olsen Ag and Poco, those amounts amounted to millions

23  of dollars, didn't it?

24  A    Would you say that again?

25  Q    With regard to the defendants identified as Poco, LLC --

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  A    Yes.

2  Q    -- and Olsen Ag --

3  A    Okay.

4  Q    -- that flow of funds that you talk about as being a loan

5  or a line of credit, that amounted to millions of dollars.

6         MR. SCHWARTZ:  Excuse me, your Honor.  I object.  I

7  think it needs to be tied down to years.

8         THE COURT:  Sustained.

9  Q    (BY MR. ANDERSON)  Do you know how much these flows of

10 funds were in 2001?

11 A    No, I don't recall.  No.

12 Q    2002?

13 A    No, I don't recall.  If you show me a document, I can --

14 Q    2003?

15 A    I don't recollect at the moment.

16 Q    2004 either?

17 A    No.

18 Q    Now, you had prior employment you said as an IRS criminal

19 investigator?

20 A    That's correct.

21 Q    Are the proceeds of a loan characterized as income to the

22 recipient?

23         MR. SCHWARTZ:  Objection.  Beyond the scope.

24         MR. ANDERSON:  They got into his background, your

25 Honor.

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/CR - ANDERSON

1        THE COURT:  Sustained -- excuse me, overruled.  Go

2  ahead.

3  Q    (BY MR. ANDERSON)  Would you like me to ask that question

4  again?

5  A    Yes, please.

6  Q    You mentioned your background as an IRS criminal

7  investigator, and do you know that the -- if the proceeds of a

8  loan are characterized as income to a recipient?

9  A    No, they're not.

10 Q    What is the -- what's known as "cancellation of debt

11 income"?  Can you tell us what that is?

12 A    Forgiveness of debt?

13 Q    Uh-huh.  What is that?

14 A    It means where one -- the party that is owed the money

15 forgives the debt.

16 Q    So the proceeds of that loan, then, become income to the

17 recipient?

18 A    That's correct.

19 Q    How does the timing of that work?

20 A    I believe it's at the time that the debt is forgiven or

21 sort of related as uncollectible.

22 Q    Okay.  And can that be through the agreement of the parties

23 to this loan?

24 A    I'd have to research the --

25 Q    As far as --

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/CR - ANDERSON

1  A     -- technical rules on that.  I don't know off the top of my

2  head.

3  Q     But the parties can agree as to whether to forgive that

4  debt.  Is that correct?  Parties to the loan?

5  A     I believe they can.

6  Q     All right.  You also compiled the schedules of what Poco

7  made under the contract with Tri-Cities Produce.  Number two,

8  what Poco would have made without the contract and, then, also,

9  a comparison of these two figures.  Is that an accurate

10  description of Exhibits 2009, 2010?  Do you need me to put those

11  up?

12        (Pause in the proceedings)

13  Q     (BY MR. ANDERSON)  Does this appear to be Exhibit 2009?

14  A     Yes, it is.

15  Q     Kind of small.  And I believe you said you compiled this

16  summary information that's contained within this exhibit?

17  A     Yes.

18  Q     You have one category -- one column that's labeled "Net to

19  Poco *If* No Contract."  How did you -- how did you determine

20  that?

21  A     I took that information off of the Grower Status Detail

22  sheets that are referred to in column two.

23  Q     Okay.  And that detail had to do with still an actual sale

24  to Tri-Cities Produce?  I'm just trying to determine what you

25  mean by a sale with -- with no contract.  Where was the sale

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  made to if there was no contract to determine this information?

2  A    Oh, I think I misunderstood your question.  Could you start

3  over with that?

4  Q    Sure.  This column is entitled "Net to Poco *If* No Contract."

5  A    Okay.  Okay.  I'm with you now.

6  Q    And, so, how did you determine that?

7  A    That would be under the commercial sales type of

8  arrangement, and you would take the -- the proceeds when

9  Tri-Cities sold it, deduct the related expenses, and the -- and

10  the balance would go to Poco.

11  Q    That's a commercial merchant arrangement?

12  A    Yes.

13  Q    Can you explain to us what that is?

14  A    Well, it's -- my understanding is it's very similar to a

15  consignment kind of basis where the Tri-Cities takes a product,

16  charges a fee for their -- packing fee is what they call it --

17  and, then, deducts the other related expenses and the balance is

18  paid to the grower.

19  Q    And, when you determine the net to Poco if no contract,

20  those figures are still based on the sale of these potatoes to

21  Tri-Cities Produce or through Tri-Cities Produce.  Is that

22  right?

23  A    Well, no.  It's based on the sale that Tri-Cities Produce

24  selling to a customer.

25  Q    Right.  Based -- based on Tri-Cities' involvement in the

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  sale of that product.  Would that be more accurate?

2  A    Yeah, I think that's correct.

3  Q    It's not based on the sale -- the use of Poco, say, going

4  to some other fresh packing shed and making a sale in that

5  manner without a contract, is it?

6  A    No, not in this case.  I believe it's all through

7  Tri-Cities, if I recall, although there were a few occasion

8  when -- when the sales went to third parties; but I believe

9  Tri-Cities was aware of that.

10 Q    So I'm just trying to narrow this down.  So what does "no

11 contract" mean to you as far as your computations?

12 A    It means what would have happened had there not been a

13 contract as there was in this particular situation.

14 Q    But still having --

15 A    But under the commercial merchant arrangement.

16 Q    Through Tri-Cities Produce.

17 A    Yes.

18 Q    Not through some other fresh packing shed?

19 A    That's correct.

20 Q    Not -- not through Poco maybe putting their potatoes in

21 storage and selling them some other time of the year?

22 A    No.  It's based on -- it's based on the -- on the

23 transactions that happened through Tri-Cities and the Grower

24 Status Detail sheets.  It's computed using those documents that

25 are referenced in the second column.

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/CR - ANDERSON

1  Q    Would you agree that without a -- a sale without a contract

2  by Poco could also be they just simply put them into storage,

3  forget Tri-Cities Produce, and sell them in some other manner.

4  Would that also be without a contract?

5  A    Would you say that again, please?

6  Q    Poco selling their potatoes without a contract could also

7  mean that they simply put them into storage.  Tri-Cities Produce

8  is not involved at all.  They sell them to some other fresh

9  packing shed.  That could be another manner.  Right?

10       MR. SCHWARTZ:  Your Honor, I -- I object to the form

11  of the question.

12       THE COURT:  Mr. Schwartz, I'm uncertain what your

13  participation is.  It's Mr. Johnston that's really handling this

14  witness, isn't it?  Thank you.

15       MR. JOHNSTON:  I would object simply as a -- as an

16  argumentative hypothetical, your Honor, that's incomplete.

17       THE COURT:  I'll overrule.  We'll see if we can get

18  a -- how these -- how the questions go.  Go ahead.

19  Q    (BY MR. ANDERSON)  And what I'm asking is other

20  possibilities as far as Poco selling their potatoes without a

21  contract.

22  A    Are you asking could they have done that if they chose to?

23  Q    Well, one example, would you agree, would be that Poco

24  simply -- simply puts their potatoes in storage and they could

25  sell it to another fresh shed somewhere down the line.  Would

1  that be another sale?

2  A    If there was no contract?

3  Q    Without a contract.  Without a contract with Tri-Cities

4  Produce.

5  A    I -- my understanding I suppose they could, yes --

6  Q    Okay.

7  A    -- if they chose to.

8  Q    And, when you determine a sale without a contract, did you

9  also factor in the quality that these potatoes might be and --

10 did you determine that at all?

11 A    No.  As I stated before, I used the documents -- screen

12 went off there -- that was in the second column that were

13 provided as part of the discovery material for the actual

14 transactions that related to those potatoes from those fields

15 and computed what the -- what the net would have been to Poco

16 had there not been the contract that there was between Poco and

17 Tri-Cities.

18         THE COURT:  For the record, when you say, "second

19 column," you're referring now to what exhibit?

20         THE WITNESS:  The -- the exhibit -- I can't read that.

21         MR. ANDERSON:  2009?

22         THE WITNESS:  Is that the one on the screen?

23         THE COURT:  2009?  Yeah.  The second -- the first

24 column is called "Poco Field."  Is that correct?

25         THE WITNESS:  That's correct.

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1      THE COURT:  Okay.  And, then, the second column would

2   be the "Document Reference Numbers"?

3      THE WITNESS:  Yes, and that's the Bates numbers on the

4   documents that were used to get the information in the rest of

5   the schedule.

6      THE COURT:  All right.

7   Q    (BY MR. ANDERSON)  So, when you looked at a sale by Poco of

8   their potatoes without a contract, you didn't consider other

9   possible scenarios --

10  A    No.

11  Q    -- of the sale.  And those other scenarios may have

12  included them making more money on those potatoes?  Would you

13  agree?

14  A    Well, yeah.  Anything is possible.

15  Q    Could have made less, as well.  Is that possible?

16  A    Anything is possible, sure.

17  Q    But the scenario you looked at involved a sale to or

18  through Tri-Cities Produce.

19  A    I looked -- I looked at the documents related to the

20  specific sale from that field that were provided by the

21  Government as to the Grower Status Detail sheets that were

22  provided and gave all the information.  That's what I relied on

23  to prepare the schedule.

24  Q    And that was information that you had that was from

25  Tri-Cities Produces' records.

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/CR - ANDERSON

1  A    It was from the discovery material provided by the

2  Government which I understand were Tri-Cities proceeds or Status

3  Detail Sheets, yes.

4  Q    And, in that column, a Net to Poco With No Contract, isn't

5  that the same as them meeting the quality specifications of that

6  contract?  Wouldn't they receive the same amount?

7  A    If there was no contract, there wouldn't have been any --

8  any requirements to meet.  I --

9  Q    Let me back that up.  In this case, they didn't meet the

10  quality specific -- are you aware that they didn't meet -- Poco

11  didn't meet quality specifications in the contract so they got

12  this floor price?

13  A    Yes, I'm aware of that.

14  Q    Okay.  And -- and is that the next column, the "Payments to

15  Poco Under Contract or as Agreed"?  Is that what's reflected

16  there?

17  A    I -- let me look at it.  I believe that's what those

18  numbers are.  It's the amount that actually was paid to Poco.

19  Q    Okay.  Based on that floor price in the contract with

20  Tri-Cities Produce.

21  A    I believe -- I believe it was all based on that.  I can't

22  recall if there was maybe some -- some exception at some point,

23  but I don't -- I don't believe there was.

24  Q    Did you also determine, then, what Poco would have received

25  if they met the quality specifications under the contract?  The

1 market rate?

2 A    I -- I -- I don't believe I computed that.

3 Q    And why didn't you do that?

4 A    Because it wasn't relevant.

5 Q    Isn't that, essentially, what the other column is, the Net

6 to Poco if there was no contract, given that these sales were

7 through Tri-Cities Produce?

8 A    No.  No.  That column, as we just discussed, is what would

9 have happened had they been sold under the commercial merchant

10 arrangement.

11 Q    Okay.  And the difference between payments to Poco under a

12 contract versus no contract you essentially added back in the

13 packing charges.  Is that accurate?

14 A    Well --

15 Q    How did -- let me -- let me rephrase that.  How did the

16 packing charges factor into your analysis?

17 A    If you look at the Grower Status Detail sheets, the amount

18 on the packing charges -- there's usually two amounts under

19 packing charges.  And the initial amount is the initial payment.

20 And, at some point, there was an adjustment to the contract;

21 and -- and there was -- that was put under packing charges.

22 And -- and, generally, that could be referred to also as a

23 contract adjustment amount.

24 Q    Okay.

25 A    And I believe that was done because of the system that

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/CR - ANDERSON

1  Tri-Cities used, this Famous system, which -- which was geared

2  to the commercial merchant type of arrangement.

3  Q    And you analyzed strictly contracts pertaining to Poco

4  sales to Tri-Cities Produce for 2003 and 2004 only?

5  A    That's correct.

6  Q    You didn't analyze how the contracts may have changed or

7  been different in 2001 or 2002?

8  A    I don't believe Poco had contracts with Tri-Cities in 2001

9  and 2002.

10  Q    And you looked at no other contracts that may relate to

11  this case at all other than those relating to Poco and

12  Tri-Cities Produce.

13  A    I may have seen them, but I -- my -- my job was to deal

14  with the transactions between Poco and Tri-Cities.

15  Q    Okay.

16          MR. ANDERSON:  If I could just have a second, your

17  Honor.

18      (Pause in the proceedings)

19          MR. ANDERSON:  Well, let's see.  I have no other

20  questions, your Honor.

21          THE COURT:  Thank you.

22          MR. JOHNSTON:  May I proceed, your Honor?

23          THE COURT:  You may.

24

25  /  /  /  /  /

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/REDI - JOHNSTON

REDIRECT EXAMINATION

REDIRECT BY MR. JOHNSTON:

Q    Mr. Miller, Mr. Anderson referred to a general ledger.
What is a general ledger?

A    A general ledger is a group of -- basically contains
accounts of -- for all the accounts of a business which records
the transactions in each particular account.

Q    Is it fair to say that, when you have an accounting system,
the general ledger is like the center of a spoke -- of a wheel
with spokes where every transaction is in the general ledger?

A    That would be a fair description, yes.

Q    Now, the document that -- do you recall the document which
Ms. Keys called a general ledger, Exhibit 126?

A    I do.

Q    Was that a general ledger?

A    No.  That is one account within a general ledger.

Q    And, in a typical business, you know, in this size range,
are there -- how many accounts would you expect to find?

A    Oh, I would expect to find in excess of a hundred accounts,
maybe more depending on the type of business.

Q    And, for example, for the grower payments, there would be
an account for each field.  Right?

A    That's correct.

Q    And, if you wanted to find out where checks were, you'd
look at those.  Correct?

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/REDI - JOHNSTON

1  A    That would be one place you could look, yes.

2  Q    You wouldn't look simply at one account dealing with loans

3  between Olsen and TCP.  Is that right?

4  A    No.  That would only -- that account would only include a

5  few checks related to that account.  It wouldn't include all the

6  checks of the business.

7  Q    And, now, you were asked about loans and cancellation of

8  loans.  Did you see any evidence in the records that any loan

9  had been canceled that was on, for example, Exhibit 126, that

10  is, the loan ledger?

11  A    No, I did not.

12  Q    And, in your business, if you found that there was a loan

13  on the books but it had, for example, been concealed from the

14  banks or hidden from people that had a right to know about it,

15  that would be suspicious.  Right?

16  A    Yes, it would.

17  Q    But, when there's a loan account that's freely disclosed to

18  third-party creditors, banks, and so forth, that would not be

19  suspicious.  Is that right?

20  A    No.  That would be normal business procedures.

21          THE COURT:  Counsel, I'd be grateful if you'd ask some

22  direct questions.  Thank you.

23          MR. JOHNSTON:  Thank you, your Honor.

24  Q    (BY MR. JOHNSTON)  In terms of the data which you were

25  asked about in these spreadsheets, is it usual or unusual when

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/REDI - JOHNSTON

1   you're comparing, you know, two possible scenarios to actually

2   have the data for both?

3   A    Would you ask that again?

4   Q    Well, the -- the account grower summaries, the packout

5   sheets, they account for the transactions -- the sales by TCP,

6   don't they, one way or the other as a commission merchant sale?

7   A    Yes, they appear to.

8   Q    And, so, that gives you one set of information; and, then,

9   you had a different one.  Is that correct?

10  A    Well, you have to analyze the information differently in

11  this circumstance because it wasn't a commercial merchant sale,

12  yes.

13  Q    But do the -- do the packout sheets actually reflect the

14  sales by TCP to their customers?

15  A    Yes, they do.

16  Q    And, so, we know, in this situation, what actually happened

17  out at the next layer.  Is that correct?

18  A    Yeah.

19       THE COURT:  Counsel, that's a leading question; and

20  you really need to try to focus.

21       MR. JOHNSTON:  It's complicated.

22       THE COURT:  I know it's a complicated task that you

23  have, and one would default to asking leading questions to get

24  through it; and I've permitted a great deal of that.  So, now

25  that you've gone through the complex areas, perhaps you can

                     JURY TRIAL - DAY 26 - MAY 21,  2013
                        F. MILLER/REDI - JOHNSTON

1  resort to your typical direct questions.

2            MR. JOHNSTON:  I will, your Honor.  Thank you.

3  Q    (BY MR. JOHNSTON)  In regard to the -- the grower details

4  and your analysis of that, what is your opinion as to the

5  difference between the impact of the contract on the actual

6  receipts versus what would have happened had they been sold

7  without the contract?

8            MR. ANDERSON:  Objection, your Honor.  I think the

9  document speaks for it itself.

10           THE COURT:  Overruled.

11           THE WITNESS:  Well, in one of the years -- I can't

12 remember which -- the -- there was a 220 some thousand dollar

13 difference in one direction and, then, the next year it was in

14 the other direction.  So, ultimately, if you net the two years

15 out, they're within $10,000 of what would have happened under

16 either method of -- of sales.

17 Q    (BY MR. JOHNSTON)  So, as to Poco, was there a big

18 difference or no difference?

19 A    Minimal difference.

20 Q    Minimal difference contract versus no contract.

21 A    Yes.

22           MR. JOHNSTON:  Thank you very much, Mr. Miller.

23 That's all I have.

24           THE COURT:  Anyone else on the defense side?

25 Mr. Anderson, some recross?

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/RECR - ANDERSON

1

2                    RECROSS EXAMINATION

3  RECROSS BY MR. ANDERSON:

4  Q    Just to be clear, Mr. Miller, that opinion that you just

5  expressed with regard to a sale without a contract, that's

6  simply based on one scenario that you looked at.

7  A    No.  It's based on the Grower Status Details of what

8  actually happened.

9  Q    Okay.  And that's one -- one possibility of a sale without

10  a contract.

11  A    Well, it's not a possibility.  It's what actually happened.

12  Q    Okay.

13  A    It's what Tri-Cities sold it for.  It's based on the

14  documents of Tri-Cities.

15  Q    But you'd agree that there are other possible ways to sell

16  without a contract.

17  A    Well, yeah.  They could have sold others, but they didn't.

18  Q    This Exhibit 126?  That's that loan ledger that's been

19  talked about?  Do you recall that one?

20  A    Yes.

21  Q    Would you consider that evidence of a loan?

22  A    I would -- I'm not sure what you mean by "evidence of a

23  loan."

24  Q    Well, you reviewed these 80 some thousand documents that

25  the Government provided.  Did you find any Grand Jury subpoenas

1   within that -- within that 80,000 documents?  Grand Jury

2   subpoena to Tri-Cities Produce for loan documents?  Did you see

3   that?

4   A   I -- I recall seeing Grand Jury subpoenas to try

5   Tri-Cities.  I don't recall the wording, but it -- most likely

6   it covered a wide range of business records.

7   Q   And -- okay.  Let's assume that one of the things requested

8   by the Government was -- was any documentations relating to

9   loans.

10           MR. SMITH:  Your Honor, this is beyond the scope of

11   the recross.

12           MR. ANDERSON:  We just got into the loan ledger on

13   redirect, your Honor.

14           THE COURT:  I'm going to permit this line.  There were

15   elicited questions about evidence regarding loans and, also,

16   126.  Go ahead.

17   Q   (BY MR. ANDERSON)  So, if documentation was requested by

18   the Government pertaining to loans that Tri-Cities Produce may

19   have made, what, within that 80,000 documents, did you see that

20   would relate to a loan?

21   A   I -- I recall seeing the -- these Tri-City, account 135,

22   ledger records --

23   Q   Um-hum.

24   A   -- which related to a note receivable from Mr. Olsen.

25   Q   And that's it, isn't it?

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/RECR - ANDERSON

1  A    I don't -- I don't recall any other documents, but I

2  didn't -- you know, 80,000 pages.  There may have been some in

3  there, but I don't recall seeing any others.

4  Q    Well -- but it was part of your analysis to look through

5  these records and determine whether loans were made or not,

6  wasn't it?

7           MR. BENTLEY:  Objection to characterization of his

8  task.  I think he said he's focused on Poco.

9           THE COURT:  Correct.  Sustained.

10  Q    (BY MR. ANDERSON)  Well, with regard -- with regard to Poco

11  and Tri-Cities Produce.

12  A    Would you ask the question again?

13  Q    As part of your analysis to look through these records and

14  see if there were any loans between Tri-Cities Produce and Poco

15  and how you would characterize them.

16  A    No.  My -- my job was to analyze the information that the

17  Government presented in -- in their analysis and determine

18  whether it was accurate or not.  I wasn't -- I wasn't conducting

19  investigation of what actually happened.  That was the

20  Government's job as I understood it.

21  Q    You've not offered any opinions as to whether loans

22  occurred between Tri-Cities Produce and Poco?

23  A    I've seen documentations between -- between who now?

24  Q    Tri-Cities Produce, Poco.

25  A    I've seen grower advances.  I don't know that you'd

JURY TRIAL - DAY 26 - MAY 21, 2013
F. MILLER/RECR - ANDERSON

1  characterize those as loans, but I suppose you could.

2  Q    What about Olsen Ag and Poco?

3  A    I believe there were some document -- documents related --

4  loans between those parties, yes.

5  Q    But, again, nothing like a loan agreement or anything like

6  that.

7  A    No, I don't recall seeing any actual loan agreements.

8  Q    All right.

9        MR. ANDERSON:  No other questions, your Honor.

10        THE COURT:  Anything else?  Mr. Johnston?

11

12                  FURTHER REDIRECT EXAMINATION

13  FURTHER REDIRECT BY MR. JOHNSTON:

14  Q    Mr. Miller, as a CPA, when a company records information on

15  its books, is that called an account?

16  A    Yes.

17  Q    And what is an open account?

18  A    An open account?

19  Q    Yes.

20  A    An account that hasn't been completed.  The transactions

21  haven't been completed.

22  Q    And what is a joint and mutual account?

23        MR. ANDERSON:  I'm going to object, your Honor.  It's

24  outside the scope.

25        MR. JOHNSTON:  It's direct --

JURY TRIAL - DAY 26 - MAY 21,  2013
F. MILLER/RECR - ANDERSON

1          THE COURT:  Overruled.

2   Q    (BY MR. JOHNSTON)  When a company maintains a -- an

3   account, such as 135 reflect by Exhibit 121, as a note

4   payable -- when they reflect that on their financial statement,

5   what does that mean?

6   A    Well, it -- in that case, it would -- it would be an

7   advance payment on a -- on a purchase or product to be delivered

8   in the future is the way I would -- if I understood your

9   question correctly.

10  Q    That's as to Poco, but if -- just in general, if a company

11  records a note payable and puts it on its financial statement,

12  what does that mean?

13  A    A note payable?

14  Q    Yes.  Or, excuse me, a note receivable.

15  A    It would mean someone owes them money.

16  Q    Okay.  And is any more -- as an accounting standpoint, if

17  its put in the financial statements and reported to the banks

18  and so forth, isn't that sufficient to -- is it or is it not

19  sufficient to advise the parties and be evidence of a loan?

20  A    It -- it clearly is evidence of a loan, yes.  It's not an

21  actual promissory note or a signed loan agreement, but it's

22  evidence of a loan, yes.

23  Q    All right.

24          MR. JOHNSTON:  Thank you.

25          THE COURT:  Mr. Anderson?

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1        MR. ANDERSON:  I have nothing more, your Honor.

2        THE COURT:  Thank you.  You may step down.  We'll take

3   our morning recess at this time.

4        (Jury out at 10:04 a.m.)

5        (Court recessed at 10:04 a.m.)

6        (Court reconvened at 10:24 a.m.)

7        THE COURT:  Okay.  Please be seated.  All right,

8   folks, we have some exhibit issues we need to confer about?

9        MR. TORNABENE:  Yes, your Honor.  Apparently,

10  Mr. Moorer will be the next witness.  And, before we get to him,

11  your Honor may remember that, with regards to Exhibits --

12  Government's Exhibit 2, 3, 6, and 9, which were admitted, these

13  are the grower charts admitted through Mr. Bearden, there was an

14  issue for Mr. Bentley and I to confer on, which was dealing with

15  the -- any reference or implication that this showed paid

16  amounts.  In other words, that it was something other than what

17  was reflected on the document.

18        THE COURT:  Yes, I recall.

19        MR. TORNABENE:  So Mr. Bentley and I have conferred on

20  that.  I'm not -- if I could have the computer.  And Mr. Bentley

21  provided a proposal, which was not acceptable for us.  I

22  provided, essentially, a counterproposal showing that --

23        THE COURT:  Is this just about the language in that

24  exhibit?

25        MR. TORNABENE:  It is just about the language, your

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1    Honor.

2            THE COURT:  What's your language?  Instead of "Paid

3    to," what do you think?

4            MR. TORNABENE:  Right.  So showing you and the

5    Court -- or and the counsel, this would be a proposed

6    replacement to Exhibit 2; and the replacement language is here

7    (indicating), "reported net to grower (Olsen)."

8            THE COURT:  And "reported" means that it's in the

9    records and, therefore, that's what you're referring to.

10           MR. TORNABENE:  Right.  And we -- our position is that

11   that's clear from, one, the testimony but also the document,

12   itself, saying that this is from Grand Jury returns and this is

13   consistent with the testimony we heard.  And the changes, then,

14   are consistent for 2 -- again, I think it's 2, 6, and 9.

15           THE COURT:  The original language was "Paid to"?

16           MR. TORNABENE:  Let me bring that up.

17           THE COURT:  Well, it was "Paid to," wasn't it?

18           MR. TORNABENE:  Showing Exhibit 2 as it currently is,

19   it was simply "from Agri-Pack and TCP to Olsen."  In an earlier

20   incarnation, I think after the Daubert -- or during the Daubert

21   hearing, there was a "paid" reference.  There was a colloquy on

22   that.  We altered that, took that out per the Court's order and

23   instructions, and, at that time, then, we landed on just "to."

24       This change now takes out that even further and simply

25   explicitly references that the documents are saying the "net to

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  grower (Olsen) from Agri-Pack and TCP" is X amount.

2          THE COURT:  Okay.  Mr. Bentley, there are two

3  microphones.  You can share the podium.

4          MR. BENTLEY:  Your Honor, I think I can live with the

5  language that Mr. Tornabene has here.  However, on the last two

6  of these exhibits, I object to the statement in the heading

7  which says, "Maximum amount assuming 'rejection.'"  And these

8  would be, I believe, Exhibits 6 and 9.  And I would ask that the

9  quotation marks be removed because they are argumentative and

10  somewhat snide.  I don't think it's appropriate.

11          THE COURT:  Are these going to be in evidence?

12          MR. BENTLEY:  These are.

13          THE COURT:  Excuse me.  Are you asking that these be

14  substituted?

15          MR. TORNABENE:  Yes.  Yes, your Honor.  I believe what

16  -- the previous incarnations were admitted subject to the narrow

17  issue regarding the paid issue, not regarding the new issue that

18  Mr. Bentley's brought up, which, I believe, has been brought up

19  before.  But, in any event, we -- we would propose that the

20  changes, as indicated by the Court, it appears that Mr. Bentley

21  agrees to on the "net to grower" that those, then, be the

22  substantive exhibits that have been admitted.

23          THE COURT:  And what's your problem here?  What is

24  your problem?

25          MR. BENTLEY:  My problem is this is argumentative.  If

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1  this were just something Mr. Tornabene was going to use in

2  closing, I -- I could accept it.  But I don't think it's

3  appropriate to include the quotation marks around the word,

4  which is, basically, making an argument to the jury.

5          THE COURT:  Well, the fact of it is that you want to

6  say this is the amount because of the rejection.

7          MR. TORNABENE:  Yes.

8          THE COURT:  Okay.  So why -- so I agree with

9  Mr. Bentley and, so, it will come out.  If you want to simply

10 say, "assuming rejection," it seems to me that, as well, is

11 argumentative.  And you simply can say, "maximum amount under

12 Olsen Ag's contract with Tri-Cities Produce dated 1/1/03 based

13 on rejection."  How does that -- I mean, that simply -- that

14 tells -- that's, in fact, what occurred.

15         MR. TORNABENE:  Your Honor -- and, I guess, given your

16 Honor's ruling and understand that would request that we simply

17 take out the quotation marks so it just says "assuming

18 rejection."

19         THE COURT:  No.  I like my language better so my

20 language will go in.

21         MR. TORNABENE:  If I could just -- so I can make those

22 changes actual --

23         THE COURT:  And I'm deferential to counsel.  It seems

24 to me that this is a factual statement.  This is the amount that

25 was paid based on the rejection.  So it doesn't disadvantage

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  either party to say that in that way.  And, if it does, please,

2  tell me and I'll rethink it.

3          MR. TORNABENE:  Your Honor, I think your formulation

4  is -- is accurate.

5          THE COURT:  If it's accurate, then let's use it.

6  Anything else?

7          MR. TORNABENE:  Your Honor, if I could just get that

8  formulation just very quickly from the Court.  "Maximum

9  amount" --

10          THE COURT:  So just take out "assuming rejection" and,

11  then, you'd add "based on rejection" after the digits 03 and

12  before the colon.  So it would read, "dated 1/1/03 based on

13  rejection," colon.

14          MR. TORNABENE:  "Based on rejection."

15          THE COURT:  Yes?  No?  Mr. Bentley?

16          MR. BENTLEY:  I'm fine with that, your Honor.

17          THE COURT:  Okay.  Let's go.

18          MR. BENTLEY:  Looks good to me.

19          THE COURT:  That's acceptable.

20          MR. TORNABENE:  Your Honor, with regards to

21  Mr. Moorer.  I'm not sure, of course, what Mr. Bentley may refer

22  to in his direct.  In our cross, I don't believe I will have a

23  need to get into these grower charts.  That is 6 and 9.  But may

24  get into 2 and -- one of the earlier ones -- where this

25  rejection issue isn't there.  And I would propose, then, to use

1  the -- the substituted PDF that we've discussed with the net to

2  grower language.  And I believe Mr. Bentley, if he wants to go

3  that direction, has hard copies of those and we'll supplement

4  that to jurors today.

5          THE COURT:  You good?

6          MR. BENTLEY:  That's fine.  I'm good.

7          THE COURT:  Okay.

8          MR. TORNABENE:  Your Honor, the final issue with

9  Mr. Moorer.  Mr. Bentley proposes to admit through Mr. Moorer

10 some charts and summaries of fields and sort of his,

11 essentially, alternate analysis as compared to Mr. Bearden's of

12 those packout sheets.  And my understanding is that Mr. Bentley

13 will be offering not only the -- the spreadsheet, if you will,

14 of Mr. Moorer as a step in the process as substantive evidence

15 but, also, corresponding tables of a similar nature as to the

16 one on your Honor's screen now but for the defense, both being

17 as substantive evidence.

18         MR. BENTLEY:  Can we put that on the ELMO?

19         MR. TORNABENE:  So I think that's defense proposed

20 1619.  I've informed Mr. Bentley that, I guess, we -- our only

21 objection is based on, potentially, being duplicative in terms

22 of the bottom line numbers seen here are also in a spreadsheet

23 of, again, Mr. Moorer.  That said, we're -- we're fine with that

24 if the United States can have the opportunity in a brief

25 rebuttal case to offer the corresponding charts that are now for

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1   illustrative purposes -- that's Exhibits 215 through 218 -- as

2   substantive evidence to rebut the substantive evidence from

3   Mr. Moorer of the same kind.

4          THE COURT:  I think you need to -- that may affect

5   others besides Mr. Bentley; and, so, I don't know whether the

6   others have thought that through.

7          MR. TORNABENE:  These would all be regarding Olsen and

8   Olsen Ag.

9          THE COURT:  I understand the fairness of your proposal.

10         MR. TORNABENE:  Well -- and that's why I didn't want

11  to just proceed on just an agreement or possible agreement with

12  Mr. Bentley and -- and seek a ruling from the Court on that.

13  Exhibits 215 through 218 are, again, just regarding Olsen --

14         THE COURT:  Well, I've not heard from the other

15  counsel for the defense so I can't make a definitive ruling; but

16  it sounds reasonable to me, at this point, not having heard

17  objection from others.

18         MR. TORNABENE:  Thank you, your Honor.  And that's --

19  that's all I have regarding Mr. Moorer.

20     (Discussion off the record)

21         THE COURT:  That's acceptable.

22         THE COURTROOM DEPUTY:  Thank you.

23         THE COURT:  You may enter that.

24         THE COURTROOM DEPUTY:  Okay.

25         THE COURT:  I was referring to Ms. Brasel on a

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1  different case.  Anything else?  Anything else, Counsel, before

2  I start?  Do you have anything more?

3          MR. BENTLEY:  It was Mr. Tornabene who had something.

4  I have nothing.

5          THE COURT:  Okay.

6          MR. TORNABENE:  Your Honor, the only other thing just

7  by way of preview.  My understanding is that Mr. Raekes will be

8  testifying this afternoon starting at 1:30.  I know your Honor

9  has an engagement.  We're still going through the exhibits that

10 were provided and would -- I think it would be expeditious to

11 have 10 or 15 minutes of without-jury time before Mr. Raekes

12 takes the stand after the noon break.

13         THE COURT:  Okay.

14         MR. TORNABENE:  And I -- I will confer more with

15 counsel.  And, if that is a smaller amount, then we'll --

16         THE COURT:  All right.  I hear you.  Okay.  Well, it

17 looks to me like we're going to send the jury out.  They're

18 going to take the jury out to lunch at approximately quarter of

19 12:00.  And, then, get them back in here, probably, about

20 20 minutes of 2:00.  Just so we have time to do it, and I have

21 time to get back from south Richland.  Okay.

22     Oh, one other thing.  Any issues with Mr. Raekes on

23 attorney/client privilege that we need to be sensitive to?  If

24 you're calling him in his capacity as to what he did as the

25 attorney for FCIA, I have no idea what he's going to say about

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1   that.  Does anybody know?

2           MR. JOHNSTON:  I -- I haven't discussed that issue

3   with him, your Honor; but our primary purpose is to simply

4   identify and introduce exhibits that have been produced by the

5   Government.

6           THE COURT:  Just wanted to flag the issue because he

7   is an attorney.  He has a client.  He worked for that client,

8   and that client hasn't waived the attorney/client privilege.

9           MR. JOHNSTON:  Understood, your Honor.

10          THE COURT:  Thank you.

11      (Pause in the proceedings)

12      (Jury in at 10:36 a.m.)

13          THE COURT:  Please be seated.  Next witness.

14          MR. BENTLEY:  Defense calls Bruce Moorer.

15          THE COURT:  Mr. Moorer, if you'd come forward, please.

16  If you'd place your back to the door, Mr. Moorer, we're going to

17  take your photograph for use by the jury during deliberations.

18  Thank you.

19      (Courtroom Deputy takes picture of the witness)

20      (BRUCE MOORER, called by the Defendant, was sworn)

21          THE COURT:  Thank you.  Please be seated.  That chair

22  pulls out.  And, when you're comfortable, please, tell us your

23  first and last name and, then, spell them both for the record

24  speaking directly into the microphone.  Thank you.

25          THE WITNESS:  My name is Bruce Moorer.  My name is

1 spelled B R U C E.  M O O R E R.

2       THE COURT:  Good morning.  You may proceed,

3 Mr. Bentley, when you're ready.

4

5                 DIRECT EXAMINATION

6 DIRECT BY MR. BENTLEY:

7 Q   Good morning, Mr. Moorer.  How are you employed?

8 A   I'm a certified public accountant, and I work as a

9 principal with an accounting firm in Yakima known as Villbrandt,

10 Stark & Moorer.

11 Q   Please describe your education for the jury.

12 A   I have a Bachelor of Science degree from the University of

13 Idaho in accounting.  I am a CPA licensed in the State of

14 Washington.  I'm a member of the American Institute of Certified

15 Public Accountants, the Washington Society of Certified Public

16 Accountants.  I'm also a member of the Forensic and Valuation

17 Services of the AICPA, and I am certified in financial forensics.

18 Q   Please describe your work experience as an accountant.

19 A   Well, I've been accounting for almost 35 years.  I started

20 adding and balancing general ledgers; and, then, I became a

21 junior accountant in a reasonably large regional accounting firm

22 and did tax returns; started doing -- preparing financial

23 statements.  Eventually, I did auditing of financial statements;

24 and, eventually, I managed the audits for the preparation or

25 administration of those financial statements.

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/DI - BENTLEY

1     I have testified in hearings similar to this, not in

2  federal court.  This is my first experience in federal court.  I

3  have given or provided other forensic reporting in other

4  matters.  I have actually provided valuation services in other

5  matters.  And what it amounts to is, you know, out here in

6  eastern Washington I sometimes, in smaller communities or in

7  different circumstances, you end up doing just a lot of

8  different things.

9  Q     Have you worked for agricultural clients?

10 A     Yes.  I've worked for many agricultural clients off and on

11 over the years.

12 Q     What type of work have you done for them?

13 A     Well, of course, business planning, consulting, income tax

14 returns, financial statement preparation.  And, then, I've also

15 audited those entities involved in agricultural pursuit.

16 Q     Prior to being retained in this case, have you ever done

17 any accounting or other work for Lynn Olsen or Olsen Ag,

18 Incorporated?

19 A     No.

20 Q     How about for Mark Peterson or Poco, LLC?

21 A     No.

22 Q     And, finally, Jeff Gordon or Gordon Brothers, Inc.?

23 A     No.

24 Q     Are there certain requirements that you are subject to in

25 order to maintain your certification as a certified public

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1  accountant?

2  A    Yes.

3  Q    What -- what are those?

4  A    Well, I have to maintain -- I have to take a certain amount

5  of continuing education and that continuing education has to

6  include a certain amount of technical study in various areas

7  that I do business in.

8  Q    Are you compliant with those requirements at this time?

9  A    Currently, yes.

10 Q    Are you familiar with documents known as packout or

11 settlement sheets that are used in agri business?

12 A    Yes.

13 Q    How have you gained that experience or that familiarity?

14 A    Well, over the years at different times auditing the

15 entities that produce such documents.

16 Q    What is a packout sheet?

17 A    Well, for me, a packout sheet is a summary of product

18 that's been processed, put in the box, and is ready for sale and

19 distribution.

20 Q    And what is a settlement sheet?

21 A    A settlement sheet summarizes the costs of processing and

22 distribution and lists the revenues associated with the sale and

23 distribution of the packed product.

24 Q    Now, I'd like to show you a document that has been marked

25 in evidence as Exhibit 34.  Are you familiar with this document?

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1  A    I am.

2  Q    What -- what is it?

3  A    It's a fax cover sheet from Mr. Fred Ackerman regarding

4  some information that had been requested.

5  Q    And who requested it, if you know?

6  A    Just an individual named Ken and that I believe -- well, it

7  says at the top "Ken Gilbert" representing American Ag Insurance

8  Company.

9  Q    And are you also familiar with the schedules that were

10 attached to that cover sheet that you just talked about?

11 A    Yes.

12 Q    And, looking at the first schedule, can you tell us which

13 shed this schedule pertains to?

14 A    This is -- this schedule is a compilation of onions

15 processed and sold by Agri-Pack.

16 Q    And I'm turning your attention to the second schedule.

17 A    It's a compiled schedule of potatoes processed and sold by

18 Agri-Pack.

19 Q    And the final schedule?  What packer or which shed was

20 involved in this -- in this schedule?

21 A    The shed involved with this --

22        THE COURT:  I think you've touched the microphone off.

23 It might be off.

24        THE WITNESS:  This schedule was prepared in regard to

25 Tri-Cities Produce.

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/DI - BENTLEY

1  Q    (BY MR. BENTLEY)  Would you agree with me that the --

2          MR. BENTLEY:  Oh, no.

3          THE COURTROOM DEPUTY:  Did it again.  Excuse me.

4          MR. BENTLEY:  Thank you, Ms. Brasel.

5  Q    (BY MR. BENTLEY)  Would you agree that the numbers on here,

6  referring to the fourth page of Exhibit 34, are -- are rather

7  hard to read because they've been copied, apparently, many

8  times?

9  A    Well, I had -- I certainly had trouble reading them.

10 Q    And, if I show you -- going back to 16 -- Exhibit 1615,

11 which was introduced into evidence yesterday, does that appear

12 to convey a clearer version of the page in Exhibit 34?

13 A    It's -- it's legible, yes.

14 Q    It's legible.  And did 1616 and -- which I'm showing you

15 right now, is that more legible than the part of Exhibit 34?

16 A    It's more legible.

17 Q    And, finally, does this appear to be a somewhat more

18 legible version of the onion sheet in Exhibit 34?

19 A    It does.

20 Q    Is it your understanding that these three sheets summarize

21 the settlements that Olsen received for his '01 crop?

22 A    Yes.

23 Q    And is it your understanding these were prepared by

24 Debbie Moore?

25 A    Yes.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1   Q    Were you asked to conduct an independent analysis of

2   records pertaining to the '01 crop year and Olsen's sales of

3   crops during that year?

4   A    Yes.

5   Q    And did you perform that analysis?

6   A    I did.

7   Q    Could you tell us what steps you took in performing that

8   analysis?

9   A    Certainly.  I had previous experience with Exhibit 215, as

10  well as other exhibits; and, so, those exhibits listed and

11  compiled fields identified.  What interested me with the

12  schedules prepared by Ms. Moore is that the schedules did not

13  contain any information on any fields.  They were compiled data

14  based upon packed and sold product without any identification as

15  to what fields they related to.

16       And, so, I actually have analyzed extensively the

17  production for the 2001 year.  And the challenge was to see what

18  would happen if I took that information and, again, compiled it,

19  analyzed it.  Would anything that I calculated be reasonably

20  close to the tonnage and net return as compiled and reported by

21  Ms. Moore to the insurance company.

22  Q    So, when you say that she didn't provide a breakdown,

23  you're referring, for example, to this page from Exhibit 34?

24  A    Yes.

25  Q    And would it be fair to say that your effort was to see

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1   what you would come up with as a total down here on the bottom

2   of this page?

3   A    That was the effort is to add everything up just the way

4   she might have and to see what the result would be.

5   Q    In conducting that analysis, what documents did you look

6   at?

7   A    I looked at the settlement sheets for Tri-Cities Produce

8   and Agri-Pack and, then, summary sheets prepared -- the summary

9   sheets that were available in the discovery prepared by

10  Debbie Moore.  Ms. Debbie Moore.

11  Q    Now, I'm showing you what has been received in evidence as

12  Exhibit 29.  Is that part of some of the exhibits that you would

13  have looked at or a cover sheet that went with them?

14  A    The Field Production Worksheets were prepared in

15  conjunction with the claim by Mr. Olsen, the AGR claim for the

16  2001 crop.  And I have reviewed all that I could find in

17  discovery.

18  Q    I'm showing you a document that says, "Total Packout by

19  Field."  This is part of Exhibit 29.  Did you review documents

20  of this kind in your review?

21  A    I did review documents of this kind and, specifically, this

22  document.

23  Q    And did you find documents of this kind pertaining to other

24  fields, as well?

25  A    I did.

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/DI - BENTLEY

1  Q    And it's your understanding that these documents were

2  prepared by Ms. Moore.  Correct?

3  A    Yes.

4  Q    And were submitted to the insurance company as part of the

5  adjustment of Mr. Olsen's claim?

6  A    Yes.

7  Q    Okay.  Were you able to reach a conclusion on the basis of

8  your review of the records with respect to the accuracy of the

9  information that Ms. Moore supplied to Mr. Ackerman for

10 transmission to the insurance company?

11 A    Yes.

12 Q    And what was your opinion?

13 A    After I completed the task at hand, I actually was able to

14 take the settlement sheets for all of the processed potatoes;

15 and, in the case of Tri-Cities Produce, I actually calculated

16 the exact tonnage as reported on Ms. Moore's summary.

17     As to the payout, the net payout, from Tri-Cities Produce,

18 I was within $200 of calculating the net payout on the summary

19 sheet.

20     As in the case of Agri-Pack, I was within a truckload of --

21 or half a truckload, actually -- of calculating the weight as --

22 as summarized -- as compiled by Ms. Moore.  And, then, I was

23 within a thousand of calculating the net return to grower as

24 compiled by Ms. Moore.  And the reason why I say, "half a

25 truckload" is because there were over 500 truckloads as

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/DI - BENTLEY

1  indicated by the weight on the sheet.

2  Q    Did you prepare a schedule reflecting your findings with

3  respect to Olsen's sale of potatoes to Tri-Cities Produce?

4  A    I did.

5           MR. BENTLEY:  Not for jury, if I may display

6  Exhibit 1612.

7           THE COURT:  Exhibit 12 exhibited for --

8           MR. BENTLEY:  1612.  I'm sorry, your Honor.

9           THE COURT:  All right.  I misspoke.  1612 for ID.

10  Q    (BY MR. BENTLEY)  Is that the summary that you prepared

11  with respect to Tri-Cities Produce?

12  A    It is.

13          MR. BENTLEY:  I offer 1612.

14          MR. TORNABENE:  No objection.

15          THE COURT:  Admitted.

16          MR. BENTLEY:  May it be published to the jury?

17          THE COURT:  It may.

18     (Exhibit No. 1612 admitted into evidence)

19  Q    (BY MR. BENTLEY)  So you indicated that you balanced,

20  really, with the information that Ms. Moore provided as to the

21  Tri-Cities Produce?

22  A    I balanced.

23  Q    And, when you say you "balanced" -- I'm trying to put one

24  on -- put one next to the other -- you're saying that this

25  number (indicating) came out to be the same as this number

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1  (indicating).  Is that correct?

2  A    Well, the $672,456.52 is -- and, if you look at the

3  schedule, you'll see that it's identified as coming from

4  Ms. Moore's schedule.

5      The number above it is the calculated net return to grower

6  of $672,186.85 that I calculated.  It's very close.

7  Q    Okay.  Understood.  Did you prepare a similar schedule with

8  respect to Agri-Pack?

9  A    I did.

10     MR. BENTLEY:  May -- I'd like to show this not to the

11  jury.  This is not yet admitted.

12  Q    (BY MR. BENTLEY)  Referring you to Exhibit 13 -- 1613, is

13  that your schedule on the Agri-Pack transactions in '01?

14  A    It is.

15     MR. BENTLEY:  I offer 1613.

16     MR. TORNABENE:  No objection.

17     THE COURT:  Admitted.

18     MR. BENTLEY:  May it be published?

19     THE COURT:  Published.

20     (Exhibit No. 1613 admitted into evidence)

21  Q    (BY MR. BENTLEY)  How did -- what was your total for

22  payments by Agri-Pack to Olsen in '01?

23  A    $423,270.96.

24  Q    Is that the number that the pen is pointing to here?

25  A    Yes.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1  Q    And what is this number right below it?

2  A    The amount as calculated by Ms. Moore on her schedule for a

3  net return from Agri-Pack.

4  Q    Did you find anything interesting with respect to the

5  tonnage that was sold to Agri-Pack?

6  A    Yes, I did.  Once I completed my analysis, then I wanted to

7  draw a comparison -- comparison to the Government information as

8  provided.  And one thing I had never -- I had not noticed before

9  or wasn't aware of until I looked at the summary sheets, but

10  there were several times when the tare weight associated with

11  the processed potatoes was included for payment.

12  Q    And, if you -- does that -- is that reflected over here

13  (indicating) in the bottom left side of the summary,

14  Exhibit 1613?

15  A    It is.

16  Q    And that would be that 6,143.77 tons?

17  A    Yes.

18  Q    Did you make that an adjustment to reach a net tonnage of

19  potatoes?

20  A    Yes.

21  Q    And is that the bottom line here of 16,174.98 (sic)?

22  A    Yes.

23  Q    Now, if we go back to the sheet that was included with

24  Exhibit 34, referring you to a line on this summary near the --

25  the box on the bottom, do you see a figure 12,287,540?

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1  A    Yes.

2  Q    And, if we go to the top of this chart, we'll see that that

3  is a number in pounds.  Correct?

4  A    Correct.

5  Q    So, if you divide that by 2,000, you come up with the total

6  of tonnage that you conclude was not potatoes, but paid for.

7  A    Yes.

8  Q    Did you also prepare a summary of your findings combining

9  the Agri-Pack and Tri-Cities Produce numbers?

10  A    I did.

11        MR. BENTLEY:  And this would not be for jury but for

12  identification.

13  Q    (BY MR. BENTLEY)  This is Exhibit 1614.  Is that your

14  summary?

15  A    It is.

16        MR. BENTLEY:  And I offer 1614.

17        MR. TORNABENE:  No objection.

18        THE COURT:  Admitted.

19        MR. BENTLEY:  May it be published?

20        THE COURT:  It may.

21     (Exhibit No. 1614 admitted into evidence)

22  Q    (BY MR. BENTLEY)  Did you find a difference between the

23  value determined by RMA for -- that Olsen had reported and what

24  you concluded?

25  A    Yes.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1   Q    Approximately, how much of a difference was there?

2   A    $80,000.

3   Q    Can you tell us why there was that difference?

4   A    Well, in several of the summary sheets prepared by

5   Ms. Moore, it was -- the tare weight was included in the net

6   return to grower for that particular lot of potatoes processed.

7   Q    Have you seen a summary chart that reflects your conclusions

8   with respect to the '01 year?

9   A    Are you referring to an exhibit?

10  Q    Yeah.  I'm asking if you have been shown a summary chart

11  that reflects your conclusions.  You haven't seen it.  It's not

12  in front of you right now.

13          MR. BENTLEY:  But may this be -- may this be shown for

14  identification?

15          THE COURT:  And the number is?

16          MR. BENTLEY:  1618.

17          THE COURT:  1618 for identification.

18  Q    (BY MR. BENTLEY)  Is this a summary of your findings?

19  A    Yes.

20          MR. BENTLEY:  I'd offer 1618.

21          MR. TORNABENE:  Brief voir dire, your Honor.

22          THE COURT:  Voir dire, you may.

23          MR. TORNABENE:  Good morning, Mr. Moorer.  Mr. Moorer,

24  looking at the left side here where I'm indicating, it says,

25  "Totals Not Calculated."  What is that referring to?

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1          THE WITNESS:  There were several of the settlement

2    sheets that were incomplete.

3          MR. TORNABENE:  Okay.  And this is under a heading

4    regarding "Olsen to AmAg Production Worksheets and Attachments"

5    dated 2/6/02.  Correct?

6          THE WITNESS:  Yes.

7          MR. TORNABENE:  So why is it that there's no values

8    under that heading?

9          THE WITNESS:  The -- the packing shed simply failed to

10   calculate them.

11         MR. TORNABENE:  You had access to the production

12   worksheets.  Correct?

13         THE WITNESS:  Yes.

14         MR. TORNABENE:  And those specific production

15   worksheets February 6th, 2002.  Correct?

16         THE WITNESS:  Yes.

17         MR. TORNABENE:  And, yet, those values are not

18   summarized or reflected on this document.  Correct?

19         THE WITNESS:  Well, the -- see, that's the thing.

20   In -- what was very helpful to me was that Ms. Moore's summary

21   document, that previously had been identified to me as a source

22   document, were attached to several of these settlement sheets;

23   and it answered the question.  So the calculation wasn't --

24   didn't exist on the settlement sheet but attached to the

25   settlement sheet for many of the fields was a summary sheet

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1  prepared by Ms. Moore, which had the net return to grower

2  listed.

3          MR. TORNABENE:  I guess my question is, Mr. Moorer,

4  you have a heading here -- or a heading exists here on this

5  proposed exhibit that specifically references production

6  worksheets; and there are no values below that.  Correct?

7          THE WITNESS:  There were -- in addition to the -- some

8  of the settlement sheets, field production worksheets were

9  substituted for settlement sheets; and they only listed the

10 yield produced from the specific field and had no other

11 information.

12         MR. TORNABENE:  Mr. Moorer, I -- this is just

13 voir dire so it's just a very, very simple question.  I'm just

14 asking isn't it correct that, under this heading that references

15 specifically production worksheets and attachments,

16 February 6th, 2002, there are no values under that on this

17 proposed exhibit.  Correct?

18         THE WITNESS:  That -- that isn't correct.  The values

19 would be incomplete.

20         MR. TORNABENE:  Okay.  And, Mr. Moorer, I'm just

21 directing you to just proposed 1618.  Isn't it true that, under

22 the heading "Production Worksheets," under that, there are no

23 numbers?

24         THE COURT:  He just wants you to say that there's only

25 words below that, not numbers.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1          THE WITNESS:  Oh, there are no numbers.

2          MR. TORNABENE:  Okay.  I'm talking just about this

3    exhibit, not anything else.  Okay.

4       Your Honor, we -- we would object.  This is -- this is

5    incomplete.  If it's for substantive purposes, there's a heading

6    here that -- that doesn't make any sense.  For illustrative

7    purposes, we understand.

8          MR. BENTLEY:  We'll offer it only for illustrative

9    purposes, your Honor.

10          THE COURT:  Okay.  1618, for illustrative purposes,

11   may be displayed.

12       (Exhibit No. 1618 admitted into evidence)

13   Q    (BY MR. BENTLEY)  And, Mr. Moorer, didn't -- withdrawn.

14       In your review of all of the documents that were submitted

15   to the insurance company, did you find any tabulation or total

16   of revenues received by Mr. Olsen that had been submitted to the

17   insurance company in February of '02?

18   A    I did not.

19          THE COURT:  Did he find any what?

20          MR. BENTLEY:  Any tabulation.

21          THE COURT:  Tabulations.

22   Q    (BY MR. BENTLEY)  Now, for identification only, I'd like to

23   show you Exhibit 1619.  Not for jury.

24       Mr. Moorer, does this chart summarize the findings embodied

25   in Exhibit -- Exhibits 1612, 1613, and 1614?

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/DI - BENTLEY

1   A    Yes.

2          MR. BENTLEY:  I'd offer 1619.

3          MR. TORNABENE:  No objection.

4          THE COURT:  Admitted.

5      (Exhibit No. 1619 admitted into evidence)

6   Q    (BY MR. BENTLEY)  And tell us what this illustrates.

7   A    Well, what this illustrates is the net return to grower and

8   total processed weight for Olsen Ag for the crop year of 2001,

9   which was compiled and -- by and submitted by Ms. Debbie Moore

10  to Mr. Fred Ackerman, the insurance agent, and sent on to the

11  insurance company identified as AmAg.

12  Q    In your professional opinion, was the information that

13  Ms. Moore provided to the insurance company, as reflected in

14  Exhibit 34, accurate and correct?

15  A    That information submitted by Ms. Moore was accurate and

16  correct.

17  Q    And, in preparing your analysis, you started from scratch.

18  Is that correct?

19  A    I started from scratch.

20  Q    It wasn't a matter of looking at item by item in a

21  tabulation that Ms. Moore had put together, was it?

22  A    I had no tabulation from Ms. Moore.  I have no idea how she

23  did it.

24  Q    But you came out at the end -- in the end, you came out

25  within a tenth of one percent or less for -- of her total?

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1    A    On Agri-Pack, it was a tenth of one percent.  On Tri-Cities

2    Produce, it was exact.

3                MR. BENTLEY:  No further questions.

4                THE COURT:  Anyone else -- anyone else on the defense

5    side?  If not, then, Mr. Tornabene, you may proceed.

6

7                        CROSS EXAMINATION

8    CROSS BY MR. TORNABENE:

9    Q    Mr. Moorer, Mr. Bentley asked you about previous work and

10   whether or not you'd done any prior to this litigation with

11   several of the defendants.  Do you recall that?

12   A    Yes.

13   Q    And I wanted to ask you, have you ever done any work for

14   Mr. Bennett prior to this litigation?

15   A    No.

16   Q    And how about for Tri-Cities Produce?

17   A    No.

18   Q    In going through your qualifications as a CPA, Mr. Bentley

19   asked you if you were currently compliant with your

20   requirements; and I believe you stated that you are, of course.

21   A    Yes.

22   Q    Have you always been compliant with those?

23   A    Yes.

24   Q    Mr. Moorer, you were asked -- you referenced in your direct

25   United States' Exhibit 215.  Do you recall that?

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/CR - TORNABENE

1   A    Yes.

2   Q    And this has been previously utilized for illustrative

3   purposes and would ask that --

4         MR. TORNABENE:  Well, first, I'll just ask this be

5   shown to just witness, Court, and counsel.

6   Q    (BY MR. TORNABENE)  I'm going to zoom in on part of this,

7   Mr. Moorer.  Do you recognize this?

8   A    I do.

9   Q    Okay.  And is this the Exhibit 215 that you referenced in

10  your direct?

11  A    Yes.

12        MR. TORNABENE:  Your Honor, I would ask that we

13  publish this to the jury for illustrative purposes?

14        MR. BENTLEY:  No objection.

15        THE COURT:  You may do so.  You may do so.

16  Q    (BY MR. TORNABENE)  And, Mr. Moorer, rezooming in on this

17  for the benefit of all, this is a spreadsheet that was prepared

18  by Mr. David Bearden.  Correct?

19  A    Yes.

20  Q    And this is regarding Mr. Olsen's 2001 crop year.  Correct?

21  A    Yes.

22  Q    And it compares, essentially, three sets of numbers.  Is

23  that correct?

24  A    Yes.

25  Q    Sorry.  I'm making everybody seasick here.  On the far left

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  side, there's a -- the first set are numbers provided on

2  November 19th, 2002.  Correct?

3  A    Yes.

4  Q    And, if we go down to the bottom of that exhibit, we can

5  see those numbers.  Correct?

6  A    Yes.

7  Q    And these are the numbers from -- taken from the Exhibit 34

8  that you went over with Mr. Bentley.  Is that correct?

9  A    Yes.

10  Q    Those are those -- the final settlement sheets prepared by

11  Ms. Moore.  Correct?

12  A    The summary --

13  Q    Yes.

14  A    -- prepared.

15  Q    Yes.  And those are for, specifically, the Tri-Cities

16  Produce to Olsen for 2001 summary.  Correct?

17  A    And Agri-Pack.

18  Q    Correct.  And the Agri-Pack summary.

19  A    Yes.

20  Q    So, then, going back to the top of 215, the second set of

21  documents that this exhibit summarizes, are the -- in the middle

22  section here, are from the production worksheets provided by --

23  or signed by Mr. Olsen with those attachments on February 6th,

24  2002.  Correct?

25           MR. BENTLEY:  Object to the form.

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/CR - TORNABENE

1      THE WITNESS:  I would -- I would say that --

2      THE COURT:  We have an objection on the floor.

3  Overruled.  Go ahead.

4      THE WITNESS:  The -- they do look familiar to me.

5  Q    (BY MR. TORNABENE)  Okay.

6  A    I will say that.

7  Q    And, with regards to your analysis that you performed in

8  this case, you were given access to all of the discovery

9  provided to the defense by the United States.  Correct?

10 A    I was.

11 Q    And, so, I'm assuming you became familiar with some of the

12 different Bates numbered series.  Is that accurate?

13 A    Yes.

14 Q    With regards to sticking with this middle section of 215,

15 we're talking about documents that are all from the 40,000

16 series.  Correct?

17 A    Yes.

18 Q    And isn't it true that the documents that are summarized

19 here all relate to the production worksheets provided by

20 Mr. Olsen to his insurance company on February 6th, 2002, and

21 the attachments.

22 A    I don't know that.  I -- I don't know -- I've never seen a

23 package or a summary of all of those sheets.  I've seen

24 worksheets, but I've not seen -- and I've seen different --

25 different representations as to the claim that was filed by

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1   Mr. Olsen.  But I've never seen that claim with the worksheets

2   attached.

3   Q    Mr. Moorer, you testified at the <u>Daubert</u> hearing in this

4   case.  Correct?

5   A    Yes.

6   Q    And that was back in February of this year.  Is that right?

7   A    Yes.

8   Q    And, at that <u>Daubert</u> hearing, do you recall testifying

9   about your -- generally about your analysis of Exhibit 215?

10  A    Yes.

11  Q    And you, in fact, had -- had gone through and -- and

12  scrutinized Exhibit 215 in some detail.  Correct?

13  A    Yes.

14  Q    And do you recall answering questions where we went through

15  one of these lines, in particular, which included the -- at

16  least one of the documents referenced here in the middle

17  section?  Do you recall that?

18  A    Yes.

19  Q    And that was attachments to a production worksheet.

20  Correct?

21  A    Yes.

22  Q    The -- the next section over on the far right of

23  Exhibit 215.  This -- this summarizes the documents provided to

24  the Grand Jury by Tri-Cities Produce and Agri-Pack related to

25  Olsen's 2001 crop.  Is that accurate?

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  A    Yes.

2  Q    And, in terms of what you've testified to here today, is it

3  accurate to state that you took what was done here, in part, and

4  looked at some of these same source documents but broke it out

5  specific to Tri-Cities Produce and specific to Agri-Pack.

6  A    Yes, I did.

7  Q    And, so, much of these reference numbers here on 215 that

8  we're seeing in the column I've circled, those are going to be

9  the same -- the same source documents that you looked at for

10  some of the exhibit summaries that you admitted today.  Correct?

11  A    Some of them.

12  Q    Okay.  Mr. Moorer, if I understand your testimony correctly

13  with regards to your comparison of Ms. Moore's numbers and your

14  analysis --

15  A    Yes.

16  Q    -- you are looking at the -- excuse me.  You are looking at

17  this right side here (indicating) and similar documents from

18  Agri-Pack and Tri-Cities Produce and adding those up to see

19  what, in your analysis, it yielded in terms of tonnage.

20  Correct?

21  A    Yes.

22  Q    And in terms of what the revenue to the grower was.

23  Correct?

24  A    Yes.

25  Q    And, then, you compared that to -- going back over on 215

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  on the far left side on the bottom -- to the -- the source

2  documents referenced there, those summary sheets prepared by

3  Ms. Moore and faxed by Mr. Ackerman to Mr. Gilbert on

4  November 19th, 2002.  Correct?

5  A    No.

6  Q    You did not compare those numbers?

7  A    I did not compare those numbers.

8  Q    And let me -- let me back up a little bit.  The numbers

9  that you compared were the numbers that are from the source

10 documents on Exhibit 34 prepared by Ms. Moore.  Correct?  That

11 was one set of the documents that you looked at.

12 A    The comparison I made was to the summary of production

13 prepared by Ms. Moore submitted to Mr. Ackerman.

14 Q    And isn't that the same source documents referenced here on

15 this bottom left corner of 215?

16 A    No.

17 Q    Okay.  They're different source documents?

18 A    I don't know.

19 Q    All right.  Let's see.  I will call up for you -- let's see

20 here.  What are the reference numbers there?  If you could, read

21 Row 58 here.

22 A    Yes.  That's Bates 47254.

23 Q    And the one below it is just the following page --

24 A    Yes.

25 Q    -- ending 55.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  A     Yes.

2  Q     I'm going to show you and the jury previously admitted 34.

3  And, based on the Bates number here (indicating), is that the

4  same -- does that appear to be the same page that's first

5  referenced?

6  A     Those are the same pages.

7  Q     Okay.  And, so, again, we're dealing with the -- the less

8  clear version but this is that source document that is

9  referenced in 215.  Correct?

10 A     Yes.

11 Q     And, then, if we go to the next page ending 255 of

12 Exhibit 34, that's that other source document referenced in 215.

13 Correct?

14 A     It is.

15 Q     Now, your opinion, as I understand it, is that what

16 Ms. Moore put together that was ultimately provided by

17 Mr. Ackerman to Mr. Gilbert was, itself, accurate based on

18 packout sheets and settlement sheets provided by Agri-Pack and

19 Tri-Cities Produce.  Correct?

20 A     That's correct.

21 Q     And, with regards to Exhibit 215, going over to the far

22 left side in Mr. Bearden's summary of the packout and settlement

23 sheets from Agri-Pack and Tri-Cities Produce --

24       MR. BENTLEY:  For the record, I think we're on the

25 right side.

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/CR - TORNABENE

1          MR. TORNABENE:  Thank you, Mr. Bentley.

2          THE COURT:  We are.  Thank you.

3   Q   (BY MR. TORNABENE)  On the right side.  With regards to

4   this section of Exhibit 215, is this accurate based on your

5   review?

6   A    No.

7   Q    And let's reel down on that.  You don't have any reason to

8   believe, do you, that the reference number -- we'll just pick

9   the first line here -- that those documents do not contain the

10  numbers that are, then, indicated in the table, do you?

11  A    Well, I know they don't.

12  Q    Okay.  Do you remember testifying to this at the Daubert

13  hearing?

14  A    Um-hum.

15  Q    And --

16          THE COURT:  Excuse me.  Answer for the record "Yes" or

17  "No."

18          THE WITNESS:  Yes.

19          THE COURT:  Thank you.

20  Q   (BY MR. TORNABENE)  And isn't it true that at that time

21  you, in fact, agreed that these numbers are accurate summaries

22  of the referenced documents?

23  A    I would have to say that I don't recall saying anything

24  like that.

25  Q    Okay.  Fair enough.  Mr. Moorer, just to be completely

1    clear, my question isn't asking you whether or not you think

2    that these numbers are accurate when compared to other documents

3    or when you analyze it based on other issues.  My question is

4    whether or not the numbers that are reflected in 215 are

5    accurate summaries of the documents that they specifically

6    reference.

7    A     I understand your question.

8    Q     And you do not believe that you admitted that at the

9    Daubert hearing.

10   A     I'm -- I don't believe I did, no.

11         (Pause in the proceedings)

12   Q     (BY MR. TORNABENE)  Mr. Moorer, have you had an opportunity

13   to review your -- the transcript of your testimony from the

14   Daubert hearing?

15   A     Some of it.

16   Q     You haven't reviewed all of it?

17   A     No.  But I happen to have it here in front of me.

18   Q     All right.

19         THE COURT:  Do you have a page and a line number yet,

20   Counsel?  If so, let us know; and the witness can, then, turn

21   there, if you wish.

22         MR. TORNABENE:  Thank you.

23   Q     (BY MR. TORNABENE)  I'd like you to turn, if you could,

24   Mr. Moorer --

25         MR. TORNABENE:  And, actually, if we could just show

1   this to just Court and counsel and the witness --

2           THE COURT:  Your screens are off, then, right?  Thank

3   you.

4   Q    (BY MR. TORNABENE)  I'm going to show -- this is Page 483

5   of your testimony.  And, looking at the bottom -- well, first,

6   I'll ask you, is this -- can you orient yourself in looking at

7   that page or the pages just before as to whether or not this is

8   the section of your testimony where you're testifying regarding

9   the accuracy of 215?

10          (Pause in the proceedings)

11          THE COURT:  You've read that page?

12          THE WITNESS:  I'm looking at Page 481, your Honor.

13          THE COURT:  All right.

14          (Pause in the proceedings)

15          THE WITNESS:  Okay.  I remember the -- I remember the

16   testimony now, yes.

17   Q    (BY MR. TORNABENE)  Okay.  And, going forward, that's

18   represented -- that's, approximately, the beginning of that line

19   of questioning.  And I'd like you to go to --

20          THE COURT:  So he remembers the testimony now.

21          MR. TORNABENE:  Yes.

22          THE COURT:  So the question is --

23   Q    (BY MR. TORNABENE)  And do you recall later in that

24   testimony, once being oriented to the question being about 215,

25   summarizing documents and just bringing numbers over?  Do you

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  recall stating that that particular summarization was accurate

2  as to those documents?

3  A    Yes.  Yes, I do.

4  Q    And did you, at that time, agree that that was the case;

5  that it was accurate?

6  A    I agreed that the calculation was accurate.

7  Q    And that the numbers within 215 were accurately taken from

8  the documents that they referenced.  Correct?

9  A    I never agreed to that.  I agreed that the calculations

10  were accurate.

11  Q    All right.  I'd ask you to look at Page --

12        MR. TORNABENE:  Again, just showing to the witness and

13  counsel.

14  Q    (BY MR. TORNABENE)  This is Page 483 of your testimony.

15  And, if you'd take a look at -- starting at Line 16 to Line 25

16  and, then, I'll -- I'll show you the next page.

17        Showing you the next page, 484, if you could read from

18  line -- just to yourself -- from Line 1 to Line 10.

19  A    Yes.

20  Q    And, so, there, there's a discussion about whether or not a

21  particular number, 990.74, found in Exhibit 215 is the wrong

22  number based on the source document.  Correct?

23  A    That was the discussion.

24  Q    Okay.  And do you recall that later in your testimony you

25  admitted that, in fact, that number was found within that source

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/CR - TORNABENE

1  document?

2  A    The -- you know, the hearing that you're referring to was

3  February 26th.

4  Q    Um-hum.

5  A    And the -- and what I recollect from my testimony was not

6  that the information that was listed in the exhibit didn't exist

7  on a source document.  It simply was incorrectly calculated and

8  presented.

9  Q    Okay.

10  A    And -- and I've said that over and over.

11        THE COURT:  I think the record -- I think the

12  deposition fairly reflects that.  So -- I mean, the testimony.

13        MR. TORNABENE:  Yes.

14  Q    (BY MR. TORNABENE)  And, so, Mr. Moorer, again, I just want

15  to be very clear and go back to -- for counsel, for the jury,

16  and the witness -- going back to 215, my question is simply

17  whether or not -- not whether or not you agree with the

18  presentation but whether or not, when we look at the source

19  documents in the reference column I've circled, isn't it true

20  that you admitted that the numbers that are in the following

21  columns are, in fact, found in these source documents?

22  A    Yes.

23  Q    Thank you.  Now, with regards to your concerns about the

24  presentation, let me ask you this:  In your most recent review

25  of 215, is it accurate that you found, in your opinion, that

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  there were fields that Mr. Bearden left out?  Correct?

2  A    That is correct.

3  Q    And -- and, in fact, you specified those fields by specific

4  reference numbers in the 80,000 series?

5  A    It would be helpful to me if I could see most of the

6  exhibit.  Right now I can only see about ten line items.

7  Q    Sure.  Let me make this a little bigger for you.  And I can

8  scroll down, if you would like.

9  A    Okay.  You see several lines with --

10          THE COURT:  Do you want to use a hard copy exhibit so

11  he can make reference or not?  Mr. Bentley is offering.

12          MR. TORNABENE:  Oh, would that be of assistance,

13  Mr. Moorer?

14          THE WITNESS:  It might be, yes.

15          MR. TORNABENE:  May I approach?

16          THE COURT:  You may approach.

17          MR. BENTLEY:  Your Honor, just so the record is clear,

18  the information on the top half of that exhibit is consistent

19  with Exhibit 215 in evidence.  However, it is a prior -- the

20  bottom half was changed.  So it is not, in that respect, a -- an

21  accurate copy.

22          THE COURT:  So just the top half on the right?

23          MR. BENTLEY:  Yes, your Honor.

24          THE COURT:  Top half on the right.  Do you understand?

25          THE WITNESS:  Yes.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1          MR. BENTLEY:  Top half all the way across, but --

2          THE COURT:  Top half all the way across.  Thank you.

3   Q    (BY MR. TORNABENE)  And you understand that, Mr. Moorer,

4   because that's an important distinction.

5   A    Yes.

6   Q    All right.  So, with regards to the exhibit that's on the

7   screen, Exhibit 215, that's been used for illustrative purposes

8   in this trial, you have stated, then, that there are fields that

9   are missing from this.  We're referring to it as the top --

10          THE COURT:  Here I want you to clarify.

11          MR. TORNABENE:  Yes.

12          THE COURT:  "Fields" on a chart may be a term of art.

13   And, if you're talking about potato fields, then, please,

14   clarify that so we're all reading it correctly.

15          MR. TORNABENE:  Yeah.  Thank you, your Honor.

16   Q    (BY MR. TORNABENE)  Mr. Moorer, with regards to 215, is it

17   your understanding that, similar to the summary that you've just

18   admitted here today, that there's an attempt to summarize on a

19   field-by-field basis?

20   A    Yes.

21   Q    So each row in the -- in the summary, talking about 215,

22   references a specific field linked to Mr. Olsen in 2001?

23   A    Yes.

24   Q    Okay.  And, so, with regards to focusing on 215 and the

25   upper left -- or right portion, it's your opinion that one of

1   the deficiencies in Exhibit 215 is that there are fields missing

2   that should be included.  Correct?

3   A    Yes.

4   Q    All right.  And those fields are, in fact, some four or

5   five fields.  Correct?

6   A    Yes.

7   Q    And those are -- those fields, in your analysis and your

8   review, you found that these were fields from 2001.  Correct?

9   A    Yes.

10  Q    Packed by Tri-Cities Produce.  Correct?

11  A    Yes.

12  Q    And that were linked to -- directly to Mr. Olsen.  Correct?

13  A    Yes.

14  Q    And, in fact, these fields that you found missing from 215,

15  there is evidence on the source documents you looked at that

16  Mr. Olsen was, in fact, paid a specific amount for each of those

17  fields from Tri-Cities Produce.  Correct?

18  A    Yes.

19  Q    And those are not included in Exhibit 215.  Correct?

20  A    Yes.

21  Q    Okay.  You understand that Exhibit 215 --

22          THE COURT:  Counsel, we're going to have to leave it

23  there at this time.

24          MR. TORNABENE:  Okay.  Thank you.

25          THE COURT:  Ladies and gentlemen, a couple of things.

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1   I have some commitments that I have to go to.  And, so, we'll be

2   back -- we'll be leaving now, and we'll come back two hours from

3   now at 20 minutes to 2:00.  The lawyers and I will be back

4   discussing some of the afternoon documents before you actually

5   come back to the courtroom.  That will take us a bit of time, as

6   well, to get that all accomplished before you get back here.

7   So, that said, have a good lunch; and we'll see you at

8   20 minutes to 2:00.  Thank you.

9        (Jury out at 11:41 a.m.)

10            THE COURT:  Please be seated.  Give me an idea of how

11   testimony's going and how much longer you have, Mr. Tornabene.

12            MR. TORNABENE:  Your Honor, I would estimate that I

13   probably have another -- probably a half-an-hour.

14            THE COURT:  Okay.  So we'll be finished with this

15   witness probably around 3:00, take a break around 3:00.  What's

16   after this witness?

17            MR. JOHNSTON:  I believe that John Raekes is next on

18   the dock, your Honor.

19            THE COURT:  You'll have cleared up the issue about

20   attorney/client privilege, if any, by that time.

21            MR. JOHNSTON:  We'll discuss it with him, your Honor.

22   It's Poco's position that, because of production of substantial

23   documents, it may well have been waived.  But I will discuss it

24   with him.

25            THE COURT:  Well, there's complete waiver and, then,

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  waiver to the extent to production and you need to parse that

2  out with him --

3          MR. JOHNSTON:  We will do that, your Honor.

4          THE COURT:  -- and work in that regard.  Okay, folks,

5  see you about 1:20.  Thank you.

6      (Court recessed at 11:43 a.m.)

7      (Court reconvened at 1:32 p.m.)

8          THE COURT:  Please be seated.  Let's resume.  Okay.

9  Counsel, we have some issues.  Let's take them up.

10         MR. TORNABENE:  Your Honor, I've conferred with

11 Mr. Johnston regarding the exhibits that they plan to propose

12 through Mr. Raekes; and we've narrowed our differences down to

13 three, in particular.

14         THE COURT:  Okay.

15         MR. TORNABENE:  The first is proposed Exhibit 2060.

16         THE COURT:  2060.

17         MR. TORNABENE:  Yes.

18         THE COURT:  Let me just make sure I have the right

19 sections of your proposals.  This is as to Mr. Raekes.  Right?

20         MR. TORNABENE:  Yes.

21         THE COURT:  Okay.  And I'm not sure which ECF I should

22 look at, but -- okay.  What exhibits are you talking about?

23         MR. TORNABENE:  The first is 2060.  I have that up --

24 called up on the screen, as well.

25         THE COURT:  Thank you.  Okay.

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1    (Pause in the proceedings)

2         THE COURT:  Yes.

3         MR. TORNABENE:  Your Honor, our motion is that this

4    one appears to get into --

5         THE COURT:  I understand your position.  Mr. Johnston?

6         MR. JOHNSTON:  Yes, your Honor.  This document -- it

7    demonstrates two things.  One, it demonstrates that they were

8    talking to the Department of Justice before any question was --

9    or any payment was made.  And, secondly, it goes to the issue

10   that, if they're concealing the issue of reinsurance, it affects

11   the ability to conspire against the Government, among others.

12   So I think it is relevant.  Don Brittenham was counsel to RMA.

13   He was not a -- an FCIA person.

14        THE COURT:  Who is Bruce Green?

15        MR. JOHNSTON:  Bruce Green is an attorney with the

16   Pechacek firm back east.  They were Eastern general counsel for

17   FCIA at that time.

18        THE COURT:  Well, to the extent that you need to show

19   that there was -- how did you get a copy of this?

20        MR. JOHNSTON:  These -- this and a number of other

21   documents similar to that were produced to us by the Government

22   in the 80,000 pages of documents, your Honor.  This is a

23   document that came from the Government in this case.  And they

24   obtained it, apparently, from the insurance company and -- and

25   disclosed it.  I've spoken with Mr. Raekes and indicated to him

1  that, to the extent that there's any limited waiver in any of

2  this, we intended not to go beyond the limited waiver of any

3  particular document.  I'm not going to ask him --

4          THE COURT:  Well, the letter's not coming in, at

5  least, not at the moment because it contains too much that's

6  completely irrelevant and gets us off into a host of issues

7  that, frankly, just lead us in the wrong direction.  So it's 403

8  material.

9      But, to the extent that there are facts in there that you

10 want to elicit from Raekes and refresh his memory from this

11 letter, then, I'll permit that.  But I'm not going to permit the

12 letter to --

13         MR. JOHNSTON:  Refreshing his memory with this, you

14 Honor.  I specifically want to ask him what he knew about

15 contacts with the Department of Justice at that particular time.

16         THE COURT:  Well, the Department of Justice -- and I

17 have a very imperfect understanding of the various divisions and

18 their authorities.  So I'm uncertain what the, quote, "Office of

19 General Counsel at DOJ" has as authority or areas of

20 responsibility.

21         MR. JOHNSTON:  And my question was whether this

22 witness can enlighten us on -- on precisely that, your Honor,

23 because I don't think it's clear.

24         MR. TORNABENE:  Your Honor, I --

25         THE COURT:  Well, you work for the Department of

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  Justice so maybe you can tell us what that is.

2          MR. TORNABENE:  I can maybe shed a little bit more

3  light.  So this is just my very general understanding, for the

4  benefit of court and counsel, is that matters that are before

5  the Ninth Circuit and certainly the Supreme Court have a higher

6  level of review.  This appears to be an issue that would

7  implicate a government agency.  And, so, potentially, Department

8  of Justice back east in a particular office would be interested

9  in terms of things like national consistency, those sorts of

10 things.

11         THE COURT:  Sure.  Okay.  So we'll see where it goes.

12 I'm not -- the letter's not going in, but you can elicit facts

13 and refresh his recollection.  This is a very problematic

14 letter.  So what else?

15         MR. TORNABENE:  Your Honor, the next one is proposed

16 Exhibit 2063.

17         THE COURT:  2063.

18         MR. TORNABENE:  Yes.

19         THE COURT:  Yeah.  And that's Mr. Raekes to

20 Mr. Hovland, copy to Bruce Green.

21         MR. TORNABENE:  And there's a -- and it's a bit of an

22 email chain.

23         THE COURT:  I'm looking, and are you asking me to read

24 something in this?

25         MR. TORNABENE:  I'm sorry, your Honor.  I -- this goes

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  into internal settlement discussions and issues and would ask

2  that it be excluded for the same reasons that 2060 should be --

3  has been excluded in terms of the content reference here to

4  issues like being, I think, "tired of dealing with this insured

5  and his attorney," for instance.

6          THE COURT:  Now, this is the entire document.  Is that

7  right?  Because I saw something above that that was concerning

8  to me.

9          MR. TORNABENE:  Yes.  This --

10          THE COURT:  So is this -- this is the whole document?

11          MR. JOHNSTON:  The one page, yes, your Honor.

12          THE COURT:  So it begins with "Dave:  My suggestion

13  is ..."

14          MR. JOHNSTON:  That's the most recent.  It actually

15  starts at the bottom like most email chains and moves upward in

16  time, your Honor.

17          THE COURT:  Yes.  So you want the document in.

18          MR. JOHNSTON:  Yes, your Honor.  And -- and the first

19  email here relates specifically to a document, which is already

20  admitted in evidence, which is Mr. Witt's letter.  And this

21  document indicates that this is the point in time, October 27th

22  of 2005, where reinsurance is finally confirmed by RMA to the

23  insurance company.  The case settles within a week.  And I think

24  it's important that the sequence of events that is -- places the

25  Witt letter in its context and explains what's already in

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1    evidence.

2         THE COURT:  What does the Witt letter say?

3         MR. JOHNSTON:  The Witt letter is the letter by which

4    RMA advises FCIA that they have reinsurance; and this is the

5    letter where they say, "Oh, great."  And I want to ask, you

6    know, why was it great?  The -- the relationship between RMA and

7    FCIA in the management of this case and the influence of

8    government I think is a relevant matter.

9         THE COURT:  Well, how does this advance that issue?

10   Here there's some internal suggestions on how to negotiate,

11   which is that the -- the later email that we're looking at right

12   now and -- and, then, there's the one at the bottom.

13        MR. JOHNSTON:  The two at the bottom, your Honor, are

14   the -- are the two principal ones that I'm concerned -- that we

15   would like to have in.  If you want us to redact the one at the

16   top, we can do that.

17        THE COURT:  Okay.  And what about this do you want to

18   get in?  I apologize for being dense, but I understand it has to

19   do with Craig Witt and that Witt faxed a letter as this says;

20   that the arbitration of -- with the Poco arbitration is eligible

21   for reinsurance under the terms of the 2003 SRA.

22        MR. JOHNSTON:  Yes, your Honor.  And it also indicates

23   that the interpretation is that, based on the letter, FCIA --

24   that is, the permission from RMA allows FCIA -- is permission to

25   FCIA to do as it wishes in regard to the resolution of these

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1   claims indicating that RMA was directly involved in the decision

2   and the circumstances to have the claim settled; and it settled

3   in a matter of days thereafter.

4        THE COURT:  Well, there's -- there's other material

5   that's extraneous to those thoughts and that it simply falls

6   within the general category of things that aren't necessary to

7   be discussed in front of the jury and gets us off into side

8   issues.  And, so, it's 403.  So the question becomes:  What can

9   you elicit from him?  What can you refresh his memory on?  And,

10  once you have that, then we'll see where we are.  But I'm not

11  going to put the letter in -- or the emails in at this point.

12  It depends on the way cross goes.

13       MR. JOHNSTON:  Okay.  But I can show it to him to

14  refresh his recollection?

15       THE COURT:  You can.  Sure.

16       MR. JOHNSTON:  Thank you, your Honor.

17       MR. TORNABENE:  Your Honor, the final exhibit at issue

18  is proposed 2076 on the screen now.  Another email between

19  Mr. Brittenham and Mr. Raekes.

20     (Pause in the proceedings)

21       THE COURT:  And I'm reading.

22       MR. TORNABENE:  Thank you, your Honor.  There's a

23  factual synopsis from the perspective of Mr. -- of

24  Mr. Brittenham.  Mr. Raekes certainly can provide his factual

25  synopsis.  If this helps him refresh his recollection, then,

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1   certainly, that's appropriate.  However, there's also, at least,

2   one editorial or issue in there in the first paragraph regarding

3   not wanting it to be attributed to him.  Again, these are

4   internal conversations and ask that they be excluded.

5           THE COURT:  So what's --

6           MR. JOHNSTON:  This is not an internal communication,

7   your Honor.  This is a communication between two separate

8   entities.  Mr. Brittenham was counsel for RMA.  And this is an

9   email whereby RMA is suggesting how this matter -- and this is

10  well before, as a matter of fact, the declaratory judgment

11  action.  There are no settlements and no payments at this time.

12  And he's basically saying, "Look, this is -- Mr. Raekes, this is

13  what I think about the case.  And, by the way, don't attribute

14  it to RMA."  And, in this instance, this is RMA exercising

15  control indirectly.  And I think we need to have this one in to

16  show that kind of communication.  I think it's appropriate and

17  that Mr. Raekes certainly can discuss it.  But I do think that

18  this is not internal to FCIA.

19          THE COURT:  Well, I think it's important and relevant

20  to establish the participation by RMA and it's general counsel

21  in -- with Mr. Raekes in the way he approached it.  Now, this is

22  the Poco claim for what year?

23          MR. JOHNSTON:  The date of this is 2006.  This is the

24  Poco claim for 2004.

25          THE COURT:  Okay.  And what you want to establish is

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  that -- that RMA's general counsel was, in fact, discussing

2  tactics with Raekes.

3       MR. JOHNSTON:  That's correct.  And that he was

4  asking, specifically, that Mr. Raekes attribute none of this

5  strategy to RMA or to Brittenham.

6       THE COURT:  Well, which is -- well, that I think I

7  understand that your position is that RMA wanted him to hide

8  the -- to avoid attribution to him as to certain language that

9  they've discussed and, apparently, is in this letter.  And he's

10 setting out an analysis that Mr. Raekes could use if he wished.

11      MR. JOHNSTON:  I think that's an accurate summary.

12      THE COURT:  And I think to that extent that it's

13 appropriate.  So let me see the bottom section, please.

14    (Pause in the proceedings)

15      THE COURT:  Okay.  Anything else from your viewpoint,

16 Mr. Tornabene?

17      MR. TORNABENE:  No, your Honor.

18      THE COURT:  Okay.  I'll admit that.

19    (Exhibit No. 2076 admitted into evidence)

20      THE COURT:  Anything else, then.

21      MR. TORNABENE:  Not regarding Mr. Raekes, your Honor.

22 And I think -- I think we're good.

23      THE COURT:  Okay.  Then we're good to go.  Who are we

24 working on right now?  Who's up?  Mr. Moorer is back on the

25 stand.

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/CR - TORNABENE

1        MR. TORNABENE:  Yes.

2        THE COURT:  Okay.  So let's go.  Mr. Moorer, you can

3   retake the stand.  Thank you.  We were discussing Exhibit 215, I

4   think, when we left off.

5        MR. TORNABENE:  Yes.

6        THE COURT:  Right?

7        MR. TORNABENE:  Yes.

8        THE COURT:  Okay.

9   (Jury in at 1:49 p.m.)

10        THE COURT:  Please, be seated.  You may proceed.

11        MR. TORNABENE:  Thank you, your Honor.

12   Q    (BY MR. TORNABENE)  Good afternoon, Mr. Moorer.

13   A    Good afternoon.

14   Q    Mr. Moorer, I think where we left off we were discussing

15   Exhibit -- Government's Exhibit 215 and that you had recently

16   discovered some missing fields from that exhibit.  Is that your

17   recollection?

18   A    Yes.

19   Q    And, just before we move on to that, with regards to your

20   experience that Mr. Bentley had asked you about as a CPA and

21   your career, do you recall that line of questioning, of course?

22   A    I do.

23   Q    Now, prior to this litigation, have you ever had any

24   experience in crop insurance?

25   A    No.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  Q    And, so, you never advised a grower in terms of applying

2  for any kind of crop insurance.  Correct?

3  A    That's correct.

4  Q    You never advised a grower in terms of making a loss claim

5  under crop insurance.  Correct?

6  A    That's correct.

7  Q    And you've never advised an insurance company on, for

8  instance, underwriting of a crop insurance policy.  Correct?

9  A    That's correct.

10  Q    And never been on that -- the insurance side of a crop

11  insurance loss adjustment in any kind of capacity.  Correct?

12  A    Did you say crop insurance?

13  Q    Yes.

14  A    Yes.

15  Q    Okay.  So, with regards to the missing fields, I'm going to

16  call back up for you and the jury Exhibit 215 and zeroing in on

17  the -- that upper right side that we've been discussing; and

18  that's the summary of the materials that Tri-Cities Produce and

19  Agri-Pack provided pursuant to the Grand Jury subpoena that were

20  related to packout and settlement sheets.  Correct?

21  A    Yes.

22  Q    And, with regards to the missing fields that you found, is

23  it accurate to state that, in your review of Exhibit 215, you

24  recently found a number of fields that were missing from this

25  upper portion?  And I'm kind of scrolling through it right now.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1    Is that correct?

2    A    It is.

3    Q    Now, one of those fields you had provided information was

4    from a source document, Bates No. 00081042?  Does that sound

5    accurate?

6    A    Yes.

7              MR. TORNABENE:  And just for Court, counsel, and the

8    witness.

9    Q    (BY MR. TORNABENE)  Showing you what's marked for

10   identification as Government's Exhibit 244 -- and is that that

11   Bates number page there, Mr. Moorer?

12   A    It is.

13   Q    And this marked exhibit, 244, do you -- do you recognize

14   this?  I'm going to show you.  There's four pages to it.

15   A    Yes.

16   Q    And that's the -- the complete -- would be a settlement

17   sheet for one of the fields that you feel was missing from

18   Exhibit 215.  Correct?

19   A    It was actually a combination of fields.  So it was two or

20   three fields that were combined.

21   Q    And is this one of those?

22   A    And the -- and, so, the -- the settlement sheet represents

23   the processing of two or three different fields.

24   Q    Okay.  And by that you mean the fresh packing?

25   A    Yes.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  Q    Okay.  And, so, if we look at the top of Exhibit 244,

2  there's a field ID number on this.  Correct?

3  A    Well, there's a -- an ID of '05 for this lot that was

4  processed.

5  Q    Okay.  And is this -- is this, then, Exhibit 244, the --

6  contain, then, the information that you feel was missing from

7  Exhibit 215?

8  A    Some of the -- some of the information, yes.

9         MR. TORNABENE:  I would ask to just publish for

10  illustrative purposes Exhibit 244.

11         MR. BENTLEY:  No objection.

12         THE COURT:  You may.

13         MR. TORNABENE:  And we'll do that.  Thank you.

14     (Exhibit No. 244 admitted into evidence)

15  Q    (BY MR. TORNABENE)  Okay.  So, zooming out for the benefit

16  of the jury, is this what we've been looking at, Mr. Moorer?

17  A    Yes.

18  Q    And, so, we have an ID number there.  Correct?

19  A    Yes.

20  Q    And is it your understanding, then, based on your review of

21  documents, that this is a field -- or that these are potatoes

22  that Mr. Olsen grew in crop year 2001 and, then, had packed by

23  Tri-Cities Produce?

24  A    Yes.

25  Q    And, if we look at the back or the final page, there's a

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  handwritten reference there to $223,904.32.  Correct?

2  A    Correct.

3  Q    And it's your understanding that that was the payment by

4  check to Mr. Olsen after the contract adjustment was factored

5  in?

6  A    It was credited to his account.  Correct.

7  Q    Okay.  So that was a check that went to Mr. Olsen,

8  possibly, among others?

9  A    Yes.

10 Q    Okay.  I'd like to go back to Exhibit 215.  I believe you

11 already testified but just to make sure we're on the same page,

12 this upper right portion of Exhibit 215 is Mr. Bearden's effort

13 to have a field-by-field comparison to the middle section, which

14 I'm going over to now, linking up on a field-by-field basis

15 information attached to the production worksheets.  Is that

16 accurate?

17 A    Yes.

18 Q    And, with regards to these production worksheets, you, of

19 course, reviewed all the discovery in your analysis.  Correct?

20 A    Yes.

21 Q    And, in fact, this middle section states all of the

22 production worksheets that Mr. Olsen signed on February 6th,

23 2002, does is not?

24 A    I've not -- on the production worksheets -- and I -- we're

25 talking about -- I -- I usually say, "settlement sheets."  But

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1   are we talking about the same thing?

2   Q    Well, let's make sure we are.  And that's -- that's very

3   important.  So the production worksheets, to clarify my

4   question, what I'm meaning is is not just the face of the sheet.

5   Mr. Bentley showed you one of those.  Exhibit 29, I believe.  In

6   fact, let's call that up now.

7           MR. TORNABENE:  Previously admitted 29.

8   Q    (BY MR. TORNABENE)  So the production worksheet, obviously,

9   is the face.  I'm also referencing in this question, then, if we

10  go to the next page, the documents attached to that production

11  worksheet.

12  A    Right.

13  Q    Okay.  So, going back to 215, zeroing in on that middle

14  section, these -- this middle section has in it all of --

15  referenced all of the production worksheets and their

16  attachments that Mr. Olsen signed for on February 6th, 2002.

17  Correct?

18  A    Yes.

19  Q    And Exhibit 244, which contains the missing information

20  that you talked about, is not on this right side of the Grand

21  Jury summary on the field-by-field comparison.  Correct?

22  A    Correct.

23  Q    Going back to 244, Mr. Moorer, this amount -- this

24  $223,000 is -- according to this document, was paid in a check

25  dated November 15th, 2002?  Correct?

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  A    Yes.

2  Q    And the potatoes, we've already established, are from 2001.

3  They were packed -- it looks like there's some March, 2002,

4  dates.  Correct?

5  A    Yes.

6  Q    And looks like some fees were taken out in April of 2002.

7  Correct?

8  A    Yes.

9  Q    So it's fair to say that these potatoes were in storage

10  from the 2001 harvest and were, then, packed a little bit later

11  and paid in November.

12  A    Yes.

13  Q    Going back to Conover production worksheets, you

14  understand, of course, that Mr. Olsen was obligated to report

15  all of the potatoes that he had insured to the insurance company

16  if they were in storage or if they were sold.  Correct?

17  A    That's right.

18  Q    And, in fact, based on what we're looking at here, the fact

19  that this field is missing from Mr. Bearden's field-by-field

20  comparison, wouldn't that tell you that Mr. Olsen did not

21  include these potatoes in his production worksheets that he

22  submitted to his insurance company?

23  A    Actually, those potatoes are included in his production

24  worksheets.

25  Q    All right.  And where are they?

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/CR - TORNABENE

1   A    They're actually listed on 215, the various production

2   worksheets.

3   Q    Going back to 215?

4   A    Yeah.

5   Q    Can you show us, then, where?

6   A    Sure.  The first one I would identify for you would be

7   40619 by reference number.

8   Q    Okay.  We're looking at that right now.  Correct?

9   A    And --

10  Q    Mr. Moorer, just to make sure we're on the same page, are

11  we looking at that right now on the screen?

12            THE COURT:  Where the green dot is.

13            THE WITNESS:  Right.

14  Q    (BY MR. TORNABENE)  Okay.  That's --

15  A    Excuse me.  One down.  It's 40626.

16  Q    Okay.

17  A    That one.

18  Q    All right.

19  A    And, then, you have -- let's see here.  40630.

20  Q    For that one there?

21  A    Yes.

22  Q    All right.  And, based on your review, that is the stored

23  fields that are referenced in Exhibit 244?

24  A    Yes.

25  Q    Okay.  And, with regards to Exhibit 244 in the earlier

1  version of Exhibit 215, do you recall a section of Exhibit 215

2  that, in fact, listed this very information that we're

3  discussing?

4  A    This particular 40630?

5  Q    No.

6  A    Field 228.

7  Q    No.  Exhibit 244 for identification on missing fields.

8       (Interruption by the reporter)

9  Q    (BY MR. TORNABENE)  Exhibit 244 for identification, the

10  supposed missing field.  Wasn't that in the version of

11  Exhibit 215 previously?

12  A    The Government did have the information listed at one point

13  on Exhibit 215.  I haven't seen a recent or an updated version

14  of 215 to know.  But you are correct that, at one point, that

15  lot of potatoes that were processed was on Exhibit 215.

16  Q    And your previous analysis of that version of 215, at that

17  time did not include the opinion that you have now that that was

18  somehow not linked up properly to what you've now have oriented

19  us to.  Is that correct?

20  A    No.  Actually, I testified, and I believe that you were

21  informed by communication from Mr. Bentley, that that particular

22  lot was connected to unidentified fields above in the schedule

23  prepared by Mr. Bearden.

24  Q    So your testimony is that your recent disclosures from last

25  week are actually not new regarding this being a missing field.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  Is that your testimony?

2  A    Well, considering the fact that you had it listed as

3  fields --

4  Q    Are you talking about Exhibit 215 had it listed?

5  A    Yes.

6  Q    Okay.

7  A    And, concerning the fact that it was listed as fields that

8  could not be linked to Mr. Bearden's exhibit to his

9  calculations, I would call it missing.  When you add it to his

10 calculations, then I would call it identified.

11 Q    Okay.  Was it added to his calculations on the Grand Jury

12 side, Mr. Moorer?  Is that accurate?

13 A    I don't believe it was.

14 Q    So it wasn't added to the calculation.

15 A    Not on the Grand Jury side but on -- you were informed of

16 it.

17 Q    And, again, the -- what we've been looking at here, the

18 middle of 215, this is information provided by Mr. Olsen as of

19 February 6th, 2002.  Correct?

20 A    The -- as I said earlier this morning, I've never actually

21 been able to find a complete loss claim with the associated

22 fields and supporting documentation together.  I found bits and

23 pieces in the discovery.  And that's why I testified that the

24 only report that I'm aware of that compiles all of the field

25 information is the one prepared by Ms. Debbie Moore.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  Q    And, so, with regards to my question, the middle section of

2  215 is a summary of the information that Mr. Olsen provided,

3  signing under penalties of criminal sanctions if it was

4  incomplete, on February 6th, 2002.  Correct?

5  A    Are you talking about the middle section --

6  Q    215.

7  A    -- where one of the fields that I call missing is located

8  and listed.  Is that correct?

9  Q    According to your opinion --

10  A    Yes.

11  Q    -- that is what I'm talking about.  Yes.

12  A    I have no idea if he signed it or not.

13  Q    Well, you were shown, for instance, Exhibit 29 -- showing

14  that to you and the jury -- on direct, were you not?

15  A    That is a production worksheet that he did sign, and I

16  agree that it was signed.  And -- but what is listed by

17  Mr. Bearden on that schedule is a production lot, a lot of

18  potatoes that came from storage, consisting of two or three

19  fields of potatoes that were harvested, kept in storage and

20  processed and, then, recorded on that settlement sheet.  That

21  has nothing -- that doesn't -- that doesn't tie out to any

22  production worksheet that you -- that you have, really.  It

23  wouldn't.  It's simply the result of -- of processing 6,977 tons

24  of potatoes.

25  Q    And, by "processing," you mean fresh pack.  Is that

1  correct?

2  A    Yes.

3  Q    And my question is regarding -- I've got Exhibit 29 pulled

4  up in front of you, Mr. Moorer.  And this is zoomed in on the

5  production worksheet and the signature portion.  Are you

6  familiar that signature portion?

7  A    Yes, I am.  I've read it.

8  Q    And, so, you're aware, then, that by signing under it,

9  Mr. Olsen is stating that not only the worksheet but the

10  attachments are true, accurate, and complete.  Correct?

11  A    That's right.

12  Q    Mr. Moorer, with regards to your testimony and -- from this

13  morning with Mr. Bentley, I'd like to show you -- to you and the

14  jury -- previously admitted -- one second -- Exhibit No. 2.  Do

15  you see that, Mr. Moorer?

16  A    Yes.

17  Q    And I'd like to toggle back, then, for comparison to what's

18  been admitted this morning through you as Defendant's

19  Exhibit 1614.

20  A    Yes.

21  Q    And, so, again, this is the synopsis of your opinion that

22  the numbers that you came to -- I'm sorry.  This -- this is the

23  number that you came to.  Correct?

24  A    Yes.

25  Q    And this is the bottom line number from that middle section

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1   of 215, correct, summarizing the production worksheet data?

2   A     Yes.  Yes.

3   Q     Okay.  Now, if we go back to previously admitted Exhibit 2,

4   this side here on the left, that is the bottom line numbers from

5   the right side of 215.  Correct?

6             THE COURT:  This is the -- this is the right side of

7   this exhibit.

8             MR. TORNABENE:  Correct.  And, also, the bottom line

9   of the right side of Exhibit 215.

10  Q     (BY MR. TORNABENE)  Is that right?

11  A     I believe you're -- your left is my right.

12  Q     Well --

13            MR. BENTLEY:  Could we rephrase the question?  I

14  thought he asked about the left side of --

15            THE COURT:  He did ask about the left side, and so

16  that's why I asked the question.

17  Q     (BY MR. TORNABENE)  And I mean right on both sides.  So

18  right on Exhibit 2 here.  Correct?

19  A     Who's right, Mr. Tornabene?

20  Q     If you look at the screen.

21            THE COURT:  Right on the screen.

22            THE WITNESS:  Okay.

23  Q     (BY MR. TORNABENE)  Do you see that that's right,

24  Mr. Moorer, what I've underlined?

25  A     That's on the right side.  Yes, it is.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  Q    And, on Exhibit 215, we're also looking at the right side

2  in terms of the bottom line summary of those Grand Jury

3  materials.  Is that correct?

4  A    That's correct.

5  Q    All right.  And, so, these are those bottom line numbers

6  just taken over from 215.  Is that right?

7  A    That's right.

8  Q    So, if I understand your testimony correctly, if we go back

9  to your Exhibit 1614, or Defense Exhibit 1614, is it fair to say

10 that the difference between the number that you come up with and

11 the $2.6 million number that is the bottom line for the RMA,

12 Mr. Bearden's summary to the Grand Jury packouts and settlement

13 sheets, that that is largely reconciled, in your opinion, by

14 putting in the contract adjustments from Agri-Pack?

15 A    Right.  The -- the -- the issue and the major problem that

16 I do have with 215 is that it fails to account for the contract

17 adjustments.

18 Q    Okay.

19 A    You're right.

20 Q    And, so, for you, then, once those contract adjustments

21 from Agri-Pack are factored in, then -- I'm not going ask you if

22 it's penny for penny -- but those numbers, your 1,095,000 is

23 much, much closer to the -- Mr. Bearden's 2.6 million.  Is that

24 accurate?

25 A    If you add the contract adjustment --

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/CR - TORNABENE

1  Q    Right.

2  A    -- it would be closer to 2.6 million.  Yes.

3  Q    Okay.  And, with regards to that portion of 215, the right

4  portion, the contract adjustments that Tri-Cities Produce had in

5  their documents is reflected.  Correct?

6  A    Yes.

7  Q    Because those were on those source documents.  Correct?

8  A    Yes.

9  Q    The contract adjustments for Agri-Pack are not reflected.

10  Is that correct?

11  A    That's not correct because there were several summaries

12  prepared by Ms. Moore that were attached or a part of those

13  summaries from Agri-Pack.  And, so, I was able to use those to

14  calculate the net return to grower and the contract adjustment.

15  Q    Mr. Moorer, I'll be more clear.  My question is that, on

16  Exhibit 215, the summary does not include the contract

17  adjustments for Agri-Pack.  Correct?

18  A    That's correct.

19  Q    And you've already testified, after being refreshed from

20  your Daubert hearing testimony, that that is accurate when

21  looking at the source documents that are listed.  Correct?

22  A    I testified that the calculation was correct; that the

23  substance of the material in the -- in the exhibit is not

24  correct.  It's incorrect.

25  Q    So you believe that, if we were to look at -- and we'll

1  just take a look at the -- that, if we were to look at this

2  first line here (indicating), that reference number and those

3  pages, that, contrary to what it says here, you believe there's

4  a contract adjustment stated in those documents.  Is that your

5  testimony?

6  A    Yes.

7  Q    Okay.  Fair enough, Mr. Moorer.

8          MR. TORNABENE:  I have nothing further.

9          THE COURT:  Okay.  Any redirect?

10          MR. BENTLEY:  Yes, your Honor.

11          THE COURT:  Okay.  Let's get started.  Thank you,

12  Mr. Bentley.

13          MR. BENTLEY:  Go to ELMO.

14          THE COURTROOM DEPUTY:  Oh, ELMO?

15

16                    REDIRECT EXAMINATION

17  REDIRECT BY MR. BENTLEY:

18  Q    I'm going to show you the total packout by field.  This is

19  from Exhibit 29.  That's admitted.  Does this show the net

20  return to Olsen from Field No. 106?

21  A    It does.

22  Q    And is this what you're referring to when you're saying

23  that the contract adjustment was implicit in the documents or

24  found in the documents?

25  A    Yes.  These summaries were -- I located them with many --

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/REDI - BENTLEY

1   most of the Agri-Pack summaries that were included in the

2   discovery.

3   Q    The -- where did the issue arise with regard to these

4   missing fields?  Is that because of the data -- the data that

5   the RMA relied on were confusing?

6   A    Yes.  It was confusing because the -- there are several

7   line items on 215 that are -- are nothing more than a record of

8   the field production sheet.  Doesn't have sales, doesn't have

9   cost of production and distribution, doesn't have contract

10  adjustment, and doesn't have net return to the grower.  And, so,

11  without those -- without those amounts, what -- what the RMA did

12  is they just took the field production worksheet and said,

13  "Well, Mr. Olsen got this," whatever "this" is.  And that

14  isn't -- you know, that may or may not be the case.

15       But what I found out is that, when I had all of the

16  production worksheets, which I've previously referred to as

17  "settlements" for Tri-Cities Produce, I came up -- I was within

18  $200 of what Ms. Moore had compiled and sent off to the

19  insurance company.

20  Q    And you did that work not with the goal of reaching her

21  total, correct, but just independently working up a total on

22  your own.

23  A    That -- that's true because I've actually been working,

24  calculating, and analyzing this data off and on for two years;

25  and this was the one thing I had not done.  The reason why I

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/REDI - BENTLEY

1  didn't do it is because the summary sheets were summaries of

2  products and the number of products -- it was a summary of the

3  number of products.  Didn't tie to any field.  There's no field

4  number on the summary.  So it's just simply Ms. Moore compiling

5  all of the product sold and all of the product that was

6  byproduct or waste or not used, not sold.

7       And I just thought, gosh, you know, you can go back and see

8  if you could, using the information that you've been analyzing,

9  and -- and corroborate, prove her number on the summary.  And I

10 did.

11 Q    And, as far as you can tell, there was never such a summary

12 that recapitulated all of the individual fields and gave a grand

13 total that was prepared back in February when those production

14 worksheets were signed.

15 A    I never -- I've never found one.  Ms. Moore's schedule is

16 the only thing that I've found that summarizes the entire crop.

17 Q    And it's your opinion that that schedule is accurate and

18 complete.  Correct?

19 A    I proved it.  It is.

20 Q    I'd like to show you Government's Exhibit 2, which you were

21 asked about on cross.  Referring to the left side of -- of this

22 exhibit, this total that was calculated by RMA is about $80,000

23 less than the total that you and Ms. Moore independently

24 calculated.  Is that correct?

25 A    It is.

JURY TRIAL - DAY 26 - MAY 21, 2013
B. MOORER/REDI - BENTLEY

1  Q    Can you explain the reason for the difference?

2  A    Well, in some of the settlements -- and I wouldn't say all

3  of the settlements; but, in some of the settlements, Agri-Pack

4  actually paid Mr. Olsen for the tare weight for the product

5  delivered.

6  Q    And, turning to the right side of Exhibit 2, do you think

7  that is a fair representation of the transactions between

8  Mr. Olsen, Agri-Pack, and Tri-Cities Produce in '01?

9  A    No, I do not.

10 Q    And why is that?

11 A    Because it excludes the contract adjustment for the

12 potatoes that were processed.

13 Q    Now, going on to Exhibit 3, looking at the right side of

14 this agreement -- of this exhibit, we see the same numbers that

15 were on Exhibit 2.  Is that correct?

16 A    Yes.

17 Q    And would you say that's -- you have the same problem with

18 that that you had with those numbers on Exhibit 2.  Correct?

19 A    Yes.

20 Q    Now, looking at the right -- left side of Exhibit 3, your

21 total was $1,095,000.  And this total, which is alleged to have

22 been recorded through Mr. Ackerman, is about $292,000 higher.

23 Could you explain that difference?

24 A    The $1,389,497.37 includes the sales commission,

25 association fees, and freight that was not subtracted from the

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/RECR - TORNABENE

1  proceeds received for Mr. Olsen's crop.

2  Q    So that's a difference as to whether or not that -- those

3  fees, which total about $292,000, should be included as income

4  for purposes of the insurance claim.  Is that correct?

5  A    That's not correct.  Those fees should not be included as

6  income.  Previously, at the Daubert hearings, I heard

7  Mr. Bearden say that those expenses were value-added expenses to

8  the potatoes.  And, actually, by definition in the AGR field

9  guide for adjusting claims, those items are not included.  Those

10 are simply an expense and a charge to the grower.  And they

11 reduce the net return to the grower because somebody has to pay

12 for the expenses, and the grower does.

13            MR. BENTLEY:  Thank you.  That's all I have.

14            THE COURT:  Anything else, Mr. Tornabene?

15            MR. TORNABENE:  Yes, your Honor.

16

17                     RECROSS EXAMINATION

18 RECROSS BY MR. TORNABENE:

19 Q    Mr. Moorer, despite the fact that you haven't had

20 experience adjusting crop insurance, your opinion is that, under

21 AGR, the, say, commission and fees should not be taken out as

22 post-production expenses?  Is that accurate?

23            MR. JOHNSTON:  That was argumentative, your Honor.

24            THE COURT:  Overruled.  Go ahead.

25            THE WITNESS:  I actually brought the definition with

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/RECR - TORNABENE

1  me if you'd like me to read it to you.

2  Q    (BY MR. TORNABENE)  No.  We've heard quite a bit of

3  testimony, Mr. Moorer.  Have you been here --

4  A    I think that -- okay.  What I would say is that the manual

5  is written at a high school level per my education; and

6  commissions, association fees, and freight are not any of the

7  items included in the definition.

8  Q    Okay.  So that's -- your opinion is that that's the

9  definition of how the AGR handbook should be read.  Is that

10  correct?

11  A    My opinion is that it should be read with a mind to

12  understand what it says and apply -- apply it as stated.  And

13  if, you know, each individual, you know, depending on what their

14  level of education, experience, and knowledge is, you know, you

15  find different people that, just because they're not an AGR or

16  RMA employee, can or cannot read.  I've been reading documents

17  and deciphering pieces of paper and applying the language as its

18  written for 35 years.

19  Q    I'm sorry.  You've been doing that in crop insurance?

20  A    Every kind of accounting that I do and that includes

21  insurance policies.  And I've read many insurance policies in my

22  career, and I've negotiated many insurance policies in my

23  career.  And I believe that I'm capable of not only reading the

24  policies but the adjusting manuals because I've read those, too.

25  And I don't believe that citing a -- citing a difference or

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/RECR - TORNABENE

1   trying to create a difference or something that would be unique

2   to crop insurance as it relates to an insurance policy or an

3   adjusting manual -- I don't believe it makes any difference at

4   all.

5   Q    So would your opinion regarding how post-production

6   expenses should be treated under AGR, would that change at all

7   if, for instance, the person who's the head of the Department

8   that wrote the AGR handbook disagreed with that?  Would that

9   change your opinion?

10  A    Well, you know, I've been in -- I've been reading and

11  interpreting the Internal Revenue Code most of my life.

12  Q    Mr. Moorer, I didn't ask you about the Internal Revenue

13  Code.  I'm asking you about if that would change your opinion if

14  you would factor that in.

15  A    No, it wouldn't.  It really wouldn't.  I was trying to give

16  you an analogy or -- but, you know, the --

17  Q    So, Mr. Moorer, that wouldn't change your opinion.  How

18  about, if it were the case, that that is how it is applied

19  uniformly throughout the country?  Would -- would that change

20  your opinion?

21          MR. JOHNSTON:  Objection.  Assumes a fact not in

22  evidence, your Honor.

23          THE COURT:  We're getting off into argument.  He

24  stated his opinion.  You can call somebody else, and we'll get

25  there.  Thank you.

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/RECR - TORNABENE

1  Q    (BY MR. TORNABENE)  Now, Mr. Moorer, you testified

2  regarding the inaccuracy, in your opinion, of Exhibit 215.  And

3  I'd like to show you, in sticking with the very particular area

4  of Exhibit 215 -- showing that again to you and the jury --

5  among those inaccuracies is that you believe that these pages

6  referenced here do, in fact, have and state a contract

7  adjustment explicitly?

8  A    The -- actually, I found -- for those pages identified by

9  Bates number, I did find contract adjustments.

10  Q    That are explicitly referenced.

11  A    That are explicitly referenced.

12  Q    Okay.  Let's go there.  I've got it here.  For the record,

13  showing to you, Mr. Moorer, Bates numbered page on the screen

14  ending 00090022.  Is that accurate on the screen, Mr. Moorer?

15  A    Yes.

16  Q    That's one of the pages referenced on Exhibit 215.

17  Correct?

18  A    As soon as I find -- yes.

19  Q    And, so, can you show us where on this page there's an

20  explicit reference to the contract adjustment?

21  A    There wouldn't be an explicit reference to a contract

22  adjustment on this particular document.  It was Debbie Moore's

23  summary attachment that listed the contract adjustment.  That's

24  what I'm referring to.

25  Q    Thank you, Mr. Moorer.  My question and this line of

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/RECR - TORNABENE

1  questioning --

2         MR. TORNABENE:  We can go back to Exhibit 215 and if

3  that can be shown, again, to the jury and the witness.

4  Q   (BY MR. TORNABENE) -- was simply, Mr. Moorer, whether or

5  not 215 is inaccurate because the reference numbers here that

6  I've indicated do or do not contain a contract adjustment.

7         MR. JOHNSTON:  It's repetitive and argumentative, your

8  Honor.

9         THE COURT:  I'll permit him to finish up this section.

10        MR. TORNABENE:  Thank you.

11  Q   (BY MR. TORNABENE)  And my understanding of your testimony

12  is that you have verified now that, in fact, those referenced

13  pages, that document, does not contain an explicit reference to

14  a contract adjustment.

15        MR. JOHNSTON:  Your Honor, I object to counsel's

16  understanding in the question.

17        THE COURT:  Sustained.  Just ask him the question.

18  Q   (BY MR. TORNABENE)  Mr. Moorer, is it your testimony that

19  the contract adjustment is not explicitly stated in the document

20  starting 9 -- or 00090022?  Correct?

21  A   I've already testified that that -- that particular page

22  did not have an explicit contract adjustment.  I testified that

23  the summary document that went with that page, that was part of

24  that page, and included with that page did have it.

25  Q   Mr. Moorer, are you referring to Deb Moore's summary?

JURY TRIAL - DAY 26 - MAY 21,  2013
B. MOORER/RECR - TORNABENE

1  A    Ms. Moore's summary.  Yes, I am.

2  Q    That's not referenced here.  This is reference to a

3  particular summary sheet from Agri-Pack.

4          THE COURT:  Well, Counsel, I think that you and he

5  have had ample opportunity to talk about this; and you need to

6  move to another subject.

7          MR. TORNABENE:  If I could just have an answer to that

8  one question.

9          THE COURT:  Well, he's answered that question a couple

10  of times.  So we're going to move on.

11          MR. TORNABENE:  Nothing further.

12          THE COURT:  Any redirect?  Okay.  Anyone else?  If

13  not, thank you, Mr. Moorer.  You're excused.  You may step down.

14  And call your next witness.

15          MR. JOHNSTON:  Your Honor, Poco would next call

16  John Raekes.

17          THE COURT:  Okay.

18          (Witness enters courtroom)

19          THE COURT:  Mr. Raekes, good afternoon.  If you'd come

20  up to your right and to my left.  And, when you arrive at this

21  door, please place your back to it; and we're going to take your

22  photograph for use by the jury during deliberations.

23      (Courtroom Deputy takes picture of the witness)

24          THE COURT:  Please, raise your right hand.

25      (JOHN RAEKES, called by the Defendant, was sworn)

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1         THE COURT:  Good afternoon.  Please be seated.  And,

2   when you're comfortable, pull yourself a bit closer.  Speaking

3   directly into the microphone so you can hear yourself in the

4   overhead, tell us your first and last name; and, then, please

5   spell them both for the record.

6         THE WITNESS:  John Raekes.  J O H N.  R A E K E S.

7         THE COURT:  Good afternoon, Mr. Raekes.

8         THE WITNESS:  Good afternoon, your Honor.

9         THE COURT:  Mr. Johnston, you may proceed.

10         MR. JOHNSTON:  Thank you, your Honor.

11

12                      DIRECT EXAMINATION

13   DIRECT BY MR. JOHNSTON:

14   Q    Good afternoon, Mr. Raekes.  What is your current

15   employment?

16   A    I'm an attorney.

17   Q    Here in the Tri-Cities?

18   A    Yes.

19   Q    Yes.  And, in -- during the period of time 2001 through

20   2005 or 2006, I guess I should say, were you also so employed?

21   A    Yes.

22   Q    And were you the loyal opposition to Mr. Schultz and

23   Mr. Miller in regard to AGR claims that affected Poco?

24   A    Yes.

25   Q    And, during that time, what -- what companies were you

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  representing?  I think there was a name change, if you could

2  tell us.

3  A    The insurance companies?

4  Q    Yes.

5  A    Well, it was Farmers Crop Insurance Alliance.  I believe

6  that their name change occurred before I represented them.  I

7  could be wrong.  North Central Crop Insurance, maybe.  Does that

8  sound right?

9  Q    I think that's right.  And there was a name change, but

10 that wasn't a change of companies or anything.  Just a change of

11 name?

12 A    That's my recollection.

13 Q    Okay.  And the -- do you recall in regard to Poco -- did

14 you handle claims that related to other growers besides Poco, as

15 well?

16 A    There was Poco and Gordon Brothers.

17 Q    Okay.  I want to ask you about Poco --

18 A    Okay.

19 Q    -- because that's my client.  In --

20      MR. JOHNSTON:  Can we have 2 -- Exhibit 2043 on the

21 screen.  Maybe we can just blow up the top portion of it.  This

22 is for Court, counsel, and witness only.

23 Q    (BY MR. JOHNSTON)  Mr. Raekes, is this a -- an email that

24 you received on or about -- in May sometime -- setting up a

25 conference call for May 12th, 2005?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1   A     Yes.

2           MR. JOHNSTON:  We would offer 2043, your Honor.

3           MR. TORNABENE:  No objection.

4           THE COURT:  Admitted.

5     (Exhibit No. 2043 admitted into evidence)

6   Q    (BY MR. JOHNSTON)  And do you recall that such a conference

7   telephone call was held?

8   A     Yes.

9   Q    Now, you keep time records and so forth.  Have you had a

10  chance to review yours about this call?

11  A     Yes.

12  Q    And does it reflect how long that telephone call lasted?

13  A     Yes.

14  Q    And, do you recall, was -- were the addressees here on

15  Exhibit 2043 all on the call?  Were there others, do you recall?

16  A    I don't remember who was all on the call.  I know there was

17  several people.

18  Q    Was there anyone from RMA as opposed to just your client's

19  representatives?

20  A    I'm -- you know, I believe there was somebody from RMA.

21  Q    Okay.  And maybe we can identify these people while we're

22  looking at --

23          MR. JOHNSTON:  Can we publish 2043 if it hasn't

24  already been?

25  Q    (BY MR. JOHNSTON)  Who was Dave Hovland?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  A    I believe Dave Hovland was the senior party at Farmers Crop

2  Insurance Alliance.

3  Q    The national claims fellow or some such?

4  A    I believe so.

5  Q    And, then, Michael Hand.  Who was Michael Hand?  Was he

6  RMA?

7  A    He wasn't with the insurance company.  So I know that much.

8  He probably was with RMA.  I'm -- you'd have to show me

9  something, and I could confirm it for you.

10  Q    We'll get to that.  And Dave Paul?

11  A    Dave Paul was out of Spokane.  I think he's part of RMA.

12  Q    Okay.  And Mr. Swanson, I think, was between Mr. Hovland

13  and -- was a step below Hovland.  Is that right?

14  A    Correct.

15  Q    And Mr. Green of Willson Pechacek.  Was he the insurance

16  company's outside counsel?

17  A    He was their primary attorney, yes.

18  Q    Okay.  And you were working with him on occasion in regard

19  to these matters?

20  A    Yes.

21  Q    Okay.

22        MR. JOHNSTON:  May we next have Exhibit 2044 for

23  Court, counsel, and the witness only.  I guess we don't need

24  that.  Let's skip that one.

25  Q    (BY MR. JOHNSTON)  You said you had a memory of the

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1   telephone call --

2           MR. JOHNSTON:  Take that one off.

3           THE COURT:  Screen off, Ms. Brasel.

4           THE COURTROOM DEPUTY:  It's not to the jury.

5           THE COURT:  Thank you.

6   Q   (BY MR. JOHNSTON)  Okay.  Tell us what happened on that

7   hour-and-three-quarters call.

8   A    There were a lot of things discussed.  I think my primary

9   function was whether we were going to appeal the arbitration

10  award for Poco.  And, then, there was discussions amongst the

11  other folks about what they were doing.

12  Q   Okay.  And, when you say, "what they were doing," did that

13  involve -- were there discussions, for example, of -- one way or

14  the other -- specific gravity or --

15  A    I recall that term.

16          MR. TORNABENE:  Objection, your Honor.  It calls for

17  hearsay.

18          THE COURT:  And it may well.

19      Ladies and gentlemen, I have a couple of issues I actually

20  should have taken up.  So I think I need to ask you to step out

21  and take your break at this time, and we may give you another

22  one later.  But I have some things I need to talk about with

23  counsel.  Thank you.

24      (Jury out at 2:41 p.m.)

25          THE COURT:  Please be seated.  Counsel, with

1  Mr. Raekes present, I want to make sure that the record reflects

2  that Mr. Raekes is being called as an attorney regarding some

3  aspects of his role in the earlier civil litigation that

4  involves the defendants and RMA and FCIA and others.  And I want

5  to make certain that, in fairness to him and his client, that we

6  have thoroughly vetted the issue of attorney/client privilege.

7  I want to make certain that there's nothing that goes on in here

8  that would implicate any assertion that statements he gave

9  was -- were without the authority of his client to express and

10  that he somehow has violated Rules of Professional Conduct or

11  something of that nature.  And it's one thing to think through

12  what's been produced.  It's another thing to think through what

13  the RPCs require and what, if any, contact has been made by the

14  Government with FCIA regarding his testimony.  And, so, if

15  somebody could bring me up to date on that, I'd be -- give me

16  some status, I'd be happy to hear it.

17          MR. JOHNSTON:  Your Honor, I can -- I can tell you

18  that I share the Court's concern; and I have briefly discussed

19  the issue with Mr. Raekes.

20      But our view is -- is as follows:  I've tried to establish,

21  as in this telephone call, that there was a third-party that is

22  a nonclient on the telephone to determine that it would not fall

23  within the privilege before asking the question.  And I will

24  also advise the Court, as to that call, both RMA and -- I

25  believe it was RMA -- submitted a three-page handwritten set of

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1   notes that purport to record what happened at that call and,

2   therefore, I think that, under the circumstances, as to that

3   particular call.

4        I do not intend to ask Mr. Raekes about conversations that

5   he independently had with his client because I -- I think that

6   that would be inconsistent both -- with the matters that the

7   Court has just generally outlined.

8        So I'm looking only for nonprivileged communications or

9   privileged where the actual document, if it was solely confined

10  to the client and Mr. Raekes, has been produced to us in the

11  course of this case and would only assert -- there are cases

12  that --

13       THE COURT:  When you say actually "produced to us,"

14  what do you mean?

15       MR. JOHNSTON:  I mean, in -- by the Government in

16  the --

17       THE COURT:  It's not the Government's privilege I'm

18  worried about.

19       MR. JOHNSTON:  I -- I'm -- I agree with that, your

20  Honor; but the Government could not have gotten it without the

21  client having waived that privilege unless they stole it.

22       THE COURT:  Well, it's easily asserted; but it's not

23  something that I encounter at all in the past.  So I can't tell

24  you that I have experience with whether or not that production

25  to the Government was under circumstances where the ACP would --

JURY TRIAL - DAY 26 - MAY 21, 2013
J. RAEKES/DI - JOHNSTON

1  would continue to exist.  Though, I think there's been some

2  recent Ninth Circuit litigation on that point that held that, if

3  you want to resist the subpoena duces tecum on the Grand Jury,

4  you have to assert the privilege.  And I have a vague notion

5  that something within the last six months came out about that,

6  but I don't recall it with any greater specificity.  And --

7          MR. JOHNSTON:  I don't recall a Ninth Circuit case,

8  your Honor.  I know that, in other circuits, that issue has come

9  up in the past and that that was the general approach.  But --

10         THE COURT:  Well, isn't that the basis for your

11  position?

12         MR. JOHNSTON:  Yes.

13         THE COURT:  All right.  Well, give me a case if you

14  have a case.  I mean, this is something I want to make sure that

15  we tie this up tightly because Mr. Raekes and his client are not

16  parties to this litigation.  And, so, to make certain that

17  that's accurate, that, if they produced it pursuant to a Grand

18  Jury subpoena and doesn't assert the privilege, that the

19  privilege is lost.  And I have a notion that that actually has

20  come up fairly recently within the last six or nine months in

21  the Ninth Circuit.

22         MR. JOHNSTON:  I think it may, your Honor; but I'm not

23  the sure we need -- I don't have a case in my hand right now.

24         THE COURT:  I know.

25         MR. JOHNSTON:  But I would like to, if I could, look

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  at the paper copies of these exhibits to look at the Bates

2  numbers.  I believe the documents we're talking about were

3  actually transmitted by the insurance company to RMA and, then,

4  to the Government.  And the transmission to RMA would be a

5  waiver, I believe.

6             THE COURT:  I think it would be.

7             MR. JOHNSTON:  And, your Honor, I want to --

8             THE COURT:  Is there any question about the fact that

9  the insurance companies gave it to RMA first?  Because that

10  isn't -- that would, in fact, it seems to me, lift the

11  attorney/client privilege.

12             MR. TORNABENE:  Your Honor, we would have to look at

13  the Bates numbers.  I agree we can tell from those.  The other

14  place that it may have -- these may have come from would be

15  response to a Grand Jury subpoena by Great American.  They were

16  subpoenaed.  They did provide responsive documents.  That would

17  be the other area of -- of that.  And, other than that, I think

18  that the universe of documents would have been provided to RMA

19  through one -- one way or another.

20             MR. JOHNSTON:  And, your Honor, I would like to just

21  clarify that --

22             THE COURT:  Give me a moment.

23             MR. JOHNSTON:  Oh, sure.

24        (Pause in the proceedings)

25             THE COURT:  In Pacific Pictures vs United States

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  District Court, a writ of mandamus in May of last year, a year

2  ago, there was an issue that came up about what the District

3  Court could order one of the parties in that civil litigation to

4  do.  And the Judge ordered -- and this is a question before the

5  Court -- quote, "We must decide whether a party waives

6  attorney-client privilege forever by voluntarily disclosing

7  privileged documents to the federal government."  And it has to

8  do with comic books and typical matters that are of concern in

9  the Central District of California.

10      Well, it says in pertinent part, "Most pertinent here is

11  that voluntarily disclosing privileged documents to third

12  parties will generally destroy the privilege."  And "The reason

13  behind this rule is that, '[i]f clients ... divulge such

14  information to third parties, chances are that they would also

15  have divulged it to their attorneys, even without the protection

16  of the privilege.'"  And there's no -- and it says, quote,

17  "Under such circumstances, there simply is no justification to

18  shut off judicial inquiry into these communications," period,

19  end of quote.  And that's at 1126 and 1127 of 679 F.3d.

20      So it seems to me that it depends on what the company did

21  and who they gave their material to.  If they gave it to RMA,

22  then that's a voluntary waiver of the privilege to the extent of

23  the document.

24          MR. JOHNSTON:  Yes.

25          THE COURT:  And, if they gave it to the Government,

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  I'll have to do a deeper layer of review to make certain I fully

2  understand this particular case.  Let me just remind myself.

3       (Pause in the proceedings)

4            THE COURT:  Well, it's going to take me a bit just to

5  remind myself.  I've read the case, but it's been a while ago.

6  And I'm going to have to content myself with it.  But are we

7  dealing with a disclosure to the federal government here as the

8  foundation for the waiver?  If not, then I'm satisfied that

9  disclosure to RMA waives the privilege; and, well, we need not

10  concern ourselves with FCIA or Mr. Raekes and the RPC.  So what

11  do we have?

12            MR. TORNABENE:  You Honor, the only other -- two

13  things to add.  I think, in a quick review the documents that we

14  may be going over, I believe -- I'm not sure which one but one

15  of them, at least, may have come from the Grand Jury production

16  from Great American, which was, of course, the successor to

17  FCIA.

18       One thing to just -- not to overly complicate the matters

19  but just, I think, for the Court's consideration would be -- I

20  assume that, sort of, implicit in this analysis is that the RMA

21  and USDA was not in any kind of a joint representation or joint

22  defense agreement, if you will, that would, then, extend that

23  privilege.  That's our understanding that they were separate.  I

24  don't -- that's just our understanding.  I haven't talked to

25  Mr. Raekes about any of this nor anybody at FCIA nor any

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  attorney at RMA about any of this.  But just to put that on the

2  record that I think that is an implicit factual assumption that

3  we're making here.  I do believe that's accurate.

4          MR. JOHNSTON:  And -- and we were assuming the same

5  fact; that is, your Honor, that the privilege was not through a

6  joint counsel privilege or common interest privilege extended

7  beyond the insurance company --

8          THE COURT:  Well, was there any joint defense

9  agreement?  There was no joint defense agreement here, was

10  there?

11          MR. JOHNSTON:  No.  No, there wasn't.

12          THE COURT:  RMA was simply behind the scenes most of

13  the time and, then, out front other parts of the time.  And it

14  seems to me that right now I'm satisfied unless there's some

15  other record.  But I want to take a recess so that you two can

16  confer with Mr. Raekes; and we can all, then, make a full record

17  and everybody's protected.

18          MR. JOHNSTON:  And, your Honor, if I may, I want to

19  make it clear, the Court has indicated, you know, there are two

20  levels of the waiver of privilege.  We are not asserting any

21  general waiver.  It would only be if there's a document that

22  would otherwise have been privileged but for its disclosure --

23          THE COURT:  If there was a document --

24          MR. JOHNSTON:  We're only looking at the -- the

25  document itself.  Just wanted to make that clear.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1           THE COURT:  Right.  Thanks.  Just as long as
2  Mr. Raekes is sure of what you're talking about and we're all on
3  the same -- we all have a full understanding that's articulated
4  on the record so that everybody's doing what exactly they should
5  be doing.  Then I'm satisfied.  We'll come back and do that.
6           MR. JOHNSTON:  Thank you, your Honor.
7           THE COURT:  All right.  Thanks.
8       (Court recessed at 2:53 p.m.)
9       (Court reconvened at 3:11 p.m.)
10          THE COURT:  Please, be seated.  Mr. Raekes, I'm
11  satisfied, after reading Pacific Pictures, that, indeed,
12  documents produced pursuant to a Grand Jury subpoena require the
13  producing party to assert a privilege and that that's a factor
14  that can be taken into consideration.  And, as well, the
15  voluntary production is a waiver, as well.
16      There is no record of any countervailing consideration of a
17  joint defense agreement.  And, under the circumstances, it seems
18  to me that we can proceed.
19          MR. JOHNSTON:  Yes.  And, your Honor, if I may add,
20  Mr. Tornabene and I have discussed the etiology of these
21  documents coming in.  And these documents -- any document that
22  would fall within this category is in the 1 -- 10,000 or 100,000
23  series.  Those were produced voluntarily by the Rettig Law Firm
24  while Mr. Raekes -- after he left there.  And they were produced
25  to RMA and, then, RMA to the United States.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1    So I don't even think there's a Grand Jury subpoena issue

2    on these documents.

3         THE COURT:  I thought that somebody said they were

4    produced pursuant to the Grand Jury.  So are you saying there

5    were actions taken in advance of that which had waived the

6    privilege?

7         MR. TORNABENE:  Your Honor, yeah.  We've confirmed on

8    this series and it -- based on Mr. Johnston's representations, I

9    believe that this universe of documents we're discussing has

10   nothing to do with Grand Jury subpoenas --

11        MR. JOHNSTON:  As it turns out.

12        THE COURT:  Okay.  I'm not -- since the issue of who

13   had what authority to produce what, when, is not germane to my

14   proceedings, I'm not going to get into who had the authority to

15   do that.  But it's clear that, from what you're telling me that

16   occurred, that I don't have the problem; and, therefore, we're

17   ready to go.

18        MR. JOHNSTON:  Thank you, your Honor.

19        THE COURT:  Thank you.  You can bring the jury in,

20   then.  Are you satisfied?  Have you talked with Mr. Raekes about

21   this?

22        MR. JOHNSTON:  Yes.  I have informed him of the source

23   of the documents and --

24        THE COURT:  Is there any other record you want to

25   make?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1        MR. JOHNSTON:  No, your Honor.

2        THE COURT:  Okay.

3     (Jury in at 3:15 p.m.)

4        THE COURT:  Please be seated.  Thank you for your

5  patience, and we'll get started.  You may resume.

6        MR. JOHNSTON:  Thank you, your Honor.

7  Q    (BY MR. JOHNSTON)  Mr. Raekes, I think, when we left off,

8  you were beginning to tell us about the long conference call

9  that occurred on May 12th, 2005.  Are we on the same page?

10 A    Yes.

11 Q    Okay.

12       THE COURT:  Just so the record's clear, the parties to

13 that conference call were not only FCIA representatives but RMA

14 represent and who else?

15       MR. JOHNSTON:  Correct.  Just RMA.  And, as near as I

16 can tell, just RMA and FCIA representatives and Mr. Raekes and

17 Mr. Green.

18       THE COURT:  All right.

19 Q    (BY MR. JOHNSTON)  Mr. Raekes, I don't really want you to

20 go into any great deal about what people said; but I want to

21 know if certain subjects came up during that call.  And do you

22 recall, whether it directly involved you or not, the subject of

23 specific gravities under a contract came up?

24       MR. TORNABENE:  Your Honor, we object again.  This

25 calls for hearsay of what other people said offered for the

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1   truth.

2            THE COURT:  Well, it's not offered for the truth; but

3   I don't think it's -- at this point, what is it offered for?

4            MR. JOHNSTON:  It's just simply -- simply to establish

5   that those topics were discussed and known at a time prior to

6   any of the checks being --

7            THE COURT:  I'll permit that.

8            THE WITNESS:  I do recall that term.

9   Q    (BY MR. JOHNSTON)  And do you recall that the AGR claim of

10  Mr. Gordon as well as Poco came up in that conversation?

11  A    I don't recall that.

12  Q    Do you recall any other general topics coming up in that

13  conversation?

14           THE COURT:  Well, Counsel, that's just too broad

15  because I don't know where you're going with that.  So --

16  Q    (BY MR. JOHNSTON)  Let me ask this:  Do you recall a

17  specific reference to a possible approach to the OIG to obtain a

18  stop payment?

19  A    It's possible.  I don't have a specific recollection.

20  Again, my specific recollection of that conference call was what

21  we were going to do about the arbitration we had just lost.

22  Q    Okay.  And that would have been your focus because that

23  would have been in your specific area of responsibility?

24  A    Correct.

25  Q    Now, was it also discussed in that conversation as to

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  whether, in regard to the 2004 Poco claim, there would be a

2  declaratory judgment action brought on that issue?

3  A    It's certainly possible.  I remember that there was a, you

4  know -- that was an issue.  Did we discuss it at that particular

5  phone conversation?  More than likely.  Do you have any notes or

6  anything that you can show me?  May help.

7        MR. JOHNSTON:  Your Honor, if I may, to the witness,

8  Court, and counsel only, have Exhibit 2045.

9        THE COURT:  2045?

10        MR. JOHNSTON:  Yes.

11        THE COURT:  For the witness and counsel only.

12        MR. JOHNSTON:  And this is to refresh only and will

13  not be offered.

14        THE COURT:  Exactly.

15        MR. JOHNSTON:  Next one.

16        THE COURT:  Can you read that, Mr. Raekes?

17        MR. JOHNSTON:  That's 2004.  There we are.

18        THE WITNESS:  Not very well, your Honor.

19        THE COURT:  Yeah.  Can you either go hard copy or blow

20  it up?

21        MR. JOHNSTON:  I have a hard copy here, your Honor, if

22  I --

23        THE COURT:  "Enlarge it" is what I should say.

24        MR. JOHNSTON:  The hard copy is better if I --

25        THE COURT:  I think so.  You may approach.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1          MR. JOHNSTON:  If I may approach?

2          THE COURT:  Go ahead.  Is that better?

3          THE WITNESS:  Thank you, yes.

4          THE COURT:  Okay.

5    Q    (BY MR. JOHNSTON)  Just for reference, this indicates

6    5/12/2005 and identifies the participants.  Is that right?

7    A    Yes.

8    Q    And there are various lines across the paper.  Right below

9    the first line --

10          MR. JOHNSTON:  If we could, blow up the section

11    between the two lines.

12    Q    (BY MR. JOHNSTON)  Does this, in any way, refresh your

13    recollection as to the discussion of the arbitration award, for

14    example?

15    A    It does.

16    Q    And, then, that the processing endorsement and specific

17    gravities were discussed?

18    A    Yes.

19          MR. JOHNSTON:  And if we can have the next section.

20    Q    (BY MR. JOHNSTON)  And does it also indicate that, in

21    regard to Olsen Ag --

22          MR. TORNABENE:  Your Honor, I object.  He's reading

23    from the document.  I believe it's just to refresh the witness's

24    recollection.

25          THE COURT:  Right.  It's simply to refresh.  So, when

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1    Mr. Raekes has concluded reading it, then we can ask questions.

2    And he can't read from the document as he knows.  And he --

3    either his recollection is refreshed or it's not.  Go ahead and

4    ask him.

5    Q    (BY MR. JOHNSTON)  Yes.  Does that refresh your

6    recollection as to other claims or parties that were discussed?

7    A    Yes.

8    Q    And what other claims and parties, according to your

9    recollection, were discussed?

10   A    Olsen Ag.

11   Q    Did that or did that not also include specific gravities?

12   A    It did.

13        THE COURT:  Use the microphone, please, Mr. Raekes.

14   Q    (BY MR. JOHNSTON)  And, then, was -- does that also refresh

15   your recollection as to whether or not one way or the other

16   Gordon claims were also discussed?

17   A    It does.

18   Q    And what is the -- what is your recollection?  That Gordon

19   was discussed or not discussed?

20   A    It was.  Gordon was discussed.

21        MR. JOHNSTON:  Can we look at the next page?

22        THE COURT:  Are you asking for something?

23        MR. JOHNSTON:  I just want to see the next page.  I've

24   given the witness my only copy, your Honor.  I wanted to --

25        THE COURT:  Okay.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1   Q    (BY MR. JOHNSTON)  And does it refresh your recollection

2   one way or the other as to whether some form of stop payment was

3   discussed?

4   A    The notes indicate that it was discussed.  I don't have any

5   recollection of it.

6   Q    You don't have any recollection.  Okay.

7   A    No.

8   Q    Is there anything else now, having looked at this document

9   about that conversation on the subjects that we've talked about,

10  that you recall?

11         MR. TORNABENE:  Your Honor, I'm going to object again.

12         THE COURT:  He can ask -- he can answer whether he

13  recalls the conversation.

14         MR. JOHNSTON:  Yes.  Well, I just didn't want to --

15         THE COURT:  No, Counsel, we're going to -- let's try

16  it this way:  Let's ask if he has -- now that he's read the

17  document, if he now has a refreshed recollection of the actual

18  conference.  And -- and, if he does, then you can ask him

19  specific questions that might -- that he might be able to

20  testify about given his refreshed recollection.  Go ahead.

21         MR. JOHNSTON:  Thank you, your Honor.

22  Q    (BY MR. JOHNSTON)  Does that, at least in part, refresh

23  your recollection as to the conversation?

24  A    Very small part.

25  Q    Okay.  Do you recall any reference to issues related to the

JURY TRIAL - DAY 26 - MAY 21, 2013
J. RAEKES/DI - JOHNSTON

1  OIG, the Office of Inspector General?

2          THE COURT:  You're asking him if he currently, right

3  now, has a recollection of having discussed that topic.

4          MR. JOHNSTON:  If he has a -- yes.  Right.  Apart from

5  the document.

6          THE WITNESS:  I do not.

7  Q    (BY MR. JOHNSTON)  Thank you very much.  Do you have any

8  present recollection of whether the issue of calendar year

9  versus fiscal year was discussed?

10 A    I'm going to assume that it was because that was an issue

11 with Gordon Brothers.

12 Q    Thank you.

13         MR. JOHNSTON:  Let's next go to Exhibit 2046, and

14 that's an admitted exhibit.  And may that be displayed, your

15 Honor?  It has been prior admitted.

16         THE COURT:  It may be displayed.

17 Q    (BY MR. JOHNSTON)  Mr. Raekes, is this a -- an email you

18 received from Mr. Swanson?

19 A    Yes.

20 Q    And do you -- can you tell us what you understood to be the

21 subject of where it says, "... we will begin the process of

22 denying the 2004 MPCI claims (Olsen Ag & Poco, LLC) on the

23 premise that the processor contracts are not valid."  What --

24 what do you recall being the basis for that?

25 A    I believe it's because they didn't feel that these

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  contracts involved a valid processor.

2  Q    Is there any other basis that was discussed at that time?

3  A    Not that I can recall.

4  Q    And it indicates a draft letter is being circulated.  Let

5  me next direct your attention to what has been marked as

6  Exhibit -- or admitted as Exhibit 2047.  What is the date of

7  this letter?

8  A    I believe it's May 20th -- or thank you.  May 24th, 2005.

9  Q    And is this the letter denying the 2004 Poco claim that was

10 discussed in the prior exhibit?

11 A    I can't see the whole thing, but I believe it is.

12 Q    Okay.

13       MR. JOHNSTON:  Can we go to the third page, last

14 paragraph?

15       THE COURT:  Go down to the cc's.

16       MR. JOHNSTON:  Yeah, cover the cc's.

17 Q    (BY MR. JOHNSTON)  And you were cc'd on this document?

18 A    Yes.

19 Q    And does this refresh your recollection that the basis was

20 that there would be an upcoming action in a court of competent

21 jurisdiction?

22 A    Yes.

23 Q    Okay.  And you later filed that Complaint.  Is that right?

24 A    I believe we did.

25 Q    And was the 2004 claims process, the adjustment and so

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  forth, stopped or -- or put in -- in suspended animation, if you

2  will, during the period of time that case was pending?

3  A    Can you rephrase that?

4  Q    Well, let me ask you this:  Was the issue -- when there's

5  an insurance claim, would you agree with me that there's a

6  calculation of the indemnity side and a coverage side?

7  A    Yes.

8  Q    And was the lawsuit, in your view -- which -- which side

9  was that on?  Was that a coverage or an indemnity issue?

10 A    No, that was a coverage question.

11 Q    And my question is:  Did the indemnity part of the process

12 await resolution of the coverage issue?

13 A    I'm sure it did.  They wouldn't pay it without establishing

14 coverage.  I don't have a specific recollection of somebody

15 saying, "We're stopping the indemnity;" but that's what would

16 have happened.

17         MR. JOHNSTON:  Can we next look at Exhibit 2058.

18 Q    (BY MR. JOHNSTON)  And is this a letter that you authored

19 and sent on or about September 20th, 2005?

20 A    Yes.

21 Q    In this letter, you say, "It is my belief that if RMA would

22 allow us to proceed with mediation, ..."  Do you see that?

23 A    Yes.

24 Q    Was it your understanding that RMA had the ability to allow

25 or disallow participation in mediation at that time?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  A    My recollection is that we could not just, on our own, go

2  into mediation and agree to settle the case.  If we did settle,

3  we would be doing that while risking no reinsurance.

4  Q    I see.  And had the issue of whether reinsurance would be

5  allowed or disallowed at that time been established?

6  A    I don't believe it had.

7  Q    Had RMA indicated that they may not allow reinsurance?

8  A    I wouldn't be in contact with RMA, but the fact that we

9  were waiting to get approval from them tells me that we didn't

10 have that issue settled.

11 Q    Okay.  And the issue of whether RMA would or would not

12 grant reinsurance, was that an animating issue as to the course

13 taken by the insurance company?

14 A    I'm sure they were very concerned about it.

15         MR. JOHNSTON:  May we next look at Exhibit 2142, which

16 is also admitted and may be displayed to the jury.  Is it?

17     (Discussion off the record)

18         MR. JOHNSTON:  Oh, I'm sorry.  I didn't offer 2058,

19 your Honor; but I would do so now.

20         MR. TORNABENE:  No objection.

21         THE COURT:  Admitted.

22     (Exhibit No. 2058 admitted into evidence)

23         MR. JOHNSTON:  Can we go back to 2058 to display to

24 the jury just for a moment?  Can we highlight the paragraph?

25 Q    (BY MR. JOHNSTON)  In this letter, also, Mr. Raekes, you

JURY TRIAL - DAY 26 - MAY 21, 2013
J. RAEKES/DI - JOHNSTON

1  indicate "Perhaps RMA would be interested in participating in

2  the mediation."  Do you know whether that extension -- that

3  offer was extended to RMA?

4  A    Off the top of my head right now, I do not know.

5  Q    Do you recall whether or not -- was there, ultimately, a

6  mediation?

7  A    No.

8  Q    Was there -- there was a settlement conference outside

9  mediation later on?

10 A    No.

11 Q    So you don't recall so that -- okay.

12 A    That claim was not settled at a settlement conference.

13 Q    This was the 2000 -- did you understand this letter to

14 relate to the 2003 or the 2004?

15 A    The 2003.

16 Q    Okay.  And the 2003, though, was settled?  Is that

17 accurate?

18 A    Correct.

19 Q    And was that settled between you and Mr. Schultz?

20 A    Correct.

21 Q    There might have been a mediation scheduled, but you just

22 got together and resolved it.  Is that right?

23 A    We did.

24        MR. JOHNSTON:  Let's go next to 2142, which is an

25 admitted exhibit.  So we --

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  Q    (BY MR. JOHNSTON)  And, Mr. Raekes, can you see what the

2  date of this letter is?  I think it's October 26th.  Am I

3  reading right?

4  A    October 26th, 2005.

5  Q    And is this the letter by which -- did you receive a copy

6  of this by fax on October 27th, if you recall?

7  A    I don't see my name on a cc or a fax for my law firm; but,

8  looking at it, it seems familiar.

9  Q    Okay.  And is this the letter by which, at least receiving

10 a copy of it, you learned that the -- that there was -- that RMA

11 was going to reinsure this claim?

12 A    Whether I learned of it through this letter or some other

13 correspondence, I'm not sure; but I did learn that it would be

14 reinsured.

15 Q    And was that at about this time?

16 A    Most likely, yes.

17         THE COURT:  This involves what claim?

18         MR. JOHNSTON:  This is the 2003 claim.  Is that

19 correct, Mr. --

20         THE COURT:  2003?

21         MR. JOHNSTON:  Yes.  Is that correct?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.  So Poco's 2003 claim.  Thank you.

24 Q    (BY MR. JOHNSTON)  By the way, this letter refers to a

25 Mr. Brittenham.  Who was Mr. Brittenham?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  A    My recollection is he was an attorney with the United

2  States Department of Agriculture.

3  Q    And do you recall whether or not -- were there any

4  discussions at this time with someone from the Department of

5  Justice as opposed to that -- to Mr. Brittenham?

6          MR. TORNABENE:  Your Honor, I'm going to object.

7  Calls for hearsay.

8          THE COURT:  He's only asking about the fact of it.

9  And, so, overruled.

10          THE WITNESS:  Not with me.

11  Q    (BY MR. JOHNSTON)  Okay.  You didn't -- if that occurred,

12  you heard it from someone else.

13  A    Correct.

14          MR. JOHNSTON:  And can we look next at 2064?  Witness,

15  counsel, and court only.

16  Q    (BY MR. JOHNSTON)  Mr. Raekes, what is the date of this

17  email?

18  A    It looks like it begins November 4th, 2005, an email from

19  me and, then, there -- a response on November 7th, 2005.

20  Q    I'm only trying to get time frame with this.  Is it on or

21  about November 4th, 2005, that the 2003 Poco claim was settled?

22  A    Yes.

23  Q    And that was the meeting with you and Mr. Schultz and no

24  mediation.  Is that right?

25  A    Correct.

1          MR. JOHNSTON:  And may we have Exhibit 2066.  And I --

2   that's a redacted document.

3   Q    (BY MR. JOHNSTON)  Now, within days following the

4   settlement of the 2003 claim, is this a letter that you sent to

5   Mr. Miller regarding the 2004 claim?

6   A    It is.

7   Q    And, in regard to the 2004 claim, was there discussion one

8   way or the other between you and Mr. Miller whether the MPCI

9   claim should be put aside and focus on the AGR claim to move

10  things along?

11  A    I do recall that.  I'm not sure if it was regarding Olsen

12  or Gordon Brothers or Poco; but I do recall that, when these

13  claims were settled, there was discussions about, you know, if

14  the AGR claim's resolved, the MPCI claim is going to be

15  withdrawn or waived or whatever.

16  Q    So was there, then, a process whereby the indemnity side of

17  the claim issue for 2004 was discussed involving yourself,

18  Mr. Miller, Mr. Rippee, and a Mr. Harper?

19  A    Yes.

20  Q    And I take it that there was initial differences but that,

21  ultimately, at least as to the amount covered in January, there

22  was an agreement.  Is that right?

23  A    That is correct.

24  Q    And it went through several iterations, but it came up to

25  1,907,000 some odd thousand dollars?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1  A    That sounds about right.

2  Q    Okay.  And, then, there was a continuing dispute, was

3  there, about some remainder of the 2004?

4  A    I don't recall that.

5  Q    Was there a subsequent arbitration with Judge Utter?

6  A    There was.

7  Q    Okay.  And that was over what was not resolved on the

8  indemnity agreement in January of 2000 -- or December of 2005,

9  January, 2006?

10  A    Justice Utter, to me, was in the Poco arbitration; and --

11  and he wasn't.  So I'm -- these arbitrations are a little

12  confusing to me about which one was which.  I would have -- if

13  you would have asked me, I would have said Justice Utter did the

14  2003 claim; and, apparently, he didn't.  So I need some help on

15  what the issues were.

16  Q    We have a couple of documents.  Let's go next to -- let me

17  ask this:  Is that generally what happened?  There was an

18  agreement on a portion of the 2004 claim, which was, then, paid

19  and, then, there was a follow-up arbitration?

20  A    I believe that's right.

21  Q    Okay.

22           MR. JOHNSTON:  May we next have Exhibit 2076.  And

23  this is for Court, counsel, and the witness only.  Can we

24  have -- do you recall -- let's have the caption of this for

25  Mr. Raekes first.

JURY TRIAL - DAY 26 - MAY 21, 2013
J. RAEKES/DI - JOHNSTON

1  Q    (BY MR. JOHNSTON)   This is an email to you from

2  Mr. Brittenham.  Is that correct?

3  A    Yes.

4  Q    And that was July 31 of 2006?

5  A    Yes.

6  Q    So -- and it was Poco's arbitration?

7  A    Yes.

8  Q    Okay.

9         MR. JOHNSTON:  Then we have the body of the document.

10 Q    (BY MR. JOHNSTON)   And I -- did you identify

11 Mr. Brittenham?  He was with the RMA?  Counsel for RMA?

12 A    I believe he was counsel for USDA.

13 Q    And that would include RMA?

14 A    Correct.

15 Q    Now --

16        MR. JOHNSTON:  We would offered 2076, your Honor.

17        MR. TORNABENE:  No objection.

18        THE COURT:  Admitted.

19    (Exhibit No. 2076 admitted into evidence)

20 Q    (BY MR. JOHNSTON)   Now, this appears, in general, if we can

21 display that, to be kind of a strategy indication from RMA to

22 your office regarding the arbitration.  Is that generally a fair

23 description?

24        MR. TORNABENE:  Your Honor, I'd object to leading.

25        MR. JOHNSTON:  I'll withdraw it, your Honor.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/DI - JOHNSTON

1      THE COURT:  Thank you.

2    Q    (BY MR. JOHNSTON)  What -- what is this email, as you

3    recall it, in the context of the work you were doing at that

4    time?

5    A    I believe that I had contacted him for his analysis on the

6    issue that we wanted to go forward with; and I believe that this

7    was his analysis as to, you know, telling us that it's -- that

8    we should go forward.

9    Q    Okay.  And, in the first paragraph, he indicates "As per

10   our conversation, feel free to use this language" --

11             THE COURT:  You can ask him a question, Counsel.

12             MR. JOHNSTON:  Okay.

13   Q    (BY MR. JOHNSTON)  Would you look at the second sentence

14   there of the first paragraph.  And, in that sentence, you're

15   telling us --

16             THE COURT:  Counsel, you can simply ask him a question

17   about a fact.  And, then, he can refresh himself if he needs to.

18   So --

19   Q    (BY MR. JOHNSTON)  Did Mr. Brittenham indicate he did not

20   want this attributed to him?

21   A    Yes.

22   Q    Did you have -- did he ever explain that to you?

23   A    No.

24   Q    Okay.  And did you follow his advice to not attribute it to

25   him?

JURY TRIAL - DAY 26 - MAY 21, 2013
J. RAEKES/DI - JOHNSTON

1  A    I don't recall one way or the other, but I hope I didn't.

2  Q    Okay.

3  A    I mean, I hope I did follow his advice and didn't disclose

4  it.

5  Q    In your dealings with RMA, were there any other instances

6  that you can recall where they gave you information but told you

7  not to attribute it to them?

8  A    No.

9  Q    And, then, in regard to --

10       MR. JOHNSTON:  And may we have 2079, please?

11 Q    (BY MR. JOHNSTON)  Mr. Raekes, is this a memo you received

12 concerning the final payment to Poco?

13 A    Yes.

14 Q    And does it properly indicate the amount of the award and

15 the arbitration expense reimbursement award?

16 A    I don't remember the amount of the arbitration award, but

17 I'm assuming that it is correct because I never heard back that

18 we gave them a check for the incorrect amount.

19 Q    Okay.  And is -- what's the date of this document?

20 A    October 27, 2006.

21 Q    And was that the -- when the check was delivered, was that

22 the end of any claims back and forth or dealings or litigation

23 or anything with Poco between Poco and FCIC -- or FCIA rather?

24 A    I believe it was.

25       MR. JOHNSTON:  We would offer 2079, your Honor.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1      MR. TORNABENE:  No objection.

2      THE COURT:  Admitted.

3    (Exhibit No. 2079 admitted into evidence)

4      MR. JOHNSTON:  Thank you very much, Mr. Raekes.

5  That's all the questions I have.

6      THE COURT:  Anyone else on the defence side?

7      MR. SMITH:  Yes, your Honor.

8      THE COURT:  Mr. Smith.

9      MR. SMITH:  If I could have just one moment, your

10  Honor.

11      THE COURT:  Yes.

12

13                    CROSS EXAMINATION

14  CROSS BY MR. SMITH:

15  Q   Mr. Raekes, I had the opportunity to introduce myself to

16  you at the break.  I'm Rick Smith.  I represent Jeff Gordon.

17  And you recall that, as with Poco, with Mr. Gordon, you were the

18  adversary of Mr. Miller.

19  A   Correct.

20  Q   All right.  And, in that regard, you recall that you were

21  engaged in arbitration with Mr. Gordon?

22  A   Yes.

23  Q   And do you recall the date now that the arbitrator issued

24  his ruling?

25  A   I don't recall the specific date.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1  Q    The -- did the -- would the award, itself -- would that

2  refresh your recollection?

3  A    It should.

4  Q    Okay.

5          MR. SMITH:  Just for the witness, your Honor.

6          THE COURT:  Witness only.

7  Q    (BY MR. SMITH)  I'm showing you what's been marked as

8  defense identification --

9          THE COURT:  And, Counsel, of course.

10         MR. SMITH:  And counsel.

11 Q    (BY MR. SMITH)  Defense Identification 4117.  Do you see

12 that that's what it is?  The award of the arbitrator?

13 A    Yes.

14 Q    And, then, I'll show you the second page.  Does that

15 refresh your recollection as to the date of the award?

16 A    It does.

17 Q    And does it also assist in your recollection as to who the

18 arbitrator was in 2003?

19 A    It does.

20 Q    All right.  And the date of the award was what, please?

21 A    May 25th, 2005.

22 Q    All right.  The -- Mr. Johnston asked you with regard to a

23 meeting, a telephone conversation, that you were involved in.

24 And, although you didn't have a specific recollection of it, you

25 did use a document to refresh your recollection.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1   A    Yes.

2   Q    I'd ask you this:  Do you recall, specifically with regard

3   to Gordon Brothers, whether there was any conversation at that

4   meeting regarding reinsurance?  Let me ask you this:  Do you

5   have any independent recollection of that?

6   A    I have independent recollection of the issue of reinsurance

7   being discussed.  Whether it was discussed in relation to Poco,

8   Gordon, or Olsen or all three, I can't say.  My assumption is it

9   would pertain to all three.

10  Q    The -- with regard to Mr. Gordon -- and there's -- if -- if

11  you could see if this will refresh -- well, let me ask you a

12  question first.

13       Was -- do you recall any conversation with regard to

14  whether or not he had -- or his potatoes had actually -- did not

15  fail the multi-peril process?

16  A    No, I don't have any specific recollection of that.

17  Q    Does it assist your recollection or does it refresh your

18  recollection to review the document with regard to that -- that

19  meeting?

20  A    Not really.

21  Q    Okay.  The -- I think you had testified that the meeting

22  was in response to a communication from RMA to -- to FCIA?

23  A    Yes.

24  Q    And that -- that it was specifically a letter that was sent

25  to FCIA?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1  A    Either that or was it an email?  I'm not -- one or the

2  other.

3  Q    The -- I'm showing you -- just for the Court and counsel --

4  what's identified as a fax cover sheet.

5           THE COURT:  And you're going to use that microphone,

6  Mr. Smith?  Thank you.

7  Q    (BY MR. SMITH)  It's a document that we've identified as

8  4091, and do you recognize the signature on it?

9  A    I don't recognize the signature.

10  Q    Do you recognize it as being a fax to you?

11  A    Yes.

12           MR. SMITH:  We'd move for the admission of 4091.

13           MR. TORNABENE:  No objection.

14           THE COURT:  Admitted.

15      (Exhibit No. 4091 admitted into evidence)

16  Q    (BY MR. SMITH)  Now, the --

17           MR. SMITH:  Now, if it could be published.

18           THE COURT:  It may be published.  You may publish.

19  Q    (BY MR. SMITH)  So the date of this indicates it's May 2nd

20  of 2005, and it's to you from Kevin.  Is Kevin -- is that

21  Kevin Swanson?  Would that who that would be? (sic)

22  A    I believe it is.

23  Q    And he was the Northwest Operations Manager?  Do I have

24  that correct?

25  A    I'm not sure of his specific title, but I know he was a --

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1  he worked for Farmers Crop Insurance Alliance and was pretty

2  important there.  I don't -- I don't remember his specific

3  title.

4  Q    All right.  Well, if we took it in terms of levels, there's

5  -- Mark Masters was the claims manager.  Do you recall that?

6  A    Yes.

7  Q    And, then, above Mark Masters, was there -- do you recall

8  who it was?

9  A    I would say it was Kevin Swanson.

10  Q    And, then, Dave Hovland above him?

11  A    Correct.

12  Q    Okay.  And this is a -- this is a fax from -- from Kevin to

13  you.  And the comments are -- it includes three pages.  And it

14  says, "At this point FCIC is asking that we not make this letter

15  'public' due to the pending investigation."  Is that right?

16  A    That's what it says.

17  Q    And, then, that was ten days prior to the meeting that you

18  held with persons involved in RMA and discussing the Gordon,

19  Poco, and Olsen Ag claims.

20  A    Correct.

21  Q    And the "letter," presumptively, is referring to the letter

22  that was -- that was sent by R -- RMA to FCIA, correct, telling

23  them not to pay the claims.

24  A    I have no idea what letter was with that fax.

25  Q    You -- you recall that with -- with Gordon Brothers, the --

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1  the -- the arbitrator ruled in favor of Gordon Brothers?

2  A    Correct.

3  Q    And, then, after the arbitration, is it fair to say that

4  FCIA had to make a decision as to whether they were going to pay

5  the claim or they were going to appeal the arbitration award?

6  A    Yes.

7  Q    And, in -- in that regard, do you recall that -- that FCIA,

8  your -- your client, was in contact with RMA regarding the issue

9  of reinsurance?

10  A    I assume they were.  I wasn't a party to that.

11  Q    Okay.  I'm showing you what's been -- just for counsel and

12  the Court and the witness -- what's been identified as 4118.

13  Defense Exhibit 4118.  And that is an email -- or excuse me.  Do

14  you recognize that?  Let's see if I can get it closer for you.

15  A    An email to me or that I was involved in, yes.

16  Q    Okay.

17        MR. SMITH:  And move for the admission of 4118.

18        MR. TORNABENE:  No objection.

19        THE COURT:  Admitted.

20      (Exhibit No. 4118 admitted into evidence)

21        MR. SMITH:  Move to publish.

22        THE COURT:  You may publish.

23  Q    (BY MR. SMITH)  Now, this is so small that nobody can read

24  it so I'm going to just make it a little larger; and we'll look

25  at the top part first.  This is a -- an email from Bruce Green,

JURY TRIAL - DAY 26 - MAY 21, 2013
J. RAEKES/CR - SMITH

1 and I think you identified him as the -- the attorney for --

2 A    Farmers Crop Insurance Alliance.

3 Q    And it's sent specifically to you and Kevin Swanson,

4 Dave Hovland.  Is that right?

5 A    And, also, Greg Burger, Dale Vogt, and Dave Hovland.  You

6 already said him.  He's on there twice.

7 Q    Do you know who Dale Vogt is and Greg Burger?

8 A    I do not.

9 Q    It was also cc'd to the -- to the claims supervisor or the

10 claims -- excuse me, Mark Masters and, then, Ed Long.  Ed Long

11 was a supervisor -- adjuster supervisor for FCIA?

12 A    Yes.

13 Q    All right.  And, here, what Mr. Green is telling you, am I

14 right, was that you may want -- "You may want to wait until you

15 get the written instructions from RMA.  Having reinsurance on

16 the claim is the best possible result under the circumstances"?

17 A    He wouldn't be sending that to me because I wouldn't be

18 getting written instructions from RMA.  It would be somebody

19 from the insurance company.

20 Q    Okay.  And there -- and they're passing it on to -- they're

21 including you in that because you're their attorney.

22 A    Correct.

23 Q    All right.  But does that -- does that help your

24 recollection as to whether or not the insurance company was in

25 contact with RMA regarding reinsurance of Gordon's claim?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1  A    According to this, they were awaiting instructions from

2  RMA.  So I don't -- I wasn't involved in those phone calls,

3  those letters.  I have no idea.

4  Q    Okay.

5  A    But, according to this, I'm sure they were.  I have no

6  firsthand knowledge of it; or, if I did, I lost it eight years

7  ago.  I mean, it's been a while.

8  Q    All right.  Well, let's look at the second part of it then.

9  Again, this is simply the -- the email stream that says that --

10 from Kevin Swanson to Bruce Green and to you that -- telling

11 them -- telling you that they're going to "process the claims as

12 instructed by RMA."  Correct?

13 A    That's what it says.

14 Q    And, "unless instructed differently by Greg or Dave," the

15 FCIA employees.  Correct?

16 A    Correct.

17 Q    And the approved indemnity would be approximately 425,000

18 and 850 (sic) on the 2004 claim.

19 A    Correct.

20 Q    All right.  Showing you what's been marked as

21 Identification 4119 only for Court and counsel.

22     (Discussion off the record)

23         THE COURT:  Do you folks have it?

24     (Discussion off the record)

25         THE COURT:  Do you have something on the screen?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1          MR. JOHNSTON:  No.

2          THE COURT:  And this is just for the witness?

3          MR. SMITH:  It is, your Honor.

4          THE COURT:  Okay.

5          MR. SMITH:  Now.

6  Q    (BY MR. SMITH)  Okay.  Mr. Raekes, again, this is -- I'm

7  showing you a document.  We've identified it as 4119.  And this

8  is -- again, it indicates at the top that it is an email stream

9  including you.  Is that right?

10 A    Yes.

11 Q    And it's to you as part of the email stream?  Is that

12 right?

13 A    Yes.

14          MR. SMITH:  Move for the admission of 4119.

15          MR. TORNABENE:  No objection.

16          THE COURT:  Admitted.

17     (Exhibit No. 4119 admitted into evidence)

18          MR. SMITH:  I'd move to publish, your Honor.

19          THE COURT:  You may publish.

20 Q    (BY MR. SMITH)  All right.  I'm just going to ask you some

21 questions with regard to it.  It indicates that it's June 2nd of

22 2005.  And this is a -- a -- the bottom part is an email from

23 Dave Paul to the -- Kevin Swanson, the operations manager for --

24 for FCIA.  Correct?

25 A    Yes.

JURY TRIAL - DAY 26 - MAY 21, 2013
J. RAEKES/CR - SMITH

1   Q    And it -- it indicates that there was a "discussion today

2   related to the arbitrator's decision on the 2003 crop year"?

3   A    Yes.

4   Q    And that "Claims settlement should be run through the

5   Reinsurance Accounting system as an approved settlement"?

6   A    Yes.

7   Q    And "the Spokane RO."  Do you know what that means?

8   A    Not ringing a bell right now.

9   Q    All right.  But they would assist in the underwriting.

10  Assist the FCIA.  Correct?

11  A    That's what it says, yes.

12  Q    "... to calculate [the] revenue to count for the 2003 crop

13  year ... as we ... worked on that claim when correcting the

14  American Growers files."  Is that right?

15  A    That's what it says, yes.

16  Q    And that's with regard to Gordon Brothers.

17          THE COURT:  Leave it on the screen, please.

18          THE WITNESS:  Yes.

19          THE COURT:  Does "RO" mean "regional office,"

20  Mr. Raekes, do you recall?

21          THE WITNESS:  I'm gonna go with that, your Honor.  I

22  believe that's correct.

23          THE COURT:  Okay.

24  Q    (BY MR. SMITH)  I'm showing you what's been previously

25  admitted as Exhibit 4120.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1          MR. SMITH:  Am I correct, Ms. Brasel?

2          THE COURTROOM DEPUTY:  Yes.

3   Q    (BY MR. SMITH)  Mr. Raekes, if you look at this document,

4   now it's dated June 6th.  Correct?

5   A    Yes.

6   Q    And it's under your signature?

7   A    Yes.

8   Q    And what it -- what it tells us is that you're -- again,

9   it's a follow-up letter to Mr. Miller.  And, apparently -- go

10  ahead.

11  A    Yes.

12  Q    And, apparently, the -- now "the Federal Crop Insurance

13  Corporation has authorized Farmers Crop Insurance Alliance to

14  pay Gordon Brothers 2004 AGR indemnity."

15  A    Correct.

16  Q    So does that -- does that tell you or tell us of the FCIC's

17  involvement with the insurance company at this point?

18  A    Yes.

19  Q    And their approval of Gordon's claims.  Correct?

20  A    Their approval to reinsure Farmers Crop Insurance Alliance

21  for paying Gordon's claims, yes.

22  Q    Okay.  And do you recall that -- that there was a further

23  issue between Gordon and FCIA with regard to the coverage level?

24  A    There were a lot of disputes.  I'm sure there was something

25  going on.

JURY TRIAL - DAY 26 - MAY 21, 2013
J. RAEKES/CR - SMITH

1  Q    All right.  I just want to refresh your recollection with

2  this.

3         MR. SMITH:  Although, I think -- has 4126 been

4  admitted, Ms. Brasel?

5         THE COURTROOM DEPUTY:  4126 may not be admitted and

6  that was as of yesterday.

7         MR. SMITH:  May I use it to refresh?

8         THE COURT:  Witness and counsel only.

9  Q    (BY MR. SMITH)  I'm showing you a document that's been

10 identified as 4126 if you'd just take a moment to read that.

11 Does that refresh your recollection as to whether there was a

12 continuing dispute regarding the coverage level for Gordon

13 Brothers even after the FCIA had settled the claim?

14 A    Yes.

15 Q    And was there?

16 A    Pardon me?

17 Q    And was there a continuing dispute?

18 A    Yes, and I believe it was resolved.

19        MR. SMITH:  4129 only for Court and counsel.

20 Q    (BY MR. SMITH)  You -- do you recognize this document?

21 A    I do.

22 Q    And that's under your signature.  Correct?

23 A    Correct.

24        MR. SMITH:  Move to admit 4129.

25        MR. TORNABENE:  Your Honor, I'm not sure if this is a

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

 1  multipage document or not with references in it.

 2          MR. SMITH:  It isn't.  We're -- we're -- it isn't.

 3          MR. TORNABENE:  Then no objection.

 4          THE COURT:  Admitted.

 5      (Exhibit No. 4129 admitted into evidence)

 6          MR. SMITH:  Move to publish.

 7          THE COURT:  Publish.

 8  Q   (BY MR. SMITH)  Sir, do you recall a final Mutual Release

 9  that was signed by Farmers Crop Insurance Alliance and

10  Mr. Gordon?

11  A    Yes.

12  Q    And the -- this -- this letter is a letter from you to

13  Dave Hovland then?

14  A    Yes.

15  Q    And indicating that, at the end of -- apparently, the end

16  of this litigation, October 28th, of 2005 --

17  A    Yes.

18  Q    -- that you're closing your file because all issues with

19  Gordon Brothers have been resolved.

20  A    Correct.

21  Q    I'm taking this out of order.  We just finished up.  I want

22  to go back now for a moment.

23          MR. SMITH:  This is Document 4112 just for Court and

24  counsel.

25  Q    (BY MR. SMITH)  The -- if you'd take a moment to just read

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - SMITH

1    this document.  And was it copied to you?

2    A    Yes.

3    Q    And the -- do you recall that, through the arbitration

4    process, that -- that you, as the attorney, and Mark Masters, as

5    the client, were provided with calculations that had been

6    provided -- or prepared by Dave Paul regarding the indemnity

7    calculation for -- for Jeff Gordon.

8    A    I don't have specific recollection of Dave Paul preparing

9    any indemnity.  I know there were indemnities prepared by

10   Ed Long, Dan Harper, Mr. Rippee.  Whether Dave Paul did, I don't

11   have, at this point, a clear recollection of that.  I --

12   Q    This -- this --

13             MR. SMITH:  I'm going to move to admit 4112.

14   Q    (BY MR. SMITH)  That would have been a letter sent to you

15   regarding that very issue.  Am I right?

16   A    It is.

17             MR. TORNABENE:  No objection.

18             THE COURT:  Admitted.

19        (Exhibit No. 4112 admitted into evidence)

20             MR. SMITH:  And may we publish?

21             THE COURT:  You may publish.  Yes, you may publish.

22   Q    (BY MR. SMITH)  Sir, I'm just using you as the witness.

23   You were copied the letter, but the letter was from Mr. Gordon's

24   attorney to Mark Masters, who was the claims manager.

25   A    Correct.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - TORNABENE

1  Q    All right.  And -- and, ultimately, there was an agreement

2  on the indemnity.  Do you recall that?

3  A    Ultimately, all issues were resolved or settled, yes.

4        MR. SMITH:  Fair enough.  Thank you, sir.  No other

5  questions.

6        THE COURT:  Anyone else on the defence side?  If not,

7  Mr. Tornabene or Mr. Anderson, cross examination?

8

9                     CROSS EXAMINATION

10  CROSS BY MR. TORNABENE:

11  Q    Good afternoon, Mr. Raekes.

12  A    Good afternoon.

13  Q    Sir, before today, you and I had never met.  Is that true?

14  A    That is true.

15  Q    Never had an opportunity to talk about this case.  Is that

16  correct?

17  A    That is correct.

18  Q    I just have a few quick follow-up questions for you.  First

19  of all, you had mentioned in part of your direct, if I remember

20  correctly -- well, I'll just ask you.  Was it your testimony

21  that you were aware of some general discussions of others that

22  there may have been some kind of contact with the Department of

23  Justice?  Is that -- is that a fair synopsis of your testimony?

24  A    Yes.

25  Q    Do you have any other information regarding that, or is

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - TORNABENE

1  this just a general awareness?

2  A    I believe it would just be a general awareness.

3  Q    So you don't know what component of Department of Justice

4  may have been referenced?  Is that accurate?

5  A    Oh, absolutely accurate.

6  Q    And Department of Justice is pretty large?

7  A    I know nothing about the Department of Justice.  So --

8  Q    Fair enough, Mr. Raekes.  You mentioned a -- well, I have

9  only one other question.  In terms of the -- the context of any

10 potential contact with the Department of Justice, do you have

11 any idea of whether or not that would have been a civil or a

12 criminal component of Department of Justice?

13 A    My recollection at the time was it was a criminal contact.

14 Q    All right.  Do you have a -- do you have a recollection of

15 that?  That it was -- that it was a criminal component versus a

16 civil component of the Department of Justice?

17 A    That's the way I remember it.

18 Q    Okay.  Mr. Raekes, you mentioned a Donald Brittenham as the

19 counsel for USDA.  Do I have that name right?

20 A    Yes.

21 Q    And do you -- he was based outside of the State of

22 Washington?  Was that your understanding?

23 A    My understanding he was in Washington, DC.

24 Q    You were shown what, I think, has now been admitted,

25 Exhibit 4118.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/CR - TORNABENE

1            MR. TORNABENE:  And ask to show that to witness -- the

2  witness and the jury.

3  Q    (BY MR. SMITH)  This is that email that Mr. Smith went over

4  with you, or one of them, regarding reference to instructions

5  from RMA.  Do you recall testifying about that?

6  A    Yes.

7  Q    I think you went over this a little bit, but I just wanted

8  to point you to the email that preceded the top email.  That's

9  from Mr. Swanson, who was with FCIA.  Correct?

10 A    Correct.

11 Q    And the reference to "unless instructed differently by Greg

12 or Dave," do you know who "Greg" is referring to?

13 A    Not really other than it says, "Greg Burger" in the email;

14 but I have no memory of that name whatsoever.

15 Q    And, with regards to "Dave," is that a reference to

16 Dave Hovland?

17 A    Dave Hovland, yes.  He was a -- I think the senior person

18 at FCIA that I dealt with.

19 Q    So he was with FCIA, not RMA.  Correct?

20 A    Correct.

21            MR. TORNABENE:  Nothing further.  Thank you.

22            MR. JOHNSTON:  No further questions, your Honor.

23            MR. SMITH:  I have one.

24            THE COURT:  Mr. Smith?

25            MR. SMITH:  Thank you, your Honor.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. RAEKES/RECR - SMITH

1

2                           RECROSS EXAMINATION

3    RECROSS BY MR. SMITH:

4    Q    Sir, I'm showing you the document, 4118, that -- that

5    Mr. Tornabene just referenced.  And it may have been that he

6    just misspoke, but he asked you if -- to look at the language

7    that preceded the instructions at the top.  And I just wanted to

8    make it clear that the -- the top indicates an email

9    communication at 1:45 on June 2nd.  Correct?

10   A    Yes.

11   Q    Telling Kevin Swanson from Bruce Green that he -- that he

12   may want to wait until he gets the written instructions from

13   RMA.  Correct?

14   A    Correct.

15   Q    And, then, the following communication is that FCIA is

16   going to process the claim as instructed by RMA, correct, at

17   2:22.

18   A    That's what it says.  My only concern would be that --

19   well, Bruce was in the Midwest and Kevin's on the West Coast.  I

20   don't know about the time stamps and -- and what was sent first.

21   So, if you're asking me --

22   Q    Are you saying that --

23   A    -- which one was sent first, I don't know.

24   Q    Are you -- are you saying that 1:45 on the top may be 1:45

25   there and that 2:22 on the bottom may be 2:22 here?

JURY TRIAL - DAY 26 - MAY 21,  2013
K. RECORD/DI - BENTLEY

1  A    I don't know.

2  Q    No?

3          MR. SMITH:  Very good, sir.  Thank you.  Thank you for

4  answering my questions.  I have no other questions, your Honor.

5          THE COURT:  Anyone else?  Mr. Raekes, thanks for being

6  here.  You have may step down.  You're excused.

7          THE WITNESS:  Thank you, your Honor.

8          THE COURT:  Who's next and how long a witness will

9  they be do you think?

10          MR. BENTLEY:  Kerri Record, your Honor, custodian of

11  records.

12          THE COURT:  Custodian of records.  Okay.

13          MR. BENTLEY:  Conover.

14          THE COURT:  Well, let take a -- let's stand and take a

15  stretch while we wait.

16      (Witness enters courtroom)

17          THE COURT:  If you'd come forward, please, to your

18  right and to my left.  We're all just taking a stretch.  That's

19  why we're all standing.

20      (KERRI RECORD, called by the Defendant, was sworn)

21          THE COURT:  Welcome back.  Please, be seated.

22

23                      DIRECT EXAMINATION

24  DIRECT BY MR. BENTLEY:

25  Q    Ms. Record, you testified -- it seems like months ago and

JURY TRIAL - DAY 26 - MAY 21, 2013
K. RECORD/DI - BENTLEY

1  -- for us, anyway.  Right?  And you were not -- you were not

2  excused at that time in case there were further questions.  Do

3  you remember that?

4  A    That's correct.

5  Q    I have just one set of questions for you about a single

6  document.  I'm going to show you what has been marked as

7  Defendant's Exhibit 1023.

8          MR. BENTLEY:  Not for jury at this time.

9  Q    (BY MR. BENTLEY)  Does that appear to be a fax cover sheet

10 of the type that was used by Conover Insurance back in 2001?

11 A    It does.

12 Q    Do you recognize the -- the fax number that's in the

13 heading at the very top of the page as the fax number of Conover

14 Insurance?

15 A    Yes.

16 Q    And would this be considered a business record of Conover

17 Insurance?

18 A    Yes, it would.

19 Q    Made and kept in the ordinary course of business of

20 Conover?

21 A    Yes.

22 Q    And it was the ordinary course of business of Conover to

23 make and keep this record.  Correct?

24 A    Correct.

25          MR. BENTLEY:  I offer Exhibit 1023.

JURY TRIAL - DAY 26 - MAY 21, 2013
K. RECORD/DI - BENTLEY

1      MR. ANDERSON:  No objection, your Honor.

2      THE COURT:  Admitted.

3      (Exhibit No. 1023 admitted into evidence)

4      MR. BENTLEY:  May it be published, please?

5      THE COURT:  It may.  Do you have additional questions

6 for this witness?

7      MR. BENTLEY:  I do on the document.  Just -- yes.

8      THE COURT:  Ms. Record, pull that microphone a little

9 closer so you can hear yourself in the overhead speakers.

10 Ms. Record?

11      THE WITNESS:  I'm sorry.  Here?

12      THE COURT:  Yes.  Pull that.  If you can hear yourself

13 in the overhead speakers just like you can hear me, then you're

14 good.

15      THE WITNESS:  Okay.

16      THE COURT:  Thank you.

17 Q    (BY MR. BENTLEY)  Referring to the top line of the

18 document, does that indicate a date and time when the document

19 was faxed?  Can you see that?

20 A    It looks like the date was 8/14 of 2001.

21 Q    And the time?

22 A    10:17.

23 Q    And this is part of a multipage document?

24 A    It appears to be over in the far right-hand corner.  It

25 says, "1 of 13," I believe.

JURY TRIAL - DAY 26 - MAY 21,  2013
K. RECORD/CR - JOHNSTON

1    Q    Okay.  So there would have been 12 additional pages that
2    were sent along with this.  Correct?
3    A    It would appear so.
4    Q    And would you agree that this is a document that might also
5    have been received by the -- by one of the recipients of the fax
6    or a cc on the fax?
7    A    It would have been received by one of the recipients on the
8    fax cover.
9    Q    Yes.  Yes.
10   A    Yes, I would think so.
11          MR. BENTLEY:  No further questions.
12          THE COURT:  Mr. Johnston?
13
14                    CROSS EXAMINATION
15   CROSS BY MR. JOHNSTON:
16   Q    Good afternoon, Ms. -- good afternoon, Ms. Record.
17   A    Good afternoon.
18          MR. JOHNSTON:  May I proceed, your Honor?
19          THE COURT:  You may.
20          MR. JOHNSTON:  For the Court, counsel, and the
21   witness, may we look at Exhibit 2032.
22   Q    (BY MR. JOHNSTON)  Ms. Record, is this a document that was
23   sent by Conover to Farmers Alliance?
24   A    I believe so, yes.
25   Q    Okay.

JURY TRIAL - DAY 26 - MAY 21, 2013
K. RECORD/CR - JOHNSTON

1        MR. JOHNSTON:  And can we look at 2033.

2   Q    (BY MR. JOHNSTON)  By the way, what is that?  Is that just

3   a loss notice?  Typical loss notice?

4   A    I really can't see it too well.

5        MR. JOHNSTON:  Can you expand that?

6        THE COURT:  Give us a moment, and we'll try to make

7   that larger.

8   Q    (BY MR. JOHNSTON)  And is that a loss notice for Poco's

9   onions in 2004?

10  A    I -- I don't know.

11  Q    Do you see it says, "Poco, LLC" and, then, "winter onions"

12  and a date of 10 -- 6/10/04?

13  A    I see that.  I'm just not familiar with the type of

14  document that it is.

15  Q    Okay.  In any event, it is from the Conover records?

16  A    Yes.

17       MR. JOHNSTON:  And can we look at 2033.

18  Q    (BY MR. JOHNSTON)  And is that a similar document from the

19  Conover records?

20  A    Yes, it is.

21       MR. JOHNSTON:  And we would offer 20 -- may we next

22  have 2034.

23  Q    (BY MR. JOHNSTON)  And is this a Conover email from its

24  records?

25  A    It appears to be.

JURY TRIAL - DAY 26 - MAY 21,  2013
K. RECORD/CR - JOHNSTON

1  Q    And that's Fred Ackerman to Blia Hoopes and Rick Gress?

2  All Conover folks?

3  A    They were Conover folks, yes.

4  Q    And it's also a potential claim document.  Is that right?

5        THE COURT:  She's the records custodian for Conover.

6  Correct?

7        MR. JOHNSTON:  Yes.  I'm just introducing the records

8  of --

9        THE COURT:  She's not a claims person.  Correct?

10        MR. JOHNSTON:  Correct.  I'm just asking if this is

11  a --

12        THE COURT:  All right.  If you want to establish that

13  it's kept in the usual foundations, go right ahead.

14  Q    (BY MR. JOHNSTON)  And is the email system kept in the

15  ordinary course of Conover's business?

16  A    It is.

17  Q    And are the other documents kept in the ordinary course,

18  that is the loss notices we've --

19        THE COURT:  You're talking about 2032 and 2033?

20        MR. JOHNSTON:  Yes, your Honor.  Thank you.

21        THE WITNESS:  The -- the previous two documents?  Yes,

22  those would be keeped (sic) in our -- kept in our files.

23        MR. JOHNSTON:  We would offer 2032, 2033, and 2034,

24  your Honor.

25        MR. ANDERSON:  With the understanding that Ms. Records

JURY TRIAL - DAY 26 - MAY 21,  2013
K. RECORD/CR - JOHNSTON

1   is the record custodian --

2          THE COURT:  That's correct.

3          MR. ANDERSON:  -- we have no objection to

4   authenticity, but we'd reserve other objections that we might

5   have to these.  Actually, 2034 there was a previous stipulation

6   as to authenticity.

7          THE COURT:  I don't know what the -- I can't recall

8   that at the moment.  So you'll have to refresh me out of the

9   presence of the jury if that's what you want to do.

10          MR. ANDERSON:  Regardless, on these three, no

11   objection as to the authenticity of the document, the record of

12   Conover.

13          THE COURT:  Okay.

14          MR. ANDERSON:  Reserving any other objections we would

15   have to the admissibility of these documents.

16          THE COURT:  Well, I think she's here as a business

17   records exception under 803(6).  So she's -- these are being

18   offered now, if I understand it correctly.

19          MR. JOHNSTON:  That is correct, your Honor.

20          THE WITNESS:  So, if they're being offered now, then

21   you need to make your record now.  It's -- unless -- because

22   that's what she's here for.

23          MR. ANDERSON:  Okay.  Do you want me to do that?

24          THE COURT:  If you want to -- are you asking for some

25   voir dire?  Or make your objections.

JURY TRIAL - DAY 26 - MAY 21,  2013
K. RECORD/CR - JOHNSTON

1          MR. ANDERSON:  I object to the relevancy of these

2 documents.

3          THE COURT:  Okay, if that's your objection.

4          MR. JOHNSTON:  And, your Honor, we think they're

5 relevant.  They are related to AGR crops in the whole farm

6 system that were given in the same manner and the same way that

7 claims were given in -- or law -- notices.  These aren't claims.

8          THE COURT:  They're offered for what purpose?

9          MR. JOHNSTON:  Simply to establish that the other

10 crops were part of this whole program, your Honor, and that

11 the -- there wasn't anything unusual about potatoes versus

12 onions versus the other crops.

13          THE COURT:  All right.  I'll admit them.  So admitted.

14 2032, 2033, and 2034.

15      (Exhibit No. 2032, 2033, and 2034 admitted into evidence)

16          MR. JOHNSTON:  And may we next have 2035?

17 Q    (BY MR. JOHNSTON) And is 2035 from the Conover email

18 system?

19 A    Yes, it appears to be.

20 Q    And was it kept in the ordinary course of business?

21 A    Yes.

22          MR. JOHNSTON:  We would offer 2035.

23          THE COURT:  Same objections or --

24          MR. ANDERSON:  Same objections, your Honor.

25          THE COURT:  Same ruling.  Admitted.

JURY TRIAL - DAY 26 - MAY 21, 2013
K. RECORD/CR - JOHNSTON

1    (Exhibit No. 2035 admitted into evidence)

2         MR. JOHNSTON:  And next if we may look at 2103.

3    Q    (BY MR. JOHNSTON) And is 2103 a Conover record kept in the

4    ordinary course of its business?

5    A    Could you scroll down to the Bates number, please?

6    Q    601762?

7    A    Yes, that is.

8         MR. JOHNSTON:  And we would offer 2103, your Honor.

9         THE COURT:  And how is this relevant?

10        MR. JOHNSTON:  Your Honor, it indicates that

11   Mr. Ackerman is going to bat for other customers, as well as

12   defendants.  We only are offering just an example of that, but

13   it's been contended that there was some type of different

14   relationship; and this indicates to the contrary.

15        MR. ANDERSON:  I'd like to take this up outside the

16   presence of the jury given the nature of the email -- or the

17   letter, rather.

18        THE COURT:  All right.  And anything else we can do

19   before we do that?

20        MR. JOHNSTON:  Yes.  I've got two more exhibits, your

21   Honor, if we may look at 2120.

22   Q    (BY MR. JOHNSTON)  And is this an email from the Conover

23   system?

24   A    I can't read it.

25        THE COURT:  Are we going to be able to enlarge that,

JURY TRIAL - DAY 26 - MAY 21,  2013
K. RECORD/CR - JOHNSTON

1  do you think?

2           MR. JOHNSTON:  It appears that -- try the button at

3  the bottom.

4       (Discussion off the record)

5           MR. JOHNSTON:  It appears we've had a system failure,

6  your Honor.  May I approach the witness with copies --

7           THE COURT:  You may.

8           MR. JOHNSTON:  -- so that we can move through this?

9           THE COURT:  And this is exhibits what?  2120 and --

10          MR. JOHNSTON:  2120 and 2126 and they're both in the

11  JERS system.

12          THE COURT:  Exhibits 2120 and 2126 for identification.

13  Okay.  Have you seen these, Mr. Anderson?

14          MR. ANDERSON:  I have, your Honor.

15          THE COURT:  Okay.

16          THE WITNESS:  2120 appears to be an email from our

17  system, yes.

18  Q    (BY MR. JOHNSTON)  And it relates to, apparently in the

19  first line, Mr. Olsen.  Is that right?

20  A    Subject is "Lynn Olsen, MPCI."

21          MR. JOHNSTON:  We would offer 2120, your Honor.

22          MR. ANDERSON:  No objection to this.

23          THE COURT:  Admitted.

24       (Exhibit No. 2120 admitted into evidence)

25  Q    (BY MR. JOHNSTON)  And the last one is 2126.  Is that,

JURY TRIAL - DAY 26 - MAY 21,  2013
K. RECORD/CR - JOHNSTON

1  likewise, an email from the Conover system kept in the ordinary

2  course of its business?

3  A    Yes.

4           MR. JOHNSTON:  We would offer 2126, your Honor.

5           MR. ANDERSON:  And I'd like to take this one up

6  outside the presence of the jury, as well.

7           THE COURT:  Okay.

8           MR. JOHNSTON:  I -- I -- I take it authenticity is not

9  an issue as to the two that we've restrained so that we can take

10  those up later?

11           THE COURT:  Yeah.  Authenticity is not an issue.  So

12  this records custodian -- all the foundation under 803(6) has

13  been established.  So the question is:  What's next?

14           MR. JOHNSTON:  Thank you.  That's all of the documents

15  we have for Ms. Record.

16           THE COURT:  Thank you.

17           MR. JOHNSTON:  Thank you, Ms. Record.

18           THE COURT:  Anyone else?  Any cross examination?

19           MR. ANDERSON:  No, your Honor.

20           THE COURT:  Okay.  What else do we have for the day?

21           MR. SMITH:  Your Honor, we have Tiffany Couch.  If the

22  Court -- she's here.  She's ready to go.  It would take us

23  until -- probably with direct and cross -- until 5:30, if the

24  Court would do that.

25           THE COURT:  5:30, no.  We're not going until 5:30.  So

1  how can I help?  I'll be happy to do what I can, but we're not

2  going after 5:00.  And it may have been, had you acquainted me

3  with that earlier, yesterday or this morning, I might have been

4  able to make some adjustments or I might have been able to talk

5  to the jury; but I'm not going to hold them after 5:00 unless I

6  have full warning that that's going to occur.  So --

7          MR. SMITH:  You know, your Honor, I appreciate your

8  consideration.  I -- we were just hoping that we'd go a little

9  faster.  I kept thinking we'd get her on.  So I can -- we can

10  start.

11          THE COURT:  Mr. Vovos, you've risen for some reason.

12          MR. VOVOS:  I have risen.  I don't want to get in a

13  conflict with -- I have a witness, too.

14          THE COURT:  Have you talked with Mr. Smith?

15          MR. VOVOS:  We have, but we didn't want to --

16          THE COURT:  What do you want to do?

17          MR. SMITH:  Go ahead.  Go ahead.  I'll -- I will defer

18  to Mr. Vovos, your Honor; and we'll have Ms. Couch tomorrow

19  morning.

20          MR. VOVOS:  My witness is -- my witness is not going

21  to be very long, Judge.  Just some pictures and some questions.

22          THE COURT:  She'll be 30 minutes if she's -- that's

23  the way I see it.  So, if you have a 30-minute witness, that's

24  great.

25          MR. SCHWARTZ:  Your Honor, could we excuse Ms. Record?

JURY TRIAL - DAY 26 - MAY 21,  2013
K. RECORD/CR - JOHNSTON

1          THE COURT:  Ms. Record, do you actually want to leave?

2  Go ahead, Ms. Record.  Yes.  Go right ahead.  Thank you.  You're

3  excused.

4          THE WITNESS:  These documents.  Does somebody want

5  these back?

6          THE COURT:  We'll retrieve those.  Thank you.  And the

7  witness is excused at this point.  Is that correct?  She's not

8  subject to recall?  There you go.  Thank you.  Okay.  Are we

9  ready for the next witness?  And who is the person that we'll be

10 calling?

11         MR. VOVOS:  Jeff Smith.

12         THE COURT:  All right.  Let's call Mr. Smith.

13     (Pause in the proceedings)

14     (Witness enters courtroom)

15         THE COURT:  Mr. Smith?

16         THE WITNESS:  Yes.

17         THE COURT:  If you'd come forward, please, to your

18 right and to my left.  And, when you arrive here, Mr. Smith,

19 please place your back to the door; and we're going take your

20 photograph for use by the jury during deliberations.

21     (Courtroom Deputy takes picture of the witness)

22         THE COURT:  Please, raise your right hand.

23     (JEFFREY SMITH, called by the Defendant, was sworn)

24         THE COURT:  Please be seated.  And, speaking directly

25 into the microphone, tell us your first and last name and spell

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/DI - VOVOS

1  them both for the record, please.

2          THE WITNESS:  Jeffrey Smith.  J E F F R E Y.  S M I T H.

3          THE COURT:  Good afternoon.  You may proceed.

4

5                        DIRECT EXAMINATION

6  DIRECT BY MR. VOVOS:

7  Q    How are you doing, Mr. Smith?

8  A    Good.

9  Q    It's important that you keep your voice up and speak to the

10 jury so everyone can hear you.  Please the Court, ladies and

11 gentlemen.  Where do you live, sir?

12 A    In Kennewick.

13 Q    Okay.  And do you have a family?

14 A    Yup.  A wife and three kids.

15         THE COURT:  You need to pull a little closer, and you

16 need to be hearing your voice just like you're hearing mine.

17 Okay?

18         THE WITNESS:  Okay.

19         THE COURT:  Thank you.

20         THE WITNESS:  Wife and three kids.

21 Q    (BY MR. VOVOS)  Okay.  And can you tell us what your

22 education background is, briefly, from high school on through

23 college, if can you tell the jury?

24 A    Went to high school in Prosser, graduated; went to

25 Washington State University where I got my bachelor's degree in

1    economics and ag business and marketing.

2    Q    Okay.  And can you tell the jury, at the present time,

3    where are you employed?

4    A    Tri-Cities Produce.

5    Q    And can you tell the jury what you do there?

6    A    I handle the day-to-day sales of the fresh potatoes to our

7    customers and, also, manage the Food Safety Program.

8    Q    What is the Food Safety Program?

9    A    Basically, all our main customers require us to have a

10   third-party certification, which as -- as food safety's

11   continued to be a huge issue and -- and trying to keep up with

12   all the potential problems in the fresh produce that you buy at

13   the stores, we use a company called PrimusLabs that -- they --

14   once a year they come and inspect the -- do a walk through of

15   the facility, which includes the inspector.  We basically start

16   where the product comes in and walk all the way through the

17   process.  They look for safety issues, possible food

18   contamination places, any areas of -- of a safety concern,

19   whether for the product or for the employees.

20        And, when that's all done, a major part of food safety

21   certification is the amount of paperwork.

22        MR. ANDERSON:  Your Honor, number one, we object to

23   the narrative.  Number two, I understood this witness was simply

24   going to authenticate certain photographs of the --

25        MR. VOVOS:  That's not.  I've given a summary.  He --

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/DI - VOVOS

1          THE COURT:  Well, I think he's answered the question.

2    So move on to another one.

3          MR. VOVOS:  He -- he has.

4    Q    (BY MR. VOVOS)  Okay.  Mr. Smith, can you tell the jury,

5    are there inspectors on site at Tri-Cities Produce?

6    A    Yes.  Anytime we're packing fresh potatoes, there's an

7    inspector on site.

8    Q    All right.

9          MR. VOVOS:  How are we doing with the pictures?

10   Q    (MR. VOVOS)  I want to show you some pictures.

11         MR. VOVOS:  And I'd like to go to 3072-6, please.  And

12   is this being displayed to the jury?

13         THE COURTROOM DEPUTY:  No.

14   Q    (BY MR. VOVOS)  Do you recognize this document?

15   A    Yes.  That is the sign out front of Tri-Cities Produce.

16   Q    Okay.  And where is Tri-Cities Produce located so we know?

17   A    North Railroad Avenue, Pasco, Washington.

18   Q    All right.  And does this picture adequately show the

19   outside -- or -- or generally show the outside and can you

20   identify it for what it -- what it purports to be?

21   A    Yes.

22         MR. VOVOS:  I would move for the admission of 3072-6,

23   Judge, and that's --

24         MR. ANDERSON:  No objection.

25         THE COURT:  Admitted.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/DI - VOVOS

1      (Exhibit No. 3072-6 admitted into evidence)

2          THE COURT:  Have you reviewed each of the photos that

3  I'm permitting to have him --

4          MR. VOVOS:  I can do that to speed it up, Judge, if I

5  can.  Yes, I am.

6          THE COURT:  Be grateful if you would.

7          MR. VOVOS:  I can do it.  May I show 3072-4 -- or 14.

8  I'm sorry.

9  Q    (BY MR. VOVOS)  And may I -- do you recognize that?

10 A    Yup.  That is the -- the receiving area of Tri-Cities

11 Produce where the potatoes come in and -- and are going into

12 tanks to -- to begin the packing process.

13         MR. VOVOS:  May I display that to the jury?  Or should

14 I introduce them first?

15         THE COURT:  Are you asking for its admission?

16         MR. VOVOS:  I'm asking for its admission, yes.

17         MR. ANDERSON:  No objection, your Honor.

18         THE COURT:  Admitted.

19     (Exhibit No. 3072-14 admitted into evidence)

20         THE COURTROOM DEPUTY:  What about 6?

21         THE COURT:  6?

22         THE COURTROOM DEPUTY:  He said he had a series of

23 photos to go through?

24         THE COURT:  We'll just do it the way Mr. Vovos is

25 doing it.  And were you asking for 3072-6 to be admitted at this

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/DI - VOVOS

1   time.

2           MR. VOVOS:  I just want to do it the fastest way,

3   Judge.  I can go through each picture.  I just would like to

4   have the opportunity to publish them to the jury.  I don't think

5   there's going to be any problem.

6           THE COURT:  As you wish.

7           MR. VOVOS:  All right, Judge.

8   Q   (BY MR. VOVOS)  Mr. Smith, showing you No. 3072-15, do you

9   recognize that?

10  A   Yup.

11  Q   And that is -- does it portray a portion of Tri-Cities

12  Produce?

13  A   Yup.

14  Q   All right.

15          MR. VOVOS:  And 17, please.

16  Q   (BY MR. VOVOS)  Do you recognize that photo?

17  A   Yup.

18  Q   And what does that show?

19  A   That's the potatoes after they've been washed and being --

20  just the flow divided so they can go in to be packed.

21  Q   All right.  I want to go through that.  No. 18.  And do you

22  recognize that photo?

23  A   Yes, I do.

24  Q   And what does that show?

25  A   The potatoes as they're about to enter -- they're going up

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/DI - VOVOS

1  to go into the main packing shed.

2  Q    And 21?  Do you recognize that photo?

3  A    I do.

4  Q    I'm going to come back to that, then.  Does that predict

5  (sic) part of the process --

6  A    Yes, it is.

7  Q    -- at Tri-Cities Produce?

8  A    Yup.

9  Q    And No. 22?  Do you recognize that?

10  A    Yes.

11  Q    What does that show?

12  A    That is -- the potatoes are going into the sizer where

13  they're sized by weight.

14  Q    All right.  And 27?  Do you recognize that?

15  A    Yes, I do.

16  Q    And what is that?

17  A    That is -- the potatoes are being final weighed after

18  they've gone in the box to make sure they are the exact weight

19  they're supposed to be.

20  Q    All right.  And 28?  Do you recognize that?

21  A    Yes, I do.

22  Q    And what does that show, just generally?

23  A    It's different size potatoes going into a different shed --

24  part of the shed.

25  Q    And 32?  Does that show equipment at Tri-Cities Produce?

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/DI - VOVOS

1  A    Yes, it does.

2  Q    All right.

3         MR. VOVOS:  And 41, please.

4         THE WITNESS:  That's final palletized packs going on a

5  truck.

6         MR. VOVOS:  I'll try to make some sense.  I'd move for

7  the admission of 3072-6, 14, 15, 17, 18, 21 --

8      (Interruption by the reporter)

9         MR. VOVOS:  I'd move for the admission of 3072-6, 14,

10  15, 17, 18, 21, 22, 27, 28, 32, and 41.

11         MR. ANDERSON:  No objection, your Honor.

12         THE COURT:  Admitted.

13      (Exhibit No. 3072-15, 3072-17, 3072-18, 3072-21, 3072-22,

14  3072-27, 3072-28, 3072-32, and 3072-41 admitted into evidence)

15         MR. VOVOS:  May I display --

16         THE COURT:  You may.

17         MR. VOVOS:  -- No. 6?  No. 6 now?  May I publish

18  No. 6?

19         THE COURT:  If you speak into the microphone, you

20  certainly can.

21         MR. VOVOS:  How's this?  May I publish No. 6?

22         THE COURT:  Great.  Thank you.  Appreciate that.

23  Q    (BY MR. VOVOS)  I just want to go through these.

24  Mr. Smith, can you tell the jury what that is?  I think they've

25  seen that before.

JURY TRIAL - DAY 26 - MAY 21, 2013
J. SMITH/DI - VOVOS

1  A    Yeah.  The sign out on the front of the street of

2  Tri-Cities Produce.

3  Q    All right.

4         MR. VOVOS:  No. 14, please.

5  Q    (BY MR. VOVOS)  What does this show for the jury?

6  A    That shows the potatoes after they've been out of the bulk

7  trailers when they come into the plant to go into the tanks to

8  wait to be washed and sorted.

9         MR. VOVOS:  No. 15, please.

10        MR. ANDERSON:  Your Honor, I hate to interrupt; but

11 could we have these blown up bigger so we don't have the script

12 that's off to the left?  I think that's within the capabilities.

13     (Discussion off the record)

14        MR. VOVOS:  Are we on No. 15, Mr. Johnston?

15 Q    (BY MR. VOVOS)  What does No. 15 show?

16 A    The potatoes exiting the washer.

17 Q    Okay.

18        MR. VOVOS:  No. 17, please.

19 Q    (BY MR. VOVOS)  What does No. 17 show?

20 A    That's a picture of them being put on the belts after the

21 washer to go into the pack -- inside the -- where they're sorted

22 and packed.

23        MR. VOVOS:  No. 18, please.

24 Q    (BY MR. VOVOS)  What does this show?

25 A    The -- the potatoes going up to begin the -- the packing

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/DI - VOVOS

1  process.

2  Q    Okay.  Is this a different portion of Tri-Cities Produce?

3  Is this going from one -- one portion of the building to

4  another?

5  A    Yeah.  The -- just the little wall that separates the

6  receiving area from where the crew packs.

7  Q    All right.

8        MR. VOVOS:  No. 21, please.

9  Q    (BY MR. VOVOS)  What does this show?

10  A    That's on the other side of that wall that was the previous

11  picture.  Just the -- the top view of the packing facility where

12  the potatoes are sized and go off to -- to different parts of

13  the shed to be boxed or bagged.

14  Q    And -- and tell the jury, when you say, "sized," what --

15  what kind of sizing are we talking about?  What -- what are they

16  grouped into?

17  A    They're -- they're sized by weight.  Everything from -- and

18  potatoes are sold as a -- a count.  And, so, a big box of

19  potatoes, you know, 18 ounces and larger, is, like, a 40 count

20  all the way down to a 110, 120 count, which are your 5 and 6

21  ounces potatoes.  And, then, your bags that you buy at the

22  grocery store could be anything from the smallest allowable size

23  up to a 5 or 8 ounce potato depending on the customer.

24        MR. VOVOS:  No. 22, please.

25  Q    (BY MR. VOVOS)  What is this picture, No. 22, that's been

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/DI - VOVOS

1  admitted into evidence show for the jury?

2  A    That is the sizer that every potato goes through that gets

3  electronically weighed --

4  Q    Tell the jury.

5  A    -- and is -- from there, that's what throws it into

6  whatever size that potato is.

7  Q    Okay.

8         MR. VOVOS:  No. 27, please.

9  Q    (BY MR. VOVOS)  What is this?

10 A    That's a picture of the count boxes I was describing to you

11 a minute ago.  Every box has to go -- is individually weighed to

12 make sure it's 50 pounds or -- or whatever the weight is

13 supposed to be.

14        MR. VOVOS:  All right.  And No. 28, please.

15 Q    (MR. VOVOS)  What is this part of the -- that process show,

16 please?

17 A    That just depicts sized potatoes that have been sized

18 already.  They're going to the side of the shed where we bag

19 the -- the different sizes for retail.

20        MR. VOVOS:  And No. 32, please.

21 Q    (BY MR. VOVOS)  What is this?

22 A    That is a bagger that takes the potatoes from the -- the

23 earlier picture -- picture right before it -- and puts them in

24 the -- the 5, 10, 15, 20-pound bags that you see in the grocery

25 store.

JURY TRIAL - DAY 26 - MAY 21, 2013
J. SMITH/DI - VOVOS

1        MR. VOVOS:  And, finally, No. 41, please.

2        THE WITNESS:  That's a picture of a palletized product

3   of potatoes being loaded onto a truck that'll take them to our

4   customers.

5   Q    (BY MR. VOVOS)  Okay.  On -- on the left side as I'm

6   standing here, I think if you point to that, is that the -- is

7   that the bed of a truck where these are actually going to be

8   loaded into a truck?

9   A    That looks like a truck that's backed into the dock to be

10  loaded.

11  Q    Okay.  And where do those trucks go?

12  A    All over Canada, U.S.  We export a lot to the -- Singapore,

13  Asia, Hong Kong.  Just about anywhere.

14  Q    All right.  Thank you.  I want to ask you about your job as

15  far as selling potatoes, Mr. Smith, briefly.  Without violating

16  any privileges or confidences, who -- who are your customers?

17  Who -- who do you sell potatoes to, or who does Tri-Cities

18  Produce sell potatoes to?

19  A    Our -- lots of customers.  Our -- our core customers every

20  week that we take care of would be, you know, Costco, Kingston,

21  United Solid, and Cavendish Produce are kind of the main -- main

22  four that we -- we take care of daily, if not, you know, weekly

23  basis.

24  Q    Can you state whether or not you ever sell any potatoes in

25  bulk?

1 A    Tri-Cities Produce?  Yeah, for different times -- different

2 times.  And, you know, in the eight years I've been here,

3 we've -- we've sold a lot of potatoes that, if it meets specs,

4 we've sold to fryers, if needed.  Or we also have contracts for,

5 you know, the process grade to dehy or -- and stuff like that.

6 Q    Okay.  I want to ask you, in your experience, sir, in -- in

7 selling potatoes.  In -- in your experience, is -- is bruising

8 of potatoes an issue that's important to you in selling potatoes

9 or in the process of selling potatoes --

10 A    Yes.

11 Q    -- in the business of -- of being a fresh packer or

12 processor?

13 A    Bruising is considered a major defect.  So as we --

14         MR. ANDERSON:  Your Honor, I'm going to object if it

15 gets to any sort of expert opinion.  There's been no Rule 16

16 disclosure.  We've heard plenty on this issue already through

17 the course of the case.

18         MR. VOVOS:  Judge, he -- he's not an expert.  He's

19 talking about his experience as a -- as a seller and --

20         THE COURT:  I'll permit him to testify to some of

21 this --

22         MR. VOVOS:  All right.

23         THE COURT:  -- but he cannot express expert opinions

24 because he --

25         MR. VOVOS:  No.

JURY TRIAL - DAY 26 - MAY 21, 2013
J. SMITH/DI - VOVOS

1    THE COURT:  -- was not identified as an expert.

2    MR. VOVOS:  That's correct.

3  Q    (BY MR. VOVOS)  So why is it important, as a fresh packer,

4  as far as bruises is concerned?

5  A    If you have a -- if I sell a product that has bruising to a

6  customer and they see something wrong with it, they can legally

7  get a USDA inspection.  And, if it is above the five percent,

8  which is the -- the tolerance ends at five percent, it doesn't

9  make U.S. No. 1 anymore.  So I'm, basically, at their mercy

10  since it isn't what I sold them.  I -- I just hope they do a

11  decent job selling it as a No. 2 or whatever options that they

12  have.

13    So -- and, you know, what makes bruising hard on our side

14  is bruising is very difficult to find at the shed level when you

15  pack it.  It usually takes a few days or more to find it.  You

16  know, the only way to find bruising, unless it is very advanced,

17  is to peel the potato.  And, so, customers don't like me to send

18  them peeled potatoes.  So, if it's there -- I'm -- you know,

19  there's not much I can do about it.  They -- they peel it.  And,

20  if it's there, you know, they're not very pleased with them.

21    THE COURT:  I think we've covered it.

22    MR. VOVOS:  Okay.

23  Q    (BY MR. VOVOS)  Sir, can you tell me, does Tri-Cities -- do

24  you sell different varieties of potatoes?

25  A    Yeah.  We've sold -- different times of the year there

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/CR - JOHNSTON

1   might be Rangers.  There's, you know, your -- your Russet

2   Norkotahs.  There's -- there's different types of -- of potatoes

3   we can sell in the fresh market.

4   Q    Okay.  I -- I want to ask you this:  Are Ranger potatoes --

5   are they ever fresh packed?

6   A    Yes, most definitely.

7   Q    And what customers would have fresh packed Ranger potatoes

8   in your experience?

9   A    We've had several occasions where we have a fresh contract.

10  Kingston is -- specifically is the main customer who will take

11  those.  They -- we take a No. 2 or better, a certain size spec

12  that they give us.  And we'll pack those Rangers fresh because,

13  up until just two years ago, all the Outback restaurants made

14  fresh cut fries.  And Kingston is the -- the sole sourcing agent

15  for all the produce for Outback restaurants.

16  Q    Okay.  Okay.  Well, I don't think I have any more questions

17  for you.  I -- counsel may have to ask you some questions.

18  Thank you, Mr. Smith.

19  A    You're welcome.

20          THE COURT:  Mr. Johnston?

21          MR. JOHNSTON:  Okay.

22

23                      CROSS EXAMINATION

24  CROSS BY MR. JOHNSTON:

25  Q    I just have one question.  When you said you put

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/CR - ANDERSON

1 50-pounds -- if the boxes or bags are 50 pounds, is it accurate

2 that you put in exactly 50 pounds; or do you avoid unders by

3 having a little over?

4 A    There's always over.  Yeah.  You cannot be below that.  So

5 there's, you know, usually 50.75 to 51 pounds in a box or even

6 in the 5 -- 5- and 10-pound bags are always a little over.

7         MR. JOHNSTON:  Thank you very much.  That's all I

8 have.

9         THE COURT:  Anyone else?  Any cross?  Mr. Anderson?

10

11              CROSS EXAMINATION

12 CROSS BY MR. ANDERSON:

13 Q    Morning, Mr. -- or afternoon, rather, Mr. Smith.  My name's

14 Shawn Anderson.  Can you tell us what a No. 1 potato is?  U.S.

15 No. 1?  What's that grade?

16 A    Its grade is a U.S. No. 1.

17 Q    What does a potato have to be to be a U.S. No. 1?

18 A    Well, there's lots of things.  To be U.S. No. 1, you have

19 to have -- I mean, it encompasses the shape.  I mean, all the

20 defects, like, bruising, decay, cuts, greening.

21     At the shed level, where -- and -- and the receiver, you're

22 allowed up to -- 5 percent is the -- the breaking point of a

23 No. 1.  You usually don't want -- you know, depending on some

24 lots, you'd have zero percent defects.  And a No. 1, which would

25 be a very nice box of potatoes, are 1 or 2 percent.  But to

1  describe how to rate a No. 1 would -- it encompasses a lot.

2  Q    When you say, "5 percent," what do you mean by 5 percent of

3  a --

4  A    As a -- if an inspector samples your potatoes or, on the

5  receiver's end, if they do an inspection, they take so many

6  samples for the -- however many the total load would be for the

7  total order in question.  And they're instructed -- I can't

8  remember myself what -- what the rule of thumb is.  It's 3 boxes

9  per every 400 pounds or something like that.  But they inspect

10  -- five percent is the total weight of their sample.  You're

11  allowed only up to five percent defects.

12  Q    And what type of defects are those that they're looking

13  for?

14  A    To be a No. 1, you can have -- you'd have a -- have to have

15  under 5 percent of the decay, greening, mechanical cuts,

16  bruising.  And then, you know, that would fall into a No. 2.

17  And, then, No. 2 has another whole spec themselves.

18  Q    So what's a No. 2, then?  Can you tell us what makes a

19  potato a No. 2?

20  A    That would be anything that you pull out of the 1's from

21  the stuff I just -- just stated up and to -- I think you're

22  allowed 10 or 12 percent of -- up to -- as the cutoff.  Then it

23  -- it goes into a process grade.

24  Q    So the -- the percentage, then, changes --

25  A    Yes.

JURY TRIAL - DAY 26 - MAY 21,  2013
J. SMITH/CR - ANDERSON

1  Q    -- from the five --

2  A    Yes.  It increases from -- from a 1 to a -- there's a

3  little wider spec there for No. 2.

4  Q    All right.  You mention this company called Kingston.  They

5  accept -- accept No. 2s?

6  A    Part of their contract in the years past has been a No. 2

7  and better, which would include No. 2's and 1's.

8  Q    Okay.

9          MR. ANDERSON:  I have no other questions.

10          THE COURT:  Okay.  May this witness be excused,

11  Mr. Vovos?

12          MR. VOVOS:  Yes, Judge.  We don't have any other

13  questions.

14          THE COURT:  Mr. Johnston?

15          MR. JOHNSTON:  No questions, your Honor.

16          THE COURT:  All right.  You're excused.  Thank you for

17  being here.  You may step down.

18      Ladies and gentlemen, we'll conclude for the evening at

19  this point.  Please, keep in mind my usual admonitions to you

20  about not to look at, listen to, or talk about anyone or any of

21  the issues in the case and not to allow anyone to do that with

22  you.  And no research of any kind or nature.

23      And, that said, we'll see you at quarter of 9:00 tomorrow

24  morning.  Thank you.

25          (Jury out at 4:55 p.m.)

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1          THE COURT:  Please, be seated.  Okay.  Let's talk

2   about our lineup of witnesses for tomorrow.  And we have two

3   issues to take up outside the presence of the jury,

4   Exhibits 2103 and 2106 -- or 2126.  Let's see.  I believe that's

5   correct.  Mr. Anderson, these were yours.  These were some

6   emails, I believe, Ms. Record had.  They were authentic.  They

7   are part of the Conover records, and you were objecting on

8   certain bases.

9          MR. ANDERSON:  So this -- this should be 2126 and --

10          THE COURT:  Are we all agreed this is 2126?

11   Mr. Johnston?  It is?

12          MR. ANDERSON:  It has an exhibit tab at the bottom.

13   It references other entities, including Carr Farms.  And I'd

14   submit that is just has absolutely no relevance to this case

15   whatsoever.

16          THE COURT:  I think the relevance that's asserted is

17   it demonstrates that Mr. Ackerman's behavior was not unique to

18   the grower defendants in this case and that he, indeed,

19   communicated or concerned himself with the similar issues for

20   other clients of his that had MPCI policies and AGR policies.

21   That's what I understand its being offered for.  To demonstrate

22   that he was not behaving differently with these grower

23   defendants.  Am I correct, Mr. Johnson?

24          MR. JOHNSTON:  Yes.  That's correct, your Honor.  And

25   we've offered only two documents having the Court's admonition

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  to not multiply the exhibits other than for examples.

2          THE COURT:  Okay.

3          MR. ANDERSON:  Okay.  That's that one.

4          THE COURT:  That one is 2126.  So I'm going to admit

5  that.

6      (Exhibit No. 2126 admitted into evidence)

7          THE COURT:  And, then, 2120?

8          MR. ANDERSON:  I thought it was 2103 --

9          THE COURT:  2103.  I apologize.  You're right.

10          MR. ANDERSON:  -- which is what this says.  And this

11  one is, essentially, a long, lengthy statement --

12          THE COURT:  I haven't read it, and if you --

13          MR. ANDERSON:  -- from Mr. Ackerman as we see down at

14  the bottom.

15          THE COURT:  I'd like to try it read it with you, but

16  I --

17          MR. ANDERSON:  I'll leave it as is.

18          THE COURT:  I'm having a little trouble.  I think I'm

19  developing some sort of issue or --

20          MR. ANDERSON:  Yeah.

21          THE COURT:  -- problem here.  But thank you.

22          MR. ANDERSON:  It's, essentially, a long laundry list

23  of complaints by Mr. Ackerman regarding companies not really

24  relating to this proceeding at all.  So it's -- it's the same

25  objection as to relevance.  And, I believe, the issues raised

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1   are 403 issues, as well, as to confuse the jury as to the

2   issues.

3                  THE COURT:  All right.  Mr. Johnston?

4                  MR. JOHNSTON:  Your Honor, I indicated we'd offer two

5   exhibits for the purpose we discussed.  2126 was one and 2103 is

6   the other.  We tried to find a document that would be concise

7   and indicate Mr. Ackerman's -- the fullness of Mr. Ackerman's

8   behavior without having to introduce too many documents.  And

9   it's offered for the same purpose.

10                 THE COURT:  What about 2120?  What was that?

11                 MR. JOHNSTON:  I -- I don't think there was an issue

12  as to 2120, was there?

13                 THE COURT:  I'm just asking what, in fact, it was.

14                 MR. JOHNSTON:  Oh, it -- it was offered as to show a

15  Simplot rejection and refusal to renegotiate, which speaks

16  directly to evidence that was discussed with other witness

17  earlier in the case.

18                 THE COURT:  Was this a Conover record?

19                 MR. JOHNSTON:  Yes, it is.

20                 THE COURT:  Okay.  Let's go back.  Thank you for that.

21  And, then --

22                 MR. ANDERSON:  I believe those were the only two.

23                 THE COURT:  2120 and 2126.  And the more extensive

24  document was which of the two?

25                 MR. ANDERSON:  That was 2103, I believe.

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1      THE COURT:  I apologize.  So 2103 is the one in

2 dispute.  Okay.  I've made an incorrect note to myself.  All

3 right.  Well, then, 2103.  Is that the more extensive one that

4 we -- put it up again so I'm certain that I have it in mind.

5      MR. ANDERSON:  That's the first page.

6      THE COURT:  Okay.  Second page?

7    (Pause in the proceedings)

8      THE COURT:  And the third page?  Give me the bottom of

9 that page.  Thank you.

10    (Pause in the proceedings)

11      THE COURT:  And the last page.  Overruled.  It may be

12 admitted.

13    (Exhibit No. 2103 admitted into evidence)

14      THE COURT:  Okay.  I'm done with those two.  That's,

15 what, 2103 and 2126.  All right.  What else before we move on to

16 tomorrow's witnesses?  Anything else lingering from today that

17 would be an issue we need to resolved now?  I can't -- I don't

18 have any notes to that effect.

19      MR. BENTLEY:  Your Honor, I just want to mention that

20 there are two exhibits that I will discuss with the Government.

21 I believe they are self-authenticated.  There may be some issues

22 as to some of the Bates numbering or Grand Jury exhibit numbers

23 on them, but we'll work on that.

24      THE COURT:  For whom?  What witness are we talking

25 about?

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1        MR. BENTLEY:  They are not -- there's -- I understand
2   we have an agreement that, if they were received by RMA, then
3   their authenticity would not be an issue.  The issue would be
4   relevance.
5        THE COURT:  That's what I understand.
6        MR. BENTLEY:  Yes.  So I just wanted to highlight
7   that, and hopefully we can resolve that overnight and bring it
8   back tomorrow.
9        THE COURT:  Okay.  Any other issues before we talk
10  about the defense lineup for tomorrow?  So we have Ms. Couch.
11  Are we going to start with her?
12       MR. SMITH:  Yes, your Honor.
13       THE COURT:  Okay.  And, following Ms. Couch, who's
14  next?  Mr. Smith, you have other witnesses for tomorrow?
15       MR. SMITH:  I do not, your Honor.
16       THE COURT:  Okay.  Mr. Vovos, do you have other
17  witnesses for tomorrow?
18       MR. VOVOS:  Judge, I'd like to call -- I guess by
19  disclosing this, I have a witness that I would call -- I have a
20  witness that I would call or recall for the introduction of the
21  video that the Court has seen of Tri-Cities Produce.  That would
22  be all I would have.  Just to identify it.
23       THE COURT:  Okay.
24       MR. VOVOS:  That's all I have.
25       THE COURT:  Mr. Bentley?

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1    MR. BENTLEY:  Other than those two exhibits, your

2  Honor, I'm done.

3    THE COURT:  Mr. Johnston?

4    MR. JOHNSTON:  Your Honor, we had planned to call

5  Dave Long.  We under he has a serious family emergency and will

6  not be available.  So we will not be calling him.

7    The only other witness that we'd indicated is Allen

8  Cleaver, and Mr. Schwartz and I are discussing whether Poco will

9  call him at all.  And we'll advise counsel before 7:00, if

10 that's agreeable.

11   THE COURT:  Mr. Marchi?

12   MR. MARCHI:  I'm done, your Honor.

13   THE COURT:  So you're done.  Mr. Smith, you're done?

14   MR. SMITH:  Yes, your Honor.

15   THE COURT:  And you have a witness that you're not

16 sure you're going to call, Mr. Johnston?

17   MR. JOHNSTON:  Yes.  And -- and that witness would not

18 be more than about 15 minutes, if we do call them, your Honor;

19 but we'll let the Court and Mr. Tornabene know, as I say, very

20 shortly after --

21   THE COURT:  Okay.  Mr. Vovos?

22   MR. VOVOS:  The witness we have wouldn't be ten

23 minutes.

24   THE COURT:  Okay.  And you, Mr. Bentley?

25   MR. BENTLEY:  I -- I said I have -- I -- I do not have

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1  any witnesses -- any live witnesses.  I have these two

2  documents, which I think we can offer per stipulation.  And I

3  would like to review my trial notes to see if there's any other

4  miscellaneous documents like that before going to the next step.

5      THE COURT:  Okay.  And, then, Mr. Tornabene, what do

6  you have for rebuttal, if any?

7      MR. TORNABENE:  Your Honor, I think our rebuttal, at

8  this point -- I'll have to review my notes, as well --

9  previously indicated -- as previously indicated, we do believe

10  that the NAD audio regarding statements of Mr. Olsen and

11  Mr. Bennett are appropriate rebuttal.  I don't have my notes

12  regarding the precise points, but there are multiple points that

13  they would -- that that information would rebut.  And your Honor

14  may remember, at the end of the United States's case in chief,

15  your Honor had ruled that those statements were statements in

16  furtherance of a conspiracy.  We've provided the redactions to

17  counsel of -- not Brutonized (sic) because that would not be

18  necessary given that ruling but taking out issues of other

19  people speaking who are not Mr. Bennett or Mr. --

20      THE COURT:  Do I have the transcripts of those?

21      MR. TORNABENE:  Yes.  That's -- I want to say 177 and

22  178 are the full transcripts.

23      THE COURT:  Okay.  I'll look at them.

24      MR. TORNABENE:  The other potential portion of a

25  rebuttal case -- and we need to determine this, obviously,

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1  quickly -- but potentially on the table would be recalling

2  Mr. Bearden, in part, for the reasons stated today, I think,

3  just prior to Mr. Moorer's testimony regarding offering as

4  substantive evidence some of the summary charts; that being, 215

5  through 218.  And there may also be some issues regarding Poco

6  '03 and '04 and Gordon '03 and '04.  But, again, all along the

7  lines of what he's -- summary of documents and that sort of

8  thing.  So we think that would be brief.

9          THE COURT:  Well, tell me, given what we've been

10  discussing, what do you think tomorrow's going to look like,

11  then, from your respective viewpoints?  It sounds like we're --

12  the case's testimonial portion of the case will conclude

13  tomorrow.  That's what it sounds like to me.

14          MR. TORNABENE:  Yes, your Honor.  I -- my only slight

15  reluctance is we're -- we've reached out to Mr. Bearden

16  regarding his availability.  I believe previous defense

17  estimations had us finishing on Wednesday.  I guess I didn't

18  assume Wednesday morning.  And I talked to him about being

19  available on Thursday.  We'll talk to him about being available

20  Wednesday -- tomorrow afternoon should that need arise.

21          THE COURT:  Well, I'm not sure we have a morning.  It

22  sounds to me like we have a morning.  Ms. Couch is going to be

23  how long?  An hour?

24          MR. SMITH:  She won't -- yes, your Honor.  I think --

25  not with us but --

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1    THE COURT:  On direct how long will she be?  Because
2  tonight it was an hour.  So what's it going to be tomorrow?
3    MR. SMITH:  I asked for an hour.  I think it will be a
4  half hour to 45 minutes, your Honor.
5    THE COURT:  Okay.  And, then, cross examination maybe
6  another half hour.
7    MR. TORNABENE:  That's Mr. Anderson's witness.
8    MR. ANDERSON:  I would agree, your Honor.
9    THE COURT:  All right.  So, if we start at quarter of
10 9:00 or thereabouts, we're going to have that witness off the
11 stand around quarter of 10:00, 10:00.  There's some other
12 miscellaneous things we can take up; but it seems to me we'll be
13 through pretty much around 11:00.  That's what I'm thinking.  A
14 little after 11:00 and we'll be done.
15    MR. TORNABENE:  Your Honor, the NAD hearing audio is
16 probably about 50, 55 minutes.  And we're talking, again, just
17 the testimony of Mr. Olsen and Mr. Bennett.  So, if -- if that
18 occurs, that's a chunk of time.
19    MR. BENTLEY:  Let me just -- lest my acquiescence be
20 misconstrued, we do not believe this would be appropriate
21 rebuttal.  And I think that's an issue the Court will have to
22 address.
23    THE COURT:  Well, it may be that the jury would go to
24 an early lunch and come back.  It seems like we can fill part of
25 the day tomorrow, but they'll leave early.  But, at some point,

1  we're going to be talking about the defense making a decision

2  about whether it's resting.  I assume that will occur tomorrow

3  morning.  And, then, we'll take up what's occurring after that

4  as to whether you get any -- whether we get into rebuttal.  And,

5  then, that will take up most of the morning and, then, maybe

6  part of the afternoon, if I permit rebuttal.  But let's assume

7  that -- we still have to do other things.

8       So the other things are we've got jury instructions; we've

9  got, maybe, Rule 29 motions; and, if so, when do you want to do

10 the -- the 29 motions?

11          MR. TORNABENE:  Your Honor, I guess, from the United

12 States's perspective -- well, I guess, we could potentially do

13 something similar to what was done last time, in terms of the

14 timing and have any argument that -- oral argument set for

15 Tuesday before noon and, then, proceed into closing arguments

16 after that for a half --

17          THE COURT:  Well, you know, it seems to me that's not

18 a good way to go.  It seems to me that we really need to try to

19 get these 29s done Friday, send the jury home.  When I say,

20 "Friday," only because I think that gives you some time to get

21 some things done.  But I think it's -- I think a better way to

22 go is to simply excuse the jury and send them home for a long

23 weekend and bring them back for final arguments.

24          MR. TORNABENE:  That sounds perfectly acceptable.

25          THE COURT:  And, then, get our 29s done Friday

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1 morning.  And, if there's -- and that will give everybody a day

2 to proceed and get them done.  It seems to me that's the best

3 way to go.

4     Now, Friday -- and the jury is expecting this case to be

5 done.  So, I think, in order to preserve their goodwill, it

6 would be helpful for them to know that, indeed, when they come

7 back, there will be final argument.  And that's what they'll see

8 when they come back from their long weekend.

9     And I anticipate, as we talked about before, that, as to

10 final arguments, then you're talking about, as I recall it, two

11 days of final arguments.  But tell me if you have a different

12 view.

13         MR. TORNABENE:  Your Honor, I think that sounds

14 likely.  I mean, perhaps, maybe it's a day-and-a-half.  However

15 it breaks down.  But, yeah, I think that's a good estimation.

16         THE COURT:  Well, let's assume, for the sake of

17 discussion, that there are 20 -- that the 29s are not granted or

18 they're not granted fully and that you, in fact, have to make a

19 final argument.  Then you're going to need two or three hours

20 for your opening final argument, it seems to me, plus breaks.

21 You're talking about most of the morning, if not the entire

22 morning.  And, then, coming back after lunch, there'll be

23 arguments, as well, just using as a rule of thumb but for no --

24 no better guidance than that.  Just hypothetically, if we have

25 final arguments, I don't see us getting them done in an

1  afternoon by the defense.  It seems to me we roll over into a

2  morning the second day; and, then, there's some -- your

3  rebuttal.  And, then, we're to the jury noon of the second day.

4  I think that's how it kind of plays out.  That's how I think it

5  plays out.  But --

6      So, if we tell the jury that, then we're looking at

7  Tuesday, finishing up sometime Wednesday, and deliberations late

8  Wednesday or midafternoon Wednesday or something like that.

9  That's kind of how I see it.  Does anybody else have a different

10 perspective that I need to think about?

11     So, if we finish up tomorrow, that's great.  We'll give the

12 jury a very long weekend and bring them back.  We've got --

13 because it's a five-day weekend, I think we should just keep

14 them all together because it's a five-day weekend.  So who

15 knows.  So, rather than excuse any one of the jurors because we

16 don't need them, so to speak, it may be just as well that we go

17 about the business of leaving them all here.  And, sometime

18 after final arguments, excusing those that we -- the jurors that

19 are not needed for deliberation.  So there'd be, currently,

20 three of those jurors; and we all know who they are.  So,

21 Mr. Johnston?

22     MR. JOHNSTON:  Just one matter, harkening back to

23 tomorrow.  It appears that we'll get to the rebuttal case fairly

24 early in the day or midday.  We need to know if Mr. Bearden is,

25 in fact, going to testify because we'll -- we would -- given the

JURY TRIAL - DAY 26 - MAY 21, 2013
COLLOQUY

1  nature of his testimony and our criticism of it, I'm confident

2  there will be a surrebuttal.  It'd be short.  It would be

3  Mr. Miller, and we'll just have him stay tomorrow.

4          THE COURT:  So Mr. Miller will be the person staying.

5  He will be here.  If you have rebuttal, it will be surrebuttal.

6          MR. JOHNSTON:  Yeah.  He's -- he's the person that

7  would deal with that.

8          THE COURT:  Okay.

9          MR. JOHNSTON:  So, if we could learn that by a

10 reasonable time tonight so I --

11         MR. TORNABENE:  That's our absolute goal, and we'll

12 confer with Mr. Johnston --

13         THE COURT:  Sure.

14         MR. TORNABENE:  -- as to where we're at this evening.

15         MR. BENTLEY:  I would request the same notice.

16         MR. TORNABENE:  I will confer with all defense

17 counsel.

18         THE COURT:  Sure.  And we've got jury instructions.

19 Do we have a draft we can give them or not?

20         LAW CLERK:  I can print that off tonight.

21         THE COURT:  We have a rough draft that we'll give you

22 of jury instructions, and you can at least begin looking at

23 those just on the theory that let's fill our time with things we

24 need to get done.  At least we'll give you our first rough draft

25 of jury instructions.

1    That said, I do that only because I want to get something

2    in front of you to start you thinking and in no way does it

3    reflect on any decisions I've made about Rule 29s.  I haven't

4    given any thought to Rule 29s.  But I have given a lot of

5    thought to jury instruction, verdict forms; and I want to take

6    care of that.  And that's my job.  And I'll give you a set, and

7    we'll have you take them home with you tonight.

8        MR. BENTLEY:  Is it the Court's practice to send a

9    copy of the indictment back?  And, if so, obviously, there

10   should be some redaction in light of the Rule 29 rulings the

11   Court has already made.

12       THE COURT:  Well, if you'll examine our -- the jury

13   instructions that Ms. Hartliep has drafted that we have

14   conferred about, you can take a look at those and, then, tell me

15   what your thoughts are.  Sending the indictment back is

16   questionable in my mind, but I'm open minded.  I'll be happy to

17   hear you.  I don't traditionally send the indictment back.

18       So, that said, wait around; and, in ten minutes or so,

19   we'll have a set of jury instructions for you.  Most of them are

20   standard, but there'll be some elemental instructions.  And, I

21   think, on the whole, we have a pretty good grip.  I don't have

22   any -- there's -- there's no 404(b) in this case, is there?

23   There is 404(b).

24       MR. TORNABENE:  Your Honor, the testimony from Agent

25   Tillotson regarding the bankruptcy numbers for Mr. Olsen's

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1  bankruptcy, that was admitted pursuant to 404(b) and a notice

2  had been filed.  So it was limited to -- to that area.  And,

3  then, obviously, we heard some more from Mr. Sackmann in the

4  defense case.  So that would be --

5          THE COURT:  Mr. Who?

6          MR. TORNABENE:  Sackmann, the attorney.

7          THE COURT:  Oh, Sackmann.

8          MR. TORNABENE:  Yeah.

9          THE COURT:  What was the 404(b) about that?

10          MR. TORNABENE:  Well, I don't think it was necessarily

11  404(b), although Mr. Bentley made a decision to explain the

12  circumstances a little bit more fully.

13          THE COURT:  We have a bankruptcy?

14          MR. TORNABENE:  The -- the bankruptcy.  And, I think,

15  the only additional -- if memory serves, the only additional

16  piece of information that came out was the amount of 14

17  unsecured creditors and under-secured creditors, which totaled

18  over 6 million.  I think the jury already had that information

19  through Agent Tillotson.  The additional information from

20  Mr. Sackmann that came in was that they were paid $0.14 on the

21  dollar.

22          MR. BENTLEY:  Your Honor, this was briefed pretrial;

23  and the -- the responsive briefs I filed -- I don't have the ECF

24  number at my fingertips -- but cited some Ninth Circuit law that

25  said this is not really 404(b).  This is -- may be admissible as

JURY TRIAL - DAY 26 - MAY 21,  2013
COLLOQUY

1   motive, but it's not another wrong or crime.  And I would not

2   think a 404(b) instruction is necessary.  I think it would be

3   rather confusing to the jury.

4           THE COURT:  Why is it 404(b)?

5           MR. TORNABENE:  Your Honor, we're not requesting any

6   kind of an instruction.  I'm simply recounting that -- that we

7   had provided a notice under 404(b).

8           THE COURT:  If you don't want 404(b) and he doesn't

9   want 404(b), then --

10          MR. TORNABENE:  Right.

11          THE COURT:  Is there anybody else that wants 404(b)?

12  Hearing no objections, well, that's just one less thing we have

13  to copy.  Thank you.

14      All right.  We'll get something to you.  And that was the

15  -- was there some other question I had?  We've adjusted

16  consistent with my Rule 29 motions -- or rulings, and we want to

17  give it to you as a work in progress and see what you think and

18  get your feedback.

19      That said, I guess we'll see you folks in the morning.

20  Now, you may go about your business.  Court's in recess.  Thank

21  you.

22          (Court adjourned at 5:17 p.m.)

23

24

25

1                          **GENERAL INDEX**

2                                                                **PAGE**

3    Reporter's Certificate............................. 240

4

5

6

7

8

9

10                         **WITNESS INDEX**

11   **DEFENDANT WITNESSES**                               **PAGE**

12   FRANK MILLER              DIRECT BY MR. JOHNSTON       16
                               CROSS BY MR. ANDERSON        36
13                             REDIRECT BY MR. JOHNSTON     54
                               RECROSS BY MR. ANDERSON      58
14                             FUR REDIRECT BY MR. JOHNSTON 61

15   BRUCE MOORE               DIRECT BY MR. BENTLEY        72
                               CROSS BY MR. TORNABENE       89
16                             REDIRECT BY MR. BENTLEY      130
                               RECROSS BY MR. TORNABENE     134
17
     JOHN RAEKES               DIRECT BY MR. JOHNSTON       140
18                             CROSS BY MR. SMITH           172
                               CROSS BY MR. TORNABENE       186
19                             RECROSS BY MR. SMITH         189

20   KERRI RECORD              DIRECT BY MR. BENTLEY        190
                               CROSS BY MR. JOHNSTON        193
21
     JEFFREY SMITH             DIRECT BY MR. VOVOS          203
22                             CROSS BY MR. JOHNSTON        216
                               CROSS BY MR. ANDERSON        217

23

24

25

**EXHIBIT INDEX**

| NO. | DESCRIPTION | ADMITTED |
|-----|-------------|----------|
| 244 | Complete Settlement Sheet - For Illustrative Purposes Only | 118 |
| 1023 | Fax from Ackerman to Connie Constable of American Agrinsurance dated August 14, 2001 Discovery Bates 850354 | 192 |
| 1612 | Moorer Calculation of Olsen's Crop at TCP 2001 | 80 |
| 1613 | Moorer's Calculation of Olsen's Crop at Agri-Pack 2001 | 81 |
| 1614 | Moorer's Analysis of Aggregate Data from TCP and AP | 83 |
| 1618 | Chart Reflecting February 2002 Submission - For Illustrative Purposes Only | 87 |
| 1619 | Chart Comparing Ackerman Data with Moorer's Findings | 88 |
| 2005 | Poco 2003.  Comparison of Contract vs. No contract | 32 |
| 2007 | Poco 2004.  Comparison of Contract vs. No contract | 33 |
| 2009 | Chart.2003 Poco LLC per TCP documents | 23 |
| 2010 | Chart.2004 Poco LLC per TCP documents | 26 |
| 2032 | Poco notice of onions loss, 6/15/04 | 197 |
| 2033 | Poco notice of grass loss 5/13/04 | 197 |
| 2034 | Ackerman email, 5/13/04 re:  Grass | 197 |
| 2035 | Ackerman email, 6/15/04 re:  Grass and onions | 198 |
| 2043 | May 2005 email.  Hovland re conf call | 142 |
| 2058 | 00102361 Sep 2005, Raekes letter re:  Appeal | 163 |
| 2076 | 00103028 July 2006 email, Brittenham to Raekes | 114 & 169 |

**EXHIBIT INDEX (continued)**

| NO. | DESCRIPTION | ADMITTED |
|-----|-------------|----------|
| 2079 | 00107543 Oct 2006, transmit to Raekes check arb | 172 |
| 2103 | Feb 2002 letter.  Ackerman – American Agrisurance | 223 |
| 2120 | Ackerman email, 9/20/2000 | 199 |
| 2126 | Ackerman email to Gress, 8/23/04 | 221 |
| 3072-14 | Photo of TCP receiving potatoes heading to wash | 206 |
| 3072-15 | Photo of TCP processing and cleaning after receipt | 209 |
| 3072-17 | Photo of TCP processing and cleaning after receipt (3) | 209 |
| 3072-18 | Photo of Heading from receiving to TCP grading area | 209 |
| 3072-21 | Photo of TCP separating and grading equipment | 209 |
| 3072-22 | Photo of TCP separating and grading equipment (3) | 209 |
| 3072-27 | Photo of TCP weighing and boxing station (2) | 209 |
| 3072-28 | Photo of TCP potatoes from grading to packaging area | 209 |
| 3072-32 | Photo of TCP potato bagging equipment (2) | 209 |
| 3072-41 | Photo of processed potatoes at loading dock | 209 |
| 3072-6 | Photo of TCP outside view | 206 |
| 4091 | 5/3/2005 E-mail from Dave Hovland re Poco LLC, Olson AG Inc., Gordon Brothers | 175 |
| 4112 | 4/9/2005 letter from Brian Miller to Mark Masters with calculations for 2003 AGR loss | 185 |

1

**EXHIBIT INDEX (continued)**

2 **NO.**    **DESCRIPTION**                                              **ADMITTED**

3 4118      6/2/2005 Email from Bruce Green to John              177
           Raekes re Gordon Brothers

4
           4119      6/2/2005 Email from Kevin Swanson to John          180

5          Raekes re processing of claims

6 4129      10/28/2005 letter from John Raekes to Dave           184
           Hovland enclosing the original Mutual

7          Release signed by Gordon Brothers

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, RONELLE F. CORBEY, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and at the time and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true and accurate transcription of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings.

DATED this [!DATE CERTIFIED] day of [!MONTH CERTIFIED], [!YEAR CERTIFIED].


                              */s/ Ronelle F. Corbey*

                              RONELLE F. CORBEY, RPR, CSR, CRR
                              Official Court Reporter for the
                              U.S. District Court in
                              Spokane County, Washington